# Exhibit  I



FEDERAL INSURANCE COMPANY
WESTATE II
555 MARYSVILLE ROAD, P.O. BOX 817
LIBERTY CORNER, NEW JERSEY 07938-0817
13034 10000
69/003531618900000001/01-0

001 - 02153147
88-16
433

03/24/95

PAY TO THE
ORDER OF        THE GRADUATE SCHOOL OF FIGURATIVE ART
*****************************************************

THE SUM OF     ONE HUNDRED THOUSAND AND 00/100**************
*****************************************************
*****************************************************        $100,000.00

IN SETTLEMENT OF   (EMPLOYEE THEFT CLAIM KIMBERLY M. HAWKINS)
"Not Valid After One Year From Date Of Issuance"

MELLON BANK, N.A.
PITTSBURGH, PA

THE KORNREICHINA ORGANIZAT
919 THIRD AVE
ATTENTION: MARION GREENSTEIN
NEW YORK     NY   10022-9970

Chubb & Son, Inc. Manager, Authd. Agent
Authorized Signatures

"02153147"    ":043301601:"    161"1408"

Nov. 22 1996 05:19PM P7

# Exhibit  J

NYS DEPT OF LAW          3x:212-416-8931          Nov 19 '96, 16:27     P.02



**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**

DENNIS C. VACCO
Attorney General

CHRISTOPHER C. QUINN
Deputy Attorney General

46-20088

To: State of New York Insurance Department
From: ▓▓▓▓▓▓▓
Re: NY Academy of Art                    11/20/96
Date: November 19, 1996                     JT

We have been contacted by ▓▓▓▓▓▓ former board member to the above institution. It is alleged that on March 29, 1995 the Director of the school ▓▓▓▓▓▓ signed a sworn statement which was submitted to Chubb Insurance Company which claimed a loss in excess of $100,000 (the policy). Such statement alleged that the loss was a result of employee theft through the use of checks payable to petty cash. The Director stated that none of the monies were utilized in payment or reimbursement for any services or goods related to the school. As a result the Chubb insurance company allegedly paid $100,000 on the policy.

Contrary to the assertions made by the director, it is alleged that petty cash checks totaling approximately $4,000 a month for two years were utilized to pay workers of the school off the books. In addition, such director was allegedly made aware of this by board members known to the Attorney General's Office and allegedly though internal documentation long before the filing of such form.

According to ▓▓▓▓▓▓ Chubb insurance company has hired an outside attorney, to investigate and possibly reclaim the 100,000 policy.

As a result of the above facts we request that a 63(3) referral be made to this office, so that we may investigate this matter.

C#4 -21-  96
RT

Criminal Division • Criminal Prosecutions Bureau
120 Broadway, New York, N.Y. 10271-0332 • Phone (212) 416-8750 • Fax (212) 416-8931 • not for service of papers

21

.

.

# Exhibit  K



NEW YORK
ACADEMY
OF ART

HRH THE PRINCE OF WALES, PATRON

ROBERT ANGONA
*Controller*

January 17, 2004

Stephen Farthing, Executive Director
David Levinson, Chairman
New York Academy of Art
111 Franklin Street
New York, New York 10013

CONFIDENTIAL

## CONTROLLERS REPORT

This report outlines the last two years of history as it applies to the restructure and operation of the Controllers Office and the interaction with the Executive Director.

Attached are various reports submitted to the past Chairman and the Trustees. These reports contain confidential and sensitive information. The areas involve Accounting System Breakdowns, serious compliance issues, and Building C of O deficiencies .

Any of these could have rendered the Academy out of business, with its charter being revoked, and exposing its Trustees to both civil and criminal investigations.

The other issues centered on the long term debt and cash Management. This office found the Mortgage to be full of covenants that rendered the Academy in default the day it was executed. This note also included a second mortgage with terms and conditions most unfavorable to the Academy. The main Mortgage is a balloon note with heavy prepayment clauses, and an equity put that violated our non-profit status.



# CONFIDENTIAL

I restructured the main Mortgage to eliminate the equity put as to insure a clean Audit Report. I established a operation Credit Line for cash control and eliminated the need to call the Trustees for short fall cash coverage, I eliminated the second mortgage of $115,000.00 and rolled it into the Credit Line Line, releasing the Real Estate Lien on 111 Franklin Street in that amount. I also open a Building Construction Line with the understanding that when and if we roll it into the Main Mortgage the Main Mortgage would be renegotiated. This will eliminate the prepayment cost.

This construction line is used to complete the repairs for the C of O project, replacement of the staircase, and roof, and skylights. (The Skylights were cancelled by Russ Wilkenson) All work was completed on time and on Budget. The Balance of the line is reserved for the Elevator Project.)

As of this date the Accounting system is completely overhauled. We are now operating a non-profit system (Blackbaud) designed for Schools. It will give us the ability to control all cost and account for all front room operation on a daily basis.

We are now fully compliant with INS, Homeland Security, US and NYS DOE and Campus Security. The Building at 111 Franklin Street is currently under a Temp. C of O and is fully compliant under the Building Codes and Fire Safety Codes.

I encourage you to review the enclosed memorandums.

Respectfully Submitted,
Robert Angona, Controller

COPY

INDEX

1: REPORTS TO TRUSTEES ON ACCOUNTING AND CONTROLLERS OFFICE.

2: COVER LETER TO US DOE ON FAILURE TO SUBMIT AUDITS IN PRIOR YEARS.

3: STUDENT LOAN VIOLATION US DOE AND BANKS (PAST DEAN)

4: INS HOMELAND SECURITY STUDENT VISA VIOLATIONS.



III *Franklin Street, New York, NY* 10013 (212)966-0300   FAX (212)966-3217   *www.nyaa.edu*

June 27, 2002                    **CONFIDENTIAL**

                                                    COPY

TO: Rob Bollardin FAX 631-907-1037

FROM: Robert Angona

SUB: Transfer from Investment Funds to Operating Account;
     Account of Salomon Smith Barney:

Stephen has asked me to fax you the Statements on the above Investment Account.

My Immediate need is to transfer $200,540.00 to our Construction account as contracts
and work will start next week.

The Contribution was made on May 31,2002 for 3700 shares of Colgate. It hit the
Account at $200,540.00. This Gift was given for the Creation of "The Lawrence and
Josephine C. Wilkinson Hall"

Spoke to Jerry Tepper at Smith, Barney, he moved $175,157 to a Money Market Account
and claims he was authorized to use the balance of $25,383. in common Stock portfolio.

We need to transfer by Friday 5pm $200,540. to our Account at the North Folk Bank.
The Money Market Account of $175,157. and sell order of Stock to cover the balance.

I am looking forward to meeting with you and address the entire Investment Account in
various Brokerage accounts. These funds are Restricted or other wise conditional from
Contributors. As of May 31 our position with Smith Barney is a LOSS ($14,2960). We
have to replace those funds at some point. We should not Invest Restricted or Conditional
funds in the Market.

Best regards,

Robert Angona,
Controller

cc: Stephen Farthing

**Robert Angona**

| | |
|---|---|
| From: | Robert Angona |
| Sent: | Tuesday, July 02, 2002 9:51 AM |
| To: | Stephen Farthing |
| Subject: | Year End Audit |

Stephen,

As we discussed, the Acadmeys Books are seriously out of balance. This was caused by historic mis postings and falling behind on daily accounting work. There are major failures in recording proper, Cash, Income, Assets, and Liabilities. For over one year the New Mortgage Note has not been set up and the old note remains. The current payments for the year have been applied to the old note. Expense accounts have been misposted, and the Balance sheet is void of significant Inventory assets. The petty cash accounts, and Bank Account reconciliations are not performed in accordance with accepted accounting proceedures and a long list of uncleared checks and checks posted but not issued remain unresolved. This misrepresents the cash balance.

The Fire asset account is in danger of being written down, the accounting is poor and a internal audit is needed.

The payroll and Benefit accounts are out of balance, and we have a major claim and demand from the New York Child Surport unit.

Please understand that this goes back into prior years. It will take time to repair it.

I have taken the following steps.

1: New proceedures are being installed for this f/y. we are providing a bookkeeper to maintain daily operations.

2: I have arrange through a reliable source that we use, (Eastern Accounting Personel)a short term
 project accountant,(July and August)  to assist me in,
 a) A pre-audit and Correcting the General Ledger
 b) Internal Audit of the Fire Asset Account and Insurance Claim.

3: I will revisit the budget and State Regents requirements. We will need to meet with Board Members and Install Financial Policy and Fund Management.

Best Regards
RA

1



111 Franklin Street, New York, NY 10013 (212)966-0300  FAX (212)966-3217  www.nyaa.edu



## CONFIDENTIAL MEMORANDUM

July 15, 2002

**TO: Stephen Farthing, Executive Director,**

**FOR DISTRIBUTION TO**

**Randy Lerner, Chairman of the Board**
**David K. Schafer, President**
**Ludwig Kuttner, Treasurer, CFO**

**FROM: Robert Angona, Controller**

**SUBJECT: Financial Condition of the Academy.**

I have assumed the duties of the Controller effective July 1, 2002. This memorandum outlines some of the conditions and deficiencies found.

1: Daily Accounting is not performed in accordance with (GAAP) General Accepted Accounting Procedures, and non-profit Accounting is completely absent.

2: Cash Accounts are not in balance and postings are months behind.

3: Account reconciliation's are absent for the most part and Cash Reconciliation's are 3 to 12 months behind and are not performed under GAAP.



