# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JOHN R. BLUMATTE, a.k.a        :
ROBERT ANGONA, a.k.a           :
JOHN BLUE,                     :
                               :
                    Plaintiff,  :          JUDGE RAKOFF
                               :
    --against--                :     07 CV 2944
                               :
GERARD QUINN, DONALD ROGERS,   :
STEPHEN FARTHING, RANDOLPH LERNER, JR.,  :
DAVID LEVINSON, RUSSELL WILKINSON, EILEEN  :
GUGENHEIM, ROBERT BOLANDIAN,   :          2007 Civ.
CHARLES CAWLEY, ANTHONY COLES, :
CHRISTOPHER FORBES, MARGOT GORDON,  :
ROLAND GRYBAUSKAS, LUDWIG KUTTNER,  :          COMPLAINT
DAVID LONG, DOUGLAS OLIVER,    :
JULIA JITKOFF, DAVID SCHAFER,  :
SYBIL SHAINWALD, DENNIS SMITH, :
THE GRADUATE SCHOOL OF FIGURATIVE  :
ART OF THE NEW YORK ACADEMY OF ARTS,  :
JEFFREY C. SLADE, and ELYSE RUZOW,  :
                               :
                    Defendants. :
-------------------------------------------------------------------x



Plaintiff John R. Blumatte, a/k/a Robert Angora, a/k/a John Blue, for his

complaint against Defendants avers:

### The Parties

1.    Plaintiff is a natural person and a citizen of the State of New York.

2.    Defendants Gerard Quinn ("Quinn") and Donald Rogers ("Rogers")

are natural persons, citizens of the State of New York and at all relevant times were

detectives employed by the Police Department of the City of New York (the "NYPD").

Quinn and Rogers are referred to collectively as the "Police Defendants."

3.    Defendant The Graduate School of Figurative Art of The New York Academy of Art (the "Academy") is a charitable organization chartered by the New York State Board of Regents. The Academy was founded by the late Andy Warhol and his friend, Stuart Pivar, in 1982. At all relevant times, contributions to the Academy were tax deductible by reason of Section 501(c) (3) of the United States Internal Revenue Code.

4.    Defendant Stephen Farthing ("Farthing") is a natural person and citizen of the United Kingdom. During relevant times, Farthing was employed by the Academy as its Executive Director and also served on its Board of Trustees. During all or substantially all of this period, Farthing was also employed by MBNA Bank ("MBNA") and served on its Board of Directors.

5.    Defendant Randolph Lerner, Jr. ("Lerner"), is a natural person and citizen of New York. At relevant times Lerner (a) was a Trustee of the Academy, (b) served as Chairman of its Board of Trustees and (c) served on the Board of Directors of MBNA, which was founded by his late father Alfred Lerner. Lerner resigned his Chairmanship of the Board of Trustees of Academy when, due to his father's death, he became obliged to assume the Chairmanship of the Board of Directors of MBNA.

6.    On January 1, 2006, and February 28, 2006, respectively (after the events giving rise to this action), in a publicly disclosed transaction, Lerner and Farthing terminated their relationship with MBNA as a result in a change of control of that institution.

7.    Defendant David Levinson ("Levinson") is a natural person and citizen of New York. At relevant times, Levinson was a Trustee of the Academy and

served as Chairman of its Board of Trustees following Lerner's resignation of that position.

8.    Defendant Russell Wilkinson ("Wilkinson") is a natural person and citizen of New York. At relevant times Wilkinson was a member of Board of Trustees of the Academy.

9.    Defendants, Robert Bolandian, Anthony Coles, Christopher Forbes, Margot Gordon, Roland Grybauskas, Ludwig Kuttner, Douglas Oliver, David Schafer, Sybil Shainwald and Dennis Smith are natural persons and citizens of New York. At relevant times, these Defendants served as Trustees of the Academy.

10.    Defendant Charles Cawley is a natural person and a citizen of the State of Delaware. At relevant times, Defendant Cawley served as a Trustee of the Academy.

11.    Defendant David Long is a natural person and a citizen of the State of California. At relevant times, Defendant Long served as a Trustee of the Academy.

12.    Defendant Julia Jitkoff is a natural person and a citizen of the State of Colorado. At relevant times, Defendant Jitkoff served as a Trustee of the Academy.

13.    Defendant Eileen Guggenheim ("Guggenheim") is a natural person and citizen of New York. At all relevant times, Guggenheim served as Special Advisor to the Board of Trustees of the Academy.

14.    Defendant Jeffrey C. Slade ("Slade") is a natural person, citizen of New York, a member of the bar of the State of New York and of the law firm of Slade & Associates, P.C. At relevant times, Slade served as general counsel of the Academy. In

addition to providing legal advice, Slade acted as a de facto Trustee and indeed had far greater ability to control the Academy than did many of its actual Trustees.

15.    Defendant Elyse Ruzow (the "ADA") is a natural person and citizen of New York. At relevant times she served as an Assistant District Attorney of the Office of the District Attorney of New York County.

16.    Defendants other than the Police Defendants, the ADA and the Academy are from time to time referred to collectively as the "Trustee Defendants" or the "Trustees."

## Jurisdiction and Venue

17.    Plaintiff asserts claims over which this Court has subject matter jurisdiction pursuant to 42 U.S.C. §1983; 18 U.S.C. § 1961, *et seq.*, and 28 U.S.C. §§ 1331, and 1367.

18.    All, or substantially all, of the events giving rise to Plaintiff's claims occurred within this district, where, upon information and belief, most of the Defendants resided at the time of the events and all transacted the business from which these claims arise. Venue is therefore proper pursuant to 28 U.S. C. § 1391(b).

## Background of This Action

### Plaintiff's Criminal Record and Violation of His Probation

19.    Plaintiff has been convicted of felonies not involving the use or threat of force by both the United States of America and the State of New Jersey.

20.    In or about 1998, Plaintiff unlawfully left the supervision of the United States Probation Department in connection with probation following a period of

4

incarceration arising from proceedings had before the United States District Court for the District of New Jersey.

21.    Plaintiff's motivation for violating his probation arose principally from issues relating to his health and the unwillingness of his assigned probation officer to permit him to be employed in the only capacity at which he had relevant experience and training, namely accounting and financial services.

## The Formation of First Manhattan and Empire

22.    Shortly after violating his federal probation, Plaintiff married Shirly Allyn ("Allyn"); assumed a variety of names, ultimately settling on "Robert Angona;" obtained a New York driver's license in the name of Robert Angona with the assistance of the real Robert Angona, an acquaintance of Plaintiff, who at the time was incarcerated with years left to serve on his sentence before he could be eligible for release; caused Allyn to form under the laws of the State of New York two corporations named The First Manhattan Group Inc. ("First Manhattan") and Empire Solutions Inc. ("Empire"); caused Allyn to obtain federal "E.I.N. numbers" for First Manhattan and Empire; and thereafter, as the sole fulltime employee of Empire and First Manhattan, provided accounting services to a number of small companies.