4: Payroll and Personnel postings are late, employee files are non-compliant and lack information, (current W-4 and I-9 forms) which exposes the Academy to fines and sanctions. Contract employees are misclassified and should be on the Payroll, we are liable for past year tax deductions, fines, and sanctions. There is a $20,000 dollar child support claim by the State of New York as a result of payroll deductions from an employee, under Court Order, and not remitted by the Academy to the State.

5: Equipment and Capital Asset purchases have been expensed and overstate the actual expense budget.

6: No Accounts Receivable was maintained throughout the year to record Income.

7: No fund accounting or Investment monitoring was performed resulting in activity losses of over $30,000 from restricted funds.

8: No fund management exists resulting in arbitrary disbursements.

9. Accounts Payable, not debited for payments and incorrectly expensed ,overstated actual budget expense.

10. The loan recast from the HSBC to North Fork Bank has not been recorded as of June 30th 2002 (Fiscal Year End) The payments were credited through out the year to the old HSBC note. The resulting cash proceeds were incorrectly credited to other income overstating the income account by some $25,000. and understating the loan liability by the same amount. The current cash postings remain two to three months behind. The short term portion of the note is 115,000  unrecorded on our books and became due this month. The $700,000 Mortgage portion remained unrecorded.

11: The loan documents were not reviewed and contain extremely adverse covenants which placed the Academy in technical default of the note. The auditors will pick this up, and will result in a Financial Disclosure on our Statements indicating that we are in default of our Mortgage. This will have an impact on the State Regents and Public view of the Academy's ability to conduct development or fund raising.

12. The Fire Restoration Account is totally un- reconciled and the documentation will not support the Asset Replacement Value that was paid out. In short we are in danger of an Asset Write Down to casualty Fire Loss without recovery.

Over the past three years our financial statements have been noted with internal control issues that have not been complied with as we enter this audit.

Reportable conditions involved matters coming to the attention of the Auditors involving internal control and its operation they consider to be reportable conditions under standards established by the American Institute of Certified Public Accountants.



Auditors found reportable conditions involving matters relating to significant deficiencies in design and operation of internal control that in their judgment, could adversely affect the Academy's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements.

The areas cited were, Segregation of Employee Duties, Personnel Policies, Accounting System, Retirement Plan, Insurance, Management and Control of Endowment Funds, Scholarship Funds, and Investment Funds.

These reports were addressed to the Board of Directors in 1999, 2000, and 2001. We now approach the fourth Year audit and these issues remain un-addressed. Should these reportable deficiencies be published it would have the effect of nullifying the Academy's Financial Certification, and expose the Board and Management.

While the trail of these conditions remain, this will not continue on my watch. I have on behalf of the Board and Management taken the following steps.

1: I have assigned a full time bookkeeper to keep current with daily postings.

2: I have assigned a Staff Accountant to make all adjusting entries to correct miss-posting and bring all accounts current for this fiscal audit. We will also conduct an internal audit of the Fire Restoration Account in order to support the Asset recovery value to our books.

3: I am in the process of implementing internal accounting procedures, and inter department policies to cure, those deficiencies outlined above. Monthly closings will be enforced, Quarterly Statements will be issued with auditors reviews for the Board. Update cash flow, and budget reports will be provided to department heads and the board on a timely basis.

4. I have with the Executive Directors approval transferred all Investment funds to our Bank in a segregated account. (We are out of the Market)

5: I am conducting an equipment and inventory audit to upgrade our assets.

**With the help and approval of the Board and Finance Committee,**

6: I will identify and set up fund management for Endowment, Restricted, and non-restricted and special purpose funds.

7: I will revisit the operating budget and establish a Capital Expenditure Budget for this fiscal year.

8: I will restructure the Long Term and Short Term Debt, and establish sound cash flow management. I have made arrangements to roll over the Short Term Note, $115,000 At the North Fork Bank, and I am re-negotiating the covenants of the Mortgage Note.



9: We should establish a Five Year Plan and establish Fiscal Policy that will expand the Income Base, Increase Asset Value, and bring the operating budget into balance.

Hopefully this will lessen the potential damage attendant to this years audit, and place us in sound Accounting and Financial compliance for the future.

Respectfully Submitted;

Robert Angona,
Controller

## RESTRUCTURE OF CONTROLLORS OFFICE:

## CONTROLLOR:

**Activities:**

Budget Preparation and Management, Cash Management and Treasury Duties, Investment and Financial Control Management, Oversee all Accounting Functions.

**FY 02/03 Projects:**

1:  Establish Monthly Closing and Financial Reports.
2: Establish Operating Budgets
3: Establish Capital Expenditure Budgets
5: Establish Projected Cash Flow Reports
6 Establish Monthly Department Reports
7: Create Accounting Policies and Department Processing Rules.
8: Establish and Recommend  Investment and Endowment Policy.
9: Switch Accounting Software and Reporting to Non-Profit GAAP

## STAFF ACCOUNTANT:

**Activities:**

Control of General Ledger, Reconciliation  of all Accounts, A/R and Income Reconciliation with Development Department, Events, and the Bursar Office, Daily Deposits, Credit Card Sales, and Educaid Deposits. Reconciliation of Employee Benefits and Liability Accounts. Monthly Closings. Oversee Daily Bookkeeping Activities.

**FY 02/03 Projects.**

1: Establish Methods of Control and reconciliation with Income point of Sales.
2: Establish Methods of Reconciling G/L Accounts.

## BOOKKEEPER/ACCTG.CLERK:

**Activities:**

A/P, Payroll, Expense Reports, Model Accounts Payments and Time Sheets, Petty Cash, and General Clerical.



111 Franklin Street, New York, NY 10013  212 966-0300 FAX 212 966-3217  www.nyaa.edu

# memorandum

TO:              Stephen Farthing, Executive Director

FROM:            **Robert Angona, Controller**

DATE:            July 25, 2003

RE:  THAN 03, Payment of Trust Funds to Artist.

I have received an E-Mail order from Sandra April, Director of Development to issue 20,092.50 to Artist that sold art work through our THAN Event in June. The order directs this disbursement under your direction to be made by noon today.

First we only have some $14,000.00 calculated at 50% of Sales. This amount was audited and in the books which includes activity from the July post sales. The cash is in balance and the art inventory supports the recorded sales.

Second and more Important, as far as I am concern these payments lack the necessary third party authorizations to release such trust funds short of the total sale amount being reported to the IRS.

Please be advised that in my opinion these payments will expose the Academy to violations of both IRS Regulations, and could result in both Civil and Criminal allegations.

Therefore as your Controller I cannot make such payments.

Respectfully,

Robert Angona
Controller



*!11 Franklin Street, New York, NY 10013  212 966-0300 FAX  212 966-3217  www.nyaa.edu*

# memorandum

TO:    Stephen Farthing, Executive Director

FROM:  **Robert Angona, Controller**

DATE: November 24, 2003

RE:  Oversight Policies Memorandum of March 17, 2003

Following the Academy's review of the Activities of the former Dean attendant to Federal
Subsidized Loans and the Processing of Student Visa's, the Controllers Office assumed the
duties of compliance for the Academy and polices were approved to safeguard the Academy
from Civil and Criminal Exposure and ensure that the Academy Officers, Employees and
Contractors operate within all State, City, and Federal Rules, Regulations, and Laws.

It has come to my attention that certain activities attendant to the Theater Program may
expose the Academy to liability.

1: It appears that a WEB PAGE was designed and  reports to be under copyright by Kim
Bartley (Former Employee) This Web Page is Titled "NEW YORK ACADEMY OF
THEACTRICAL ART".  This page is on all internet search engines. On Google it is listed
twice as follows.

...Copyright 2003 New York Academy of Art  "of" New York Academy of Theatrical Art
Website Designed by Kim Bartley

and;

New York Academy of Theatrical Art New York Academy of Art School of Continuing
Education Presents New York Academy of Theatrical Art...Nancy Zahzam. Director New
York Academy of Theatrical Art www.nyaa.edu

This Office is unaware that the Board of Trustees has established or filed in any jurisdiction a
Division or Subsidiary Corporation or is otherwise trading as the New York Academy of
Theatrical Art. There is no filing with any tax authority or authorization by the New York
State Department Of Education, which issued this Academy's Charter to Amend its name or
add any such Division or Subsidiary.

This Office is unaware of any Officer or Trustee whom Authorized Kim Bartley to Copyright
any Web Page connected to this Academy, and is in fact not aware of any such copyright.



*111 Franklin Street, New York, NY 10013  212 966-0300 FAX  212 966-3217  www.nyaa.edu*

This Office is unaware that Nancy Zahzam was appointed by the Board of Trustees as a Director

2: WEB Page. When the Web Page is Open (Among other things) it list to the Public the Following Information.

  a)  Full Time Tuition $10,000
  b)  Scholarships and LOAN PROGRAMS available

This program is a CE Pilot Project of N.Y.A.A. Only Students enrolled in Full Time MFA Program are eligibile for the Loan Programs

This Office is unaware of any Tuition Structure in the Approved Budget of $10,000.00 per Student nor are we aware of a Full Time Program.

Given the past history of the former Deans activity attendant to the Federal Loan Programs this Office is extremely troubled by the representation in the public forum on the Internet. Neither the Federal or State Agencies have granted any such permission to this Academy to offer Loan Programs to these Students.