23.    Other than continuing to violate the terms of the probationary portion of the sentence imposed by the New Jersey District Court, at all relevant times, Plaintiff did not engage in any criminal or otherwise unlawful activities.

24.    The Academy hired First Manhattan to in substance provide the accounting services of Plaintiff in or about April 2002.

### Employment of Plaintiff Via First Manhattan as Controller of the Academy

25.   In or about June 2002 Plaintiff was offered the position of Controller of the Academy by Farthing and asked to sign the Academy's standard form of contract.

26.   The standard form of contract contained, among other things, representations to the effect that Plaintiff had never been convicted of a felony.

27.   Plaintiff advised Farthing that he could not sign the contract because of his prior federal and state convictions about which he provided considerable detail to Farthing.

28.   Plaintiff also explained that he did not have a social security number he could provide to the Academy and, therefore, could not accept employment as a W-2 employee.

29.   Farthing told Plaintiff that he had to consult with Lerner, who was his immediate superior at both the Academy and MBNA.

30.   Farthing subsequently told Plaintiff that Lerner, the Academy's then Chairman, and he were eager to procure Plaintiff's services on behalf of the Academy in the capacity of its Controller.

31.   Farthing proposed entering into another contract with First Manhattan, which had a legitimate federal EIN number against which the Academy could (and later did) lawfully report its payments for Plaintiff's services.

32.   Farthing stated further that Plaintiff should refrain from "sharing his past" with anyone else at the Academy, including the other Trustees.

33.   On or about June 14, 2002, the Academy and First Manhattan signed a letter agreement pursuant to which Plaintiff was engaged to serve as Controller of the

Academy for a term between July 1, 2002 and June 30, 2003. Compensation for the services of Plaintiff alone was fixed at $70,000, plus reimbursement of out-of-pocket expenses. A copy of that letter agreement is annexed hereto as Exhibit A.

34.    Farthing signed Exhibit A on behalf of the Academy.

35.    On or about June 20, 2002, the Academy and First Manhattan entered into a second letter agreement pursuant to which First Manhattan undertook to provide personnel other than Plaintiff to perform bookkeeping and accounting services at up to $25 per hour, payable weekly, with no annual limit; staff accounting services at up to $45,000 per year payable weekly; and Controller Special Projects at up to $70,000 payable bi-monthly. A copy of that agreement is annexed hereto as Exhibit B.

36.    Farthing signed Exhibit B on behalf of the Academy.

**Plaintiff's Discovery of and Attempts to Rectify A Multiple Year Pattern Of Wire Fraud, Mail Fraud, Tax Fraud, False Statement, and Breaches of Fiduciary Duty By the Academy and Its Trustees**

37.    When Plaintiff became intensely involved with the Academy after becoming its controller he discovered with certainty that its financial affairs were in complete disarray. For example, the Academy had a restricted endowment account, whose principal was never to be invaded and the interest on which could be made available either to fund scholarships to deserving students or to otherwise support the educational activities of the Academy.

38.    Plaintiff soon discovered that for years the previous controller, Constance McCord, had routinely invaded this restricted endowment account to cover ordinary operating expenses because the Academy had no financial controls and was spending much more than it could afford.

7

39.   A substantial portion of the restricted endowment account had been contributed in sums of less than $5,000 by hundreds of people.  For example, in its 1997 federal tax return on Form 990, the Academy reported bequests of less than $5,000 in the aggregate amount of $444,646 and in its 1999 Form 990 reported such "small donations" in the aggregate sum of $373,912.

40.   Copies of the aforesaid two tax returns are annexed hereto as Exhibits C and D, respectively.

41.   As a consequence of gross if not criminal malfeasance the restricted endowment account was overstated on the Academy's financial statements by over $1+ Million.

42.   Plaintiff also discovered that the Academy's 1997 Form 990 reported cash income from gifts, interest and tuition totaling $3,603,822 and total cash expenses of $2,381,094.  Of those total expenses, 66% were spent on "Fundraising" rather than the Academy's charitable purpose.

43.   Thus the net asset position of the Academy's balance sheet at the end of this period should have increased in net value by not less than $1,222,728.

44.   Yet, an examination of the balance sheet portion of the Academy's 1997 Form 990 does not reflect the over $1 million net increase in cash during the reporting period.  It is simply "missing" without explanation.

45.   A copy of the Academy's 1997 tax return is annexed as Exhibit E.

46.   Plaintiff also learned that the Academy's so-called auditors lacked independence, because before conducting their audit procedures, they first themselves made the very journal entries that they would then purport to audit.

47.    An auditor auditing his own entries in books of account is in blatant violation of Generally Accepted Auditing Standards.

48.    Plaintiff also learned that the audited financial statements of the Academy routinely filed, among other places, with the New York Board of Regents and the Internal Revenue Service, were materially misstated in that, among other deficiencies, they falsely reported the $1+ Million in restricted endowment funds existed.

49.    These funds had been improperly disbursed long prior to Plaintiff's involvement with the Academy to cover operating expenses.  The Trustees nonetheless continued to knowingly and falsely state that these funds existed as current restricted assets in the Academy's 990 filings, among other places.

50.    Plaintiff also learned that the Academy was routinely spending substantially in excess of 50 per cent of its annual revenues for purposes wholly unrelated to its charitable purpose of education such as fund raising junkets; frequent air travel to France, Italy and England for its Trustees; and entertainment – all in the name of increasing the restricted endowment, which in fact was shrinking due to the Trustees' gross mismanagement..

51.    These practices violated the Academy's legal obligations under Section 501(c)(3) of the Internal Revenue Code and thus placed its charitable status at risk.

52.    Plaintiff also learned that there were still no financial controls at the Academy.  Each department operated as a fiefdom; did not report its activities to any central source; and when viewed as a whole the Academy had no budget and no method for determining if it was operating with its means and preserving its valuable privilege of

tax exempt status by complying with federal tax law and spending in excess of 50 per cent of its annual income on charitable purposes.

53.   Plaintiff also learned that the Academy was violating federal law in connection with federally guaranteed loans by knowingly and falsely informing the FDIC insured banks making these guaranteed loans that the student/borrowers were participating in a 48 month program (a requirement of the federal guarantee), when in fact the students were enrolled in a so-called "three semester program" that incongruously spanned only 12 calendar months.

54.   Accordingly, neither the students nor the Academy was lawfully entitled to receive these federally guaranteed loans.