Under the authority of the memorandum of March 17,2003, I am requesting independent counsel to open a preliminary investigation to determine any exposure to liability in this matter.

A review of Employment Contracts disclose that principle Contractors and Employees have listed this program as their property. A review of Kim Bartley's resume revels that she has worked for Terrence Mann as his Web Site Manager from 1999 to the Present at her home address. This is during the time she had access to the Academy's Web Site. I am requesting that our counsel investigates this matter.

I request that your office directs the Web Site to be Closed.

I request that your Office Suspends the Theater Program until Independent Counsel Reports.

I request that your Office Suspends Nancy Zahzam until the investigation is complete.





111 *Franklin Street, New York, NY* 10013 212 966-0300 FAX 212 966-3217 *www.nyaa.edu*

June 20, 2003

Mr. Bruce Brinbaum
United States Department of Education
Office of Student Financial Assistance
75 Park Place, Room 1206
New York, New York 10007

Re:  Financial Aid Audit Compliance

Dear Mr. Brinbaum,

As we discussed earlier this week, enclosed please find a copy of the year 2000/2001
Financial Aid Audit which was previously prepared and filed with your Department.

As best I can ascertain, this Audit was filed on or about January 15, 2002.  In June 2001, the
Academy suffered a serious fire which forced us to relocate to temporary quarters on Hudson
Street.  Many of the books and records maintained in the ordinary course of business were
destroyed or damaged, and for months afterwards, while renovations and repairs were
ongoing, we slowly recovered much of what we believed was lost.

Thereafter, we then suffered monumental business disruption following the events of
September 11, 2001. As you may know, we were, and are, in the designated disaster zone,
and the school was shut down for Twelve weeks.  Afterwards, between cleanup activity and
dealing with other student and faculty problems, the completion of many business-related
projects was delayed.  Indeed, the Academy eventually applied for,  and received, FEMA
relief through the SBA.

Despite all these setbacks, the Audit was eventually completed and the report filed.

We now understand that because of the size of our student loan program, we were obligated
to file the more comprehensive "Form A-133" Reports, and that they properly should have
been filed with the United States Department of Education "Federal Audit Clearing House"
in Jeffersonville, Indiana.  Needless to say, we were unaware of this requirement and, more
importantly, it appears that this was an oversight by our outside Auditors (who are Certified
Public Accountants).  Simply put, we had no in-house expertise and relied completely on
professionals for expertise and compliance with federal funding programs.



*111 Franklin Street, New York, NY* 10013  212 966-0300  FAX  212 966-3217  *www.nyaa.edu*

Since that time, I have taken over the financial reigns of the institution, and have instituted more formal compliance checks in this and other areas.  In addition, we have asked our auditors to prepare corrected A-133 reports – a project which, we anticipate, will be completed by the end of this week.

In our conversation, you indicated that the Department of Education would, among other things, consider requiring the Academy to secure a bond, or incur some other financial penalty.  We urge you not to pursue that course for three reasons:  1) because the Academy's filings, although not utilizing the appropriate forms, nevertheless provided the Department of Education with complete information, 2) because any deficiency in filing was unintentional and based on the advice of outside professional assistance, and 3) because according to the Academy's primary subsidized lender, Educaid, the student loan program, as it has been utilized by the Academy's students, has enjoyed an overwhelmingly successful payment compliance history.

The Academy is a small school whose focus is on delivery of its academic programs.  It is a not-for-profit institution originally founded by artists, scholars, and patrons of the arts, including Andy Warhol.  It operates a fully accredited graduate program which awards the degree of Master of Fine Arts to students who have successfully complete its programs A substantial portion of the student body relies on federally subsidized and unsubsidized student aid to attend.  Thus, most importantly, the imposition of additional financial requirements would cause the Academy, which is highly dependent on its donor contributions to make ends meet, substantial hardship which would affect the programs currently offered.

The lifeblood of this institution is its "struggling" artist-students.  We ask you to refrain from imposing any penalty that would make that struggle any more difficult than it already is.

I would like I thank you for your courtesy in speaking to me about this matter, and I encourage you to call should you require any further information.  Most important, if you would like to see how we operate and the level of artistic creativity that this institution has fostered and given birth to, I invite you to visit.

Yours truly,

Robert Angona
Controller



111 *Franklin Street, New York, NY* 10013  212 966-0300 FAX  212 966-3217  *www.nyaa.edu*

## memorandum

TO:            Stephen Farthing, Executive Director

FROM:          Robert Angona, Controller

DATE:          March 17, 2003

RE: Oversight Policies.


## INTRODUCTION

Following our review and investigation of the activities of our former Dean, Michael Gormley, we have resolved the issues related to the Academy's procedures in dealing with: two areas of major concern:  1) the processing of federally subsidized student loans, and  2) the filing and certification of Student Visas (INS Form I-20).

When these issues were first uncovered, we expressed concern that both the individuals responsible for these procedures, as well as the Academy and, perhaps, its Trustees, would be exposed to a wide range of civil and criminal liability.  Reviewing our options with counsel, we undertook to ascertain where our practices and procedures were deficient, how to correct those deficiencies, and to install policies which would insure our compliance in the future.

After three months of investigation, which included the assistance of our primary federally subsidized student loan lending institution, Wachovia/Educaid, as well as officials in the state and federal Departments of Education, we resolved all outstanding issues relating to student loans.  As you know, just two weeks ago, the U.S. Department of Education "signed off" on our Accelerated Master of Fine Arts Program, which not only meant that loans in the past were found to be in full compliance with current federal regulations, but that loans to students in the program going forward could be continued on that same basis.

Similarly, following a total review of the immigration status of all of our foreign students, we organized files that were either missing or inadequate, while at the same time re-registered under the new mandatory Student and Exchange Visitor Information System ("SEVIS") which was implemented by the recently created Bureau of Citizenship and Immigration Services ("BCIS," formerly known as INS), which is now under the Department of Homeland Security.



111 *Franklin Street, New York, NY* 10013  212 966-0300 FAX  212 966-3217  *www.nyaa.edu*

Accordingly, I propose the following policies and procedures to be administrated under the office of the controller in order to insure future compliance in matters subject to Government oversight in the future.

**A.    Processing of Federally Subsidized and Unsubsidized**
**    Loan Applications; Collections and Refunds.**

1.  The Academy now has a financial aid officer who is fully aware of and compliant with all requirements for the processing of federally subsidized and unsubsidized student loans.  In addition, we have instituted a line of communication with both lending institution officials, as well as industry organizations which provide backup and guidance.

2.  Collections of tuition and fees from subsidized and unsubsidized student loan funding is now being administered through the office of the bursar under the supervision of the controller.  The receipt and tracking of these funds is now computerized – something which was not fully operational in the past – but which should insure proper compliance with regulatory requirements.

3.  Each semester, both the controller's office and the financial aid officer will be required to review each student's application to insure compliance with applicable government regulations.

4.  The financial aid officer and the controller will be required to review and confirm, prior to commencement, each year's "exit interviews," to insure full compliance with applicable government regulations.

5.  The controller will be required to conduct an internal "pre-audit" each year - prior to the independent audit which is annually conducted pursuant to government regulations.

6.  Any inquiries and/or questions regarding compliance will be directed to the controller.  In the event that the controller perceives any issues or irregularities warranting further review and investigation, he will make his concerns known to the executive director and seek independent counsel to investigate and resolve the issue.

7.  In his discretion, the controller shall establish additional items to be tested by the auditors to ensure complete compliance with applicable government regulations



111 Franklin Street, New York, NY 10013  212 966-0300 FAX  212 966-3217  www.nyaa.edu

**B.    Processing International Students.**

1.   The Director of Admissions will be  designated as the Primary Designated School Official (PDSO) for purposes of dealing with BCIS; he is responsible for the Filing of required BCIS/SEVIS Forms (such as Form I-20), and he acts as the advisor to foreign students at the Academy.

2.   The registrar **is presently authorized as a Designated School Official ("DSO")** and the Executive Director will be added to the BCIS/SEVIS Form I-17, School Registration, as additional Designated School Officers ("DSO").  The controller will also be added to the I-17 as a DSO, and will act as the School Compliance Officer and monitor; his duties will include the performance of routine audits and spot checks to insure full compliance with applicable federal law regulations.

3.   Effective April 1, 2003, or as soon thereafter as such procedures can be implemented, all Form I-20 certifications for individual foreign students will be reviewed to insure the current financial status of each foreign student – as required by applicable federal regulations.

4.   Effective April 1, 2003, or as soon thereafter as such procedures can be implemented, all foreign students attending the Academy will be monitored for their current immigration status – thereby insuring that the Academy satisfies its own obligations under present federal law.

5.   Effective April 1, 2003, or as soon thereafter as such procedures can be implemented, all foreign students shall be required to pay full tuition and fees prior to commencement of class each semester, as is required under the Student handbook.  (In the past this requirement has not been diligently followed.)  The office of the bursar shall report to the controller any student not current with his (or her) payments.  In the event that a foreign student is dropped from registration for the semester as a result of non-payment, under federal law that change of status triggers a "reportable event," and the controller will be required to advise the PDSO to file a "Change of Status" with BCIS/SEVIS.

6.   Effective April 1, 2003, or as soon thereafter as such procedures can be implemented, copies, endorsements, and entries to all foreign student's records will be filed with the controller.

7.   The PDSO, as well as any interested DSOs, shall join **the National Association of Foreign Student Advisors ("NAFSA")** in order to receive continuing training in the required areas of compliance and processing of foreign students.