55.   Plaintiff also discovered that the Academy did not have a legitimate certificate of occupancy for its building; had improperly dealt with insurance claims resulting from a fire; had not recorded in its books and records a recent mortgage taken to cover is net cash deficiencies; and was violating the New York State liquor laws by selling liquor in its cafeteria to its students without a license to do so.

56.   After he developed a preliminary grasp of these issues, Plaintiff had a face-to-face conversation with Farthing, the then Executive Director, and Lerner, the then Chairman of the Board of Trustees, during which he advised them that they had two choices: either liquidate the Academy in an orderly fashion or clean up the mess that Plaintiff discovered.

57.   Farthing and Lerner told Plaintiff to use his best efforts to "clean up the mess" before the Academy lost its 501(c)(3), which would vitiate its ability to offer

tax deductions to potential contributors, and leave it unable to replenish its plundered endowment .

58.    Plaintiff made substantial progress in cleaning up the mess.

59.    As a result of the good work he had done and was doing for the Academy, on or about October 27, 2003, the Academy and First Manhattan entered into a new Employment Contract pursuant to which Plaintiff would continue his service as Controller. A copy of that Agreement is annexed hereto as Exhibit F and is hereafter referred to as the "2003 Controller Agreement."

60.    His activities as Controller were the subject of considerable discussion at Trustee meetings to which he was routinely invited to attend and did attend without exception.

61.    Every Trustee knew that Plaintiff was not only the Controller of the Academy, but an active controller as well.

62.    For example, the Trustees approved Plaintiff's recommendation that the Academy hire the law firm of Grover & Block, P.C., to address the multiple issues of gross mismanagement, outlined above, that faced the Academy and were potentially of a criminal nature and would certainly mature into criminal matters if not swiftly and properly resolved by the Academy. Plaintiff recommended this firm to the Trustees based principally upon the fact that its members were experienced, recent alumni of the United States Justice Department's Organized Crime Strike Force. For reasons made clearer below, Plaintiff stated – and the Trustees agreed -- that their RICO experience was highly relevant to their engagement.

63.   On August 22, 2003, Plaintiff entered into yet another letter agreement with the Academy via his other New York corporation, Empire. This agreement was – like its predecessors – signed by Farthing on behalf of the Academy. It provides in pertinent part that Empire will provide the Academy:

> with solutions and support in connection with the integration of your new systems, Financial Edge, Razor Edge, and your Educational Student Billing, Fixed Assets and Purchase Order Applications through the use of "Crystal Reports."

A copy of that letter agreement, which was signed by Farthing in his capacity as Executive Director, is annexed hereto as Exhibit G and hereafter referred to as the "Empire Contract."

64.   Successful implementation of these programs would have reduced dramatically the Academy's needs for accounting/bookkeeping personnel and thus the Academy was in concept "spending money to save money."

65.   The Empire Agreement concludes by requiring a "$5,000 deposit with the acceptance of this letter."

**Events Resulting in Plaintiff's Termination of the 2003 Controller Agreement for Cause and Convenience**

66.   Although Plaintiff was able to accomplish a great deal in terms of placing the Academy's house in order, the Trustees and Plaintiff locked horns on three issues. First, Plaintiff insisted that the Academy (a) restate its financial statements to bring them in line with reality so that they would no longer be materially misleading and (b) reflect the $1+ Million "missing" from its restricted endowment account that prior to his arrival at the Academy had been unlawfully invaded to cover operating expenses.

67.    Second, Plaintiff insisted that the Academy immediately comply with federal law by ceasing and desisting spending more than 50 per cent of its annual income for purposes unrelated to its charitable purpose of education in violation of Section 501(c)(3).

68.    Third, Plaintiff insisted that the Academy end its illegal practice of giving "kick-backs" to artists, who claimed publicly to donate their works for auction to increase the Academy's endowment, but privately and secretly were paid approximately 50 per cent of the sale price in violation of law.

69.    Most, if not all, of the Trustees of the Academy are socially prominent, wealthy individuals. Every year the Academy hosts "The Tribecca Ball," whose costs are very substantial.

70.    The character of the Trustees' charitable conduct is fairly described as materially different from that of Mother Theresa. Annexed hereto as Exhibit H are copies of newspaper articles recounting the Trustees' "charitable activities," which in the words of F. Scott Fitzgerald recount a gathering of "Swells."

71.    MBNA (of which Farthing and Lerner were Directors) has substantial business activities in the United Kingdom. Farthing, as Executive Director of the Academy, and Lerner, as its then Chairman, abused their control over the activities of the Academy in order to curry favor with prominent individuals in England, including HRH Prince Charles, for the benefit of MBNA and to the detriment of the Academy.

72.    Other Trustees placed their intangible, social and business interests above their fiduciary obligations to the Academy that, among other things, required them to see to it that the Academy refrain from knowingly filing with the New York Board of

Regents and others false financial statements and refrain from spending in excess of 50% of its annual income for purposes other than its charitable purpose in violation of federal law.

73.    In 1994 the Academy's Trustees filed by mail a false insurance claim contending that a previous controller, Michael Hawkins, had embezzled hundreds of thousands of dollars. Hawkins had, in fact, innocently used petty cash, over a period of two years, to pay casual labor to complete construction projects ordered by the Trustees. The insurer, Chubb Federal Insurance Company, settled this knowingly false claim with the Academy for $100,000. Annexed hereto as Exhibit I is a copy of Chubb's check.

74.    When the New York Attorney General's Office(the "AG") opened an investigation into the claim in 1996,  based on the complaint of a former board member, Barbara S Krulik, the then Academy Director refused to answer questions, "on the advice of counsel." Attached hereto as Exhibit J is a copy of the AG's Criminal Prosecutions Bureau's request for information on the claim.

75.    The same Trustees were complicit in filing by mail false and vastly inflated insurance claims, on behalf of the Academy, relating to a minor fire. The Trustees sought to recover from the Academy's insurance carrier the costs of improvements to parts of its building that were not damaged by the fire.

76.    The Trustees also willfully approved of the filing by mail of multiple claims for the same alleged damages attributing these same damages both to a fire and to the 9/11 Tragedy.  Obviously, the Academy was not entitled to double recoveries, which the Trustees knowingly sought and obtained via use of the mails and wires.

14

77.    In short, through the use of the mails, telephone and internet, the Trustees willfully controlled the Academy in a fashion that perpetrated a fraud on the Internal Revenue Service, the New York Board of Regents, the Academy's insurance carriers, individuals who thought they were contributing to a restricted endowment fund and others, including Plaintiff, in order to foster their own social and business interests.

78.    In a "Controllers Report" dated January 17, 2004, addressed to Farthing and Levinson and, upon information and belief, shared with all other Trustees, Plaintiff reported on "Accounting System Breakdowns, serious compliance issues, and Building C of O deficiencies," any one of which Plaintiff reported "could have rendered the Academy out of business, with its charter being revoked, and exposing its Trustees to both civil and criminal investigations." A copy of that report is annexed hereto as Exhibit K.