111 Franklin Street, New York, NY 10013  212 966-0300 FAX 212 966-3217  www.nyaa.edu

    8.   The controller's office will be advised of all inquires, audits, on site visits, and/or requests for documents from all government agencies.  All inquiries and question relating to the Academy's compliance with immigration laws and regulations should be directed to the Controller.  The Controller may refer any issues and/or questions of compliance to independent counsel for investigation, review and/or a legal opinion.

    9.   The controller shall establish a compliance audit list and conduct an annual pre-audit of all foreign student files.

    10.  The controller shall engage outside independent counsel to conduct an annual compliance audit - again, too insure that all applicable federal regulations are being complied with.

**CONCLUSION**

While we are pleased that we have been able to resolve these open issues and create procedures for working in the future, this was not accomplished without significant cost to the Academy and effort by myself and the staff.  Nevertheless, as we look to the future, with the computerization of much of our recordkeeping and new procedures for regular oversight, we anticipate that some of the pitfalls we have experienced in the past will be avoided in the future.

**Exhibit  L**

## Robert Angona

**To:**          Stephen Farthing
**Subject:**     David Levinson

I talked to Christina,  David said he would resolve it with you when he comes back on Monday.  We can not accept the check as is for a split. The lawers advise as I do seperate checks. Only one tax letter can go out for the 15,000.00. I am leaving the $25,000.00 check on your desk in a envelope.  you can reach me on the cell.

1

**Karen Hickey**

300 Park Avenue
New York, NY 10022
Telephone: 212 326-1097
Facsimile: 212 750-6281
khickey@studley.com

March 22, 2004

 **STUDLEY**

Mr. Robert Angona
The New York Academy of Art
111 Franklin Street
New York, NY 10013

Dear Robert:

Please be advised that we recently sent in a check in the amount of $25,000 payable to the New York Academy of Art. The breakdown of the check should be as follows:

| | |
|---|---|
| $10,000 | Contribution on behalf of Studley |
| $15,000 | Contribution on behalf of David Levinson |

I apologize for any inconvenience we may have caused by sending both contributions in one check and I do hope this letter clarifies any misunderstanding.

Please feel free to call me with any questions or comments.

Sincerely,

Karen Hickey

cc: David Levinson, CB Richard Ellis

**Robert Angona**

**To:**                    david.levinson@cbre.com
**Subject:**               Anthony Todd

As per your Instructions, I am paying this Vendor a $25,000.00 Deposit without a Contract for the Tribecca Ball Event. I note the adjustments reducing the Invoice to $29,783.00. We also advised the Vendor we require a Certificate of Insurance Naming NYAA as Additional Insured $1M, $1M, and $5Mil.

1

**Exhibit  M**

Sajedesign, LLC
580 Broadway # 710
New York, NY 10012
212.334.1296       TAX ID #42-1560284

# Invoice

| Date | Invoice No. |
|---|---|
| 03/10/04 | 50051 |

**Bill To**

New York Academy of Art
111 Franklin Street
New York, NY 10013

RE: 2004 Tribeca Ball

**Ship To**

New York Academy of Art
200 west 57th street
suite 808
New York, NY 10019
RE:Tribeca Ball

| P.O. No. | Terms | Rep | Ship Date | Ship VIA | Project |
|---|---|---|---|---|---|
| | | | 03/10/04 | | |

| Qty | Rate | Item | Description | Amount |
|---|---|---|---|---|
| | 1,650.00 | Design Fee | Design Fees | 1,650.00 |
| | 2,800.00 | Printing | Printing - 1500 Invites | 2,800.00 |
| | 950.00 | Printing | Printing - 1500 Reply Card | 950.00 |
| | 505.00 | Printing | Printing - 1500 Reply Card Envelopes | 505.00 |
| | 923.00 | Printing | Printing - 1500 Liners | 923.00 |
| | 443.00 | Printing | Printing - 750 Notecards | 443.00 |
| | 1,200.00 | Printing | Printing - Laser Cutting | 1,200.00 |
| | 400.00 | Produt. Suppl | Cello Envelopes | 400.00 |
| | 30.00 | Mes/Del | Messenger | 30.00 |
| | 45.00 | Produt. Suppl | Misc Expenses - Comps, Discs to Printer, etc | 45.00 |
| | 200.00 | Ship & Hand | Shipping & Handling | 200.00 |
| | 0.00 | | Wholesale Non taxable | 0.00 |

We appreciate your prompt payment. Thank You!

**Total** $9,146.00

Sajedesign, LLC
580 Broadway # 710
New York, NY 10012
212.334.1296

# Invoice

| Date | Invoice No. |
|------|-------------|
| 03/10/04 | 50051 |

| Bill To |
|---------|
| Simone Levinson<br>930 Park Avenue<br>New York, NY 10028 |

| Ship To |
|---------|
| Simone Levinson<br>930 Park Avenue<br>New York, NY 10028 |

| P.O. No. | Terms | Rep | Ship Date | Ship VIA | Project |
|----------|-------|-----|-----------|----------|---------|
|  |  |  | 03/10/04 |  |  |

| Qty | Rate | Item | Description | Amount |
|-----|------|------|-------------|--------|
|  | 1,650.00 | Design Fee | Design Fees | 1,650.00 |
|  | 2,800.00 | Printing | Printing - 1500 Invites | 2,800.00 |
|  | 950.00 | Printing | Printing - 1500 Reply Card | 950.00 |
|  | 505.00 | Printing | Printing - 1500 Reply Card Envelopes | 505.00 |
|  | 923.00 | Printing | Printing - 1500 Liners | 923.00 |
|  | 443.00 | Printing | Printing - 750 Notecards | 443.00 |
|  | 1,200.00 | Printing | Printing - Laser Cutting | 1,200.00 |
|  | 400.00 | Produt. Suppl | Cello Envelopes | 400.00 |
|  | 30.00 | Mes/Del | Messenger | 30.00 |
|  | 45.00 | Produt. Suppl | Misc Expenses - Comps, Discs to Printer, etc | 45.00 |
|  | 0.00 |  | Wholesale Non taxable | 0.00 |

We appreciate your prompt payment. Thank You!

| Total | $8,946.00 |
|-------|-----------|

**Barbara Bell**

| | |
|---|---|
| **From:** | jane wagman [jane@sajedesign.com] |
| **Sent:** | Wednesday, March 10, 2004 6:23 PM |
| **To:** | SMartel3@aol.com |
| **Subject:** | $$ |


SL.pdf


ATT15957.txt

```
                      hi simone

here is the invoice. unfortunately we need payment before delivery
because we need to pay our vendors. we broke it down pretty clearly.

i am working on getting you your notecards before you leave.

thanks!
jane
```

Robert,

Here is the original email
from the designer to Simone
asking for payment in full
before delivery.

Attached is the Revised INVOICE
which I have asked Christine
to get David's approval.

Barbara

1

## Robert Angona

**From:**    Barbara Bell
**Sent:**    Thursday, March 11, 2004 9:57 AM
**To:**      Robert Angona
**Subject:** FW: Invoices

FYI

-----Original Message-----
**From:** Barbara Bell
**Sent:** Thursday, March 11, 2004 8:55 AM
**To:** 'SMartel3@aol.com'; Christine.Lilitka@cbre.com; Sandra April; jane@sajedesign.com
**Subject:** Invoices

In order for the New York Academy of Art to legally pay this invoice and have it be tax exempted, the bill needs to be made out as follows:

New York Academy of Art
111 Franklin Street
New York, NY 10013

RE: 2004 Tribeca Ball

Jane, would you mind terribly re-doing it and emailing it to all listed above.

Christine, can you please have David initial it again and fax it to me at 212/581-1977 and I will have it processed today.

Thank you.

Barbara

3/11/2004

## Robert Angona

**To:**              david.levinson@cbre.com
**Cc:**              Stephen Farthing
**Subject:**         Invoices for good and service Tribecca Ball

David,

I have a Invoice for 8,946.00 from Sajedesign The Invoice is made out to  Simone Levinson. I understand this Invoice must be paid in advance.

First. I can not pay an Invoice made out to a third party. Invoice must be to The New York Academy of Art.

Second: Our Vendor Policy is that we only use pre-approved Vendors, unless it is an emergency. The procedure here is that the vendor is checked through D&B we need Tax ID Number and Vendor Agrees to bill on terms. With some vendors such as caterers, We need Cert, of Insurance, Copy of Licn. or Certification as to State and City Health permits and the serving of liquor .

Third. We pay on the First & 15th of the Month.  We do honor deposit request on Jobs.  If we pay in advance for this much money and the product is not acceocptable we have no recourse except a law suit.

I just received the Budget for the Ball. I need to manange the cash flow.  If the services to be delivered are from vendors we have not done business with, I need to clear them before contracts are made.

Would you be so kind as to have this Invoice reissued to New York Academy of Art on the terms above.  Please keep this office in the loop as to avoid delay in prcessing bills for this event.