79.    The Trustees refused to address most of Plaintiff's concerns including the known misstatements in the Academy's financial statements and in particular the misstatement about the "missing" $1+ Million" that was improperly withdrawn from the restricted endowment account prior to Plaintiff's arrival at the Academy.

80.    The Trustees again indicated that acknowledging this unlawful invasion of restricted endowment funds would too seriously impair their ability to continue to seek contributions to the Academy's endowment. In other words, if the Trustees told the truth about their stewardship of endowment funds, no reasonable person would entrust additional funds to their stewardship.

81.    The Trustees also refused to refrain from spending more than 50% of the Academy's annual income on non-educational purposes such as fund raising junkets, because to do so would not serve their private desires.  Indeed, some Trustees donated substantial sums of money to the Academy so that they could fly across the Atlantic to entertain their friends at fancy restaurants in the name of fund raising.  Given their average tax brackets, the net consequence of these actions was that the Trustees could deduct roughly 50% of the cost of what would otherwise be purely social entertainment.

82.    Thus by the end of the first quarter of 2004 Plaintiff and the Trustees had reached an insurmountable impasse.  Plaintiff wanted the Academy to obey the law and the Trustees would not do so because complying with the law would impair their undeserved emoluments and otherwise be inconvenient.

### A Disgruntled Former Trustee and Co-Founder of the Academy Focuses Unwanted Attention on Plaintiff

83.    In or about February 2004, Plaintiff had surgery to deal with a serious heart episode.

84.    After surgery, Plaintiff took time off from work and went with his wife to Florida to recuperate.

85.    While he was in Florida, newspaper articles appeared both in the United States and Great Britain suggesting that the Controller of the Academy, Robert Angona, was associated with organized crime.

86.    This was the result of activities initiated by the surviving founder of the Academy, Stuart Pivar ("Pivar"), who has had very stormy relations with the Trustees since he was unceremoniously voted off the Board in 1994.

87.    Pivar had hired the celebrity private eye, Beau Dietle ("Dietle"), to investigate any possible wrongdoing by the current Trustees.

88.    Dietle's investigation yielded the fact that the real Robert Angona had long been alleged to be associated with organized crime.

89.    In response to the press barrage and a website established by Pivar/Dietle, Plaintiff spoke to Dietle.

90.    He asked Dietle to compare his physical appearance with the "mug shot" of the alleged mobster Robert Angona.

91.    Plaintiff assured Dietle that that comparison would persuade Dietle that Plaintiff was "not that Robert Angona."

92.    Dietle did so, and, upon information and belief, learned that "that Robert Angona" was presently in custody and had been in such custody during the entirety of Plaintiff's dealings with the Academy.

93.    Dietle/Pivar then admitted on their website that Plaintiff was "not that Robert Angona," but still asked on that website: who is this mystery man who serves as Controller of the Academy?

94.    None of this press was happily received by any of Levinson, Farthing or Plaintiff.

95.    Given Plaintiff's obvious desire to avoid the attention of federal probation officers, this press was even less happily received by Plaintiff, who had very good cause to try to avoid any publicity.

**The Brooklyn Diner Meeting At Which Plaintiff Resigns for Cause and Lerner and Farthing Accept the Resignation on Behalf of the Academy**

96.   In or about late March 2004. Farthing and Plaintiff met at the Brooklyn Diner on West 57th Street in Manhattan.

97.   Lerner had recently resigned as Chairman of the Board of Trustees due to his increased obligations to MBNA and had been replaced by Levinson.  The transition from Lerner to Levinson was still very much in process.

98.   Farthing remained at this time the Academy's Executive Director.

99.   During that meeting Plaintiff pointed out that the 2003 Controller Agreement provided in Section 6(D):

**Termination by Angona for Good Cause:**  Angona shall have the right to terminate his employment for "Good Cause".  For the purpose of this agreement "Good Cause" Shall mean: .... (6) acts or request by the Academy that Angona and/or the Group deems as contrary or in violation of any Accounting Professional Rule or Laws ....

100.   As a result of the stalemate with the Trustees described in above, Plaintiff suggested that he had cause to resign and was, therefore, entitled to the lump sum payment expressly contemplated by the 2003 Controller Agreement.

101.   Farthing agreed as a preliminary matter, but also said he needed to speak privately by telephone with Lerner

102.   Farthing and the Plaintiff returned to the Academy's office where Farthing telephoned Lerner privately from his personal office.

103.   Farthing then entered the Plaintiff's office and stated that Lerner had agreed to Plaintiff's proposal and stated that the Academy would pay Plaintiff his severance benefits under the 2003 Controller Agreement according to its terms.

104.   Farthing also stated that Lerner said that "they should not give Pivar any more ammunition." They should therefore "settle this thing quietly."

105. Farthing stated also that Lerner and he both believed that because the Trustees would not take Plaintiff's advice, the Academy would also agree that Plaintiff's services as controller were now "without purpose" within the meaning of Section 6(A) of the 2003 Controller Agreement and would, therefore, agree that the Academy would make the same immediate lump sum payment under that provision of the Controller Agreement as well.

### Resolution of Issues Relating to Plaintiff's Loan To Officer Account

106. At the Brooklyn Diner meeting, Plaintiff raised the issue of the outstanding balance of his portion of the Academy's "Loans to Officers" account and personal charges on a credit card issued by MBNA bearing both his name and that of the Academy that had not yet been received by the Academy, i.e. current charges for which the Academy had not yet received a bill.

107. At Farthing's insistence, most of the Academy's officers had MBNA cards. Indeed, Farthing as a director of both MBNA and the Academy had signed the authorizations for these cards wearing in substance two hats.

108. It was common for the Academy's officers, from time to time, to charge expenses unrelated to the Academy's business on these credit cards.

109. One of the procedures that Plaintiff initiated as Controller was for the Academy accounting staff to reconcile each officer's monthly MBNA credit card statement before the Academy paid the statement. Each expense properly charged to the Academy was assigned to the proper account and those charges unrelated to the Academy's business were charged to a "loan to officer" account.

110. Thus at no time during Plaintiff's term of service as Controller did the Academy ever advance funds on behalf of an officer (including Plaintiff) without simultaneously recording in its books of account the officer's obligation to repay those funds.

111. Plaintiff proposed to Farthing and Lerner that either these balances be deducted from the lump sum severance payment he was owed under the 2003 Controller Agreement, or, alternatively, Plaintiff would write a check once the full amount was known.

112. None of Farthing, Lerner or Plaintiff indicated any strong preference as to either alternative, and Farthing undertook to solicit the views of the other Trustees.