1

**Exhibit  N**

# New York Academy of Art

## Invoice History Report

| Vendor Name | Transaction Date | Transaction Number | Transaction Type | Description | Transaction Amount Post Date | Invoice Balance |
|---|---|---|---|---|---|---|
| Empire Solutions Inc. | | | | | | |
| Empire Solutions Inc. | 8/22/2003 | 082203 | Invoice | DEPOSIT ON FEES FOR ONSITE AND REMOTE SERVICES | $5,000.00 | $5,000.00 |
| Empire Solutions Inc. | 11/5/2003 | 6450 | Payment | | ($5,000.00) | $0.00 |
| Empire Solutions Inc. | 12/1/2003 | C-1000-001 | Invoice | November Crystal Project Blackand/December Retainer | $7,000.00 | $7,000.00 |
| Empire Solutions Inc. | 12/8/2003 | 1377 | Payment | | ($7,000.00) | $0.00 |
| Empire Solutions Inc. | 1/28/2004 | C-1000-2 | Invoice | December System Support on contract | $6,550.00 | $6,550.00 |
| Empire Solutions Inc. | 1/30/2004 | 1401 | Payment | | ($6,550.00) | $0.00 |
| Empire Solutions Inc. | 2/12/2004 | C-1000-3 | Invoice | Report Formatting and Integration | $6,000.00 | $6,000.00 |
| Empire Solutions Inc. | 2/27/2004 | 7060 | Payment | | ($6,000.00) | $0.0 |
| Empire Solutions Inc. | 3/29/2004 | C-1000-4 | Invoice | Completion of contract | $4,100.00 | $4,100.00 |
| Empire Solutions Inc. | 3/29/2004 | 7201 | Payment | | ($4,100.00) | $0.00 |
| Empire Solutions Inc. | 4/12/2004 | C-1000-5 | Invoice | Training and Assisting the closing of books in Blackbaud | $7,500.00 | $7,500.00 |
| Empire Solutions Inc | 4/12/2004 | 1447 | Payment | | ($7,500.00) | $0.00 |

Totals for Empire Solutions Inc.:   $0.00

Report name: New Invoice History Report
Include those invoice dates: 7/1/2003 to 4/16/2004
Include all due dates
Include these Vendors: Empire Solutions Inc.
Include all Invoices
Include all Roads
Include all Vendor Attributes
Include all Invoice Attributes

# Exhibit  O

# THOMPSON HINE

BRUSSELS    CINCINNATI    CLEVELAND    COLUMBUS    DAYTON    NEW YORK    WASHINGTON, D.C.

December 15, 2004

**BY HAND**
James R. Pigott, Jr.
Assistant Attorney General
State of New York Office of the Attorney General
120 Broadway
New York, New York 10271

RE:  New York Academy of Art
     Endowment Fund Inquiry: document production

Dear Mr. Pigott:

Enclosed please find documents responsive to the above-mentioned request for documents and interrogatories, returnable December 15, 2005.

At the top of the production is Wayne Linker's analysis and answers to your inquiries about the "endowment" funds. Behind that are a series of schedules, prepared by or for Mr. Linker to assist you in this inquiry. Finally, backup documentation, to the extent available, has been gathered and included as well.

We have not included copies of the Academy's Internal Revenue Service Form 990 Tax Returns, including annual financial statements, for the years 1998 through 2002, but they can be can be provided to you if requested.

If you have any questions, please do not hesitate to call me.

Very truly yours,

Douglas E. Grover

Douglas.Grover@ThompsonHine.com  Phone 212.908.3920  Fax 212.809.6890                    adr  127710.1

THOMPSON HINE LLP            One Chase Manhattan Plaza      www.ThompsonHine.com
ATTORNEYS AT LAW             58th Floor                     Phone 212.344.5680
A Limited Liability Partnership     New York, New York 10005-1401  Fax 212.806.6890    05-540-0001
Including A Professional Corporation



NEW YORK

ACADEMY

OF ART

HRH THE PRINCE OF WALES, PATRON

December 10, 2004

**Response to the Letter of Inquiry, Dated 1 November, 2004, from Assistant Attorney General Robert Pigott, Charity Bureau, New York Attorney General's Office**

*1. The NYAA reports permanently restricted net assets on its IRS Form 990. With respect to such permanently restricted net assets:*

*(i) Identify each separate fund or gift that makes up the total permanently restricted net assets, and for each such separate fund or gift identify (a) the nature of the restrictions to which the fund or gift is subject, (b) historic dollar value within the meaning of N-PCL 103(a)(16) and (d) the current market value.*

Exhibit 1, attached, reflects the breakdown of each of the gifts/funds related to the information that has been reported on the Academy's IRS Form 990 in recent years. As my tenure with the Academy began on August 16, 2004, with the assistance of the Academy's accountant, I reviewed files and gift records relating to each of the funds which had been reported as "permanently restricted net assets." By and large, most of the funds, while often gifts to the "endowment" of the Academy, do not appear to have been made as "permanently restricted" by the donors, as defined under accounting rules. (See individual correspondence submitted herewith.)

In late 1997, Academy staff and trustees initiated a small fundraising campaign, the goal of which was to raise $5 million for an endowment. Two phases of the campaign were envisioned: first, securing $2 million in gifts and pledges from the members of the board of trustees of the Academy; and second, "going public" to raise the balance of funds from other sources. It appears that the Academy never implemented phase 2 of the fundraising effort.

In the letters that I reviewed regarding the campaign, it appears that the request was for funds for a capital campaign or an endowment fund, and no mention has been found of solicitations seeking "permanently restricted funds". Conversations with the trustees who were on the board in 1997-99 as to the nature of the endowment campaign indicated that it was a very broad fundraising effort, and while it was hopeful that the proceeds from the campaign would generate annual income to sustain the institution, it was also envisioned

05-546-0002

REDACTED                                                      2

that these funds would constitute an operating reserve, an emergency fund and a source
of funding for certain capital improvements.

By and large, the nearly $1.6 million reported as permanently restricted funds in fact
appear to be gifts given in support of an "unrestricted or board restricted endowment or
quasi-endowment fund" as few donors indicated a restriction on principal or a purpose
for the gift aside from "the campaign" or "the endowment". In some cases there were
restrictions on the use or purpose of the funds (Temporarily Restricted gifts and grants),
but the Academy seems to have directed these gifts as well to the endowment. In a
number of instances, based on the gift award letters, the gifts or grants appear to be
totally unrestricted.

Based on these findings, I spoke with the Academy's auditor (in her 7th year of service to
the Academy and thus covering the entire period during which "permanently restricted"
funds were reported in the audit report and the IRS Form 990.) She appears to have
accepted staff statements that these funds were permanently restricted gifts based on the
use of the term "endowment," which in her mind is/was synonymous with "permanently
restricted endowment". I have been unable to determine why certain gifts or grants
which were clearly intended for operating purposes or were fully unrestricted by the
donor were classified as "permanently restricted" on the IRS Form 990 or in the
Academy's audit.

ANNOTATED DESCRIPTIONS OF GIFTS, DONATIONS AND GRANTS TO THE
ACADEMY'S ENDOWMENT FUND AS LISTED IN IRS FORM 990

Several gifts were made to the Academy through the John L. Weinberg Charitable Trust
and The John L. Weinberg Family Fund of The New York Community Trust.
Original Gift:        $76,000
Current Value:        76,000
Restriction:          Gifts to the "Endowment Fund". No mention of purpose or
                      permanent restriction on principal. Several Academy trustees
                      report, however, that her intentions were that the gifts be
                      permanently restricted.

Quarterly anonymous gifts were made to the Academy over a period of time.
Original Gift:        $300,000
Current Value:        0
Restriction:          Donations were made as gifts to the Endowment Fund, and no
                      mention has been found of the donor permanently restricting
                      principal of the gifts or limiting use of the funds to a particular
                      project or purpose. . . .        ed letters approving the
                      Academy's draw upon the gifts he made to the Endowment Fund
                      supporting expenditures for general operations.

REDACTED                                                3

Periodic gifts were made to the Academy during the campaign period. Academy acknowledgments indicate application of the funds to the campaign or the Endowment Fund.

*Original Gift:*      $536,000
*Current Value:*       100,000
*Restriction:*        None of the donor letters reviewed placed any restrictions on the use of funds. No mention has been found of funds being "permanently restricted".          lso signed letters approving the Academy's draw upon gifts he made that were held in the Academy's Endowment Fund for use for capital and general operating expenses.

A pledge of $300,000 over a 3-year period was made and fulfilled.

*Original Gift:*      $299,419
*Current Value:*            0
*Restriction:*        No donor transmittal or pledge letter was found in the files. Staff acknowledgements indicate that the gift commitment was "to the capital campaign to establish an endowment for the Academy". Signed note confirming the Academy's use of $100,000 of his gift for the support of operating expenses.

A pledge of $75,000 was made in 1998 to be fulfilled over a five-year period.

*Original Gift:*      $73,808
*Current Value:*           0
*Restriction:*        Donor imposed no restriction on the gift and asked that it be allocated to the endowment fund.

A pledge of $15,000 was made to the campaign in 1998, but only a portion of the pledge was fulfilled.

*Original Gift:*      $10,000
*Current Value:*        1,500
*Restriction:*        Pledge and gift acknowledgement letters from the Academy indicate that the commitment was to "the capital campaign to establish an endowment for the Academy" and that "funds will be added to the Academy's Endowment Fund". Donor did not fulfill pledge and it was written down in the audit of 2003.

# REDACTED

A gift of stock was made to the Academy by

*Original Gift:*          $10,013
*Current Value:*          0
*Restriction:*            The gift transmittal letter for 1998 indicates that it is simply a
                          contribution to the Academy. No restriction on the funds is noted.
                          The Academy's acknowledgment of this gift does not state that
                          there is any restriction on the gift nor does it even indicate that it
                          was a gift to the Endowment Fund.