113. When Plaintiff left the Academy's offices on the day of the Brooklyn Diner meeting he understood based upon Farthing's unequivocal statements that he had struck a deal with the Academy regarding his departure.

**Levinson and Other Trustees in the "Anti-MBNA" Clique Seize Upon the Unfavorable Press to Embarrass Lerner and the other "MBNA Trustees" and To Blame Plaintiff for Their Transgressions, Including Improperly Invading the Academy's Restricted Endowment Account**

114. For some time prior to April 2004 the Academy Board of Trustees was populated with cliques. One clique included those Trustees having an association with MBNA, consisting of Trustees Lerner, Farthing, Bolandian, Cawley and Coles and another clique fairly described as an "Anti-MBNA" clique, which was lead by new Chairman Levinson and to which Guggenheim and Wilkinson belonged.

115. The Levinson lead clique viewed the adverse press as an opportunity to embarrass Lerner and the other MBNA Trustees.

116. Plaintiff had already alienated Levinson by refusing to fraudulently issue a tax credit to Levinson personally on March 24, 2004 for a donation made by Studley Inc., Levinson's employer. *See* correspondence annexed as Exhibit L. Plaintiff had in addition offended Levinson's wife, Simone, by refusing to pay an invoice made out to her personally for $9,000, in direct violation of the Academy's strict policy against paying with Academy funds invoices to third parties who were often attempting to exploit for their personal gain the Academy's tax status as a charity.. *See* annexed correspondence, Exhibit J. For these and other reasons, there was "bad blood" between Plaintiff and Levinson.

117. The anti-MBNA clique also desperately wanted to learn Plaintiff's real identity and the other facts about Plaintiff's background. Facts that Lerner and Farthing were told when Plaintiff explained why he could not sign the Academy's standard form of employment agreement, but apparently had not shared with all of the other Trustees.

118. Farthing was aware that neither Lerner nor he disclosed to the other Trustees the information that Plaintiff had shared with them about his past prior to accepting the position of Controller.

119. Indeed, on August 27, 2004, Nancy Lindberg Zahzam, now the Director of Financial Aid at Brooklyn Law School, but formerly the Registrar of the Academy, testified under oath that Farthing once stated directly to her: "If Robert [Plaintiff] ever gets arrested, we are all through."

120. Slade was involved from the outset with this inquiry about Plaintiff after his resignation for cause had been accepted by the Academy. Slade's law firm's

invoice to the Academy for the month of April 2004 showed charges for his time relating to Plaintiff on April 1, 8, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, and 29.

121. On or about April 14, 2004, Slade engaged the firm of IPSA International ("IPSA") to investigate Plaintiff.

122. IPSA employees conducted 24 hour surveillance of Plaintiff and his wife between April 15 and 18, 2004.

123. The IPSA surveillance revealed nothing interesting other than the ability of both Plaintiff and his wife to perceive they were being followed.

124. Many, if not all of the assigned IPSA employees assigned to the Academy engagement were former and in many cases retired special agents of the Federal Bureau of Investigation (the "FBI").

125. As former FBI agents, IPSA – and through IPSA Slade and the Academy – enjoyed a special relationship with both the New York Police Department and the Office of the District Attorney for the County of New York.

126. By April 16, 2004, Levinson, Wilkinson, Guggenheim, Slade, Farthing and employees of IPSA were in direct contact with the ADA.

127. For obvious reasons, Plaintiff was trying to avoid further publicity and seeking to leave as quickly as possible the public stage.

128. After Plaintiff had had his resignation accepted on the day of the Brooklyn Diner meeting, he received a telephone call from Levinson, Wilkinson, Guggenheim and Slade demanding that he immediately report in person to the Academy and explain who he really was if he was not "that Robert Angona."

129. Plaintiff declined to do so.

130. Plaintiff then consulted with the Grover & Block firm regarding his obligations, if any, to provide the Academy with further information in light of the fact that it had accepted his resignation for cause.

131. At this time, Grover & Block had completed its work for the Academy and had no conflict of interest in providing legal advice to Plaintiff.

132. Plaintiff disclosed to the Academy during a conversation with Levinson that he had engaged Grover & Block to advise him as to his continuing obligations, if any, to the Academy.

133. The Academy expressed no objection to this representation.

134. Plaintiff was advised by Grover & Block that he had no obligation to provide any information about his background since his employment by the Academy had been terminated by mutual agreement and for cause.

135. Plaintiff therefore adhered to his position of "no comment" in reliance on the Grover & Block advice.

**Levinson, Farthing, Wilkinson, Guggenheim and/or Slade Enlist the Aid of the Police Defendants and the ADA to Violate Plaintiff's Civil Rights**

136. Upon information and belief, Levinson, Farthing, Wilkinson, Guggenheim and/or Slade communicated with the ADA, Quinn and Rogers and urged them to use their best efforts to learn Plaintiff's true identity.

137. On April 23, 2004, Plaintiff left his doorman apartment building on East 54th Street in Manhattan to walk his dog.

138. Upon his return to his apartment building, Quinn and Rogers followed him into the lobby of his building barging past his doorman and yelled "Mr. Angona – Robert – we want to talk with you."

139. Quinn then said "What's your real name."

140. These statements were made by Quinn and Rogers inside the lobby of Plaintiff's apartment building, which they had entered without a warrant or probable cause to believe that Plaintiff had engaged in unlawful conduct or that exigent circumstances justified the absence of a warrant.

141. Neither Quinn nor Rogers identified himself as a police officer and Plaintiff assumed that they were employees of Dietle.

142. Plaintiff told Quinn and Rogers that he did not want to talk to them and then turned to enter the elevator with his dog.

143. Rogers then threw Plaintiff up against the wall and placed him in a choke hold.

144. Quinn punched him in the chest and started to put him in handcuffs – again without possession of a warrant for his arrest; probable cause to believe that he had committed a crime; or the existence of exigent circumstances that might have otherwise justified his conduct or that of Rogers.

145. Plaintiff was still recovering from heart surgery, which was well known to all of the Trustee Defendants and, upon information and belief, had been disclosed to the ADA, Quinn and Rogers.

146. As a result of the aforesaid use of unwarranted and grossly excessive force by Quinn and Roberts, Plaintiff had another heart episode; was in great pain; could

24

barely breathe; and then begged for his Nitro pills that were located in his apartment – a short elevator ride away.

147.  In response, Rogers told Plaintiff that "he had delivered people to the morgue before."

148.  Other residents of the building, upon observing the commotion, demanded that Quinn and Rogers identify themselves.

149.  The doorman telephoned Plaintiff's wife, who brought him his Nitro pills thereby saving his life.

150.  Quinn called his NYPD supervisor on his cell phone and then told Rogers that their supervisor and the ADA had instructed them to call EMS.