## The Prince of Wales Foundation

The Academy applied to the foundation for a grant to provide scholarship support for
students from the United Kingdom. A grant was awarded, and an endowment fund was
established.

*Original Gift:*          $100,000
*Current Value:*          100,000
*Restriction:*            Permanently restricted fund per donor. An endowed scholarship
                          was established and donor requested that it support "in perpetuity"
                          "The Prince of Wales Scholar".

## Gosnell/Lucelia Foundation

A gift was made to the Academy on 18 December 1998 to support the library and faculty
salaries.

*Original Gift:*          $50,000
*Current Value:*          50,000
*Restriction:*            The donor's gift transmittal letter is explicit defining this as a
                          temporarily restricted operating grant to "purchase books,
                          periodicals, slides, videotapes, etc. and the gift to support the
                          faculty will increase faculty salaries…" The Academy in error has
                          treated this gift as a permanently restricted gift.

## ⸺ ⸺ ⸺, ⸺ Frankel Foundation

A pledge of $50,000 was made to the Academy late in 1998, which was to be fulfilled
over 5 years. In the audit of 2002 the pledge was written down by $24,000 as
was not able to fulfill the original commitment. The Evan Frankel Foundation
contributed toward the fulfillment of the pledge.

*Original Gift:*          $22,500
*Current Value:*          22,500
*Restriction:*            Once again the pledge is to the capital campaign and the
                          establishment of an Academy endowment, as noted in the
                          Academy's thank you letter. There is no mention that the funds
                          are "permanently restricted".          ⸺s pledge was partially
                          fulfilled by a grant to the Academy from the Evan Frankel
                          Foundation, and the file on this $10,000 contribution reveals that
                          the grant was unrestricted; the Academy thanked the foundation
                          for the gift, not noting any restriction on use of the funds; and

# REDACTED

the award ends up being recorded in the Academy's 990 report under permanently restricted endowment. Thus it appears that these are unrestricted and not permanently restricted funds.

▪, now chairman of the board of trustees of the Academy, contributed to the campaign.

| | |
|---|---|
| *Original Gift:* | $15,094 |
| *Current Value:* | 0 |
| *Restriction:* | A letter dated 14 December 1999 from            states that a gift of stock (approximately $10,000) was being given to the Academy and the money from the gift was to be "put into the Academy's endowment." No further restriction was noted in the donor's letter. |

### The Horace W. Goldsmith Foundation

A grant was made to the Academy in two separate payments.

| | |
|---|---|
| *Original Gift:* | $50,000 |
| *Current Value:* | 50,000 |
| *Restriction:* | The Foundation's award letters indicate that there was great latitude in how the Academy could use the funds awarded. Thus it is not a permanently restricted endowment, although the Academy has treated it as if it were. |

In 1998 Trustee and Academy Treasurer            affirms in a letter a pledge to the Academy of $35,000 to be paid over a 5-year period.

| | |
|---|---|
| *Original Gift:* | $32,652 |
| *Current Value:* | 0 |
| *Restriction:* | The pledge letter provided to the Academy places no restriction on the use of the gift. |

### Erlebacher Fellowship Fund

The Academy and a faculty member established an endowed fund in honor of Walter Erlebacher. A list of donors and the amounts are attached on the following page.

| | |
|---|---|
| *Original Gift:* | $16,023 |
| *Current Value:* | 16,023 |
| *Restriction:* | Set up as a permanently restricted scholarship fund, the earnings of which will eventually support a full-year student at the Academy. |

05-540-0006

6

2. *With respect to the Prince of Wales Restricted Endowment, describe the nature, purpose and amount of this fund. Identify the extent to which this restricted fund has been invaded, if any, and the circumstances of any such invasions.*

Please see above description of origin of the grant from the Price of Wales Foundation and its restrictions, purpose and current and original value. The fund has not been invaded and the principal remains in tact. (Original award letter for this grant is included in the following attachments.)

3. *Describe any efforts undertaken by the NYAA to ascertain whether its restricted assets were in any way impaired or misappropriated during the period that Robert Angona was rendering services to the NYAA and the results of any inquiry by the NYAA into this subject matter.*

After Robert Angona was terminated, we engaged several means of determining the extent of his employee dishonesty, misuse of Academy funds, misuse of the Academy credit card and fraud. First, we engaged IPSA, a respected private investigation firm, to investigate the extent of his dishonesty; second, Cohen, Greve & Company, our regular auditors, undertook an audit for the Fiscal Year 2004; third, there was an insurance investigation undertaken by Atlantic Mutual upon the Academy's submission of a claim (approximately $35,000 in covered funds) under its employee dishonesty coverage. And finally, a forensic accountant, Thomas Harris, had been engaged before the discovery of Angona's illegal activities, and he had already begun to review and examine income and spending at the institution in preparation of an improved business plan. None of these investigative reviews have identified any inappropriate actions by Robert Angona with regard to the Academy's endowment.

Respectfully submitted,

*Wayne A. Linker*

Wayne A. Linker
Executive Director and Trustee
New York Academy of Art

Enclosures

05-540-0007

Exhibit B

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 31
 2   ------------------------------------x

 3   THE PEOPLE OF THE STATE OF NEW YORK        Indictment
                                                No. 2331/04
 4                    -against-
                                                GL 2
 5   ROBERT ANGONA,
                                                Calendar Call
 6                              Defendant.
     ------------------------------------x
 7
                                     October 8th, 2004
 8
                                     100 Centre Street
 9                                   New York, NY   10013

10
     B e f o r e:
11

12                    HONORABLE RONALD A. ZWEIBEL,

13                                        Justice.

14
     Appearances:
15
                        ROBERT MORGENTHAU, ESQ.
16                      District Attorney, New York County
                        BY:  AMY AMSTER, ESQ.
17                           Assistant District Attorney

18
                        MICHAEL RODI, ESQ.
19                      Attorney for Defendant

20

21

22

23

24
                                     Joanne Fleming
25                                   Senior Court Reporter
```

Proceedings                                     2

1              (In open court)

2              THE CLERK:  Calendar number fourteen, from

3      the pens, Robert Angona, indictment number 2331,

4      2004.

5              MS. AMSTER:  Amy Amster for the People.

6              MR. RODI:  Michael Rodi, 350 Broadway, New

7      York, New York, for Mr. Angona.

8              THE COURT:  Mr. Rodi, is there a possible

9      disposition?

10             MR. RODI:  May we approach?

11             THE COURT:  Yes.

12             (Whereupon, a discussion was held at the

13     bench and off the record.)

14             MR. RODI:  Your Honor, we have a

15     disposition.  At this time, after much discussion

16     with Mr. Angona and Ms. Lipinski from the District

17     Attorney's Office, we are prepared to dispose of

18     this case with a plea of guilty to grand larceny in

19     the second degree, the first and only count in this

20     indictment, in satisfaction of the whole indictment.

21             THE COURT:  Alright.

22             Mr. Angona, you heard what your lawyer just

23     stated?  You heard what your lawyer just stated?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Is it your wish at this time

                    Joanne Fleming

1    to withdraw your heretofore not guilty plea to this

2    indictment, and are you now offering to plead guilty

3    to grand larceny in the second degree in full

4    satisfaction of this indictment?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  Are you entering this plea of

7    your own free will?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Using drugs or medication of

10   any kind at this time?

11             THE DEFENDANT:  No, sir.

12             THE COURT:  Have you discussed the case

13   and your plea with your attorney?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Have you had sufficient time

16   to thoroughly discuss your decision to plead guilty?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Are you pleading guilty

19   because you are, in fact, guilty of this crime?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  You understand, by pleading

22   guilty, you are waiving your constitutional rights

23   which include your right to a trial by jury, your

24   right to confront witnesses against you, your right

25   to remain silent and your right to put the People to

                    Joanne Fleming

1    the burden of proving your guilt beyond a reasonable

2    doubt?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  You also understand that if

5    your plea of guilty is accepted by this Court, it

6    will be exactly the same as if you were found guilty

7    after the trial of the charge of grand larceny in

8    second degree?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  You understand the charge you

11   are pleading guilty to, is that correct?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  The assistant district

14   attorney, your lawyer or anyone else force you or

15   threaten you to enter this plea of guilty?

16             THE DEFENDANT:  No.

17             THE COURT:  The indictment charges you

18   with grand larceny in the second degree committed as

19   follows:

20             The defendant, in the County of New York,

21   during the period from August 1st, 2003 through

22   April 30th, 2004, stole property from New York

23   Academy of Art and the value of the property

24   exceeded fifty thousand dollars.

25             Do you admit to that charge?

                      Joanne Fleming

Proceedings                          5

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  I am agreeing to enter the

3   agreement between your lawyer and the district

4   attorney's office whereby you will receive a minimum

5   sentence of four years and a maximum sentence of

6   eight years.

7           Do you understand that?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  Have any other promises been

10  made aside from that promise?

11          THE DEFENDANT:  No, sir.

12          THE COURT:  Plea acceptable to the People?

13          MS. AMSTER:  Yes, your Honor.

14          THE COURT:  Take the plea.

15          THE CLERK:  Mr. Robert Angona, do you now

16  withdraw your previously entered plea of not guilty

17  and are you now entering a plea of guilty to grand

18  larceny in the second degree?  Is that your plea,

19  sir?  Are you pleading guilty to grand larceny?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Do we have a predicate

22  statement?

23          MS. AMSTER:  No, Judge, the predicate

24  statement isn't here.

25          THE COURT:  We will have to arraign him as

                    Joanne Fleming

1       a predicate on the date of sentence.

2                   How is October 29th, counsel?

3                   MR. RODI:  Fine, your Honor.

4                   THE CLERK:  October 29th.

5                   Remand, Judge?

6                   THE COURT:  Defendant's remanded.

7                   - - - - - - - - - - - - - -

8                   CERTIFIED TO BE A TRUE AND ACCURATE

9       TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC MINUTES

10      TAKEN OF THIS PROCEEDING.

11

12

13

14      _____

15      JOANNE FLEMING
        Senior Court Reporter

16

17

18

19

20

21

22

23

24

25

                        Joanne Fleming

Exhibit C

```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  CRIMINAL TERM
              PART: 41
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
THE PEOPLE OF THE STATE OF NEW YORK        Indictment
                                           No. 2331/04

          -against-

ROBERT ANGONA,

                         Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                   100 Centre Street
                                   New York, NY 10013

                                   December 1, 2006

BEFORE:  HONORABLE RONALD A. ZWEIBEL, JUSTICE


A P P E A R A N C E S:

     For the People:

             ROBERT M. MORGENTHAU, ESQ.
             District Attorney, New York County
             One Hogan Place
             New York, NY 10013
             BY:  LAUREN LITTMAN, ESQ.