151.  Plaintiff and his wife asked Quinn and Rogers whether Plaintiff was being arrested.

152.  They replied by stating "they did not know yet."

153.  Plaintiff and his Wife also asked if Quinn or Rogers had a warrant for Plaintiff's arrest.

154.  They replied they did not.

155.  At no time prior to the arrival of EMS did Quinn or Rogers offer any explanation for their assault on Plaintiff before identifying themselves as police officers after unlawfully accosting him in the lobby of his building without either a warrant or lawful cause to be in that non-public place.

156.  Nor did they offer any explanation for their use – indeed excessive use – of force given that Plaintiff was a frail 64 year-old man, incapable of violent or aggressive action, and was known to be recovering from recent heart surgery.

157. EMS arrived with a cardiac specialist, who applied heart monitor and took an EKG.

**At the Behest of Levinson, Wilkinson and Farthing, Quinn and Rogers Continued to Violate Plaintiff's Civil Rights While He Was In Cornell Medical Center**

158. Plaintiff was then taken by ambulance to Cornell Medical Center still handcuffed.

159. Quinn rode in the ambulance and continued to try to interrogate Plaintiff, who was obviously in great pain.

160. Notwithstanding Plaintiff's demand for an attorney, Quinn continued to question him.

161. Quinn stated that he wanted Plaintiff's "real identity" and asked whether Plaintiff took any money from the Academy.

162. Plaintiff continued to decline to answer questions and continued to insist upon his right to counsel.

163. Plaintiff was admitted to the Cornell Medical Center and remained in guarded condition for some 12 hours.

164. During this period, Quinn and Rogers continued to question Plaintiff as to his identity and his activities at the Academy notwithstanding his demand for counsel and his precarious physical condition.

165. During this period Plaintiff heard Quinn state to Rogers that the ADA was meeting with Farthing, Levinson, Wilkinson, Guggenheim and Slade and that as a consequence they would be working overtime.

166. Quinn then thanked Plaintiff for the extra pay.

167. Plaintiff remained in the Cornell Medical Center for ten days from April 23, 2004 until May 3, 2004. During the entire period he remained under armed guard.

168. During his hospital stay, a cardioverter defibrillator was implanted in his heart.

169. While Plaintiff was undergoing pre-operative preparations for this surgical procedure, Quinn and Rogers continued to question him as to (a) his identity and (b) his activities at the Academy. Upon information and belief, this questioning was at the behest of, among others, some or all of the Trustee Defendants.

170. Plaintiff continued to decline to answer these questions and continued to demand his right to counsel. The questioning nonetheless persisted until medical staff wheeled Plaintiff into the operating room.

171. During his hospitalization, Plaintiff was given the Last Rights by a Catholic priest as Plaintiff is of the Catholic faith.

172. Following this private and privileged communication, Quinn and Rogers attempted to interrogate the priest about this privileged communication in violation of law and common decency.

## Plaintiff Is Falsely Charged With Grand Larceny

173. By the morning of April 24, 2004, the NYPD, Quinn, Rogers and the Trustees knew that had a mutual problem. Quinn and Rogers had taken Plaintiff into custody with neither a warrant nor probable cause to do so as a consequence of agreeing perform a "favor" (at IPSA's request) for the Trustees by browbeating Plaintiff's true identity out of him.

174. Their problem was exacerbated by the fact that they had no right to enter the lobby of Plaintiff's apartment building to attempt to intimidate him.

175. In the process of intimidating a fragile man in the process of recovering from a heart operation they used vastly excessive and inappropriate force and caused him to suffer another heart episode requiring further surgical intervention.

176. Their mutual problem was further exacerbated by the fact that Plaintiff was demanding both an attorney and a bed-side arraignment if, as and when he was told he was being charged with a crime.

177. So, lead by Levinson and Farthing, the Trustees provided a solution for the NYPD, the ADA, and Quinn and Rogers by fabricating a series of false allegations of fraud, embezzlement and grand larceny against the Plaintiff.

178. In a felony complaint purportedly signed on April 23, 2004, Quinn stated that he was informed by Farthing that:

    a.  "Empire Solutions is not an authorized vendor known to the New York Academy of Art;" and

    b.  "Between August 2003 and April 2004, six checks totaling in excess of $40,000 were written to a Company called Empire Solutions but no matching invoices could be located."

179. These statements by Farthing were known by him to be false at the time he made them because he signed the Academy's contract with Empire (Exhibit D hereto).

180. The statements were also known to be false by the other Trustee Defendants, since all of them knew based on many face-to-face exchanges, including the

Plaintiff's attendance at every Board Meeting, that Plaintiff was the Controller of the Academy and based upon the Academy's own business records that Empire was entitled to payment pursuant to the terms of Exhibit D annexed hereto.

181. Indeed, a comparison of the Empire Contract with either the Academy's Invoice History Report relating to Empire or to the actual checks summarized in that report would have shown all payments to Empire were authorized.

182. As noted above, the Empire Contract is dated August 22, 2003, and provides for payment by the Academy of $5,000 with its execution.

183. Annexed hereto as Exhibit N is a copy of an Invoice History Report prepared from the Academy's computer based records relating to Empire.

184. The first payment to Empire was made on the very same date as the Empire Contract in exactly the $5,000 sum that the Empire Contract expressly requires be paid at the time of its signing by the Academy. This precise congruence of date is no accident.

185. The next payment to Empire of $7,000 under description states "November **Crystal** Project Blaubaud/December retainer." This description aligns with the Empire Contract's express reference to "**Crystal** Reports." (Emphasis added.)

186. The next payment is described as being for "Report Formatting and **Integration**." The Empire Contract expressly refers to "the **integration** of your new systems." (Emphasis added.)

187. The next payment is described as "Completion of "**Contract**."

188. The final payment is described as "Training and assisting the closing of books in Blackbaud."

189. Thus anyone with a modicum of common sense, who compares the Empire Contract with the Academy's Invoice History Report relating to Empire, cannot escape the conclusion that each and every payment made to Empire was wholly consistent with the plain language of the Empire Contract.

190. In addition, many employees of the Academy and all of the Trustees knew that during the period that payments were made to Empire the Academy was integrating the new systems to which the Empire Contract makes express reference. Indeed, the Invoice History Report attached to this complaint was prepared on one of those very systems.

191. Last and certainly not least, Farthing signed both the Empire Agreement and some of the checks in payment of Empire invoices.

192. Indeed at page 8 of a report prepared by IPSA dated May 4, 2004, the Trustees and Slade were informed that Farthing had in fact signed some of the Empire checks, while other had been signed using a signature stamp.

193. That same May 4 IPSA report advised the Trustees and Slade in finding number 9 on page 14 that IPSA had "[c]onfirmed that the results of operations as communicated in Board meetings [by Plaintiff] agreed with the audited financial."