     For the Defense:

             CHARLES MILLER, ESQ.
             105-15 Cross Bay Boulevard
             Ozone Park, NY 11417




                         LAURIE EISENBERG, C.S.R., R.P.R.
                         Senior Court Reporter
```

Proceedings

1    THE CLERK:  Added to the calendar,

2    Robert Angona, Indictment 2331/04.

3    Appearances for the record, please.

4    MS. LITTMAN:  Lauren Littman for the

5    People.

6    MR. MILLER:  Charles Miller, 105-15

7    Cross Bay Boulevard, Ozone Park, New York

8    11417.

9    THE COURT:  Is there an application?

10   MR. MILLER:  Yes, Your Honor.

11   Your Honor, at this time, I believe,

12   based upon the consent of the People, my client

13   makes an application at this time to vacate his

14   prior guilty plea and now plead guilty to grand

15   larceny in the third degree.

16   THE COURT:  Mr. Angona, have you had

17   an opportunity to discuss the case and your plea

18   with your attorney?

19   THE DEFENDANT:  Yes.

20   THE COURT:  You had thorough time to

21   fully discuss your decision to plead guilty?

22   THE DEFENDANT:  Yes, sir.

23   THE COURT:  Are you pleading guilty

24   because you are, in fact, guilty of the crime?

25   THE DEFENDANT:  Yes, sir.

Proceedings

1          THE COURT:  By pleading guilty you're

2     waiving your constitutional rights, which

3     include your right to trial by jury, your right

4     to confront witnesses against you, your right

5     the remain silent, and your right to put the

6     State to its burden of proving your guilt beyond

7     a reasonable doubt.

8          Do you understand?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  You understand if your

11    plea of guilty is accepted by this Court, it

12    will be exactly the same as if you were found

13    guilty after trial of the charge of grand

14    larceny in the third degree; you understand?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  You understand the charge

17    you're pleading guilty to; correct?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  Has anyone, including the

20    Court, the DA, your lawyer, or anyone else

21    forced or threatened you to enter the plea of

22    guilty?

23         THE DEFENDANT:  No, sir.

24         THE COURT:  You're charged with grand

25    larceny in the third degree, committed as

Proceedings

```
 1    follows:
 2              The defendant, in the County of New
 3    York, during the period from August 1, 2003
 4    through April 30, 2004, stole property from New
 5    York Academy of Art, and the value of the
 6    property exceed three thousand dollars.
 7              Do you admit to that charge?
 8              THE DEFENDANT:  Yes, sir.
 9              THE COURT:  Plea is acceptable to the
10    Court.
11              For the People?
12              MS. LITTMAN:  Yes.
13              THE COURT:  Take the plea.
14              THE CLERK:  Robert Angona, do you now
15    wish to withdraw your previously entered plea of
16    guilty to grand larceny in the second degree and
17    change that to grand larceny in the third
18    degree; is that what you wish to do?
19              THE DEFENDANT:  Yes, sir.
20              THE COURT:  Remand.
21              Date for sentence?
22              MS. LITTMAN:  The promised sentence is
23    two-and-a-half to five years.
24              The defendant should be sentenced as a
25    predicate felon.
```

Proceedings

1              There's also a waiver of appeal.

2              The People are not going to object to

3    the request of counsel that his time run

4    concurrent with the defendant's time that he has

5    still to serve in, I believe, a federal New

6    Jersey case.

7              MR. MILLER: That's correct.

8              THE COURT:  He needs to be arraigned

9    as a predicate.

10             MS. LITTMAN:  Yes.

11             If we could execute the waiver of

12   appeal?

13             THE COURT:  Yes.

14             MR. MILLER:  Your Honor, we're willing

15   to waive a presentence report, if that's

16   possible.

17             THE COURT:  I don't think it can be

18   waived, although he was previously sentenced.

19             THE CLERK:  I'm told he can be

20   resentenced immediately.

21             THE COURT:  All right.

22             THE CLERK:  Arraign him for sentence?

23             THE COURT:  He needs to be arraigned

24   as a predicate.

25             THE CLERK:  Robert Angona, the

Proceedings

1      district attorney filed a statement with this

2      Court that charges you with a previous felony

3      conviction.

4               It reads that on June 26, 1992, in the

5      Superior Court of Ocean County, New Jersey,

6      State of New Jersey, you were convicted of a

7      felony of larceny in the third degree.

8               Now, you may challenge this

9      conviction on the ground it was obtained

10     unconstitutionally.  Failure to do so at this

11     time will be deemed a waiver of any allegation

12     of unconstitutionality.

13              Mr. Angona, are you the person named

14     in the statement?

15              THE DEFENDANT:  I am.

16              THE COURT:  Do you challenge the

17     constitutionality of that conviction?

18              THE DEFENDANT:  I do not.

19              THE COURT:  He'll be adjudicated a

20     predicate felon for purposes of the sentence.

21              There's also a waiver of appeal.  Has

22     that been executed?

23              MR. MILLER:  It has.

24              THE COURT:  I'll sign it.

25              By executing this waiver of appeal,

Proceedings

1    you're waiving your right to appeal this

2    judgment of conviction?

3            THE DEFENDANT:  I did.

4            THE COURT:  I also signed the waiver

5    of appeal.

6            THE CLERK:  Robert Angona, you're

7    being arraigned for sentence following your plea

8    of guilty to grand larceny in the third degree.

9            Before the Court pronounces sentence,

10   he will allow the district attorney, your

11   attorney and yourself an opportunity to make a

12   statement with respect to your sentence.

13           DA wish to be heard?

14           MS. LITTMAN:  The People rely on the

15   promised sentence.

16           MR. MILLER:  Briefly, Your Honor.

17           First, I want to thank the district

18   attorney's office and Your Honor for your

19   assistance in this matter.  Also, the ability to

20   get my client down here.  I realize it was

21   difficult.

22           I ask the Court to indicate it will

23   sentence my client accordingly with his current

24   federal sentence.

25           I want to give the Court the docket

Proceedings

1    number of that sentence.  It was United States

2    District Court for the District of New Jersey,

3    CR04-768-01.  That is the current docket he's

4    serving a federal sentence on.

5                THE COURT:  That wasn't part of the

6    original plea; was it?

7                MR. MILLER:  No.

8                THE COURT:  The People are agreeing to

9    that?

10               MS. LITTMAN:  Yes, that this time will

11   run concurrent.  We agree.

12               THE COURT:  Does your client want to

13   state anything further?

14               MR. MILLER:  No, sir.

15               Thank you.

16               THE COURT:  The defendant will be

17   sentenced in accordance with the plea agreement,

18   minimum of two-and-a-half years, maximum of five

19   years.

20               The sentence will run concurrent with

21   the federal sentence, the number that was

22   indicated by counsel for that case.

23            *          *          *          *
           The foregoing is hereby certified to be a
24   true and correct transcript  of the proceedings
     held in this matter.
25                    LAURIE EISENBERG, CSR, RPR
                         Senior Court Reporter

Exhibit D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:           PART 41
------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,       :

                                           : Indictment Number 2331/04
            -against-

                                           :
ROBERT ANGONA,                               Decision & Order

                                           :
                      Defendant.
------------------------------------------x
ZWEIBEL, J.:

        Defendant Robert Angona, pursuant to CPL 440.20(1), moves to set

aside a sentence of this Court, rendered October 29, 2004, sentencing

him, as a second felony offender, to a term of from 4 to 8 years

incarceration upon his conviction, pursuant to his plea of guilty, to

Grand Larceny in the Second Degree (Penal Law § 155.40[1]).  In the

instant motion, defendant claims that he has cancer, which has

worsened since being incarcerated.  Defendant claims that his physical

condition has worsened since being incarcerated partly because of a

lack of medical evaluation and treatment at the facilities defendant

was placed in.  He asks this Court to vacate his sentence because (1)

he entered a plea without full knowledge and understanding of his

current condition of health; (2) that the Court sentenced defendant

without full knowledge and understanding of his current condition of

health; (3) that defendant was denied his right to testify before the

Grand Jury in violation of CPL § 190.50; and (4) the Court's sentence

was unduly harsh in light of defendant's current state of health.  The

People oppose the motion, arguing that defendant's claims lack any

legal merit.

        Defendant's motion to vacate his sentence pursuant to CPL 440.20

is denied as the sentence imposed was authorized, legally imposed and

otherwise valid as a matter of law (see People v. Rosenthal, 305 A.D.2d 327 [1st Dept. 2003]). Defendant, however, fails to allege any of the grounds specified in CPL § 440.20 in his papers, but rather, he merely sets forth bare conclusory allegations that he is entitled to have his sentence vacated in light of his current health problems and because his CPL 190.50 rights were violated.[1] Defendant is mistaken.

Defendant pled guilty to second degree Grand Larceny, a Class C felony offense. Penal Law § 70.06 (3)(c) states that the maximum sentence for a second felony offender for a Class C felony offender must be at least six years and not exceed fifteen years. Penal Law § 70.06 (4(b) states that minimum sentence for a second felony offender for a Class C felony offender must be set at least one-half of the maximum. Defendant was sentenced to four to eight years incarceration. Not only is defendant's sentence in full compliance with the Penal Law, it is substantially less then the maximum sentence that defendant could have received (see People v. Kehn, 109 A.D.2d 912 [3rd Dept. 1985]; People v. Pierce, 51 A.D.2d 634 [3rd Dept. 1976]).

The Court notes that defendant's state of poor health and the Court's knowledge of it is not relevant for a CPL 440.20 as defendant's health has nothing to do with whether the sentence is authorized, legal and otherwise valid. Defendant's claims that his sentence was harsh or excessive should be raised on direct appeal, not in a CPL 440.20 motion (see People v. Escobales, 146 Misc.2d 573 [Sup.

---

[1]The Court notes that this is the first time defendant is complaining about a violation of his CPL § 190.50 rights.

Ct Bx. Co. 1990] and cases cited therein).

The Court notes that a review of the plea minutes, annexed to the People's December 5, 2005 Affirmation in Response to the Defendant's Motion Pursuant to CPL Sec. 440.20 as Exhibit A, reflects that defendant's plea was entered knowingly and voluntarily, with a clear understanding of the sentence to be imposed (see People v. Stevens, 140 A.D.2d 741 [3rd Dept.], app. denied 72 N.Y.2d 925 [1988]; People v. Ferrante, 107 A.D.2d 846 [3rd Dept. 1985]). The plea minutes establishes that defendant indicated that he was entering his plea of his own free will; that he was not under the influence of any drugs or medications at the time of his plea; that he discussed the case and his plea with his attorney and that he had sufficient time to throughly discuss his decision to plead guilty with his attorney.

Moreover, as the People argue, defendant was 64 years old at the time he entered the underlying guilty plea and it is not unforeseeable that an individual of that age could face serious health conditions, which may not be evident at the time of his plea. In any event, the mere fact that defendant suffers from cardiac arrest and an advanced stage of cancer is not, in and of itself, a ground for reducing or setting aside an otherwise appropriate legal and bargained-for sentence which was imposed (see People v. Clark, 176 A.D.2d 1206 [4th Dept. 1991], app. denied 79 N.Y.2d 854 [1992]; People v. Napolitano, 138 A.D.2d 414 [2nd Dept. 1988]). Additionally, defendant has not proven that he has not, or that he cannot, obtain the proper medical treatment while incarcerated but presented only hearsay and conjecture on this question. Thus, there is no legal basis for defendant's

-3-

motion.

Similarly, defendant's claim that he was denied his opportunity to testify before the Grand Jury is similarly meritless.   Defendant was arraigned on the indictment filed in this case on May 17, 2004. The instant motion is the first time defendant has claimed a violation of his CPL § 190.50 right to testify before the Grand jury.   CPL § 190.50 gives a defendant five days from the time of his arraignment on an indictment to claim a violation of his right to testify before the Grand Jury.   One and a half years is to long to wait to complain about a CPL § 190.50 violation and his current complaint is untimely.

Accordingly, the motion to set aside defendant's sentence pursuant to CPL 440.20 is denied in its entirety.

This constitutes the decision and order of this Court.

ENTER:

Ronald A. Zweibel, J.S.C.

Dated: January 17, 2006

Exhibit E

1