194. There can be no doubt that Farthing's statement to Quinn, made on behalf of the Academy and within the scope of his then employment, to the effect that "the Academy had never heard of Empire" was known to Farthing to be false and venal.

195. Quinn also swore that Farthing told him that

a. Between August 2003 and April 2004 Plaintiff charged over $29,000 on his MBNA credit card; and

b. Plaintiff had no permission or authority to obtain that card.

196. These statements by Farthing were known by him to be false at the time he made them because he authorized the issuance of Plaintiff's credit card; on several occasions observed him use it to pay for proper Academy charges; and was aware of the existence of the Academy's accounting records in general and the loans to officers ledger in particular. Indeed, Farthing was personally subject to the same procedure described above that had been implemented by Plaintiff regarding reconciliation of officers' monthly credit card statement before such statements were paid.

197. Farthing was also aware that the terms of the Brooklyn Diner Agreement precluded Farthing from stating that any funds owed by Plaintiff could not be offset against the far greater amount owed to the Plaintiff by the Academy.

198. Quinn's felony complaint, based on Farthing's false testimony, was presented to a grand jury. The grand jury returned an indictment against Plaintiff.

199. Plaintiff was not given the opportunity to testify before the Grand Jury as was his right.

200. Had he testified before the Grand Jury, as was his right, Plaintiff would have produced the Empire Contract annexed hereto, copies of the Empire invoices, the Academy Invoice History Report and the Academy checks. Faced with this evidence, the Grand Jury never would have indicted Plaintiff based upon the proposition that: "Empire Solutions is not an authorized vendor known to the New York Academy of Art."

201. Had Plaintiff testified before the Grand Jury, as was his right, Plaintiff would have produced evidence of the Academy's "loans to officers" account and its procedures regarding credit card reconciliation. He also would have pointed out that

the Academy owed him far more than he owed it. Faced with this evidence, the Grand Jury would not have indicted him.

202. By the time of his arraignment, the Plaintiff's violation of his New Jersey federal probation had come to light and federal authorities had issued a warrant for his detention.

203. The ADA was threatening to prosecute Plaintiff's wife based upon her association with Empire and First Manhattan.

204. Defendants were engaging in a common scheme to blame Plaintiff for all of the Academy's long existing problems including the $1+Million that had been missing from the Academy's restricted endowment account long before Plaintiff's arrival at the Academy. For example, at the time of his arraignment on May 17, 2004, the ADA stated:

> Your Honor, the Defendant was indicted for stealing approximately $60,000 at this time. However, we are looking at donations that were made to the school, pledges that were made.
>
> However, no checks associated with them were ever deposited and we believe it would be a substantial amount of money. The investigation in this case is continuing.
>
> Since Defendant has become controller of the New York Academy of Art, I believe they began operating with a deficit of $40,000 and now they are operating at a deficit at **over a million dollars**. The extent to which that is contributed to the Defendant at this point is not yet known.
>
> However, we do believe we will find a much larger dollar amount associated with this Defendant's theft.

205. This statement was made by the ADA, upon information and belief, with actual knowledge of its falsity based, among other reasons, upon IPSA finding number 9, quoted above in paragraph 193, which information, upon information and

belief, was provided to the ADA approximately two weeks before she made the statement quoted in the preceding paragraph.

206.  Plaintiff had received the Last Rites, was exhausted, was in agonizing pain, and was afraid his wife would be indicted for forming his companies. He was clearly aware and afraid of the vast social, political and business power of the Trustees. He was cognizant of the fact that he owed the federal government prison time by reason of his probation violation and was under the mistaken belief that any time he might serve in connection with his wrongful New York indictment for larceny would be served concurrently with a federal sentence for his violation of probation.

207.  Accordingly, on October 29, 2004, Plaintiff pled guilty to a Class C felony and was sentenced to a term of 4 to 8 years.

208.  As the Plaintiff slowly recovered sufficient strength, he was able to engage new counsel in 2006, who marshaled some of the evidence outlined above. Plaintiff's attorney brought this evidence to the attention of the Office of the District Attorney.

209.  After speaking with Farthing by telephone and obviously perceiving that an injustice had been perpetrated, on November 30, 2006, the District Attorney agreed to vacate Plaintiff's prior conviction and permitted Plaintiff to replead to a Class D felony for which he was sentenced to a term of 2.5 to 5 years.

210.  The practical consequence of this re-sentencing was that Plaintiff was immediately eligible for parole and thus would be free many months earlier than he could have been had he successfully pursued a re-trial.

211. Since Plaintiff has only a year or two left to live due to a terminal medical condition that was exacerbated while in custody of the State of New York, this was a meaningful saving of time.

212. At the time of his re-sentencing, the Court did not require any allocution and accordingly Plaintiff did not admit any wrong doing. In short, the re-sentencing court recognized the practicalities at work and aided in Plaintiff's swift release from the custody of the State of New York.

213. Plaintiff's arrest, conviction and incarceration were (a) the direct result of Farthing's aforesaid false statements, which formed the basis of Quinn's felony complaint, and (b) part of a greater and continuing fraudulent scheme of the Trustees, Guggenheim and Slade that pre-existed Plaintiff's first contact with the Academy that was designed to prevent public discovery and subsequent criminal and civil prosecution of the Trustees and others for tax fraud, bank fraud, mail fraud, breach of fiduciary duties and other misconduct.

**The Pattern of Fraud of the Trustees, Guggenheim and Slade Continues In Respect of the Restricted Endowment Account**

214. As a result of the notoriety generated by the Pivar/Dietle website and Plaintiff's arrest, the Charity Bureau of the New York Attorney General's Office made an inquiry as to the status of the Academy's restricted endowment account in 2004.

215. The Academy responded via a letter and its enclosures dated December 15, 2004, signed by Douglas E. Grover, Esq., formerly of Grover & Block and now of the Thompson Hine law firm.

216. A copy of that response is annexed hereto as Exhibit O

217. Recognizing that for the most part all of the restricted funds had gone missing, the Academy responded by telling the Attorney General that the funds reported for many on its tax returns as restricted had in fact never been restricted.

218. The Academy's response signed by Wayne A. Linker, Executive Director and Trustee, states in pertinent part:

> In late 1997, Academy staff and trustees initiated a small fundraising campaign, the goal of which was to raise $5 Million for an endowment. Two phases of the campaign were envisioned:  first securing $2 million in gifts and pledges from members of the board of trustees of the Academy; and second, "going public" to raise the balance of funds from other sources. It appears that the Academy never implemented phase 2 of the fundraising effort.

219. That statement is demonstrably false and it frankly is difficult to understand how the Attorney General could accept it at face value.

220. First and foremost, if the Academy never reached Phase 2, why did it employ Sandra April ("April"), Farthing's one time girlfriend, at an annual salary of some $125,000 to serve as "Director of Development?"