```
 1

 2    CRIMINAL COURT OF THE CITY OF NEW YORK
      COUNTY OF NEW YORK - CRIMINAL TERM - PART AR3
 3    -------------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,
 4

 5

 6
                    - against -
 7

 8

 9

10    ROBERT ANGONA,

11

12

13
                                    Defendants
14    -------------------------------------------X
                              100 CENTRE STREET
15                            NEW YORK, NEW YORK
                              MAY 3, 2004
16
      B E F O R E:
17    HONORABLE PATRICIA NUNEZ,
                              JUDGE.
18
      A P P E A R A N C E S:
19    ROBERT MORGENTHAU, ESQ.,
      DISTRICT ATTORNEY, NEW YORK COUNTY
20    BY: CAREY NG, ESQ.,
      Assistant District Attorney
21
      LEGAL AID SOCIETY
22    BY: MONICA WHITE, ESQ.,
      Attorney for the defendant
23

24                            DANIEL KOCHANSKI,
                              Official Court Reporter
25
```

1            THE COURT OFFICER:  Docket ending 854, Robert

2    Angona.

3            The defendant is charged with Grand Larceny

4    in the second and resisting arrest.

5            The sworn complaint is signed.

6            Counsel, do you waive the reading of the

7    rights and charges but not the rights thereunder?

8            MS. WHITE:  Yes.

9            THE COURT OFFICER:  Did you advise your

10   client of his 190.50 rights?

11           MS. WHITE:  Yes.

12           MR. NG:  Your Honor, the People are filing a

13   certificate of affirmative Grand Jury action on the

14   Court.

15           The People are requesting bail in this case

16   in the amount of $75,000 plus a 72-hour surety.

17           The People, for the record, filed a

18   certificate of affirmative Grand Jury action.  The

19   People are also requesting remand in this matter.

20           The defendant worked as a bookkeeper at the

21   New York Academy of Arts for over two years, and an

22   investigation by the organization revealed that the

23   defendant had written $40,000 in checks to a company

24   called Empire Solutions.  That company in fact is owned

25   by his wife, and there are no matching invoices for any

1   of that money.

2           Your Honor, this defendant had been indicted

3   for Grand Larceny in the Second Degree.

4           Your Honor, at the time of arrest this

5   defendant refused to give his date of birth or social

6   security number.

7           Upon investigation it turned out that this

8   defendant's name is fictitious.  The defendant's name

9   is John Blue.  His social security number was issued in

10  1956 and was subsequently changed to another name, John

11  Blue, back in 1996.

12          This defendant currently has -- is a

13  predicate felon and faces three to six years in

14  prison.

15          THE COURT:  He is a predicate felon?

16          MR. NG:  My information indicates he has a

17  conviction for Larceny in 1992, Larceny and Fraud in

18  1991 and Fraud in 1981.

19          Your Honor, this defendant is currently

20  wanted by the Federal Government in Atlanta for a

21  probation violation, and that's a mail fraud case.

22          It's the People's position that this

23  defendant poses a clear flight risk.  This defendant

24  ended his lease on his offices two weeks ago and

25  informed the landlord that he was leaving for

1  California and informed his co-workers he was departing

2  for California.

3          For the reasons previously stated, your

4  Honor, the People are requesting remand in this

5  matter.

6          MS. WHITE:  Judge, we are asking you to

7  release Mr. Angona on his own recognizance or set much

8  more reasonable bail.

9          One of the facts the DA named is that Mr.

10 Angona allegedly gave false information to the police.

11 At the time Mr. Angona was arrested he was suffering

12 from congestive heart failure and he was arrested a

13 week ago Friday, I believe the 23rd, and spent the

14 entire last week in Cornell Hospital where he received

15 a shunt in his heart and also a pacemaker.  He was in

16 the hospital the whole time, that is why I imagine that

17 the People have been able to indict him without him

18 being represented.  Although he was arrested last

19 Friday, he was not arraigned until today.

20         His family is in the audience.  His wife and

21 his daughter are sitting here today.  They verified

22 they he lives at 405 East 54th Street, Apartment 7B,

23 and also gave a phone number.

24         Mr. Angona denies that he was involved in any

25 illegal activity at work, the Academy of Arts.  He is a

1   chief financial officer there.

2          He strongly believes that the evidence will

3   show that every transaction he was involved in was

4   legal and authorized by the corporation, and if there

5   is something else going on in the corporation, it is

6   causing them to blame him.

7          I believe that the DA said he -- I asked him

8   about his record.  I don't believe he is a predicate.

9   The DA said his convictions were over ten years ago.   I

10  think that it is a close call in that case.

11         Because of the circumstances in this case,

12  where he did suffer greatly after his arrest, and he

13  also currently has leukemia and diabetes and he spent

14  the last week in the hospital and the People did

15  indict, perhaps legally but without the benefit of

16  being represented and not having the opportunity to

17  testify, and because he is probably not --

18         THE COURT:  All right, based on the

19  representation by the People, he will be remanded.

20         Medical attention is ordered.

21         What part does this case go to, People?

22         MR. NG:  Part 60, your Honor.

23

24

25

```
1          THE COURT:  Part 60, May 17th for Supreme
2   Court Arraignment.
3
4
5
6                    *      *      *
7          CERTIFIED to be a true and accurate
8   transcript of the proceedings.
9
10
11
12          Daniel Kochanski,
13        Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
```