221. Second, the Forms 990 for years 1997 to 2004 show tax deductible donations to the Academy's endowment of $8,425,000 of which an aggregate of at least $2,600,000 were of $5,000 or less. The contributions of under $5,000 represented the donations of hundreds and possibly thousands of individual donors who relied on the veracity of the Academy's 990's. Those 990's are the only publicly available information for donors to verify that their donations are actually applied in accordance with their wishes, namely to permanently endow the **charitable** activities of the Academy.

222. The simple facts are that (a) the Trustees launched "phase 2"of the fundraising campaign; (b) grossly mismanaged the Academy by, among other things,

invading its restricted endowment funds to pay for operating costs (including substantial bonuses paid to Farthing and April); (c) failed to report to the Academy's financial supporters that the Trustees had squandered their restricted contributions; and (d) then lied to the Attorney General of the State of New York so that they could maintain their control over a RICO enterprise, to wit the Academy.

## AS AND FOR A FIRST CLAIM
### (Against All Defendants Other Than the Academy for Money Damages Pursuant to 42 U.S.C. 1983)

223.  Plaintiff repeats and reavers the averments of paragraphs 1 through 222 as if fully set forth herein.

224.  By reason of the foregoing, Quinn, Rogers and the ADA actively violated Plaintiff's rights under the Constitution of the United States while acting under color of state law.

225.  Plaintiff was damaged by such conduct in a sum not less than $5 Million.

226.  The Trustees actively conspired with and induced Quinn, Rogers and the ADA to violate Plaintiff's Constitutional rights and by reason of that conspiracy and concert of action are jointly and severally liable to Plaintiff for his damages as persons acting under color of state law.

## AS AND FOR A SECOND CLAIM
### (Against Quinn and Rogers for Money Damages for Battery)

227.  Plaintiff repeats and reavers the averments of paragraphs 1 through 226 as if fully set forth herein.

228.  The force used by Quinn and Rogers at the time of Plaintiff's unlawful arrest was so excessive and so unreasonable as to constitute battery.

229. By reason of this battery Plaintiff was damaged in a sum not less than $5 Million.

## AS AND FOR A THIRD CLAIM
### (Against All Defendants Other Than the Academy for False Imprisonment)

230. Plaintiff repeats and reavers the averments of paragraphs 1 through 229 as if fully set forth herein.

231. By reason of the foregoing, as a result of Defendants' culpable conduct Plaintiff was falsely imprisoned for a period of approximately 2.5 years.

232. During that term of that imprisonment Plaintiff was denied appropriate medical care for his heart condition and his leukemia and was otherwise mistreated.

233. As a consequence, his life expectancy has been shortened by a term of approximately 6 years.

234. Plaintiff has lost past earnings and future earnings; endured past pain and suffering; and will endure future pain and suffering.

235. Plaintiff was thus damaged by his false imprisonment in a sum not less than $5 Million.

## AS AND FOR A FOURTH CLAIM
### (Breach of Contract Against the Academy)

236. Plaintiff repeats and reavers the averments of paragraphs 1 through 235 as if fully set forth herein.

237. Lerner and Farthing had authority to – and did – accept Plaintiff's resignation on the day of the Brooklyn Diner meeting in March 2004.

238. Upon acceptance of that resignation, under the terms of the 2003 Controller Agreement the Academy immediately owed First Manhattan the sum of $190,208.39.

239. On behalf of First Manhattan, Plaintiff agreed that the Academy could set-off against the aforesaid amount the final aggregate amount of his indebtedness to it in respect of his loan to officer account once the Academy received the final MBNA bill for the credit card account in the names of Plaintiff and the Academy.

240. Upon information and belief, that sum is approximately $25,000.

241. Prior to the commencement of this action, First Manhattan assigned to Plaintiff its contractual right to recover from the Academy monies owed it under the 2003 Controller Agreement.

242. Accordingly, the Academy is indebted to Plaintiff in the sum of $190,208.39 less the Academy's proof at trial of the amount of Plaintiff's final loan to officer account.

## AS AND FOR A FIFTH CLAIM
### (Against the Trustees for
### Civil Remedies Pursuant to 18 U.S.C. § 1964)

243. Plaintiff repeats and reavers the averments of paragraphs 1 through 241 as if fully set forth herein.

244. At all relevant times, the Academy has been an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

245. During their respective terms of service each of the Trustees in conspiracy, concert and participation with each of the other then Trustees indirectly derived income from the aforesaid pattern of racketeering activities including (a) mail

38

fraud, (b) wire fraud, (c) tax fraud, (d) bank fraud and (e) tampering with a witness in violation of 18 U.S.C. §1962 (a).

246. During their respective terms of service each of the Trustees in conspiracy, concert and participation with each of the other then Trustees controlled the Academy through the aforesaid pattern of racketeering activities including (a) mail fraud, (b) wire fraud, (c) tax fraud, (d) bank fraud and (e) tampering with a witness in violation of 18 U.S.C. §1962 (b).

247. During their respective terms of service each of the Trustees in conspiracy, concert and participation with each of the other then trustees participated directly in the conduct of the Academy's affairs through the aforesaid pattern of racketeering activities including (a) mail fraud, (b) wire fraud, (c) tax fraud, (d) bank fraud and (e) tampering with a witness in violation of 18 U.S.C. §1962 (c).

248. By reason of the foregoing, each of the Trustees violated 18 U.S.C. §1962 (d).

249. Plaintiff was one of many persons who was injured in his business and property by the Trustees' violations of 18 U.S.C. § 1962.

250. Plaintiff's actual damages from these violations exceed $5 Million.

WHEREFORE Plaintiff demands judgment as follows:

On his First Claim in his favor and against all Defendants other than the Academy in a sum not less than $5 Million;

On his Second Claim in his favor and against Quinn and Rogers for not less than $5 Million;

On his Third Claim in his favor and against all Defendants other than the Academy in a sum not less than $5 Million;

On his Fourth Claim in his favor and against the Academy in the sum of $190,208.39, together with prejudgment interest thereon at the rate of 9% per annum less the proof at trial, if any, of the amount of Plaintiff's final loan to officer account;

On his Fifth Claim in the sum of not less than $5 Million actual damages; not less than $15 Million trebled damages; and a reasonable attorney's fee pursuant to 18 U.S.C. § 1964(c); and

Such other, further or different relief as to the Court may seem just and proper.

Dated:  New York, New York
        April 12, 2007

BAINTON McCARTHY LLC

By: _____
    J. Joseph Bainton (JB-5934)
Attorneys for Plaintiff
26 Broadway
New York, NY 10004-1840
Telephone: (212) 480-3500
Facsimile: (212) 480-9557

41