LEXSEE 2000 U.S. DIST. LEXIS 12202

**CARLOS BAILEY PARKS, Plaintiff, -against- NEW YORK CITY POLICE DE-PARTMENT, POLICE OFFICER NARI, [1] POLICE OFFICER JOHN DOE, and DISTRICT ATTORNEY OF KINGS COUNTY CHARLES J. HAYNES [2], Defendants.**

1  The correct spelling of the police officer's name is James Neri.

2  The correct spelling of the district attorney's last name is Hynes.

**00-CV-2564 (JG)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 12202*

**August 24, 2000, Decided**

**NOTICE:**    [*1]  FOR ELECTRONIC PUBLICA-TION ONLY

**DISPOSITION:**    Motion to dismiss the complaint on two grounds granted in part and denied in part.

**COUNSEL:** CARLOS BAILEY PARKS, Plaintiff, Pro Se, Rome, NY.

Muriel Goode-Trufant, Assistant Corporation Counsel, MICHAEL D. HESS, Corporation Counsel of the City of New York, New York, NY, for Defendants.

**JUDGES:** JOHN GLEESON, United States District Judge.

**OPINION BY:** JOHN GLEESON

**OPINION**

MEMORANDUM AND ORDER

JOHN GLEESON, United States District Judge:

This civil rights action alleges numerous causes of action arising from plaintiff's arrest and prosecution. The defendant has moved under *Federal Rule of Civil Proce-dure 12(b)(6)* to dismiss the complaint on two grounds. For the reasons discussed below, the motion is granted in part and denied in part.

BACKGROUND

The following narrative is drawn from the com-plaint, the pro se plaintiff's papers in opposition to the motion to dismiss, and the minutes of his guilty plea in state court.

At 1:30 a.m. on December 8, 1999, plaintiff Carlos A. Bailey Parks was driving from Bay Ridge to Bedford-Stuyvesant in a white Jeep Expedition. (Complaint, § IV.) A marked New York City police followed Parks for four blocks. (Id. [*2] ) Parks, who is African-American, alleges that the initial decision to follow him was based on his race, pursuant to a "vague street sweep[]" known as Operation Condor. (Id.) During this time, Parks com-mitted no traffic infractions. (Id.) However, Parks subse-quently came to "fear for his life" because of the officers' "stalking," so he ran a red light in an attempt to escape. (Id.)

Although the record includes no details, Parks was apparently pulled over by the police and a gun was found in his possession.

Parks was subsequently charged with a weapons of-fense. He contends that the District Attorney inappropri-ately used prior convictions to increase Parks's exposure to prison time. (Memorandum of Law in Opposition to Motion to Dismiss.) He therefore "had" to accept a plea offer of five years to life. (Id.)

Parks pleaded guilty on May 18, 2000, in the Su-preme Court, Kings County, to attempted possession of a weapon in the third degree.

In this civil rights action, Parks's complaint alleges -- or can be fairly read to allege -- the following causes of action: illegal search and seizure in violation of the *Fourth Amendment*, false arrest in violation of the *Fourth* [*3] *Amendment*, selective enforcement based on race in violation of the *Equal Protection Clause of the Fourteenth Amendment*, malicious prosecution, and due process violations related to his prosecution. He seeks money damages and vacatur of his conviction.

The defendants have moved to dismiss on two bases: (i) that District Attorney Charles Hynes is absolutely immune from suit; and (ii) that the action is barred in its entirety by the favorable termination requirement of *Heck v. Humphrey, 512 U.S. 477, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994)*.

DISCUSSION

A. Prosecutorial Immunity

Hynes is absolutely immune to a suit such as this one. See *Imbler v. Pachtman, 424 U.S. 409, 47 L. Ed. 2d 128, 96 S. Ct. 984, 995 (1976)*. All claims against him are accordingly dismissed.

B. Favorable Termination Requirement

In *Heck v. Humphrey, 512 U.S. 477, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994)*, the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must [*4] prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id. at 486-87* (internal footnote omitted). When assessing such claims, I am required to "consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id. at 487*. Absent a showing of favorable termination, the claim may proceed only if, assuming it is proved, it "will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff." Id.

Applying these principles, Parks's malicious prosecution and due process claims regarding the fairness of the state plea and sentencing proceedings must be dismissed. See *Heck, 512 U.S. at 486*. Likewise, his false arrest claim fails because probable cause is a "complete [*5] defense" to it, and an (unreversed) conviction is "conclusive evidence" of probable cause. *Weyant v. Okst,*

*101 F.3d 845, 852 (2d Cir. 1996)*; see also *Sealey v. Fishkin, 1998 U.S. Dist. LEXIS 20142*, No. 96 CV 6303(RR), 1998 WL 1021470, at *4 (E.D.N.Y. Dec. 2, 1998)* ("A plaintiff suing for false arrest must show that the police lacked probable cause to arrest him for any unlawful conduct. By pleading guilty . . . , plaintiff necessarily acknowledged that he was engaged in some unlawful activity for which the police could properly take him into custody. Thus, as long as that conviction stands, plaintiff cannot pursue a *§ 1983* claim for false arrest."). Finally, Parks's equal protection claim fails because the Constitution forbids convictions that are the result of racially motivated enforcement decisions, see *Whren v. United States, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996)*; *United States v. Armstrong, 517 U.S. 456, 464-65, 134 L. Ed 687, 116 S. Ct. 1480 (1996)*, so a finding in Parks's favor would necessarily undermine the validity of his conviction.

The same result does not attend the *Fourth Amendment* cause of action. The [*6] presence of an (unreversed) state court conviction does not automatically bar a *§ 1983* cause of action for an illegal search because, in some circumstances, "such a *§ 1983* action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful." *Heck, 512 U.S. at 487 n.7*. This case provides one of those circumstances. Since Parks's conviction and sentence rested on his guilty plea -- and not on the admission of any seized evidence -- a finding that his *Fourth Amendment* rights were violated would not call into question the validity of his confinement. See id.; *Haring v. Prosise, 462 U.S. 306, 323, 76 L. Ed. 2d 595, 103 S. Ct. 2368 (1983)* ("We conclude that respondent's conviction in state court does not preclude him from now seeking to recover damages under *42 U.S.C. § 1983* for an alleged *Fourth Amendment* violation that was never considered in the state proceedings."); *Copus v. Edgerton, 96 F.3d 1038, 1039 (7th Cir. 1996)* (per curiam). In the absence of any other argument by defendants against this claim, the motion to dismiss it is denied.

Finally, Parks's request for an order [*7] vacating his judgment of conviction and directing his immediate release may not be raised in an action brought pursuant to *§ 1983*. *Heck, 512 U.S. at 481* (citing *Preiser v. Rodriguez, 411 U.S. 475, 488-90, 36 L. Ed. 2d 439, 93 S. Ct. 1827 (1973)*, for the proposition that habeas corpus provides the only vehicle for such relief). That portion of his complaint is dismissed.

CONCLUSION

All claims against Hynes are dismissed. The false arrest, malicious prosecution, due process, and equal protection claims are dismissed without prejudice to refiling upon Parks's demonstration of favorable termina-

tion of the criminal judgment against him. That much of the complaint that seeks an order vacating the judgment of conviction is dismissed. The illegal search and seizure claim (against the three defendants other than Hynes) remains.

So Ordered.

John Gleeson, U.S.D.J.

Dated: August 24, 2000

Brooklyn, New York

LEXSEE 2005 U.S. DIST. LEXIS 26173

**WILLIAM REYNOLDS and DOREEN REYNOLDS, Plaintiffs, -against- THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY POLICE OFFICERS WASHINGTON AVILA and DANIEL CONTI, and NEW YORK CITY POLICE OFFICERS "JOHN and JANE DOE", Defendants.**

**04 Civ. 6540 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 26173*

**October 31, 2005, Decided**
**October 31, 2005, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted as to all counts.

**COUNSEL:** For Doreen Reynolds, William Reynolds, Plaintiffs: Daniel Cherner, Law Offices of Dan Cherner, New York, NY.

For Police Officer Daniel Conti, Police Officer Washington Avila, The City of New York, Defendants: Liora Jacobi, NYC Law Dept. Off. of the Corporation Counsel (Bklyn), Brooklyn, NY.

**JUDGES:** Sidney H. Stein, U.S.D.J.

**OPINION BY:** Sidney H. Stein

**OPINION**

*OPINION & ORDER*

SIDNEY H. STEIN, U.S. District Judge.

The relationship between tenant and landlord is a central factor of life for most residents of New York City. This litigation arises out of a particularly discordant landlord-tenant relationship and involves an alleged post-breakfast assault by two tenants against their landlord by means of porridge, pot and knife; the ensuing involvement of our local constabulary; and the commencement and subsequent dismissal of criminal charges against the tenants, leading in turn to this litigation and terminating with this Opinion.

Specifically, this action pursuant to *42 U.S.C. § 1983* stems from the 2001 arrest of plaintiffs Doreen and

William Reynolds on charges of assault, criminal possession of a weapon and harassment. After the criminal prosecution against the Reynolds was dismissed in December 2001, they brought this action alleging false arrest, malicious prosecution and failure to intervene against the arresting officers--Police Officers Washington Avila and Daniel Conti--and the [*2] City of New York. [1] Defendants have now moved for summary judgment on all counts pursuant to *Rule 56 of the Federal Rules of Civil Procedure.* Because the police officers had probable cause to arrest the plaintiffs and did nothing to coerce prosecution of them, defendants' motion is granted.

> 1 Although plaintiffs also named the New York City Police Department ("N.Y.P.D.") as a defendant, not only was it never served with the summons and complaint, but the N.Y.P.D. is not a suable entity. *See Jackson v. City of New York, 2005 U.S. Dist. LEXIS 12986 (S.D.N.Y. June 28, 2005).*

*I. BACKGROUND*

Doreen and William Reynolds rented a second floor apartment from Clair Dennison at 4424 Furman Avenue in the Bronx, where they lived with their two children. (Defendants' Local Civil *Rule 56.1* Statement of Undisputed Facts ("Defs.' 56.1") at P8; Decl. of Liora Jacobi dated Sept. 16, 2005 ("Jacobi Decl."), Ex. I at 40, 58; Ex. J at 42-43; Plaintiffs' Local Civil [*3] *Rule 56.1* Statement of Undisputed Facts ("Pls.' 56.1") at P8; Compl. at PP12-13.)

At 11:00 a.m. on August 13, 2001, Dennison called 911 and reported that she had been hit on the head "with [a] pot" and "burned with hot porridge" and that she was "bleeding from [her] neck." (Defs.' 56.1 at P4; Jacobi Decl., Ex. E.) Defendant Police Officers Avila and Conti responded to the 911 call and Officer Jason DiMurro joined them 20 minutes later. (Defs.' 56.1 at PP5, 6; Jacobi Decl., Ex. F at 39-40, Ex. G at 68, Ex. B, Ex. D at 3.)

When Officers Avila and Conti arrived at the Furman Avenue residence, Dennison informed them that Ms. Reynolds "threw hot porridge" on her and "hit her with the empty pot." (Defs.' 56.1 at P9; Jacobi Decl., Ex. A at P50, Ex. K, Ex. I at 197; Pls.' 56.1 at 9; Dep. of William Reynolds dated August 22, 2005 ("W. Reynolds Dep.") at 147-167, Ex. C to Decl. of Dan Cherner dated Aug. 22, 2005 ("Cherner Decl.").) Dennison also asserted that Mr. Reynolds had stabbed her arm with a knife. (Id.) Officer DiMurro observed that Dennison had a cut, had "oatmeal or something that looked like that on her head, her clothing" and had "blood stains on her as well." (Dep. of [*4] Jason DiMurro dated Apr. 29, 2005 ("DiMurro Dep.") at 41-42, Ex. G to Cherner Decl.; Defs.' 56.1 at P14; Pls.' 56.1 at P14.)

Mr. Reynolds, Ms. Reynolds and Dennison were all placed under arrest and taken to the hospital. (Defs.' 56.1 at PP19-20; Jacobi Decl., Ex. H at 48, 51-52, 74-78, Ex. D at 3; Pls.' 56.1 at PP17-20; W. Reynolds Dep. at 144-167; Cherner Decl., Ex. C.) The treatment report prepared at the hospital for Dennison records that she had sustained "superficial lacerations" on her arm, toes and finger, "first degree burns" on her right thigh and her neck and that she had a "contusion" on her right shoulder and "contusion (bite)" marks to an arm and leg. (Medical Treatment of Prisoner Form at Ex. J to Cherner Decl.; Defs.' 56.1 at P18; Jacobi Decl., Ex. M; Pls.' 56.1 at P18.)

Mr. and Ms. Reynolds were both arraigned the next day on charges of assault in the third degree, criminal possession of a weapon and harassment in the second degree. (Defs.' 56.1 at P22; Jacobi Decl., Ex. N; Pls.' 56.1 at P22.) The charges against the two were subsequently dismissed and the records sealed. (Defs.' 56.1 at P23; Jacobi Decl., Ex. O.)

## II. DISCUSSION

### A. The Summary Judgment [*5] Standard

Summary judgment is appropriate if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995);

LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); see LaFond, 50 F.3d at 171. However, the nonmoving party "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" in support of its factual assertions. Patterson, 375 F.3d at 219 (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)); see also Akinde v. Bronx-Lebanon Hospital Ctr., 2005 U.S. Dist. LEXIS 17762 [*6] *11-12 (S.D.N.Y. August 23, 2005).

### B. False Arrest

A claim for false arrest asserted pursuant to 42 U.S.C. § 1983 has four elements: (1) that the defendants intended to confine the plaintiff; (2) that the plaintiff was conscious of his confinement; (3) that the plaintiff did not consent to that confinement; and (4) that the confinement was not otherwise privileged. See Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2004), Golub v. City of New York, 334 F. Supp. 2d 399, 403-04 (S.D.N.Y. 2004). Because police officers are empowered to effect an arrest based on probable cause, "the existence of probable cause to arrest . . . is a complete defense to an action for false arrest." Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001), Golub, 334 F. Supp. at 404. However, when an arrest is made without a warrant, the government bears the burden to demonstrate the existence of probable cause. See Wu v. City of New York, 934 F. Supp. 581, 586 (S.D.N.Y. 1996).

Probable cause to arrest is present when "the law enforcement official, on the basis of the totality of the [*7] circumstances, has sufficient knowledge or reasonable trustworthy information to justify a person of reasonable caution in believing that an offense has been committed by the persons to be arrested." See United States v. Gagnon, 373 F.3d 230, 234 (2d Cir. 2004) (internal quotation omitted). Because the determination as to the existence of probable cause is an objective one, the subjective intent of the arresting officer is not relevant. See Arkansas v. Sullivan, 532 U.S. 769, 771-72, 121 S. Ct. 1876, 149 L. Ed. 2d 994 (2001). When law enforcement officers receive information from someone who claims to be the victim of a crime, probable cause exists unless circumstances raise doubt as to the putative victim's veracity. See Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995).

In this case, Officers Avila and Conti had probable cause to arrest the Reynolds. At the time of the arrest, the officers possessed the following information: First, they knew that they were responding to an emergency 911

call in which a victim alleged that she had been hit on the head with a pot, burned with porridge and was bleeding. Second, when [*8] the officers arrived at the scene, Ms. Dennison repeated this story, claiming that Ms. Reynolds had hit her on the head with a pot and burned her with oatmeal and that Mr. Reynolds had stabbed her arm with a kitchen knife. Finally, the officers observed that Dennison had injuries thoroughly consistent with this report. Specifically, the officers observed that Dennison had a cut on her hand, oatmeal on her head and what appeared to be blood stains on her shirt. Moreover, the officers found the Reynolds alone in the kitchen with Dennison. Considered together, this evidence is sufficient to "justify a person of reasonable caution in believing that" the Reynolds had assaulted Dennison in the manner she claimed. *Gagnon, 373 F.3d at 234.*

Plaintiffs claim that probable cause did not exist because the police officers should have known that Dennison was lying and that she had put the oatmeal on herself. However, a police officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997)* (citing *Baker v. McCollan, 443 U.S. 137, 145-146, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)).* [*9] Plaintiffs also allege that the police officers should have known, based on prior visits by the N.Y.P.D. to the address, that Dennison had a propensity to lie. However, given the fact that Dennison appeared to have injuries consistent with having been assaulted by the Reynolds, "a person of reasonable caution" would be justified in believing that the couple had in fact assaulted her, regardless of what may or may not have occurred in previous incidents. *Gagnon, 373 F.3d at 234.*

Because Officers Avila and Conti had probable cause to arrest the Reynolds, plaintiffs do not have a claim for false arrest.

### C. Malicious Prosecution

To sustain their *Section 1983* claim for malicious prosecution, the Reynolds must proffer evidence to show "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding;" and (4) actual malice. *See Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003).* The inquiry into the existence of probable cause for prosecution is distinct from that into whether probable cause exists for arrest. [*10] *See Posr v. Court Officer No. 207, 180 F.3d 409, 417 (2d Cir. 1997).* However, as the Second Circuit has clarified, in order for probable cause that existed at the time of arrest to "dissipate" prior to commencement of prosecution, "the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact." *See Kinzer, 316 F.3d at 144* (quoting *Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996)).*

Defendants are entitled to summary judgment as to the Reynolds' malicious prosecution claim because plaintiffs have not offered any evidence of involvement by either Conti or Avila in their criminal prosecution after the initial arrest and charge. *See Golub v. City of New York, 334 F. Supp. 2d 399, 407 (S.D.N.Y. 2004)* (police officers were entitled to summary judgment on a malicious prosecution claim where there was no evidence of any involvement in the prosecution by the police officers after the original arrest and charge); *see also Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999)* ("it is well settled" that in the absence of evidence that [*11] the police officers misled the prosecuting officer, "the chain of causation" between an arrest and a subsequent conviction and incarceration "is broken by the intervening exercise of independent judgment"). Nor have the Reynolds adduced any evidence that facts had come into Conti or Avila's knowledge that would cause them to believe that the charges against the Reynolds were "groundless." On the contrary, when Dennison was brought to the hospital after the altercation, the hospital records listed injuries consistent with Dennison's account of assault by the Reynolds. Finally, the Reynolds have failed to set forth any evidence whatsoever of actual malice. Accordingly, because probable cause existed at the time of the Reynolds' arrest, and no new facts emerged to dissipate that probable cause prior to commencement of their criminal proceeding, the Reynolds do not have a claim for malicious prosecution. *See Lowth, 82 F.3d at 572.*

### D. Failure to Intervene

The complaint alleges that each police officer breached his respective duty to prevent the other from falsely arresting plaintiffs. Police officers have "an affirmative duty to intervene to protect the constitutional [*12] rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).* "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that a citizen has been unjustifiably arrested." *Id.* (citing *Gagnon v. Ball, 696 F.2d 17, 21 (2d Cir. 1982)).* However, law enforcement officers' affirmative duty to intervene exists only where a person's constitutional rights have been violated. *See id; see also Stefanopoulos v. City of New York, 2005 U.S. Dist. LEXIS 22445 *13 (S.D.N.Y. 2005).* Because Avila and Conti had probable cause to arrest the Reynolds, the Reynolds did not suffer a constitutional violation by that arrest. Therefore, Officers Avila and

2005 U.S. Dist. LEXIS 26173, *

Conti had no duty to prevent each other from making the arrest and the Reynolds do not have a claim for failure to intervene.

### E. Municipal Liability

A municipality may be held liable for constitutional deprivations that arise from an official city policy, practice or custom. *See DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998);* [*13] *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).* Here, as the Reynolds have not adduced facts sufficient to show that they suffered deprivations of their constitutional rights, the City of New York must be dismissed as a defendant.

### III. CONCLUSION

Because probable cause existed for plaintiffs' arrest and prosecution, defendants' motion for summary judgment is granted as to all counts. The Clerk of Court is directed to enter judgment dismissing the complaint.

Dated: New York, New York

October 31, 2005

SO ORDERED:

Sidney H. Stein, U.S.D.J.

LEXSEE 2001 U.S. DIST. LEXIS 609

**WINSTON CAMPBELL, Plaintiff, - against - RUDOLPH GIULIANI, in his official capacity as Mayor of the City of New York; HOWARD SAFIR, in his official capacity as Commissioner of the New York City Police Department; CHARLES J. HYNES, in his official capacity as the District Attorney for County of Kings in the City of New York; Police Officer/Detective GONZALES of the 70th Precinct of the New York City Police Department; New York City Police Officers "JOHN DOE 1" thru Police Officers "JOHN DOE 10"; and MILTON S. ALTMAN., Defendants.**

**99-CV-2603 (JG)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 609*

**January 24, 2001, Decided**

**NOTICE:**    [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:**    Defendants' motion for summary judgment granted.

**COUNSEL:** For Plaintiff: EDWARD A. ROBERTS, ESQ., Brooklyn, New York.

For Defendants: Stacy Laine Matthews, Assistant Corporation Counsel, MICHAEL D. HESS, Corporation Counsel of the City of New York, New York, New York.

**JUDGES:** JOHN GLEESON, United States District Judge.

**OPINION BY:** JOHN GLEESON

**OPINION**

*MEMORANDUM AND ORDER*

JOHN GLEESON, United States District Judge:

Plaintiff initiated this action against several New York City police officers and other city officials pursuant to *42 U.S.C. § 1983*, seeking compensatory and punitive damages for alleged deprivations of his federal constitutional rights arising out of his arrest for grand larceny on August 7, 1997. Plaintiff also seeks damages for alleged violations of New York law, as well as declaratory relief and attorney's fees. The defendants now move for summary judgment pursuant to *Fed. R. Civ. P. 56(c)*. For the reasons stated below, the motion is granted.

BACKGROUND

A. *The Facts*

The following facts are not in dispute.

In early 1997, plaintiff Winston Campbell, owner of Campbell Home Care Agency, Inc., began providing [*2] home care services to defendant Milton S. Altman, an 83-year-old man who is homebound. Deposition of Winston Campbell ("Campbell Dep.") at 102. Pursuant to their agreement, Campbell assigned one of his employees, Judith Bassant-Close ("Close"), to serve as Altman's caretaker.

On June 19, 1997, a complaint report was filed with Officer Richard Gonzalez at the 70th Precinct. The written report of the complaint listed Altman as the victim and Campbell as the perpetrator. *See* Declaration of Stacy Laine Matthews dated October 27, 2000 ("Matthews Dec."), Ex. B. The information was imparted to the police by Close. *See* Deposition of Richard Gonzalez ("Gonzalez Dep.") at 26. Close told the police that Altman had noticed a check missing from his checkbook on May 23, 1997; that Altman had received an account statement on June 5 or 6, 1997, showing that the missing check had been written out in the amount of $ 5,376 and deposited into Campbell's corporate account; that Altman, who was of sound mind, had stated that the check was forged; and that Altman had stated that Campbell was in Altman's home on May 6, 1997, the day before the check was deposited in Campbell's business account. [*3] *See* Matthews Dec., Ex. B.

2001 U.S. Dist. LEXIS 609, *

On June 22, 1997, Gonzalez interviewed Altman by telephone. Altman confirmed that the check in question had been stolen from him and forged, and that his bank statement had revealed that the check had been written to the "Campbell Agency" and deposited into Campbell's business account. *See* Matthews Dec., Ex. D.; Gonzalez Dep. 8-9, 27-28.

On June 29, 1997, Close delivered to Gonzalez, at the 70th Precinct, a copy of the forged check. Gonzalez's report of the event indicated that Close had delivered the check, rather than Altman, because he was homebound. *See* Matthews Dec., Ex. E.

On July 18, 1997, Gonzalez and another officer went to Campbell's place of business, left a business card, and requested that Campbell contact him. *See* Matthews Dec., Ex. F., at 1. Campbell called Gonzalez on August 1, 1997, and stated that he would come to the precinct approximately one week later. *See id.* at 2. On August 7, 1997, Campbell arrived at the 70th Precinct and was placed under arrest for grand larceny in the third degree and forgery in the second degree. *See id.* at 3; *see also* Matthew Dec., Ex. G.

The criminal case against Campbell was dismissed [*4] on March 17, 1998. Declaration of Edward A. Roberts dated November 15, 2000, Ex. F. Neither the certificate of disposition nor the record of this case sets forth the grounds for the dismissal.

## B. *The Procedural History*

On May 6, 1999, Campbell filed the complaint in this case. He alleged claims against Gonzalez, as well as other unnamed officers, Mayor Rudolph Giuliani, Police Commissioner Howard Safir, and Kings County District Attorney Charles J. Hynes, asserting claims of false arrest and malicious prosecution, in violation of *42 U.S.C. §§ 1981, 1983*, and *1988*, and of corresponding New York laws. On February 16, 2000, I granted in part and denied in part defendants' motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6). Campbell v. Giuliani, 2000 U.S. Dist. LEXIS 1617, 2000 WL 194815 (E.D.N.Y. 2000)*. Specifically, I dismissed the claims against the Mayor and the Police Commissioner to the extent they were sued in their official capacities and the claims against the District Attorney in their entirety. *Id.* at *2. I denied the motion to dismiss the *§ 1983* claim based on false arrest, and granted the motion with respect to Campbell's malicious prosecution [*5] claim with leave to replead in a complaint alleging that the criminal charge resulted in a favorable termination for plaintiff, as that element has been construed by the Second Circuit. *Id.* at *3-*4. Campbell filed such an amended complaint on May 18, 2000.

The remaining *§ 1983* claims, which are addressed on this motion for summary judgment, are the false arrest and malicious prosecution claims against Officer Gonzalez. [1]

> 1  Counsel for Campbell confirmed at oral argument that he is no longer pursuing his individual-capacity claims against the Mayor and the Police Commissioner, and that he had similarly abandoned any claims against any other police officers.

## DISCUSSION

### A. *The Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R.* [*6] *Civ. P. 56(c)*. In determining whether material facts are in dispute, courts must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)*.

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *See Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994)*. "When the moving party has carried its burden under *Rule 56(c)*, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (quoting *Fed. R. Civ. P. 56(e)*). The non-moving party cannot survive a properly supported motion for summary judgment by resting on its pleadings "without offering 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968))*. [*7] Moreover, the moving party is not required to affirmatively disprove unsupported assertions made by the non-movant. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Conclusory allegations, conjecture, and speculation are "insufficient to create a genuine issue of fact." *Kerzer, 156 F.3d at 400* (citing *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.), cert. denied, 524 U.S. 911, 118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998))*.

### B. *The False Arrest Claims*

Campbell claims that Gonzalez subjected him to a false arrest, in violation of *42 U.S.C. § 1983.* Claims brought under *§ 1983* are guided by the tort law of the forum state. *See Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)* (false arrest); *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)* (malicious prosecution). Thus, a claim for false arrest, premised on the *Fourth Amendment* right to be free from unreasonable seizures, is "substantially the same" as a false arrest claim under New York law. *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).* To state a claim of false arrest, a plaintiff must [*8] establish that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. New York, 37 N.Y.2d 451, 456-57, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975).* [2]

> 2    The common law elements of false arrest and false imprisonment under New York law are the same. *See Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991)* (citing *Jacques v. Sears, Roebuck & Co., 30 N.Y.2d 466, 473, 334 N.Y.S.2d 632, 285 N.E.2d 871 (1972)).* Thus, I construe Campbell's claims for false arrest and false imprisonment as one claim.

I conclude that, as a matter of law, Gonzalez had probable cause to arrest Campbell. The existence of probable cause to arrest is a complete defense to an action for false arrest, whether that action is brought under state law or under *§ 1983. Weyant, 101 F.3d at 852.* "In general, probable cause to arrest exists when the officers have knowledge or reasonably [*9] trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* When an officer is advised of a crime by a person who claims to be the victim, and that person signs a complaint accusing another, the officer generally has probable cause to arrest. *Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995), cert. denied, 517 U.S. 1189, 134 L. Ed. 2d 779, 116 S. Ct. 1676 (1996).* Indeed, as sources of information go, crime victims are among the most reliable; they usually can provide a first-hand, nonhearsay account of the criminal activity. *See Miloslavsky v. AES Engineering Society, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)* ("The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed."), *aff'd, 993 F.2d 1534 (2d Cir.), cert. denied, 510 U.S. 817 (1993).* Probable cause requires only a probability, or a "substantial chance" of criminal activity, not an actual showing of criminal activity. *Illinois v. Gates, 462 U.S. 213, 244 n. 13, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983).* [*10]

If the determination of whether an arresting officer had probable cause requires the resolution of disputed facts, the existence of probable cause is to be decided by a jury. *Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997), cert. denied, 522 U.S. 1115, 140 L. Ed. 2d 114, 118 S. Ct. 1051 (1998).* Where there is no dispute as to the pertinent events and the knowledge of the arresting officer, probable cause may be determined as a matter of law. *Weyant, 101 F.3d at 852; see also Singer, 63 F.3d at 118-19.* Even where factual disputes exist, a *§ 1983* claim may fail if the plaintiff's version of events establishes probable cause to arrest. *Cf. Tierney v. Davidson, 133 F.3d 189, 194 (2d Cir. 1998)* (even where factual disputes exist, qualified immunity may properly be found as a matter of law if defendant is entitled to it even under plaintiff's version of the facts).

On June 19, 1997, Close informed Officer Gonzalez that Altman was homebound and could not file the complaint himself. Based on this information, Gonzalez called Altman, who confirmed the complaint, including the allegation that Campbell had been alone for several minutes in Altman's [*11] apartment on the day before the missing check was presented to the bank. Gonzalez obtained a copy of the forged check, which evidenced its deposit into plaintiff's business account. *See Matthews Dec., Ex. H.* Based on that information, Gonzalez arrested Campbell on August 7, 1997. These facts were sufficient to warrant a reasonable officer to believe that Campbell had stolen the check, forged Altman's signature on it and had the proceeds deposited into the account. [3]

> 3    These facts establish the elements of grand larceny in the third degree ("when [a person] steals property and when the value of the property exceeds three thousand dollars,") and forgery in the second degree ("when, with intent to defraud, deceive or injure another, [a person] falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or to represent if completed a . . . commercial instrument."). *See Penal Law §§ 155.35, 170.10; Matthews Dec., Ex. F.*

Campbell bases his claim [*12] that there was no probable cause for his arrest on several assertions: (1) that Gonzalez spoke only to Close, and had no contact with Altman, Plaintiff's Rule 56.1 Statement, P 4; (2) that Gonzalez misrepresented this fact in his police reports, *id.* at PP 5, 7; (3) and that plaintiff offered Gonzalez cassette tapes with recorded conversations between Close and another of plaintiff's employees that would have established the existence of a conspiracy to accuse plaintiff falsely and cause his arrest, *id.* at P 8.

The claim that Gonzalez had no contacts with Altman finds no support in the record. Indeed, it is flatly refuted by the very testimony plaintiff cites in support of it, and the claim was properly abandoned by plaintiff's counsel at oral argument. What remains of this assertion is counsel's complaint that Gonzalez failed to visit Altman in person. While one might reasonably expect the officer to visit the complainant in person in these circumstances, particularly since it would have been so easy to do, I cannot conclude that the failure to do so vitiates the probable cause to arrest Campbell.

Campbell's allegation of "perjury" by Gonzalez boils down to a complaint that [*13] Gonzalez failed to make clear, in the Complaint Report filled out on June 19, 1997, that the information was provided by Close, not Altman himself, an omission Gonzalez freely admitted at his deposition. *See* Gonzalez Dep. at 26 ("She should have been on the report as a reporter."). Especially since Gonzalez promptly confirmed the information conveyed by Close by speaking directly to Altman, the failure to mention Close in the initial report is wholly inconsequential.

Campbell's assertion that Gonzalez effected a false arrest because he refused to accept cassette tapes that would have revealed Campbell's innocence is frivolous. First, there is no admissible evidence in the record that any such tapes exist, or that any such conversations occurred. Second, there is no evidence that Campbell offered any evidence, let alone exculpatory tapes, to Gonzalez before the August 7, 1997, arrest. [4] Finally, even if Campbell had offered such evidence to Gonzalez, Gonzalez would have had no obligation to examine it. It is hardly uncommon for people suspected of crimes to deny their involvement. When they do, police officers who have probable cause to arrest are not required to adjudicate disputed [*14] issues of fact on the spot. Nor are they required to walk away; once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997).* A suspect's denial of his suspicious behavior is a factor the officer may consider in determining whether probable cause exists, but it does not require the officer to forego arrest if the facts otherwise establish probable cause. *Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988).* To hold otherwise would allow suspects to avoid arrest simply by denying guilt. *Id.* The function of law enforcement officers "is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989).* Accordingly, they have no duty to investigate an exculpatory statement of the accused, and their refusal to do so does not defeat probable cause. *Torchinsky v. Siwinski, 942 F.2d 257,* 264 (4th Cir. 1991); *Dukes v. City of New York, 879 F. Supp. 335, 343 (S.D.N.Y. 1995);* [*15] *Grant v. City of New York, 848 F. Supp. 1131, 1135 (S.D.N.Y. 1994); Steiner v. City of New York, 920 F. Supp. 333, 338 (E.D.N.Y. 1996).*

4 Campbell has also offered no evidence to support his claim that Officer Grace O'Donnell violated *§ 1983* by failing to relay phone messages to Gonzalez. Regardless of whether that allegation has any truth, failing to pass on messages does not rise to the level of constitutional violation necessary under *§ 1983*.

As I observed in addressing defendants' motion to dismiss, officers are not absolutely privileged to arrest upon a charge by any private individual who claims to be a victim. There is a caveat: victim complaints ordinarily establish probable cause absent circumstances that raise doubts as to the victim's veracity. *Singer, 63 F.3d at 119; Lee v. Sandberg, 136 F.3d 94, 102-03 (2d Cir. 1997); see generally* 2 Wayne A. La Fave, Search and Seizure § 3.4(a), at 204-14 (3d ed. 1996 & Supp.1998). Here, [*16] there were no such circumstances.

C. *The Malicious Prosecution Claims*

Under New York law, malicious prosecution claims have four elements: "(1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).* Thus, a plaintiff must demonstrate the absence of probable cause to prevail on claims of false arrest or false imprisonment or malicious prosecution. *Zanghi v. Village of Old Brookville, 752 F.2d 42, 45 (2d Cir. 1985)* ("It is abundantly clear that a finding of probable cause will defeat state tort claims for false arrest, false imprisonment and malicious prosecution."). Plaintiff's claim of malicious prosecution under *§ 1983* is therefore defeated by the presence of probable cause to arrest.

The malicious prosecution claim is also deficient because plaintiff has failed to establish that the prosecution terminated in his favor. As stated by the Second Circuit, "where the prosecution did not [*17] result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused." *Murphy, 118 F.3d at 948. See also Steiner, 920 F. Supp. at 340* (noting the complexities in this area of the law). Plaintiff has failed to make such a showing. [5]

5 Gonzalez is also protected from liability by the doctrine of qualified immunity. *See Salim v.*

*Proulx, 93 F.3d 86, 89 (2d Cir. 1996)* ("A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.") (citations omitted); *O'Neill v. Town of Babylon, 986 F.2d 646, 649-50 (2d Cir. 1993)* (applying a qualified immunity defense to a malicious prosecution claim); *Posr v. Court Officer Shield # 207, 180 F.3d 409, 416 (2d Cir. 1999)* (applying qualified immunity to false arrest). Having found as a matter of law that there was probable cause to arrest, I of course further find, in the alternative, that Gonzalez is qualifiedly immune.

[*18] D. *The Supplemental State Law Claims*

Under *28 U.S.C. § 1367(a)*, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Subsection (c)(3) provides that the district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction." Such supplemental jurisdiction is discretionary, and if the federal claims are dismissed before trial, the state claims generally should be dismissed as well. *See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)*. Here, there is no independent basis for retaining jurisdiction over the remaining state law claims of false arrest and malicious prosecution. Accordingly, the state law claims are dismissed.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

So Ordered.

[*19] JOHN GLEESON, U.S.D.J.

Dated: January 24, 2001

Brooklyn, New York

LEXSEE 2005 U.S. DIST. LEXIS 26956

**JEFFREY SILVER, Plaintiff, - against - CHRISTINE KUEHBECK, THOMAS RYAN, CARL BERNSTEIN, JOHN DOES 1 THROUGH 20, and JONATHAN ABADY, Defendants.**

**05 Civ. 35 (RPP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 26956**

**November 7, 2005, Decided
November 7, 2005, Filed**

**SUBSEQUENT HISTORY:** Affirmed by, Sanctions disallowed by Silver v. Kuehbeck, 2007 U.S. App. LEXIS 3087 (2d Cir., Feb. 8, 2007)

**DISPOSITION:** [*1] Kuehbeck and Bernstein's motion to dismiss Silver's claims for relief granted as to the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Thirteenth Claims for Relief; Abady's motion to dismiss granted as to the Fourteenth Claim for Relief; and Detective Ryan's motion to dismiss granted as to the Eleventh and Twelfth Claims for Relief.

**COUNSEL:** For Plaintiff Silver: Heller Horowitz & Feit, P.C., New York, New York, Attn: Maurice W. Heller, May Orenstein.

For Defendants Kuehbeck, Bernstein, and Abady: Emery Celli Brinckerhoff & Abady LLP, New York, New York, Attn: Andrew G. Celli, Jr., O. Andrew F. Wilson.

For Defendant Ryan: Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, Attn: Seth D. Eichenholtz, Assistant Corporation Counsel.

**JUDGES:** Robert P. Patterson, Jr., U.S.D.J.

**OPINION BY:** Robert P. Patterson, Jr.

**OPINION**

**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Jeffrey Silver ("Silver") brings this civil action against Christine Kuehbeck ("Kuehbeck"), Carl Bernstein ("Bernstein"), Detective Thomas Ryan ("Detective Ryan"), John Does 1 through 20, and Jonathan Abady ("Abady"). The Verified First Amended and [*2] Supplemental Complaint (the "Complaint") asserts fourteen claims against the Defendants arising out of an alleged campaign orchestrated by Bernstein to stalk, harass, defame, and interfere with Silver's business relationships and private communications. [1] Kuehbeck, Bernstein, Abady, and Detective Ryan have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the claims against them for failure to state a cause of action. For the reasons set forth below, the motions to dismiss are granted as to each and every claim asserted in the Complaint.

    1   Except for the Twelfth claim for relief for violation of 42 U.S.C. § 1983, the Complaint is founded on diversity, alleging that Silver is a citizen of Nevada and that the Defendants are citizens of New York. 28 U.S.C. § 1332(a)(1). The Court will apply New York law. See Erie R.R. v. Tompkins, 304 U.S. 65, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).

**BACKGROUND**

[*3] The Complaint alleges the following facts, which the Court must accept as true for the purpose of deciding these motions. Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

Silver and Kuehbeck began to date in 1993, and thereafter they were close friends and some-time lovers. (Complaint "Compl." PP21-22.) Silver and Kuehbeck were also engaged in a business relationship in which

2005 U.S. Dist. LEXIS 26956, *

Silver provided investment advice to Kuehbeck and served as a paid consultant to the law firm that acted as plaintiffs' counsel in a securities fraud class action lawsuit conceived of and organized by Silver in which Kuehbeck was the lead plaintiff. (Id. P22.)

Silver's relationship with Kuehbeck is alleged to have continued even after she became romantically involved with Bernstein in the spring of 2002. (Id. P13, 25.) Bernstein was aware of Silver's relationship with Kuehbeck and, on or about June 19, 2002, Silver received a letter from Ira Garr, a lawyer claiming to represent Bernstein and Kuehbeck, stating that Silver was stalking and harassing them. (Id. P26.) When Silver allegedly confronted Kuehbeck about the letter, she denied knowing anything about it and told him that Mr. Garr did [*4] not represent her. (Id.) Silver replied twice to the letter but never received a response from Mr. Garr. (Id.)

Silver and Kuehbeck are alleged to have continued their romantic relationship during the fall of 2002 and into 2003. (Id. P27.) On June 12, 2003, Silver wrote a letter to Bernstein at Kuehbeck's request, which referred to the securities class action lawsuit and requested that Bernstein stay out of Silver's and Kuehbeck's legal affairs. (Id. P28.)

Kuehbeck told Plaintiff about a July 4, 2003 holiday weekend in Iceland but neglected to tell Plaintiff that she and Bernstein were purportedly married during that trip. (Id. P30.) Upon learning of the marriage, Silver alleges that he suggested to Kuehbeck that his relationship with her should end, but they continued to meet throughout late 2003 and early 2004. (Id.) In the months following the wedding, Bernstein heightened his surveillance of Silver and Kuehbeck. (Id. P31.) On January 15, 2004, at Kuehbeck's urging, Silver wrote another letter to Bernstein demanding that he stop interfering with Silver's and Kuehbeck's business affairs. (Id.) Silver and Kuehbeck continued to see each other regularly [*5] during this time. (Id. P32.)

In late June 2004, a letter was hand-delivered to Silver at the apartment where he stayed while he was in New York City. (Id. P33.) Silver determined that the letter was from Bernstein and returned it unopened. (Id.) Silver later discovered that the letter contained a "Notice of Revocation of Power of Attorney," purportedly signed by Kuehbeck. (Id. P35.) Bernstein is alleged to have drafted the document and "compelled Kuehbeck to sign through a combination of threats and the refusal to comply with obligations of their pre-nuptial agreement." (Id. P35.) In addition, Silver learned from Wolf Popper LLP, the law firm handling the class action securities lawsuit brought in Kuehbeck's name, that Bernstein had begun urging the firm to ignore and cease dealing with Silver. (Id. P34.) As a result of the revocation of Silver's power

of attorney, Silver was unable to continue serving as a consultant to Wolf Popper LLP. (Id. P35.)

On June 20, 2004, Silver wrote to Bernstein demanding that he "stay away from me," and warning Bernstein of possible civil and criminal consequences if he persisted in his activities. (Id. P37.)

On the [*6] afternoon of July 17, 2004, Silver went for a swim at a lake after Kuehbeck had advised him that she and Bernstein would be visiting the lake later that day. (Id. P38.) The Complaint summarizes the encounter that took place after Silver finished his swim as follows:

> As [Silver] was walking back from the Lake, at approximately 1:15 p.m., he saw Kuehbeck and Bernstein walking toward him. Kuehbeck immediately ducked into the ladies room. Bernstein then approached [Silver], and said, in a threatening voice, "you and I are taking a walk." [Silver] told Bernstein that he had nothing to say to him, and kept walking. As [Silver] walked away, Bernstein turned to [Silver] and said "I'm going to have you taken care of." [Silver] felt threatened.

(Id.) Silver allegedly feared for his safety and filed a complaint at the New York Police Department's 19th Precinct with a Detective Morales. (Id. P39.)

On July 29, 2004, less than two weeks after the incident at the lake, it is alleged that Kuehbeck and Silver met at the same lake "to go swimming, which led, inevitably, to sex." (Id. P40.) Three days later, on August 2, 2004, Kuehbeck informed Silver that [*7] Bernstein had found out about their meeting at the lake, and Silver and Kuehbeck agreed to meet the next day to discuss the matter. (Id. P41.) However, on August 3, 2004, Kuehbeck failed to meet Silver at the agreed-upon time and place. (Id. P42.) They arranged to meet two other times that day, but Kuehbeck failed to appear both times. (Id. P42.)

On the following day, August 4, 2004, a police report was filed by Bernstein and Kuehbeck with the 19th Precinct in Manhattan accusing Silver of "aggravated harassment" and "stalking" against Kuehbeck. (Id. P43.) On the following Monday, August 9, 2004, Detective Ryan and another detective visited Silver at an office used part-time by Silver and told the receptionist that they wanted to speak to Silver to "'follow up on his earlier complaint.'" (Id. P44.) Plaintiff eventually walked downstairs and asked the two detectives "what was up," and they asked Silver to accompany them to the police station. (Id.) At the police station, Detective Ryan told

Silver that he was going to arrest him for "stalking and harassment." (Id.) However, after Silver explained that five days earlier he had met and had consensual sex with [*8] Kuehbeck and after he played a message Kuehbeck left on Silver's answering machine arranging their recent swim at the lake, Detective Ryan permitted him to leave without arrest. (Id.)

On August 10, 2004, one day after Silver spoke with Detective Ryan, Silver decided to return to the 19th Precinct to offer additional evidence that Kuehbeck's complaint against him was baseless. (Id. P45.) The following scene is alleged to have occurred:

> Detective Ryan told [Silver] that he had called Kuehbeck and Bernstein, and Bernstein had claimed [Silver] was the subject of an arrest warrant in California, a slanderous fabrication. He then told [Silver] that Bernstein and Kuehbeck wished to press charges, and that he therefore had no choice but to arrest [Silver]. [Silver] asked the precise basis upon which he was being arrested, and Ryan answered that it was on the basis of "many threatening phone messages." [Silver], puzzled, asked Detective Ryan if he found such supposed messages threatening, and Ryan replied "not to my ears, but when a woman is involved we tend to bend over backwards." Upon information and belief, there were no such "messages." Ryan then said that [*9] "Bernstein is all over the case, and I'm going to recommend that the ADA interview her separately." He declined to delay his decision pending an investigation of the actual facts. [Silver] was placed in a detention area in the police station behind a locked door, until his release later that day.

(Id.; But cf. Compl. P121 [2].)

> [2]  The Complaint also states inconsistently that Plaintiff was held overnight at the 19th Precinct. P129.

On August 19, 2004, Kuehbeck executed an affidavit at the Manhattan District Attorney's Office in which she swore, inter alia, that Silver had stalked her during the ten years after they had an only brief relationship in 1994, and that Silver had threatened her and Bernstein. (Id. P46.) Silver alleges that "each and every element of her sworn statement is a fabrication." (Id.) On August 20, 2004, Judge Anthony Ferrara issued an order of protec-

tion ordering Silver to stay away from Kuehbeck and Bernstein, which was served on Plaintiff on August 23, 2004. ( [*10] Id. P47.)

During the next three months, Silver organized a defense, hired counsel, and investigated his situation, which resulted in a presentation of the actual facts to the District Attorney's Office that suggested that Kuehbeck had not been truthful. (Id. P48.) In view of the evidence presented by Silver, the District Attorney's Office confronted Kuehbeck. (Id. P49.) Silver alleges that he "was eventually directly told that this meeting was 'not pleasant' for Kuehbeck, and . . . that they had finally realized they had 'lying woman on their hands.'" (Id.) The charges against Silver were then dismissed and the order of protection was vacated. (Id.)

On January 6, 2005, two days after Silver initiated this action by filing the original complaint in this Court, the New York Post published an article about Silver's filing of the complaint that included the following quotation from Defendant Jonathan Abady, an attorney retained to represent Kuehbeck and Bernstein in the action:

> This complaint is an outrageous falsehood and was filed in a clear effort to extract money from an internationally respected author and journalist and to slander a wonderful woman. [*11] Carl Bernstein and his wife have filed formal complaints against Mr. Silver with the NYPD and the Manhattan DA's office for making death threats against them, continual harassment and stalking, and other abusive conduct. We are anxious for the truth to be known about Mr. Silver's motivations and actions--including his record of bizarre and violent behavior against others as well.

(Id. P138.) On February 9, 2005, Silver filed the First-Amended Complaint, which added Abady as a defendant and added a claim against him for libel and slander based on Abady's comments quoted in the newspaper article.

In sum, the Complaint asserts a total of fourteen claims for relief: (1) malicious prosecution by Kuehbeck and Bernstein; (2) abuse of process by Kuehbeck and Bernstein; (3) intentional infliction of emotional distress by Kuehbeck and Bernstein; (4) prima facie tort by Kuehbeck and Bernstein; (5) tortious interference with business relations by Kuehbeck and Bernstein; (6) quantum meruit; (7) assault by Bernstein; (8) negligence by Bernstein; (9) slander by Bernstein; (10) slander by Kuehbeck; (11) malicious prosecution and false arrest and imprisonment by Detective Ryan [*12] and John Does

Case 1:07-cv-02944-JSR    Document 24-3    Filed 06/28/2007    Page 16 of 54

Page 4
2005 U.S. Dist. LEXIS 26956, *

1-20; (12) violation of 42 U.S.C. § 1983 by Detective Ryan and John Does 1-20; (13) conspiracy to violate 42 U.S.C. § 1983 by Kuehbeck and Bernstein; and (14) libel and slander by Abady.

## DISCUSSION

### I. Standard for Motion to Dismiss

A court reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. Schnall v. Marine Midland Bank, 225 F.3d 263, 266 (2d Cir. 2000). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (internal quotation marks omitted). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004) (quoting [*13] Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). A court must limit its review to the complaint, documents attached or incorporated by reference thereto, and "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

### II. Kuehbeck's and Bernstein's Motion to Dismiss

For purposes of clarity, this Opinion will group Silver's claims for relief against Kuehbeck and Bernstein into three categories. The first category includes claims arising from Silver's August 2004 arrest. The second category includes claims arising from Kuehbeck's withdrawal of the power of attorney in June 2004. The third category includes other tort claims arising from Kuehbeck's and Bernstein's actions affecting Silver.

### A. Claims Arising From Silver's August 2004 Arrest

1. Malicious Prosecution

Silver's First Claim for Relief for malicious prosecution arises Plaintiff's claim that Kuehbeck swore to a criminal complaint and an affidavit with the Manhattan District Attorney's office accusing Silver of stalking and harassment. (Compl. PP46, 52-54.) Silver claims [*14] that Kuehbeck knew that the allegations were false and intended to case Silver's arrest. (Id. P55.) According to the Complaint, Bernstein acted in concert with Kuehbeck and determined that the false sworn complaint and affidavit would be filed. (Id. P56.)

"Under New York law, a plaintiff suing for malicious prosecution must establish: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).

Kuehbeck and Bernstein dispute the sufficiency of the allegations with respect to the first element of malicious prosecution--the initiation of a "criminal proceeding" against Silver. The New York Court of Appeals discussed this element of malicious prosecution in Broughton v. State:

> The essence of malicious prosecution is the perversion of proper legal procedures. Thus, it has been held that some sort of prior judicial proceeding is the sine qua non of a cause of action in malicious prosecution. Such a judicial [*15] proceeding may be either an evaluation by a Magistrate of an affidavit supporting an arrest warrant application, or an arraignment or an indictment by a Grand Jury.

37 N.Y.2d 451, 457, 335 N.E.2d 310, 373 N.Y.S.2d 87 (1975) (citation omitted). Thus, a malicious prosecution "may arise only after an arraignment or indictment or some other 'evaluation by a neutral body that the charges [were] warranted.'" Stile v. City of New York, 172 A.D.2d 743, 743, 569 N.Y.S.2d 129 (2d Dept. 1991) (quoting Broughton, 37 N.Y.2d at 459).

Here, the Complaint does not allege that Silver was arraigned, indicted, or that an arrest warrant was evaluated by a Magistrate; it states only that "on or about August 4, 2004, Defendant Kuehbeck swore to a criminal complaint." (Compl. P52.) Silver contends that this allegation is sufficient to plead the first element of a malicious prosecution claim because, under Section 100.05 of the New York Criminal Procedure Law, [3] the filing of an accusatory instrument, such as a misdemeanor complaint, is the procedural equivalent of an indictment insofar as both commence a criminal action.

> 3 This section of the New York Criminal Procedure Law, entitled "Commencement of action; in general," states the following:
>
> > A criminal action is commenced by the filing of an accusatory instrument with a criminal court, and if more than one such instrument is filed in the course of the

same criminal action, such action commences when the first of such instruments is filed. The only way in which a criminal action can be commenced in a superior court is by the filing therewith by a grand jury of an indictment against a defendant who has never been held by a local criminal court for the action of such grand jury with respect to any charge contained in such indictment. Otherwise, a criminal action can be commenced only in a local criminal court, by the filing therewith of a local criminal court accusatory instrument, namely:

    1. An information; or

    2. A simplified information; or

    3. A prosecutor's information; or

    4. A misdemeanor complaint; or

    5. A felony complaint.

N.Y. Crim. Proc. Law § 100.05.

[*16] Plaintiff points to no holding by any court that the first element of a civil claim for malicious prosecution is satisfied when a complaint is sworn to by the complaining party. Thus, under the New York decisions, the threshold trigger for the tort of malicious prosecution is a judicial proceeding where the charges against the accused are reviewed and evaluated by a neutral body. Broughton, 37 N.Y.2d at 459 (emphasis added). A Magistrate's evaluation of an affidavit supporting an arrest warrant application, an arraignment, and an indictment by a Grand Jury each involve some kind of "evaluation by a neutral body that the charges [were] warranted." Stile, 172 A.D.2d 743, 569 N.Y.S.2d 129. The pleading in the complaint of a sworn complaint and an affidavit against Silver are not shown to have involved any evaluation by a neutral body. Furthermore, as stated in Broughton, the essence of the claim for malicious prosecution is the perversion of the legal process thereafter. 37 N.Y.2d at 457.

Silver argues that, as a result of the actions taken by Bernstein and Kuehbeck, he "suffered damages including, but not limited to, (i) legal fees and expenses [*17] incurred in his defense, (ii) damage to his reputation in the business community, and (iv) pain and suffering." (Compl. P64.) The Second Circuit noted in Bender v. City of New York that under New York law, "damages for malicious prosecution are to compensate for injuries *after* arraignment." 78 F.3d 787, 793 n.3 (2d Cir. 1996) (emphasis added) (citing Hygh v. Jacobs, 961 F.2d 359, 366 (2d Cir. 1992); Dabbs v. State, 59 N.Y.2d 213, 218, 451 N.E.2d 186, 464 N.Y.S.2d 428 (1983)). Because Silver has not pleaded that he was arraigned on the complaint in the instant case, he has not pleaded a claim for damages for malicious prosecution. Therefore, his First Claim for Relief for malicious prosecution is dismissed.

2. Abuse of Process

Silver's Second Claim for Relief alleges that Kuehbeck and Bernstein "used regularly issued criminal process, namely a criminal complaint and an affidavit, for the purpose of procuring [Silver's] arrest, detention, and prosecution" and that they did so "with the intent of doing harm to [Silver]" and "to obtain a collateral objective." (Compl. PP66-68.)

"Abuse of process" is defined as "the improper and tortious use of a legitimately [*18] issued court process to obtain a result that is either unlawful or beyond the process's scope." Black's Law Dictionary 10 (7th ed. 1999). Under New York law, abuse of process has three essential elements: "(1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." Curiano v. Suozzi, 63 N.Y.2d 113, 116, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (1984). In addition, a plaintiff bringing an abuse of process claim must allege special damages. See Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397, 405, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975).

Kuehbeck and Bernstein first dispute the sufficiency of the allegations with respect to the third element of an abuse of process claim--use of process in a perverted manner to obtain a collateral objective. In Jones v. Maples, No. 98 Civ. 7132 (SHS), 2002 U.S. Dist. LEXIS 3175 (S.D.N.Y. Feb. 26, 2002), Judge Stein explained what a Complaint must allege to plead adequately this element of an abuse of process claim.

Not every use of process motivated by selfishness or maliciousness gives rise to an abuse [*19] of process claim. See Curiano, 63 N.Y.2d at 117 (citing Hauser v. Bartow, 273 N.Y. 370, 374, 7 N.E.2d 268

(1937) ("Every one has a right to use the machinery of the law, and bad motive does not defeat that right.")). There must be an abuse of process which has as its direct object an effect outside the intended scope of operation of the process employed. Compare Curiano, 63 N.Y.2d at 116 (no abuse of process where defendant initiated libel action with dual purpose of punishing free speech and electoral participation and inflicting expense and burden), and Hauser, 273 N.Y. at 374 (no abuse of process where the defendant initiated incompetency proceeding with dual purpose of damaging the alleged incompetent and enriching herself), with Board of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397, 404, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975) (abuse of process where the defendant subpoenaed 87 of school district's teachers to testify on the same day with purpose of inflicting economic harm on the school district) and Dean v. Kochendorfer, 237 N.Y. 384, 390, 143 N.E. 229 (1924) [*20] (abuse of process where magistrate issued an arrest warrant for disorderly conduct with purpose of bringing arrested person into court for an unrelated disciplinary rebuke). Thus, without an allegation that the process has been improperly perverted "after" its issuance, a claim of abuse of process must be dismissed, even though the defendant acted maliciously in initiating the process. Curiano, 63 N.Y.2d at 117.

Id. 2002 U.S. Dist. LEXIS 3175, at *23-24 (emphasis in original).

Here, the Complaint alleges that Kuehbeck and Bernstein "used" criminal process "for the purpose of procuring [Silver's] arrest, detention and prosecution"; "with the intent of doing harm to [Silver]"; and "in a perverted manner to obtain a collateral objective." (Compl. PP66-68.) The Complaint alleges that Kuehbeck and Bernstein "coldly conspired to do [Silver] grievous harm, and concocted a vicious scheme designed quite simply to destroy [Silver], his reputation, career and very life." (Id. P9.) These conclusory allegations are not sufficient to adequately plead a claim of abuse of process. See Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004) (observing that, regardless of the [*21] complaint's satisfaction of the generous requirements of Rule 8(a)(2), a Rule 12(b)(6) motion will "lie to permit each particular defendant to eliminate those causes of action as to which no set of facts has been identified that support a claim against him") (emphasis omitted). Since Plaintiff's pleadings have not identified how Defendants used court process after its issuance to cause grievous harm to Silver, Silver's abuse of process claim against Kuehbeck and Bernstein is dismissed.

Kuehbeck and Bernstein also dispute the sufficiency of the allegations with respect to special damages. In opposition, Silver contends that the Complaint satisfies this pleading requirement because, even though the damages attributed to Kuehbeck's and Bernstein's abuse of process is included together with eight other causes of action for a total of three million dollars ($ 3,000,000), this amount is "specifically identified and causally related to the allegedly tortious conduct." (Silver Opp. Mem. at 12.) As Kuehbeck and Bernstein point out, however, courts have dismissed special damages claims where, as here, a complaint "sets forth damages in round numbers." Vigoda v. DCA Prods. Plus, Inc., 293 A.D.2d 265, 266, 741 N.Y.S.2d 20 (1st Dept. 2002); [*22] Ann-Margret v. High Society Magazine, Inc., 498 F. Supp. 401, 408 (S.D.N.Y. 1980). Thus, Silver's abuse of process claim also fails with respect to his allegations of damages.

3. Intentional Infliction of Emotional Distress

Silver's Third Claim for Relief alleges that Kuehbeck and Bernstein intentionally inflicted emotional distress by engaging in a course of conduct that was "extreme and outrageous," with the intent or knowledge that their conduct would cause the distress and suffering of Silver. (Compl. P72.)

To state a valid claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must show: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996); see also Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 121, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993).

Kuehbeck and Bernstein dispute the sufficiency of the allegations with respect to the first element of Silver's IIED claim--that the conduct complained of was "extreme and outrageous." To [*23] satisfy this element, New York law requires that their alleged conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983). Even assuming that all of Silver's

factual allegations are true, and resolving all ambiguities and drawing all inferences in Silver's favor, the conduct alleged in the Complaint does not meet this test and is insufficient to support an IIED claim. Accordingly, this claim is dismissed.

### 4. Negligence

Silver's Eighth Claim for Relief alleges that Silver suffered injuries that were proximately caused by Bernstein when he "negligently failed to use ordinary care in investigating Kuehbeck's charges before participating in any scheme to file such complaint and affidavit and procuring [Silver's] arrest, detention and prosecution." (Compl. PP96-97.)

In order to prevail on a negligence claim under New York law, a plaintiff must establish "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) [*24] injury to the plaintiff as a result thereof." Akins v. Glens Falls City Sch. Dist., 53 N.Y.2d 325, 333, 424 N.E.2d 531, 441 N.Y.S.2d 644 (1981). The existence of a duty of care is a "legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration." Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579, 585, 634 N.E.2d 189, 611 N.Y.S.2d 817 (1994). "Absent a duty running directly to the injured person there can be no liability in damages, however careless the conduct of foreseeable the harm." 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc., 96 N.Y.2d 280, 289, 750 N.E.2d 1097, 727 N.Y.S.2d 49 (2001).

At issue here is whether Bernstein owed a duty of care to Silver. Silver contends that the claim against Bernstein should not be dismissed because "it is clear that as citizens of a civil society we each owe an ordinary duty of care to our fellow man not to behave in this manner and furthermore, to investigate the truthfulness of a criminal complaint before swearing one out against an innocent man." (Silver Opp. Mem. at 19.) However, Silver fails to cite any cases or other authority that establish the existence of such a duty. Silver's negligence claim therefore [*25] is dismissed.

### 5. Conspiracy to Violate 42 U.S.C. § 1983

Silver's Thirteenth Claim for Relief alleges that Kuehbeck and Bernstein conspired with Detective Ryan and John Does 1-20 to deprive Silver of his rights, privileges, and immunities under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983 ("Section 1983"). (Compl. PP134-35.) In particular, Kuehbeck and Bernstein allegedly "procured the assistance of Defendants Ryan and John Does 1-20 and . . . acted in concert with said persons to procure the unlawful arrest, detention and prosecution of [Silver]." (Id. P135.)

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). Private persons can only be subject to liability under Section 1983 if they were "jointly engaged with state officials in the challenged action." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) [*26] (quoting Dennis v. Sparks, 449 U.S. 24, 27-28, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980)).

Kuehbeck and Bernstein contend that this claim should be dismissed because the Complaint does not adequately allege that they conspired with Detective Ryan or acted in concert with him to deprive Silver of his civil rights. "Merely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation." Vazquez v. Combs, No. 04 Civ. 4189 (GEL), 2004 U.S. Dist. LEXIS 22137, at *11 (S.D.N.Y. Oct. 22, 2004). See also Jones v. Maples, 2002 U.S. Dist. LEXIS 3175, at *16 (S.D.N.Y. Feb. 26, 2002) ("providing false information to an arresting officer is not, by itself, sufficient to state a claim against [a] private party under § 1983"); Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 n.21, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1983) (merely invoking state legal procedures against another private person does not constitute "joint participation" or "conspiracy" with state officials so as to satisfy the [*27] § 1983 requirement of action under color of law).

Here, the Complaint alleges that Detective Ryan told Silver that he had called Kuehbeck and Bernstein, that they told him they "wished to press charges," and that "'Bernstein is all over the case.'" (Compl. P45.) Such allegations do not show conspiracy or actions in concert that are necessary to establish a § 1983 violation; otherwise complainants in all arrests could be subject to retaliatory § 1983 actions.

The Complaint further alleges that Kuehbeck and Bernstein "utilized [Bernstein's] influence with the New York City Police to procure [Silver's] arrest," and that the police department "followed Bernstein's and Kuehbeck's instructions with respect to whether to arrest [Silver], when and where to arrest him, and what to charge him with." (Compl. P57.) Such conclusory allegations are not sufficient to state a claim for a § 1983 conspiracy. Furthermore, they are not consistent with the Complaint's rendition of the events immediately preceding Silver's arrest, specifically the allegation that Silver returned to the 19th Precinct of his own volition on the day of his arrest. See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) [*28] ("Courts do not

accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened."). Accordingly, Silver's § 1983 conspiracy claim against Kuehbeck and Bernstein is dismissed.

## B. Claims Arising From Kuehbeck's Withdrawal of the Power of Attorney in June 2004

### 1. Tortious Interference with Business Relations

Silver's Fifth Claim for Relief alleges that in June 2004 Kuehbeck and Bernstein tortiously interfered with his contractual and business relations with Wolf Popper LLP, the law firm representing the plaintiffs in a class action securities fraud lawsuit in which Kuehbeck was the lead plaintiff. The Complaint alleges that Plaintiff had invested for Kuehbeck in Genesis Microchip, Inc., whose shares dropped sharply. (Compl. P22.) The Complaint also alleges that Plaintiff conceived and organized a class action lawsuit against the company, hired Wolf Popper LLP, and agreed to serve as a consultant (to Wolf Popper) with Kuehbeck's knowledge and consent. (Id.) In connection with the lawsuit, Kuehbeck gave Plaintiff power of attorney to act on her behalf. (Id.)

[*29] To establish a claim for tortious interference with business relations, a plaintiff must show: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000) (citing Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)).

Kuehbeck and Bernstein first dispute the sufficiency of the allegations with respect to the first element --that a valid "business relationship" existed between Silver and Wolf Popper LLP. The Complaint alleges that Silver "agreed to serve as consultant" to Wolf Popper LLP (Compl. P22) and that he had "contractual and business relations with the Wolf Popper firm" (Id. P82). Thus, although the Complaint does not specify what Silver was to be paid, how often he would work, or what exactly he would do, the allegations are sufficient to plead the first element of this tort.

Kuehbeck and Bernstein next dispute the sufficiency of the allegations with [*30] respect to the second element -- that they intentionally interfered with a business relationship between plaintiff and a third party. Silver alleges that Bernstein "orchestrated Kuehbeck's withdrawal of the power of attorney issued in favor of Plaintiff." (Compl. P82.) The withdrawal of a power of attorney is not an interference with Plaintiff's relationship

with a third party, namely Wolf Popper LLP. Withdrawing her power of attorney is a decision by Kuehbeck that involves her own relationship with Silver, not the relationship of Silver and Wolf Popper. Therefore, Kuehbeck's withdrawal of her power of attorney does not amount to intentional interference with a business relationship.

Kuehbeck and Bernstein also dispute the sufficiency of the allegations with respect to the third element -- that they acted with the sole purpose of harming Silver or used dishonest, unfair, or improper means. Silver, citing Paragraphs 34 and 35 of the Complaint, contends that Kuehbeck and Bernstein "acted solely to harm [Silver] and his business relationship with Wolf Popper." (Silver Opp. Mem. at 24 (citing Compl. PP34-35 (emphasis added)).) However, Paragraphs 34 and 35 of the Complaint, quoted [*31] below in their entirety, do not allege that Kuehbeck and Bernstein acted with such a single-minded intent.

> 34. Now, the depth of Bernstein's "investigation" into [Silver's] private affairs was becoming apparent. [Silver] also learned from Wolf Popper that prior to this period Bernstein had begun inserting himself into the class action securities suit brought in Kuehbeck's name, and had repeatedly urged them privately to ignore and cease dealing with [Silver] in any respect. [Silver] has since heard nothing from the firm.

> 35. As [Silver] discovered later, the letter contained a "Notice of Revocation of Power of Attorney," purportedly signed by Kuehbeck. Upon information and belief, the notice was drafted by Bernstein, who compelled Kuehbeck to sign through a combination of threats and the refusal to comply with obligations of their prenuptial agreement. This notice purported to withdraw the power of attorney that Kuehbeck had given to [Silver] in connection with activity in her behalf in the securities fraud class action and purported to discharge [Silver] from any further involvement, meaning that his agreement with Wolf Popper could no longer be performed. Not [*32] only was the letter hand delivered to [Silver], but a copy of the purported notice was faxed to one of [Silver's] unrelated business colleagues in a transparent effort to embarrass [Silver].

(Compl. PP34-35.) Considerably later in the Complaint, Silver alleges that "Bernstein and Kuehbeck acted purposefully and knowingly and with the intent of harming [Silver]."

(Id. P83.) The clear import of Paragraphs 34 and 35, however, is that Kuehbeck took actions to prevent Plaintiff from continuing to act as her agent. Read as a whole, the Complaint does not imply that these Defendants' actions at Wolf Popper were taken solely to harm Plaintiff.

The Complaint further alleges that Bernstein repeatedly urged Wolf Popper LLP to ignore Silver and cease dealing with him, and that Bernstein drafted and compelled Kuehbeck to sign a "Notice of Revocation of Power of Attorney." (Compl. PP34-35). Silver charges that Bernstein communicated with individuals at Wolf Popper "to convince them to sever their relationship with Plaintiff in connection with the securities class action litigation in which Kuehbeck serves as name Plaintiff." (Compl. P82.) However, the Complaint does not [*33] allege that Kuehbeck and Bernstein used dishonest or unfair means, nor do the allegations amount to improper means. New York's Court of Appeals has noted that "there is no liability in tort unless the means employed to effect the interference was wrongful." Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 196, 406 N.E.2d 445, 428 N.Y.S.2d 628 (1980). The Court then stated that "wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." Id. at 191. Silver's claims involve persuasion, but "mere knowing persuasion would not be sufficient." Id. at 196. Therefore, even assuming that all of Silver's factual allegations are true, the conduct alleged in the Complaint is insufficient to support a claim for tortious interference. Accordingly, Bernstein and Kuehbeck's motion to dismiss the tortious interference with business relations claim is granted.

2. Quantum Meruit

Silver's Sixth Claim for Relief alleges that he is entitled to recover as damages [*34] the reasonable value of the services he has performed, at Kuehbeck's request, for Kuehbeck and the class that she represents. Specifically, the Complaint alleges that "Kuehbeck asked [Silver] to be one of her investment advisors" (Compl. P22) and that "in the course of conceiving, researching and preparing the securities class action lawsuit in which Kuehbeck is the name plaintiff, [Silver] spent hundreds of hours working on Kuehbeck's behalf and on behalf of the class that Kuehbeck represents." (Compl. P87.)

"In order to recover in quantum meruit, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994) (internal quotation marks and citation omitted).

Kuehbeck disputes the sufficiency of the allegations with respect to the third element of Silver's quantum meruit claim -- expectation of compensation. In response, Silver states in his memorandum of law that he "did not do all of this work out [*35] of the goodness of his heart without expecting some compensation in return." (Silver Opp. Mem. at 22.) However, because the Complaint alleges that Silver agreed to serve as a consultant to Wolf Popper LLP (Compl. P22) and that Silver was a longtime friend and some-time lover of Kuehbeck (Id. at PP21-22), any claim of expectation of compensation is undercut. The Complaint does not include any allegations suggesting that Silver had a "reasonable expectancy of receiving such compensation" from Kuehbeck, Argo Marine Sys., Inc. v Camar Corp., 755 F.2d 1006, 1011 (2d Cir. 1985), this claim is dismissed.

## C. Other Tort Claims Against Kuehbeck and Bernstein

### 1. Slander

Silver's Ninth Claim for Relief alleges that Bernstein slandered Silver by knowingly and intentionally making disparaging and false statements about Silver to third parties, namely an individual named Ira Garr. Bernstein allegedly stated, inter alia, that Silver is a "'stalker,'" that he is "'crazy,'" and that he was "'harassing'" Kuehbeck and Bernstein. (Compl. PP100-01.)

"The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, [*36] (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001). As Judge Scheindlin explained in Mobile Data Shred, Inc. v. United Bank of Switz., No. 99 Civ. 10315 (SAS), 2000 U.S. Dist. LEXIS 4252, at *19 (S.D.N.Y. Apr. 5, 2000), "in evaluating the sufficiency of claims of slander, the courts in this Circuit have required that the complaint adequately identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." Id. 2000 U.S. Dist. LEXIS 4252, at *19 (citing Ives v. Guilford Mills, Inc., 3 F. Supp. 2d 191, 199

(S.D.N.Y. 1998); Broome v. Biondi, No. 96 Civ. 805 (RLC), 1997 U.S. Dist. LEXIS 1431 (S.D.N.Y. Feb. 10, 1997); Reeves v. Continental Equities Corp. of Am., 767 F. Supp. 469, 473 (S.D.N.Y. 1991)).

Silver has failed to adequately plead the slander claim against [*37] Bernstein. The Complaint identifies only one person, Ira Garr, to whom Bernstein allegedly made defamatory statements about Silver. Mr. Garr was Bernstein's attorney at the time the statements were made and therefore Bernstein's communications with him were privileged. The attorney-client privilege "requires that the asserted holder of the privilege is or sought to become a client, that the person to whom the communication was made is an attorney admitted to practice, and that the communication was made while that person was acting as an attorney. Hydraflow v. Enidine, 145 F.R.D. 626, 630 (W.D.N.Y. 1993). The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 398, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). Here, Mr. Garr was acting as Bernstein's attorney at the time Bernstein allegedly made defamatory statements to him, and full communication between Bernstein and Garr is protected by the attorney-client privilege. Thus, the statements were privileged and as such, the communications between Bernstein [*38] and Mr. Garr cannot serve as the basis for Silver's slander claim. Because the Complaint does not identify any other third parties to whom Bernstein made the alleged statements about Silver, [4] this claim is dismissed.

> 4 Silver states that Bernstein hired Mr. Garr to write and send the letter to Silver, "as well as others." (Silver Opp. Mem. at 26 (citing Compl. P100).) However, the Complaint fails to identify any third parties, aside from Mr. Garr, to whom the statements about Silver were published.

Silver's Tenth Claim for Relief alleges that Kuehbeck slandered Silver by knowingly and intentionally making defamatory and false statements about Silver to third parties. (Id. PP105-06.) Kuehbeck allegedly stated, inter alia, that Silver "'tried to kill her.'" (Id. P105.) The Complaint does not identify any "third parties" to whom Kuehbeck made the alleged statements. Accordingly, the slander claim against Kuehbeck is dismissed.

2. Assault

Silver's Seventh Claim for Relief alleges that Bernstein [*39] assaulted him when the two encountered each other on July 17, 2004. According to the Complaint, "Bernstein approached [Silver], and said, in a threatening voice, 'you and I are taking a walk.' [Silver] told Bern-

stein that he had nothing to say to him, and kept walking. As [Silver] walked away, Bernstein turned to [Silver] and said, 'I'm going to have you taken care of.'" (Compl. PP38, 91.)

To establish a claim for assault under New York law, a plaintiff must show "an intentional placing of another person in fear of imminent harmful or offensive contact." Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (emphasis added). "Threats, standing alone, do not constitute an assault." Carroll v. New York Property Ins. Underwriting Ass'n, 88 A.D.2d 527, 527, 450 N.Y.S.2d 21, 22 (1st Dept. 1982) (citation omitted). Bernstein's alleged comments to Silver as he was walking away and as Silver walked away do not suggest "imminent" harmful contact, and Silver makes no arguments in opposition to the motion to dismiss this claim of the Complaint. The assault claim against Bernstein therefore is dismissed.

3. Prima Facie Tort

Silver's Fourth [*40] Claim for Relief alleges that Kuehbeck and Bernstein engaged in a course of conduct comprised of various acts with the intent and purpose of causing harm to Silver, giving rise to a claim for prima facie tort.

"The requisite elements of a cause of action for prima facie tort are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful." Freihofer v. Hearst Corp., 65 N.Y.2d 135, 142-43, 480 N.E.2d 349, 490 N.Y.S.2d 735 (1985).

Silver's prima facie tort claim must be dismissed because it alleges no facts not included in his other claims for relief, and it completely overlaps the other claims alleged in the Complaint. To the extent that allegations provide grounds for other causes of action included in the Complaint, those allegations cannot give rise to a prima facie tort claim. See Chen v. United States, 854 F.2d 622, 628 (2d Cir. 1988) (stating that "a set of facts giving rise to a common-law tort is fatal to a prima facie tort claim"). With respect to the other allegations underlying this claim, those allegations are insufficient to adequately [*41] plead a prima facie tort claim.

Silver's prima facie tort claim must also be dismissed because the Complaint fails to plead special damages. According to the Complaint, Silver demands judgment against Kuehbeck and Bernstein on the prima facie tort claim, along with eight other claims, in the amount of three million dollars ($ 3,000,000). (Compl. at 35.) As already noted, courts have dismissed special damages claims where the claim, like Silver's claim, "set forth damages in round numbers." Vigoda v. DCA Prods. Plus,

Inc., 293 A.D.2d 265, 266, 741 N.Y.S.2d 20 (1st Dept. 2002); Ann-Margret v. High Society Magazine, Inc., 498 F. Supp. 401, 408 (S.D.N.Y. 1980). Accordingly, Silver's prima facie tort claim is dismissed.

### III. Abady's Motion to Dismiss

Silver's libel and slander claim against Abady, the Fourteenth Claim for Relief, arises from a statement made by Abady that was quoted by a New York Post article. The statement announcing that Silver had commenced this action was published two days after its filing in this Court. Abady's statement, as quoted in the Complaint, reads as follows:

> This complaint is [*42] an outrageous falsehood and was filed in a clear effort to extract money from an internationally respected author and journalist and to slander a wonderful woman. Carl Bernstein and his wife have filed formal complaints against Mr. Silver with the NYPD and the Manhattan DA's office for making death threats against them, continual harassment and stalking, and other abusive conduct. We are anxious for the truth to be known about Mr. Silver's motivations and actions -- including his record of bizarre and violent behavior against others as well.

(Compl. P138.) Silver alleges that Abady's statement was materially false in a number of respects and that Abady made the statement knowing that it was false and with the intent to defame Silver, to cause damage to Silver's reputation, and to cause Silver mental and emotional distress and suffering. (Id. PP139-41.)

Section 74 of the New York Civil Rights Law ("Section 74") provides, in relevant part, that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." N.Y. Civil Rights Law § 74. "For a report to be characterized [*43] as 'fair and true' within the meaning of the statute . . . it is enough that the substance of the article be substantially accurate." Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co., 49 N.Y.2d 63, 67, 399 N.E.2d 1185, 424 N.Y.S.2d 165 (1979). "New York courts have extended the privilege to comments made by attorneys to the press in connection with the representation of their clients." McNally v. Yarnall, 764 F. Supp. 853, 856 (S.D.N.Y. 1991) (citing Branca v. Mayesh, 101 A.D.2d 872, 476 N.Y.S.2d 187 (2d Dept. 1984); Ford v. Levinson, 90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dept. 1982)).

Abady contends that, like the comments made by the defamation defendant in McNally v. Yarnall, his statement is absolutely protected by Section 74 because he was merely summarizing his client's position in the litigation. (Abady Mem. at 9.) In McNally, the plaintiff moved to add a cause of action for libel against his opposing party's attorney based on comments the attorney made to a newspaper about the litigation. Judge Sweet denied the motion, holding that statements made by a party's attorney concerning a potential defense in a [*44] pending action were protected by Section 74. See McNally, 764 F. Supp. at 856. In reaching this conclusion, Judge Sweet explained that the attorney's comments "related directly to a possible position to be taken by [his client] as a defense to [the defamation plaintiff's] charges," and that the attorney's "alleged statement was merely restating his client's position in defending the action." Id.

In opposition, Silver first argues that Abady's statement is not protected by Section 74 because it falls within an exception to that privilege recognized by the New York Court of Appeals in Williams v. Williams, 23 N.Y.2d 592, 246 N.E.2d 333, 298 N.Y.S.2d 473 (1969). In Williams, the court concluded that Section 74 was not intended to protect a party that "maliciously institutes a judicial proceeding alleging false and defamatory charges" and then publicizes those charges in the press. Id. at 599. However, the Williams exception does not apply here for the same reasons it was inapplicable in McNally. Unlike the defamation defendant in Williams, neither Abady nor Kuehbeck and Bernstein instituted the underlying litigation in order to publicize false [*45] and defamatory charges against Silver. Rather, it was Silver who instituted the litigation giving rise to Abady's statement. The Complaint does not allege that Abady called a press conference or sought to publicize his statement in any way; in fact, there is no allegation that Abady's statement was anything other than a response to a media inquiry about the complaint filed by Silver. Furthermore, Abady's statement appeared in an article reporting on the lawsuit that discussed both sides of the controversy and identified Abady as Kuehbeck's and Bernstein's attorney. [5] Accordingly, even when accepting the allegations in the Complaint as true, the situation that gave rise to Abady's statement is distinguishable from the "unusual fact pattern" considered in Williams. Cf. McNally, 764 F. Supp. at 856 (distinguishing Williams where defamation defendant did not initiate the underlying action, did not seek publicity for the action, and the attorney's comments appeared in a balanced article about the controversy).

---

5    On a motion to dismiss, the Court may take judicial notice of documents such as the New York Post article that Silver "either possessed or knew about and upon which [he] relied in bring-

ing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir. 2000).

[*46] Silver also contends that Abady's statement is not protected by Section 74 because the statement was not a "fair and true report" of the litigation. To be privileged by Section 74, a report of a judicial proceeding must be "substantially accurate." A statement is "substantially accurate" "if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Zerman v. Sullivan & Cromwell,* 677 F. Supp. 1316, 1322 (S.D.N.Y. 1988) (citations omitted). According to Silver, Abady's statement erroneously stated that Kuehbeck and Bernstein "have filed formal complaints" against Silver, that Silver made "death threats" against Kuehbeck and Bernstein, and that Silver has a "record of bizarre and violent behavior against others." However, in view of the entire article in which Abady's statement appeared, the Court finds that Abady's statement was a substantially accurate account of his clients' position in the litigation initiated by Silver's complaint. Accordingly, the Fourteenth Claim for Relief is dismissed.

## IV. Detective Ryan's Motion to Dismiss

Silver brings two claims against Detective Ryan. The [*47] Eleventh Claim for Relief charges Detective Ryan with malicious prosecution and false arrest in violation of New York state law,[6] and the Twelfth Claim for Relief charges Detective Ryan with malicious prosecution and false arrest in violation of Fourth, Sixth, and Fourteenth Amendment rights as secured by 42 U.S.C. § 1983.

> 6    The Eleventh Claim for Relief also refers to false imprisonment. However, because "in New York, the tort of false arrest is synonymous with that of false imprisonment," *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir. 1991), the Court's discussion of the false arrest claim will apply to the false imprisonment claim.

False arrest and malicious prosecution claims brought under New York state law are "substantially the same" as § 1983 false arrest and malicious prosecution claims rooted in the Fourth and Fourteenth Amendments, *Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir. 2003), with the exception that § 1983 requires that the defendant [*48] act "under color of state law," *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996).[7]

> 7    Here, because the parties do not dispute that Detective Ryan was acting in his capacity as a police officer during all times relevant to this dispute, he was clearly acting "under color of state law."

To establish a false arrest claim, a plaintiff must show that: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994); *Davis v. City of New York,* 373 F. Supp. 2d 322, 329 (S.D.N.Y. 2005). Probable cause to believe that the plaintiff committed a crime constitutes a privilege justifying the arrest. *Marshall v. Sullivan,* 105 F.3d 47, 50 (2d Cir. 1996).

"To state a claim under New York law for the tort of malicious prosecution, a plaintiff must show: (1) [*49] that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir. 2003). For a malicious prosecution claim under § 1983, a plaintiff must also demonstrate that the defendant's conduct "resulted in a constitutionally cognizable deprivation of liberty." *Id.* at 143. Probable cause defeats a malicious prosecution claim. *Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir. 2003).

Thus, the lack of probable cause is an essential element of both a false arrest and a malicious prosecution claim. *See Boyd,* 336 F.3d at 75 ("If there was probable cause for the arrest, then a false arrest claim will fail. Similarly, if there was probable cause for the prosecution, then no malicious prosecution claim can stand.") (citation and footnote omitted). Detective Ryan seeks to dismiss the claims against him on the ground that Silver has not pleaded sufficient facts in the Complaint to establish a lack of [*50] probable cause, thus defeating the claims for false arrest and malicious prosecution. Because the "probable cause determination relevant to a malicious prosecution claim differs from that relevant to a false arrest claim," *Mejia v. City of New York,* 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000), these two determinations are considered separately.

## A. Probable Cause for Silver's Arrest

Probable cause to arrest exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996)). An arresting officer may rely on the report of a victim of a crime. *See Loria v. Gorman,* 306 F.3d 1271, 1290 (2d Cir. 2002). "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as

2005 U.S. Dist. LEXIS 26956, *

prosecutor, judge or jury." Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989); see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) [*51] (officer "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest" once reasonable basis for believing there is probable cause). That the plaintiff was found not guilty of the crimes for which he was arrested has no bearing on his false arrest claim. See Singer, 63 F.3d 110, 118 ("a favorable termination of the proceedings is not an element of [the] tort [of false arrest]"). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." Weyant, 101 F.3d at 852.

Detective Ryan argues that the false arrest claim must be dismissed because "Kuehbeck's complaint to the NYPD, in and of itself, provided the probable cause for [Silver] to have been arrested." (Ryan Mem. at 6.) According to the Complaint, "on or about August 4, 2004, Defendant Ryan conducted an interview of Bernstein and Kuehbeck during which Kuehbeck falsely alleged that [Silver] had been 'stalking' and 'harassing' her." (Compl. P113.) Silver contends that Kuehbeck's allegations, as recounted in the Complaint, did [*52] not give rise to probable cause because, in view of the fact that Silver had previously filed a criminal complaint with a different detective in the same police precinct (Compl. P39), Detective Ryan "knew or should have known immediately that there was a history between the parties and that this raised inherent doubts as to the veracity of the Bernstein and Kuehbeck story" (Silver Opp. at 5).

"When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (emphasis added). Taking the facts alleged in the Complaint as true, there is no showing that Detective Ryan had reason to doubt Kuehbeck's veracity. Although Silver had previously filed a criminal complaint in the same precinct against Bernstein, Kuehbeck's husband (Compl. P39), Silver alleges no facts showing that Detective Ryan knew of that complaint. To be sure, the Complaint alleges that, after Detective Ryan informed Silver of Kuehbeck's criminal complaint on August 9, 2004,

> [Silver] related a number of facts to Detective Ryan, including the [*53] fact that only five days earlier, he and Kuehbeck had met at the Lake for as swim and had consensual sex. Fortunately, Kuehbeck's message arranging for the tryst was preserved on [Silver's] answering machine, and he played the message for the police.

Detective Ryan was apparently surprised, and told [Silver] that he could leave because he now had to call Bernstein and Kuehbeck who were in Europe.

(Compl. P44.) However, the Complaint does not allege that Detective Ryan believed what Silver told him. Silver evidently did not reach that conclusion because he alleges that he returned to the 19th Precinct on the following day, August 10, 2004, "to try to offer additional evidence that [Kuehbeck's] complaint was nonsense." (Compl. P45.) According to the Complaint, the following unfolded:

> [Detective Ryan] then told [Silver] that Bernstein and Kuehbeck wished to press charges, and that he therefore had no choice but to arrest [Silver]. [Silver] asked the precise basis upon which he was being arrested, and Ryan answered that it was on the basis of "many threatening phone messages." [Silver], puzzled, asked Detective Ryan if he found such supposed messages threatening, [*54] and Ryan replied "not to my ears, but when a woman is involved we tend to bend over backwards." Upon information and belief, there were no such "messages." Ryan then said that "Bernstein is all over the case, and I'm going to recommend that the ADA interview her separately." He declined to delay his decision pending an investigation of the actual facts. [Silver] was placed in a detention area in the police station behind a locked door, until his release later that day.

(Id. P45.)

In any event, the Complaint does not allege that Detective Ryan had any reason to question Kuehbeck's veracity in her claims that Silver was stalking or harassing her. Silver presented no evidence to demonstrate that Ryan knew of any previous complaint filed by Kuehbeck or any history between the parties. Therefore, information received from Kuehbeck provided Ryan with probable cause to arrest Silver, thereby defeating Silver's false arrest claim.

## B. Probable Cause for Silver's Prosecution

Probable cause also defeats a malicious prosecution claim. See Boyd v. City of New York, 336 F.3d 72, 75; see also Kinzer v. Jackson, 316 F.3d 139, 143. For pur-

poses of the tort of malicious prosecution, [*55] prob- able cause has been defined as "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecut- ing the defendant in the manner complained of" or whether "a discreet and prudent person would be led to the belief that a crime had been committed by the person charged." Morillo v. City of New York, 1997 U.S. Dist. LEXIS 1665 at *14 (S.D.N.Y.) (citing Loeb v. Teitel- baum, 77 A.D.2d 92, 432 N.Y.S.2d 487, 494 (1980)). "The existence of probable cause is measured as of the time the prosecution was initiated and is based on facts known to or believed to be true by the defendant at that time." Id. (citing 432 N.Y.S.2d at 494-95). Here, Detec- tive Ryan had probable cause based on defendant Kue- hbeck's complaint to the police that was strong enough to justify him in the belief that he had lawful grounds to arrest and prosecute Silver. Nor has Plaintiff shown that a judicial proceeding was instituted, which is the first element of a malicious prosecution claim. See supra

1997 U.S. Dist. LEXIS 1665, at *8-10. Accordingly, Silver's malicious prosecution claim is dismissed.

**CONCLUSION**

For the foregoing [*56] reasons, Kuehbeck and Bernstein's motion to dismiss Silver's claims for relief are granted as to the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Thirteenth Claims for Relief; Abady's motion to dismiss is granted as to the Fourteenth Claim for Relief; and Detective Ryan's motion to dismiss is granted as to the Eleventh and Twelfth Claims for Relief.

IT IS SO ORDERED.

Dated: New York, New York

November 7, 2005

Robert P. Patterson, Jr.

U.S.D.J.

LEXSEE 1997 U.S. DIST. LEXIS 1665

**MANUEL MORILLO and NATIVIDAD ROMAN MORILLO, Plaintiffs, -v.- THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, MICHAEL WALSH, KATHY ALVAREZ, STEVEN PATAKI, P.O. "JOHN DOE", and P.O. "JOHN ROE", (Two unidentified police officers involved in the illegal arrest and imprisonment of the plaintiff), Defendants.**

**95 Civ. 2176 (JSM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 1665*

**February 19, 1997, Decided
February 20, 1997, FILED**

**DISPOSITION:** [*1] Plaintiffs' motion for partial summary judgment for false imprisonment and malicious prosecution against defendants Michael Walsh, Steven Pataki, and the City of New York and for violation of *42 U.S.C. § 1983* against Michael Walsh and Steven Pataki granted. Steven Pataki's motion for summary judgment denied.

**COUNSEL:** For plaintiffs: Joseph Lanni, Dinkes & Morelli, New York, New York.

For defendants: Gail Donoghue, Tom Crane, Corporation Counsel of the City of New York, New York, New York. Joseph P. Baumgartner, Lysaght, Lysaght & Kramer, P.C., Lake Success, New York. Joseph Crowley, Crowley & Bolz, Esqs., Elmhurst, New York.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINION BY:** JOHN S. MARTIN, JR.

**OPINION**

**MEMORANDUM OPINION AND ORDER**

JOHN S. MARTIN, Jr., District Judge:

Plaintiff, Manuel Morillo, was arrested in a building on West 138th Street in Manhattan on February 8, 1991 and charged with criminal possession of a controlled substance in the first degree and criminal possession of a weapon. Defendants Michael Walsh and Steven Pataki -- both New York City Police Officers at the time -- testified twice before a grand jury and at Morillo's trial that

they had observed Morillo drop a bag [*2] containing two pounds of cocaine on the ground. They further testified that after placing Morillo in custody, a loaded .357 firearm was found in his possession. Morillo was convicted at trial on both charges.

Defendant Walsh later recanted his account and admitted that he never saw Morillo drop a bag with cocaine and did not find a weapon in Morillo's possession. Walsh also admitted that the physical evidence used to support the charges was recovered from an apartment at 621 West 138th Street during an illegal search and seizure undertaken after Morillo was already in custody. Walsh pled guilty to perjury in connection with Morillo's case and testified against Pataki who was subsequently convicted of perjury. Morillo had served more than three years of a fifteen year-to-life sentence when he was released in May 1994 after Walsh admitted he had committed perjury.

Plaintiffs, Manuel Morillo and his wife, Natividad Roman Morillo, are moving for summary judgment on the causes of action for false imprisonment and malicious prosecution against defendants Walsh, Pataki, and the City of New York and under *42 U.S.C. § 1983* against Walsh and Pataki. Defendant Pataki is cross-moving for summary [*3] judgment claiming he has absolute immunity from liability for his actions in connection with Morillo's arrest and prosecution. Defendant New York City denies liability on the theory that the police officers were acting outside the scope of their employment when they arrested plaintiff and subsequently testified against him before the grand jury and at trial; or, in the alternative, that there is an unresolved factual question regarding whether Walsh and Pataki were act-

1997 U.S. Dist. LEXIS 1665, *

ing within the scope of their employment, thus precluding summary judgment for plaintiffs.

For the following reasons, plaintiffs' motion for partial summary judgment is granted and defendant Pataki's motion for summary judgment is denied.

## PATAKI'S IMMUNITY

Before discussing the merits of plaintiffs' claims, it is necessary to address defendant Pataki's assertion that he is absolutely immune from liability for his actions in connection with Morillo's arrest and prosecution. For the following reasons, the Court rejects Pataki's claim of immunity.

The issue of a police witness' immunity for grand jury or trial testimony depends on a determination regarding the extent of that witness' role in initiating the [*4] prosecution. In *White v. Frank, 855 F.2d 256 (2d Cir. 1988)*, the Court of Appeals underscored the distinction between a "complaining witness" who is not entitled to immunity, and a "mere witness" who is. In reviewing the common law of immunity, the Court explained: "Those whose role was limited to providing testimony enjoyed immunity; those who played a role in initiating a prosecution -- complaining witnesses -- did not enjoy immunity." *Id. at 958-59.* In *White v. Frank*, two police officers who had testified before a grand jury were found not to have immunity, although the Court noted, "they may yet be entitled to immunity if further exploration of the facts demonstrates that they did not play a *sufficient role* in initiating the prosecution to be liable for the constitutional tort of malicious prosecution." *Id. at 962.*

Pataki argues that he was not a "complaining witness," but rather a "mere witness" in the criminal proceedings against Morillo, and therefore, entitled to immunity for his actions. To support his assertion Pataki outlines the active role that defendant Walsh took in the arrest and booking of Morillo, contrasting Pataki's own role by stressing that [*5] he merely acted as a witness at a later stage in the prosecution. Pataki states that Walsh handcuffed Morillo while Pataki was out of the room, that Walsh processed the on-line booking of plaintiff at the precinct and had discussions with the assistant district attorney concerning the circumstances of the arrest, and that Walsh signed the criminal complaint prepared by the assistant district attorney and provided the supporting affidavit -- none of which Pataki did. Thus, according to Pataki, he did not play a "sufficient role in initiating the prosecution" to be held liable in this civil action.

The plaintiff, on the other hand, lists the various acts that Pataki did participate in beyond his testimony to the grand jury and at trial. Plaintiff states that Pataki did participate in the arrest of plaintiff, even if he did not place the handcuffs on plaintiff, he illegally entered the apartment where the bag of cocaine and the gun were seized, he conspired with Walsh to give false testimony about how the physical evidence was obtained and about plaintiff's connection to that evidence, he agreed with Walsh to conceal and did conceal the illegal search and seizure, *and* he testified [*6] before two grand juries and at trial.

While it is true that Walsh was the officer who actively processed the complaint against Morillo at the precinct on the night of February 8, 1991, Pataki was nonetheless an arresting officer. It is inaccurate to indicate that *all* Pataki did was testify as a witness. Even after drawing all justifiable inferences in Pataki's favor, it is clear to this Court that Pataki was present when Morillo was put in custody and when the illegal search and seizure took place, and that he actively participated in the continuing scheme to give false testimony about the circumstances of Morillo's arrest and his and Walsh's illegal conduct. It was not mere coincidence that Walsh and Pataki gave the same false account regarding the circumstances of Morillo's arrest. Walsh admitted in his sworn deposition that he and Pataki conspired to commit perjury by agreeing to give a false account of the circumstances of the arrest on February 8, 1991. This is not a case where an officer's only participation in a prosecution is when he is called to testify at trial and then commits perjury. *See Briscoe v. LaHue, 460 U.S. 325, 341-45; 103 S. Ct. 1108, 1119-1121, 75 L. Ed. 2d 96* [*7] (absolute immunity to police officer for perjured testimony). As the Second Circuit explained in *White v. Frank*, numerous decisions have afforded immunity to police officers and other officials sued under *section 1983* for testifying falsely at pre-trial proceedings and at trial. But, the Court noted, "the decisions have not been careful to recognize that such immunity is available only where the constitutional tort is simply false testimony." *855 F.2d 956, 961* (citations omitted).

In this case, as the record indicates, officers Walsh and Pataki were together when Morillo was arrested, Pataki was in the building when the gun and drugs were taken from the apartment at 621 West 138th Street, Pataki was in the squad car when Morillo was brought to the 30th Precinct, and even though he did not process the booking, he and Walsh gave virtually identical accounts of the events surrounding Morillo's arrest. Pataki is a defendant in this case, not because he merely testified falsely, but because of his participation in the arrest as well as the initiation and advancement of baseless charges against plaintiff. Pataki was an active participant in the fraudulent circumstances surrounding [*8] Morillo's arrest and prosecution. As such, according to the Second Circuit:

Where . . . the constitutional tort is the action of a police officer in initiating a baseless prosecution, his role as a "complaining witness" renders him liable to the victim under *section 1983*, just as it did at common law, and the fact that his testimony at a judicial proceeding may have been the means by which he initiated the prosecution does not permit him to transpose the immunity available for defamation as a defense to malicious prosecution.

*White v. Frank, 855 F.2d at 961.* Pataki certainly participated in the initiation and facilitation of the criminal prosecution of Morillo and can not successfully characterize himself as a "mere witness" entitled to absolute immunity.

Therefore, it is the conclusion of the Court that Pataki's conduct does not allow him to escape liability for his participation in the arrest and prosecution of Morillo. Pataki's role, while not as involved as defendant Walsh, was more substantial than a mere witness and, therefore, as a "complaining witness," Pataki is not immune from civil liability.

**FALSE IMPRISONMENT:**

To establish a cause of action [*9] for false imprisonment, the plaintiff must show that (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Broughton v. State of New York, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 (1975).* According to New York law, neither actual malice nor lack of probable cause is an essential element of the claim. *Id., 373 N.Y.S.2d at 93.*

An arrest made without a warrant is presumed to be unlawful, and in such a case, the burden rests with the defendant to prove legal justification for the arrest. *Id. at 458, 373 N.Y.S.2d at 95.* "Only probable cause existing at the time of arrest will validate the arrest and relieve the defendant of liability." *Id.; see also Ostrover v. City of New York, 192 A.D.2d 115, 118, 600 N.Y.S.2d 243, 244 (1st Dept. 1983).*

The first three elements of the false imprisonment claim are easily met by plaintiff. First, Morillo was intentionally confined by defendants Walsh and Pataki when he was detained in police custody at 621 West 138th Street, arrested, taken to the police station [*10] to be booked, and held in jail on the charges of criminal possession of a controlled substance in the first degree and criminal possession of a weapon. Second, Morillo was

conscious of the confinement. And third, Morillo did not consent to the confinement.

The pivotal issue for this claim rests with the fourth element of a false imprisonment cause of action -- whether it can be shown that there was probable cause to arrest Morillo, thus making the arrest privileged. [1] The burden of proving that there was probable cause to make the warrantless arrest lies with the defendants. "To defeat plaintiff's motion for partial summary judgment on liability for false imprisonment, the defendant's burden [is] to demonstrate that a factual question exist[s] with respect to whether the arrest was based on probable cause." *Ostrover, 192 A.D.2d 115, 118, 600 N.Y.S.2d 243, 244.* In this case, Walsh conceded in his sworn deposition that he did *not* have probable cause to arrest Morillo on the charges for which Morillo was arrested. He also admitted that the arrest of Morillo on the crimes charged constituted a "false arrest."

> 1   Plaintiffs have set forth facts sufficient to satisfy the Court that the arrest was not privileged. *See Broughton v. State of New York, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 (1975).*

[*11] The city argues that there is a disputed question of fact as to whether probable cause or reasonable suspicion existed to take plaintiff into custody on a different charge, thus precluding summary judgment on the false imprisonment cause of action. To support its argument, the city cites Walsh's testimony that although he did not see Morillo drop the bag containing two pounds of crack cocaine, he did find a one ounce bag of cocaine on the floor near where plaintiff was initially stopped. [2]

> 2   Walsh stated in his deposition that he believed he had probable cause to place plaintiff in custody, but not to arrest him for the crimes charged.

Whether or not there was probable cause to arrest plaintiff for the small amount of cocaine is irrelevant to the determination of whether there was probable cause to arrest the plaintiff on the charges of criminal possession of a controlled substance in the first degree and criminal possession of a weapon. The critical issue is not whether there was probable cause to make an [*12] arrest on *different grounds*, but whether there was probable cause to arrest plaintiff for the crimes actually charged. Even if it were found that there was reasonable suspicion to stop or probable cause to arrest Morillo for possession of the small amount of cocaine, Morillo was never charged for possession of that small amount. He was arrested and charged with possession of the drugs claimed to have been found in a garbage bag near where plaintiff was stopped. Those drugs were actually found during the course of an admittedly illegal search and seizure [3] and

cannot be relied on to establish probable cause. *Ostrover, 192 A.D.2d at 118, 600 N.Y.S.2d at 244-45.* As the *Ostrover* court noted, "the fruit of an illegal search cannot give rise, in a juristic sense, to probable cause to arrest, and the *conceded illegality* of the search and seizure is thus *conclusive against the defendant on the issue of privilege.*" *Id.* (emphasis added).

> 3 Defendant Walsh admitted during his deposition that he and Pataki illegally broke into the apartment at 621 West 138th Street where the drugs and gun were found and later falsely attributed to plaintiff.

[*13] Thus, Walsh's concession that the evidence was fraudulently obtained during an illegal search and seizure, coupled with the fact that both officers perjured themselves regarding the true circumstances of Morillo's arrest, supports this Court's conclusion that there was no probable cause to arrest Manuel Morillo for criminal possession of a controlled substance in the first degree and criminal possession of a weapon. The Court is therefore satisfied that plaintiff has established the requisite elements of the tort of false imprisonment as a matter of law.

## MALICIOUS PROSECUTION:

To establish a claim for malicious prosecution, the plaintiff must show (1) the commencement or continuation of a criminal proceeding against the plaintiff; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice. *Broughton v. State of New York, 37 N.Y.2d at 456, 373 N.Y.S.2d at 93.* In contrast to a claim of false imprisonment, a cause of action for malicious prosecution requires the plaintiff to plead lack of probable cause. *Id.* Actual malice may be inferred from the absence of probable cause. [*14] *Loeb v. Teitelbaum, 77 A.D.2d 92, 104, 432 N.Y.S.2d 487, 495-96 (2d Dept. 1980); see also Lancaster v. Kindor, 98 A.D.2d 300, 305, 471 N.Y.S.2d 573, 577 (1st Dept. 1984).*

For purposes of the tort of malicious prosecution, probable cause has been defined as "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of" or whether "a discreet and prudent person would be led to the belief that a crime had been committed by the person charged." *Loeb, 77 A.D.2d at 103, 432 N.Y.S.2d at 494* (citations omitted). The existence of probable cause is measured as of the time the prosecution was initiated and is based on facts known to or believed to be true by the defendant at that time. *432 N.Y.S.2d at 494-95* (citations omitted).

An indictment by a grand jury gives rise to a presumption of probable cause. *Colon v. City of New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248 (1983).* The presumption may be overcome, however, by evidence showing that police witnesses have "not made a complete and full statement of facts" to the grand jury or to the [*15] district attorney, that the witnesses have misrepresented, falsified or withheld evidence, or otherwise acted in bad faith. *Id. at 82-83, 468 N.Y.S.2d at 455-56.* New York law specifically provides, for a plaintiff "to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id. at 83, 468 N.Y.S.2d at 456; Lee v. City of Mount Vernon, 49 N.Y.2d 1041, 1042, 429 N.Y.S.2d 557, 407 N.E.2d 404 (1980).*

In this case, the Court is satisfied that plaintiff has established each element of the malicious prosecution cause of action. Defendants Walsh and Pataki initiated criminal proceedings against plaintiff, thus satisfying the first element of the tort. Their conduct included taking plaintiff into custody, fraudulently obtaining evidence to use against him, concocting a false story to connect plaintiff to the evidence and to justify the charges against him, and most importantly, falsely testifying before the grand jury and at Morillo's criminal trial. Walsh also officially booked plaintiff at the precinct and signed the [*16] criminal complaint prepared by the assistant district attorney.

The second element is satisfied by the fact that Morillo was released from prison after Walsh pled guilty to perjury in connection with Morillo's arrest and prosecution.

The third element, lack of probable cause, is met for a number of reasons. Initially, Walsh has admitted that there was no probable cause for prosecuting Morillo on the charges for which he was arrested and convicted. Both Walsh and Pataki knew that the prosecution of plaintiff was based on false statements made to the ADA, before the grand jury, and at trial. Furthermore, the evidence used to support the criminal charges against plaintiff was obtained during an illegal search and seizure. Even if it were true that plaintiff was in possession of the one ounce bag of cocaine, no facts have been alleged that would indicate that there was probable cause to prosecute Morillo on the crimes for which he was charged, tried, convicted, and incarcerated. As the Court noted in *Scheiner v. Wallace, 1996 U.S. Dist. LEXIS 16315, No. 93 CIV. 0062, 1996 WL 633418, at *6 (S.D.N.Y. Oct. 31, 1996),* "probable cause has been defined as 'a reasonable suspicion that the party is guilty of the offense. [*17] The suspicion must be as to a fact of guilt, not the possibility of obtaining a conviction.'" (citing *Doe v.*

*Smith, 704 F. Supp. 1177, 1187 (S.D.N.Y. 1988)).* That test is not met in this case. The officers knew that the evidence and circumstances supporting the charges was false and that plaintiff was not guilty of those crimes. Finally, the presumption of probable cause raised by the grand jury indictment is clearly overcome by the fact that Walsh admitted and pled guilty to perjury in connection with the prosecution of Morillo and the fact that Pataki was convicted of perjury for his role in that prosecution. *Colon, 60 N.Y.2d at 82-83, 468 N.Y.S.2d at 455-56 (1983)* (presumption overcome by, *inter alia*, perjury by police witnesses).

The fourth element, actual malice, is evidenced both by the deliberate perjury engaged in by Walsh and Pataki, as well as by the above finding of lack of probable cause. *See Loeb v. Teitelbaum, 77 A.D.2d at 104, 432 N.Y.S.2d at 495-96.* As discussed above, Walsh and Pataki fabricated the entire circumstances of plaintiff's arrest. The on-line booking sheet filled out by Walsh contained false statements. The criminal complaint prepared by [*18] the assistant district attorney was based on false statements relayed by Walsh. Both Walsh and Pataki committed perjury before the grand jury and at trial. The evidence relied on to support the charges against plaintiff was obtained by a warrantless and illegal search and seizure and the circumstances of its recovery were fabricated by Walsh and Pataki. In substance, the foundation of the prosecution of Manuel Morillo was perjury and false evidence. It is clear that neither Walsh nor Pataki had knowledge of facts to justify a belief that there were "lawful grounds for prosecuting the [plaintiff]" in the manner complained of." *See Loeb, 77 A.D.2d at 103-104, 432 N.Y.S.2d at 494.* The Court, therefore, determines that the above outlined conduct constitutes a malicious prosecution.

### 42 U.S.C. § 1983:

42 U.S.C. § 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to establish a valid claim under *section 1983* a plaintiff must show that (1) the conduct at issue was engaged in under color of state law and (2) the conduct subjected the plaintiff to a deprivation [*19] of rights guaranteed by the Constitution or federal law. *See, e.g., Eagleston v. Guido, 41 F.3d 865, 876 (2d Cir. 1994)* (citations omitted).

In this case, defendants Walsh and Pataki, as police officers, acted under color of state law when they took Morillo into custody and officially arrested him and then assisted in his prosecution as government witnesses in the subsequent criminal proceedings.

Plaintiff claims that because of the conduct engaged in by Walsh and Pataki he was deprived of his *Four-teenth Amendment* due process right to a fair trial and, as a result, deprived of his liberty for more than three years. As discussed above, Walsh and Pataki acted in bad faith throughout the criminal proceedings against Morillo. Walsh and Pataki did not have probable cause to arrest plaintiff for criminal possession of a controlled substance in the first degree or for criminal possession of a weapon. The evidence used against Morillo was obtained during an illegal search of an apartment at 621 West 138th Street. Walsh admitted that he and Pataki conspired to commit perjury by agreeing ahead of time to falsify their account of the circumstances of Morillo's arrest. While Pataki challenges [*20] the existence of a conspiracy, there is no dispute that Walsh and Pataki gave virtually identical and false accounts of the circumstances surrounding plaintiff's arrest. It is not reasonable to infer that such fabricated similarity was a coincidence. Finally, both police officers perjured themselves in their testimony before the grand jury on two separate occasions and at Morillo's trial.

The prosecution of Morillo was ripe with deceit and falsehood due to the actions of officers Walsh and Pataki. The officers initiated baseless charges against plaintiff based on fraudulently obtained evidence and false circumstances. *See White v. Frank, 855 F.2d at 961; cf. Briscoe v. LaHue, 460 U.S. 325, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983).* The record is clear that because of the illegal activity and false testimony of the police officers, Morillo did not receive a fair trial and, as a result, was deprived of his liberty for more than three years in violation of the *Due Process clause of the Fourteenth Amendment.* As such, defendants Walsh and Pataki violated *42 U.S.C. § 1983* by their illegal and bad faith conduct during the arrest and prosecution of plaintiff Morillo.

### CITY'S [*21] LIABILITY

The doctrine of respondeat superior renders an employer vicariously liable for the torts of its employees, even when the employee's actions are intentional, if the actions were done while acting within the scope of his employment. *See, e.g., Riviello v. Waldron, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302, 391 N.E.2d 1278 (1979).* Courts rely on various factors to determine whether a particular act falls within the scope of employment. The test has been characterized as "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Id.* (citations omitted). The precise act or the exact manner of injury need not have been foreseen as long as the "general type of conduct may have been reasonably expected." *Id. at 304, 418 N.Y.S.2d at 303.* There is no vicarious liability, however, for torts committed by the employee while he was acting solely for personal motives unrelated to the furtherance of the em-

ployer's business. *Kirkman v. Astoria General Hospital, 204 A.D.2d 401, 402, 611 N.Y.S.2d 615, 616 (2d Dept. 1994)*; *Stavitz v. City of New York, 98 A.D.2d 529, 531, 471 N.Y.S.2d 272, 274* [\*22] *(1st Dept. 1984).* Because the issue of whether a particular act is within the scope of employment depends so heavily on factual considerations, it is ordinarily one for the jury to decide. *Riviello, 47 N.Y.2d at 303, 418 N.Y.S.2d at 303* (citations omitted).

In this case, the city argues that the police officer defendants were acting outside the scope of their employment and were motivated by a personal purpose rather than the interests of New York City. The city details the litany of other criminal activities engaged in by defendant Walsh -- including numerous acts of stealing money and drugs from suspects -- and attempts to categorize Walsh's behavior with respect to Morillo as part of his repeated practice of illegal conduct for personal monetary gain.

Perhaps, in other procedural circumstances, such arguments would support a denial of summary judgment and require a jury to decide the officers' motivation. In response to Plaintiffs' Amended Request for Admissions under *Rule 36 of the Federal Rules of Civil Procedure*, however, defendant New York City *admitted* that Walsh and Pataki were acting within the scope of their employment when they arrested Morillo and when [\*23] they testified against him before the grand jury. The Response of Defendants City of New York and Kathy Alvarez to Plaintiffs' Amended Requests for Admissions reads in pertinent part as follows:

> *REQUEST NO. 6:*

> 6. That P.O. Michael Walsh and P.O. Steven Pataki arrested and placed into custody MANUEL MORILLO at or about 2:00 A.M. - 3:00 A.M. on February 8, 1991.

> *RESPONSE TO REQUEST NO. 6:*

> 6. Admit.

> *REQUEST NO.7:*

> 7. That P.O. Michael Walsh and P.O. Steven Pataki arrested MANUEL MORILLO on February 8, 1991 in the course and within the scope of their employment duties as police officers of the City of New York and the NYPD.

> *RESPONSE TO REQUEST NO. 7:*

> 7. Admit.

> *REQUEST NO. 8:*

> 8. That P.O. Michael Walsh, P.O. Steven Pataki and P.O. Cathy Alvarez testified before the Grand Jury of the Special Narcotics Part of the City of New York in *People v. Morillo* on April 10, 1991 in the course of and within the scope of their employment duties as police officers of the City of New York and the NYPD.

> *RESPONSE TO REQUEST NO. 8:*

> 8. Defendants admit that P.O. Michael Walsh, P.O. Steven Pataki and P.O. Kathy Alvarez testified before the Grand [\*24] Jury in connection with the arrest of Manuel Morillo and that so testifying was in the course of and within the scope of their employment duties as police officers of the City of New York and the NYPD.

(Resp. Defs. NYC and Alvarez to Pls. Am. Reqs. for Admis. at PP 6-8).

Despite the above admissions, the city asserts that it did not admit that the "prosecution on false charges" was within the scope of the police officers' employment and, therefore, the city should not be held vicariously liable for malicious prosecution. That reasoning ignores the significance of these admissions. The pivotal role of Walsh and Pataki in the commencement and continuation of the criminal prosecution of Morillo was the testimony offered before the grand jury that eventually issued the indictment. Similarly, the determinative act of the defendant police officers relating to the false imprisonment cause of action was the arrest of plaintiff -- an act the city admitted was done within the scope of the officers' employment for the city and the police department. The city cannot now deny that the officers were acting within the scope of their employment, ignoring its previous admissions. The city made [\*25] admissions and must be held to them. Thus, the court rejects the city's denial of liability for the torts of false imprisonment and malicious prosecution.

**CONCLUSION:**

For the foregoing reasons, plaintiffs' motion for partial summary judgment for false imprisonment and malicious prosecution against defendants Michael Walsh, Steven Pataki, and the City of New York and for violation of *42 U.S.C. § 1983* against Michael Walsh and Steven Pataki is hereby granted. Steven Pataki's motion for summary judgment is hereby denied. Thus, the only issue remaining for trial is that of the damages plaintiff is entitled to recover from the defendants.

1997 U.S. Dist. LEXIS 1665, *

**SO ORDERED.**

Dated: New York, New York

February *19*, 1997

JOHN S. MARTIN, JR., U.S.D.J.

LEXSEE 2000 U.S. DIST. LEXIS 4237

**MARK KOMLOSI, Plaintiff, -against- MELANIE FUDENBERG, Defendant.**

**88 Civ. 1792 (HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 4237*

**March 31, 2000, Decided
March 31, 2000, Filed**

**DISPOSITION:**     [*1] Defendant's motion for judgment as matter of law granted in part and denied in part.

**COUNSEL:** For MARK KOMLOSI, plaintiff: Robert E. Goldman, Speno Goldman Goldberg Steingart & Penn, P.C., Mineola, NY.

For KENNETH BRODSKY, IVAN CANUTESON, CHARLES DEYOUNGE, JAMES BRENNAH, ARTHUR FOGEL, ELIN M HOWE, LOUIS GANIM, SHELDON KRAMER, NEW YORK STATE OFFICE OF MENTAL RETRADATION, JOSEPH SABATOS, ARTHUR WEBB, ROBERT WITKOWSKY, WALTER DELEONE, defendants: Robert W Abrams, Attorney General, New York, NY.

For MELANIE FUDENBERG, defendant: Mark E. Goldell, Galasso, Langione, Garden City, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION**

*OPINION AND ORDER*

PITMAN, United States Magistrate Judge:

I. *Introduction*

Defendant moves for an order directing the entry of judgment in her favor as a matter of law pursuant to *Rule 50(b), Fed.R.Civ.P.* For the reasons set forth below, the motion is granted in part and denied in part. In addition, unless, within thirty days of the date of this Opinion and Order, plaintiff stipulates to remit all compensatory damages to the extent that they exceed $ 1,872,988.00 and all punitive damages to the extent that they exceed $ [*2] 500,000, I grant defendant's motion to the extent of ordering a new trial limited to the issue of damages. [1]

> 1 Defendant has not expressly moved for a new trial under Rule 59. However, defendant's claim concerning the excessive size of the verdict does not appear to be the type of claim on which a new trial could be granted under *Rule 50(b)(1)(B), Fed.R.Civ.P.* An excessive verdict is cured by a new trial or remittitur, *not* by the entry of judgment for the losing party. *See generally* 9A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 2538 at 359 (2d ed. 1994) ("The discretion to order a new trial [under *Rule 50(b)*] exists only if the moving party would be entitled to judgment as a matter of law.") Nevertheless, as discussed at pagea 11-12, below, defendant's notice of motion does expressly raise the issue of excessive damages, a traditional Rule 59 claim. *See generally* 11 Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 2807 (2d ed. 1994). Thus, it appears that the absence of an express reference to Rule 59 may have been an oversight. Accordingly, I deem defendant's notice of motion to be seeking, as alternative relief, a new trial on the grounds of excessiveness of the verdict.

[*3] II. *Facts*

A. *Overview*

This is a civil rights action brought pursuant to *42 U.S.C. § 1983* in which plaintiff, a psychologist formerly employed by the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"),

claims that defendant violated his federally protected rights by causing false charges of sexual misconduct to be made against him. With the parties' consent pursuant to 28 U.S.C. § 636(c), this matter was tried to a jury from May 24, through June 3, 1999. The case was submitted to the jury on three different theories of liability. The jury returned a verdict in plaintiff's favor on two of the three theories submitted to it and awarded $ 6.6 million in compensatory damages and $ 10 million in punitive damages.

B. *The Evidence at Trial*

The facts underlying this action are discussed in some detail in the Court of Appeals' decision dismissing the claims against all defendants other than Melanie Fudenberg. *Komlosi v. New York State Office of Mental Retardation and Developmental Disabilities, 64 F.3d 810 (2d Cir. 1995).* Familiarity with that decision is assumed. I shall review [*4] the facts established at trial to the extent necessary to understand the pending motion.

Plaintiff was born and educated in the Republic of Czechoslovakia and immigrated to the United States in 1970. In 1974, plaintiff obtained permanent employment as a psychologist with the OMRDD. Plaintiff was initially assigned to the Brooklyn Developmental Center ("BDC"); in 1982, he was re-assigned to the Williamsburg Residential Training Center ("WRTC").

WRTC was a residential facility for approximately 46 developmentally disabled male and female adults who were cared for by approximately 60 professional and administrative staff. By 1984, plaintiff had achieved the level of "Psychologist II" and earned approximately $ 32,000 per year. His duties included both administrative and clinical responsibilities. In the early 1980's, he was also working on completing a Ph.D. dissertation in psychology. A doctoral degree would have entitled plaintiff to additional promotions and pay increases.

The defendant, Melanie Fudenberg, was also employed at WRTC. After starting as a switchboard operator, defendant was given a position as a Mental Health Therapy Aide Trainee. She subsequently was promoted to the [*5] position of Therapy Aide. Her duties as a Therapy Aide included assisting the residents of the facility with their activities of daily living and implementing direct care plans prepared by plaintiff and other professional staff members.

In 1984, WRTC had a procedure for its employees to follow to report incidents of suspected abuse of its residents. Any WRTC employee witnessing or suspecting abuse of a resident was required to report the suspected abuse to his or her immediate supervisor and also complete a written incident report. The report of a suspected incident of abuse would trigger an internal investigation into the incident and result in an investigative fact finding report with conclusions, recommendations and, if necessary, action against the employee responsible for the abuse. The incident report and the investigative findings became a permanent record of the facility.

Plaintiff could recall three instances of conflict with his co-employee Melanie Fudenberg at WRTC prior to August 1984. The first involved a resident named Sammy Roche who reported to plaintiff that defendant had struck him in the face. In accordance with WRTC procedure, plaintiff brought Roche to his immediate [*6] supervisor and reported the incident. When confronted by Roche, plaintiff and the supervisor, defendant denied having struck Roche.

The plaintiff and defendant also had a disagreement regarding a treatment plan prepared by the plaintiff for Anthony Ford. Ford had a history of being physically abusive towards staff members and, after determining that restraint and confrontation had not succeeded, plaintiff decided to try a therapy plan that included non-confrontational or passive response to Ford's attacks. Although defendant lacked plaintiff's professional training, she disagreed with and disapproved of plaintiff's approach.

A third incident involved WRTC resident, Marion Greengrass. In August 1984, defendant accompanied Greengrass to WRTC Chief of Services, Arthur Fogel, where Greengrass complained that plaintiff had sexually abused her. Plaintiff was placed on administrative leave and an investigation into the allegation ensued. The investigation concluded that the allegations were unsubstantiated, and that defendant had bribed Greengrass with cigarettes to fabricate the allegation against plaintiff.

During the investigation into Greengrass's allegations, defendant advised Fogel [*7] of other alleged incidents of sexual misconduct by plaintiff directed at other WRTC residents. Investigations of these allegations revealed that these charges were also unfounded. The defendant also accompanied WRTC resident Michael Sakowitz to Fogel's office at which time Sakowitz claimed that plaintiff had sexually abused him. However, after defendant left Sakowitz alone with Fogel, Sakowitz recanted his allegation and stated that defendant had instructed him to make the allegation.

In November 1984, Ivan Canuteson, OMRDD Associate Commissioner of Program Operations visited WRTC. During his visit, defendant approached Canuteson and expressed concerns that the charges of abuse against plaintiff had not been properly investigated. Based upon defendant's complaint to Canuteson, another investigation was ordered by OMRDD. Client's Rights Specialist, Lovetts Joyner, was assigned to conduct the investigation. Following his investigation, Joyner also

determined that the charges were baseless. He prepared a written report dated January 8, 1985 which stated that defendant's charges against plaintiff were unsubstantiated and had been created by defendant with the intent to injure plaintiff's [*8] reputation. He further recommended that a formal letter of exoneration be placed in plaintiff's personnel file and that OMRDD Employee Relations be advised of defendant's wrongful attempt to damage plaintiff's reputation and livelihood.

In March 1985, the defendant threatened WRTC resident David Rosenberg with "trouble" unless Rosenberg accused plaintiff of engaging in acts of sexual impropriety with Rosenberg. These accusations, like the previous allegations the defendant had concocted, were false. As she had done with other residents, the defendant escorted Rosenberg to Fogel's office and caused him to complain that plaintiff had sexually abused him sometime in February or March 1984. The defendant filed the requisite incident report and, again, the investigative process began. The plaintiff vehemently denied that he had sexually abused Rosenberg or any other resident at the facility.

The plaintiff was initially placed on administrative leave and then suspended without pay pending the completion of the investigation. However, the New York City Police Department subsequently started its own investigation, and the BDC's investigation was suspended.

On May 2, 1985, plaintiff was [*9] arrested and charged with nine counts of sexual abuse including rape and forcible sodomy. The alleged victims were all WRTC residents. As a result of the charges, plaintiff was arrested, handcuffed, chained to other suspected offenders, transported to a police station on where he was fingerprinted, photographed, strip searched, booked and jailed. He was later arraigned; bail was set at $ 75,000, which plaintiff was unable to post. He remained in jail for fifteen days; during his incarceration, other inmates threatened him physically and sexually. The New York Post reported the charges against plaintiff under the headline "SHRINK HELD IN SEX ATTACKS ON PATIENTS." During this time, plaintiff was frightened, humiliated, embarrassed and uncertain what his future would hold. He described his emotional state and experiences to the jury as "a nightmare." Due to concerns for his safety, authorities placed plaintiff in administrative segregation.

From March through May, 1985, Rosenberg stated to Detective Catalfumo of the New York City Police Department and to prosecutors from the Kings County District Attorney's Office that he and plaintiff had engaged in acts of sexual impropriety. Those [*10] statements formed the basis for the arrest and indictment of plaintiff.

In May, 1985, the grand jury indicted the plaintiff on two (2) counts of "deviant sexual intercourse." Plaintiff's bail conditions were subsequently reduced, and plaintiff was released on his own recognizance. He was, however, required to surrender his passport and to attend all court appointments including the trial proceedings. Plaintiff remained suspended without pay from his position pending the disposition of the criminal charges.

Plaintiff's criminal trial commenced in May 1986. During the trial, before plaintiff was to testify, Rosenberg recanted his accusations. As a result of Rosenberg's recantation, the charges against plaintiff were dropped and the case was dismissed.

Plaintiff has been seeing a psychiatrist ever since the charges against him were dismissed and has been diagnosed with post-traumatic stress disorder. In addition to therapy, plaintiff has been prescribed anti-depressant and anti-anxiety medications. Plaintiff's treating psychiatrist characterized plaintiff's condition as chronic and permanent and of sufficient severity that it will continue to compromise plaintiff's personal, professional [*11] and social life. Plaintiff's psychiatrist also testified that plaintiff's fear and anxiety of being falsely accused, criminally charged, jailed and prosecuted for sexually abusing a patient will forever prevent him from practicing as a psychologist.

In September 1986, the plaintiff was offered reinstatement to his position at WRTC. Although plaintiff attempted to resume his duties at WRTC, he was unable to do so because defendant and Rosenberg were still at the facility and plaintiff feared a repeat of the past horrific experiences. The day following his attempt to return to work, plaintiff submitted a written resignation to BDC citing "health reasons" for his departure.

Plaintiff testified that, since his resignation from BDC, he attempted to pursue employment as a psychologist on two occasions. Plaintiff was not hired for the first position because the employer found out that he had been charged with sexual abuse of residents at WRTC. Plaintiff was terminated from the second position because he was unable to restrain a patient who attempted to run from a fire drill; plaintiff feared that he would be accused of improper physical contact with the patient if he attempted to restrain [*12] her physically.

Since 1986, plaintiff has been employed in various menial part-time positions but most steadily as a part-time doorman/concierge. During trial, plaintiff's expert economist, Dean W. Morse, testified that plaintiff's economic damages over his work life expectancy are $ 1,372,988, discounted to present value. Professor Morse

2000 U.S. Dist. LEXIS 4237, *

further testified that this is an extremely conservative figure. The defendant did not introduce any evidence to controvert this figure.

The case was submitted to the jury on three different theories of *Section 1983* liability: (1) defendant's alleged conduct constituted a violation of plaintiff's right to continued employment; (2) defendant's alleged conduct violated plaintiff's right to pursue the career of his choice (the "stigma plus" claim), and (3) defendant's alleged conduct violated plaintiff's right to be free of malicious and baseless prosecutions. The jury found for defendant on the first theory and returned a verdict for plaintiff on the second two theories. The jury awarded a total of $ 6.6 million in compensatory damages and $ 10 million in punitive damages.

III. *Analysis*

A. *Standards Applicable To a Rule 50(b) Motion*

[*13]   The standards applicable to a motion for judgment as a matter of law are well settled and require only brief review.

"Judgment as a matter of law may not properly be granted under *Rule 50* unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his] favor." *Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 289 (2d Cir. 1998); see also Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1039 (2d Cir. 1992); Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991).* In ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. *See, e.g., Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d at 289, Vasbinder v. Ambach, 926 F.2d at 1339-40.* Thus, judgment as a matter of law should not be granted unless

(1) there is such a complete [*14] absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there

is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers, 34 F.3d 1148, 1154 (2d Cir. 1994)* (internal quotation marks omitted).

*Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999). See also Fernandez v. North Shore Ortho. Surg. & Sports Med. P.C., 79 F. Supp. 2d 197, 201-02 (E.D.N.Y. 2000); Jarvis v. Ford Motor Co., 69 F. Supp. 2d 582, 590 (S.D.N.Y. 1999); Culp v. Sgt. Zaccagnino, 1999 U.S. Dist. LEXIS 13752, 96 Civ. 3280 (THK), 1999 WL 701394 at *1 (S.D.N.Y. Sept. 8, 1999).*

In an Affirmation annexed to defendant's Notice of Motion, defendant contends that she is entitled to judgment as a matter of law on six different grounds:

6. The defendant respectfully submits that she is entitled to Judgment as a matter of law because: (i) she was not acting under color of state law; [*15] (ii) at the time of defendant's alleged misconduct, there was no clearly established federally protected right to engage in the employment of one's own choosing or to practice the profession of one's own choosing; (iii) because plaintiff was not fired, no liberty interest was implicated by defendant's conduct; (iv) at the time of defendant's alleged misconduct, there was no clearly established federally protected right to be free from malicious prosecution; (v) defendant did not cause plaintiff to be maliciously prosecuted because the chain of causation was broken by the independent police investigation and the District Attorney's prosecution and presentation of the case to the Grand Jury, free of any evidence of pressure, influence or participation by the defendant; and (vi) both the compensatory and punitive damages [awards] are excessive.

(Affirmation of Mark E. Goidell, Esq., dated June 23, 1999 at 6). Notwithstanding the requirements of Local

Civil Rule 7.1 [2], the memorandum of law submitted in support of defendant's motion ignores some of the foregoing claims, and raises other arguments not identified in the affidavit. In her memorandum of law, defendant does not address [*16] her contentions that (1) the plaintiff had no clearly established federal right to pursue the career of his choosing, (2) the plaintiff had no clearly established federal right to be free of malicious prosecutions, and (3) the verdict was excessive. In her memorandum of law, however, defendant does raise the additional claim that she is not responsible for any constitutional injury because she did not have discretionary authority to cause constitutional injury. Defendant offers no explanation for the inconsistency between the affirmation annexed to her notice of motion and her memorandum of law.

    2   Rule 7.1 of the Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York provides:

> Except as otherwise permitted by the court, all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon in support of or in opposition to the motion, and divided, under appropriate headings, into as many parts as there are points to be determined. Willful failure to comply with this rule may be deemed sufficient cause for the denial of a motion or for the granting of a motion by default.

[*17] The inconsistency between defendant's affirmation and memorandum is troubling and ill serves the Court; the mere identification of an issue, without supporting briefing, is singularly unhelpful when the question before the Court is whether defendant is entitled to judgment as a matter of law. Nevertheless, because the issues raised in defendant's affirmation may be dispositive, I shall consider them notwithstanding defendant's failure to brief them in her memorandum of law.

B. *Plaintiff's "Stigma Plus" Claim*

    1. *Merits of the Claim* [3]

    3   Pursuant to *County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)* and *Medeiros v. O'Connell, 150*

*F.3d 164, 169 (2d Cir. 1998)*, I consider the merits of this claim before addressing the immunity issue.

    Although it is now well settled that damage to an individual's reputation by a state agent coupled with "the termination of some other legal right or status will suffice to constitute a deprivation [*18] of a liberty interest", *Greenwood v. State of New York, 163 F.3d 119, 124 (2d Cir. 1998)* (inner quotations omitted), it is still not clear what satisfies the additional "plus" factor. *See generally* Martin A. Schwartz, *'Stigma Plus' Claims,* N.Y.L.J., Feb. 15, 2000, at 4 ("Supreme Court decisional law, however, has not resolved whether the plus must be a tangible deprivation, such as loss of a job or inability to pursue a profession, or whether it can be the denial of any right or status recognized by state law.").

    Drawing all the inferences in favor of plaintiff, the evidence in this case showed that plaintiff was suspended without pay and subsequently subjected to a criminal prosecution as a result of defendant's causing Rosenberg to make false complaints against plaintiff. After the charges were dismissed, plaintiff was offered reinstatement, but ultimately resigned because the psychological injury he had suffered made it impossible for him to function as a psychologist. The only evidence concerning plaintiff's subsequent efforts to obtain and keep employment as a psychologist showed that one subsequent prospective employer rejected plaintiff when it learned [*19] of the abuse charges and that a second employer terminated plaintiff when he refused to restrain a patient during a fire drill for fear of being charged with inappropriate physical contact.

    As a matter of law, however, suspension without pay is not a sufficient "plus" factor to give rise to a protected liberty interest. In *Dobosz v. Walsh, 892 F.2d 1135 (2d Cir. 1989)*, the plaintiff, a Bridgeport, Connecticut police officer, had cooperated in the federal investigation of another police officer, Fitzgerald. Dobosz testified before the grand jury and at trial against Fitzgerald; Dobosz's testimony suggested that Fitzgerald had killed an individual without justification and subsequently "planted" a knife next to the decedent's body in order to fabricate a claim of self defense.

    After Fitzgerald was acquitted, Dobosz's employer announced that Dobosz would be suspended and prosecuted for perjury. Although departmental charges were subsequently brought against Dobosz, no criminal proceedings were ever commenced against him. After he was acquitted of the departmental charges, he was reinstated with full back pay and seniority credit.

    Dobosz subsequently brought a *Section* [*20] *1983* claim against the superintendent of the Bridgeport Police Department, asserting, among other things, a "stigma

plus" claim. The Court of Appeals affirmed the dismissal of this aspect of Dobosz's claim, stating:

> [*Board of Regents v. Roth, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)*] held that two kinds of liberty concerns trigger due process rights in the public employment context: (i) the employee's interest in good name and reputation; and (ii) the employee's interest in being able to seek other employment opportunities. See *id. at 573-74, 92 S. Ct. at 2707.* Dobosz has alleged that [the Superintendent's] acts and statements were injurious to his reputation. However, under *Paul v. Davis, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976),* government acts defaming an individual implicate a liberty interest only where the individual suffers a related alteration of his legal status or deprivation of a right recognized under state law. *See id. at 710-12, 96 S. Ct. at 1164-65.* Dobosz suffered no such alteration. He was reinstated with back pay and seniority credit, and his due process claim thus fails [*21] the *Paul* "reputation plus" test. *See Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir.), cert. denied, 493 U.S. 816, 110 S. Ct. 66, 107 L. Ed. 2d 33 (1989); see also Sparks v. City of Atlanta, 496 F. Supp. 770 774 (N.D. Ga. 1980)* ("stigma" suffered by police officer whose suspension was rescinded does not give rise to due process liberty interest).

*892 F.2d at 1140.*

Plaintiff makes no attempt to distinguish *Dobosz* or to explain why it is not controlling here. Indeed, plaintiff's post-trial papers do not address *Dobosz* at all.

Since *Dobosz* clearly holds that a suspension without pay is insufficient to satisfy the "plus" element of a "stigma plus" claim, defendant is entitled to judgment as a matter of law on that aspect of plaintiff's claim asserting liability based on defendant's interference with his right to pursue a career of his choosing. [4] In light of this disposition, it is unnecessary to reach the other arguments asserted by defendant concerning the merits of this aspect of plaintiff's claim.

4    I assume the jury concluded that defendant's conduct made it substantially more difficult for plaintiff to find employment as a psychologist.

That fact, however, does not salvage plaintiff's "sigma plus" claim. *Siegert v. Gilley, 500 U.S. 226, 234, 114 L. Ed. 2d 277, 111 S. Ct. 1789 (1991)* ("The statements contained in the letter would undoubtedly damage the reputation of one in [the plaintiff's] position, and impair his future employment prospects. . . . But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action."); *Paul v. Davis, 424 U.S. 693, 697, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976)* (concluding that the plaintiff suffered no violation of a liberty interest, even though his complaint alleged impairment of future employment opportunities).

[*22] 2. *Qualified Immunity*

The doctrine of qualified immunity was recently summarized by the Court of Appeals in *McCullough v. Wyandanch Union Free School Dist., 187 F.3d 272, 278 (2d Cir. 1999):*

> A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights. A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. The unlawfulness must be apparent.

*See also Anderson v. Creighton, 483 U.S. 635, 638-39, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982); Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir. 2000);* [*23] *Connell v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998); Brown v. City of Oneonta, 106 F.3d 1125, 1130-31 (2d Cir. 1997).*

The events giving rise to plaintiff's "stigma plus" claim occurred in 1985. However, except in cases in-

volving a wrongful termination of employment, the elements of a stigma plus claim were not clearly established at that time.

In *Greenwood v. State of New York, supra, 163 F.3d 119 (2d Cir. 1998)*, the issue was whether the elements of a non-termination, "stigma plus" claim had been clearly established as of 1982, and the Court of Appeals concluded that the elements of such a claim were not clearly established as of 1982. *163 F.3d at 124.* In reaching its conclusion concerning the state of the law in 1982, the Court relied on its 1989 statement that ""'stigma plus" is required to establish a constitutional deprivation, but it is not entirely clear what the plus is.'" *163 F.3d at 124, citing Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir. 1989).* Since the contours of the right were not clearly established in 1982, it necessarily follows that they were not clearly established in [*24] 1985.

Thus, defendant is also entitled to judgment as a matter of law on plaintiff's stigma plus claim pursuant to the doctrine of qualified immunity.

*C. Malicious Prosecution*

*1. Merits of the Claim*

Defendant attacks the merits of the malicious prosecution aspect of plaintiff's claim on several grounds. Again, I shall examine each issue relating to the merits of the claim before addressing the qualified immunity defense.

*a. Color of State Law*

Defendant first argues that the verdict cannot stand because there is insufficient proof that she was acting under color of state law. In substance, defendant claims that the evidence established, at most, a personal pursuit by defendant. Since the conduct was personal, says defendant, it is not actionable under *Section 1983.*

"The Supreme Court has broadly interpreted the color of law requirement, concluding that 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law.'" *United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999), quoting United States v. Classic, 313 U.S. 299, 326, 85 L. Ed. 1368, 61 S. Ct. 1031 (1941).* [5]

[*25]

To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Ibid.* "State employment is generally sufficient to render the defendant a state actor." [*Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 n.18, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982)*]. It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. *See Monroe v. Pape, [365 U.S. 167, 172, 5 L. Ed. 2d 492, 81 S. Ct. 473 (1961), overruled in part on other grounds, Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 695-701, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)].* Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law. *See e.g., Parratt v. Taylor, [451 U.S. 527, 535-536, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), overruled in [*26] part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-331, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)]; Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S. Ct. 1598, 1605-1606, 26 L. Ed. 2d 142 (1970). See also Flagg Bros., Inc. v. Brooks, [436 U.S. 149, 157 n.5, 56 L. Ed. 2d 185, 98 S. Ct. 1729 (1978)].*

*West v. Atkins, 487 U.S. 42, 49-50, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).*

5   Although *Classic* defined "color state of law" in the context of a prosecution under *18 U.S.C. § 241*, the definition is equally applicable to a civil action brought under *42 U.S.C. § 1983. West v. Atkins, 487 U.S. 42, 49, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988).*

There was clearly enough evidence in this case to sustain a finding that defendant acted under color of state law when she caused false charges to be made against plaintiff. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable [*27] inferences in his favor, the evidence established that defendant had access to Rosenberg by virtue of her employment by the state as a Therapy Aide. There was no evidence that defendant ever had any relationship with Rosenberg outside the WRTC. It was only by virtue of her access to Rosenberg that she was able to coerce him to make a false charge of sexual abuse against plaintiff.

Thus, contrary to defendant's argument, this is not a case of purely personal animus that erupted into confrontation while the participants merely happened to be on state property. Rather, this is a case in which plaintiff misused the incidents of her state employment, namely her access to and relationship with Rosenberg, to cause false allegations of misconduct to be made against plaintiff by Rosenberg. In other words, this was a case in which the abuse was "made possible only because the wrongdoer [was] clothed with the authority of state law." *United States v. Classic, supra, 313 U.S. at 326.* The notion that Rosenberg would have submitted to defendant's directions, absent her position as Therapy Aide, is an assumption that is not supported by either the record or common sense.

In support [*28] of her argument, defendant cites a number of cases in which direct physical assaults by state employees on another were found not to constitute state action. *Martinez v. Colon, 54 F.3d 980 (1st Cir. 1995); Hughes v. Halifax Co. School Bd., 855 F.2d 183, 187 (4th Cir. 1988); Segreto v. Kirschner, 977 F. Supp. 553 (D. Conn. 1997); Williams v. Josephs, 1993 U.S. Dist. LEXIS 14079, 91 Civ. 8178 (MBM), 1993 WL 403969 (S.D.N.Y. Oct. 7, 1993).* ⁶ These cases are all distinguishable. In each, although the assault took place on state property, the state employment provided "at most the occasion but not the means for committing the challenged acts." *Williams v. Josephs, supra, 1993 U.S. Dist. LEXIS 14079, *8, 1993 WL 403969 at *3.* In this case, on the other hand, there was sufficient evidence for the jury to conclude that defendant was able to cause Rosenberg to make the false allegation by virtue of her employment-based relationship with him and that it was defendant's state employment that provided the means for the conduct in issue.

> 6  In this regard, defendant also cites an unpublished Summary Order of the Court of Appeals for the Second Circuit. Since defendant's citation of this Summary Order violates Rule 0.23 of Second Circuit's Rules, I have not considered it.

[*29] Thus, defendant is not entitled to judgment as a matter of law on the theory that there was insufficient evidence that defendant acted under color of state law.

b. *Causation*

Because defendant's remaining arguments address the sufficiency of the proof of the malicious prosecution aspect of plaintiff's claim, it is helpful to first identify those elements.

The elements of a *Section 1983* claim based on malicious prosecution are borrowed from state tort law. *Lee v. Edwards, 101 F.3d 805, 810 n.4 (2d Cir. 1996); Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994).*

In order to state a claim for the tort of malicious prosecution under New York State law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995);* see *Broughton v. State, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 95, 335 N.E.2d 310, cert. denied, 423 U.S. 929, 96 S. Ct. 277, 46 L. Ed. 2d 257 (1975).* [*30]

*Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997).* Defendant's challenges here relate to the first and second elements.

Defendant first argues that she is entitled to judgment as a matter of law because the evidence was insufficient to support a finding that she caused the commencement of the criminal prosecution against plaintiff. Specifically, defendant argues that she cannot be found to have initiated the prosecution because plaintiff's indictment was the product of the intervening and independent acts of the grand jury and the Kings County District Attorney (Defendant's Memorandum of Law in Support of her *Rule 50(b)* Motion for Judgment as a Matter of Law ("Def. Memo.") at 19-21).

The direct evidence at trial concerning the commencement and termination of the criminal proceeding against plaintiff consisted primarily of the following stipulated facts:

> David Rosenberg, a resident at the Williamsburg Residential Training Center accused Mr. Komlosi of having sexually abused him.
>
> An investigation of Mr. Rosenberg's allegation was conducted by the Williamsburg Residential Training Center.
>
> [In March 1985, through May, 1985, David Rosenberg stated to Detective [*31] Catalfumo of the New York City Police Department and prosecutors of the Kings County District Attorney's Office that he and Mark Komlosi had engaged in acts of sexual impropriety which served as their bases for the arrest and indictment of plaintiff Mark Komlosi, up to the date of dismissal, May 29, 1986.]

Mr. Komlosi was arrested by the New York City Police Department.

During the criminal trial against Mr. Komlosi, before Mr. Komlosi was to testify, Mr. Rosenberg recanted, or took back, his accusations against Mr. Komlosi.

As a result of Mr. Rosenberg's recanting his accusation, the criminal charges against Mr. Komlosi were dropped and the criminal case was dismissed.

(Trial Tr. 727-28).

This evidence, in conjunction with Mr. Rosenberg's testimony that defendant forced him to make false allegations of sexual misconduct against plaintiff, supports the conclusion that it was Rosenberg's false statements, made at defendant's instigation, that brought about the commencement of the criminal proceedings against plaintiff. There was no evidence offered at trial that the District Attorney's Office had evidence concerning the alleged incident between Rosenberg and plaintiff from [*32] any other source.

Where, as here, a defendant willfully and maliciously causes false information to be presented to prosecuting officials, the prosecutor's decision, based on the false information, will not shield the source from liability for malicious prosecution.

*White v. Frank, 855 F.2d 956 (2d Cir. 1988),* involved analogous facts. In that case, the defendants, two police officers, testified falsely before a grand jury, resulting in the plaintiff's indictment. After the perjury was disclosed, plaintiff sued under *Section 1983,* alleging, *inter alia,* malicious prosecution. In dismissing the defendants' appeal from the District Court's denial of a motion to dismiss, the Court of Appeals squarely held that a witness who intentionally provides false testimony to a grand jury or prosecutor may be liable for malicious prosecution.

Appellants also contend that the role of both the public prosecutor and the grand jury in advancing the prosecution of [plaintiff] necessarily insulated them from liability for malicious prosecution. We disagree. The intervening acts of a grand jury have never been enough to defeat an otherwise viable malicious prosecution claim, [*33] whether or not the grand jury votes a true bill or even returns an indictment ultimately determined to be deficient as a matter of law. . . . And though

an indictment by a grand jury is generally considered *prima facie* evidence of probable cause in a subsequent civil action for malicious prosecution, this presumption may be rebutted by proof that the defendant misrepresented, withheld, or falsified evidence. *See Hopkinson v. Lehigh Valley R.R. Co., 249 N.Y. 296, 300, 164 N.E. 104, 106 (1928); Dennis v. Ryan, [65 N.Y. 385, 388-89 (1875)];* W. Prosser, [*Law of Torts,* (4th ed. 1971)] § 119 at 846; *Restatement (Second) of Torts § 664(2) & comment b* (1977).

The public prosecutor's role in the prosecution likewise does not affect our immunity analysis, though again it may affect appellant's ultimate liability on the merits. No doubt, the availability of the malicious prosecution action has been curtailed with the growth of the office of the public prosecutor. . . . The exercise of independent judgment by the public prosecutor and his active role in initiating criminal prosecutions may decrease the likelihood that a complaining witness will [*34] be considered to have "caused" or "procured" the prosecution, thus defeating grounds for liability under this initial prong of the common law standard. . . .

As with the grand jury, however, the public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false. *See Hopkinson v. Lehigh Valley R.R. Co., supra, 249 N.Y. at 300-01, 164 N.E. at 106; Dennis v. Ryan, supra, 65 N.Y. at 388-89; see also Russo v. New York, [672 F.2d 1014, 1018 (2d Cir. 1982), mod. on other grounds, 721 F.2d 410 (2d Cir. 1983)]* (presumption of probable cause arising from arrest warrant disappears where warrant is issued on the basis of sworn accusations of defendant in malicious prosecution action); W. Prosser, *supra,* § 119, at 837; *Restatement (Second) of Torts, supra, § 653 comment g.* "It is quite clear," wrote two English commentators in the early part of this century, "that a defendant who has misled a tribunal by dishonest evidence and thereby caused it to act to the prejudice of the plaintiff is [*35] liable, even though he

Case 1:07-cv-02944-JSR    Document 24-3    Filed 06/28/2007    Page 43 of 54

Page 10
2000 U.S. Dist. LEXIS 4237, *

may not have purported to be the prosecu-tor," J. Clerk & W. Lindsell, [*The Law of Torts*] at 639 [(7th ed. 1921)] (citations omitted).

*855 F.2d at 961-62. [7] See also Babi-Ali v. City of New York, 979 F. Supp. 268, 276 (S.D.N.Y. 1997); Morillo v. City of New York, 1997 U.S. Dist. LEXIS 1665, 95 Civ. 2176 (JSM), 1997 WL 72155 at *1-*2 (S.D.N.Y. Feb. 20, 1997); Crespo v. New York City Police Comm'r, 930 F. Supp. 109, 117-18 (S.D.N.Y. 1996).*

7    I realize that *Albright v. Oliver, 510 U.S. 266, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)* signifi-cantly altered the law applicable to *Section 1983* actions based on a malicious prosecution theory. However, nothing in *Albright* addressed the cau-sation issue addressed in *White*, and, therefore, I do not read *Albright* as affecting the continuing vitality of *White*.

Since there was sufficient evidence to sustain defen-dant's liability on the issue of causation, she is not enti-tled [*36] to judgment as a matter of law on this ground. [8]

8    I do not understand defendant to be arguing that she could not have caused plaintiff's prosecu-tion because the evidence showed that it was Rosenberg, and not defendant, who actually pro-vided the false information. If this is defendant's argument it is without merit. As noted above, the evidence was sufficient to support a finding that defendant caused Rosenberg to make the false re-port. This is sufficient personal involvement to sustain liability under *Section 1983. Jeffries v. Harleston, 21 F.3d 1238, 1247 (2d Cir. 1994)* ("a plaintiff may establish causation under *Section 1983* if he shows that the defendant[] participated in, or [was the] 'moving force[]' behind, the dep-rivation."), *vacated and remanded on other grounds, 513 U.S. 996 (1994).*

C. *Favorable Termination*

Finally, defendant claims that she is entitled to judgment as a matter of law because there was insuffi-cient evidence to sustain a finding that the [*37] crimi-nal proceeding terminated in plaintiff's favor. Defendant claims that the termination of the criminal proceeding against plaintiff was "most analogous," (Def. Memo. at 22) to a dismissal in the interests of justice and, there-fore, not a favorable termination on the merits. *See gen-erally Hygh v. Jacobs, 961 F.2d 359, 368 (2d Cir. 1992)* ("as a matter of law" a dismissal in the interests of justice

"cannot provide the favorable termination required as the basis for a claim of malicious prosecution").

The leading case in this Circuit addressing this issue is *Murphy v. Lynn, supra, 118 F.3d 938 (2d Cir. 1997)*, in which the Court of Appeals stated:

Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused. *See, e.g., Restatement* § 660 comment a; *Halberstadt v. New York Life Insurance Co., 194 N.Y. 1, 10-11, 86 N.E. 801, 803-04 (1909)* ("*Halberstadt*"); *Hollender v. Trump Village Cooperative, Inc., 58 N.Y.2d 420, 426, 461 N.Y.S.2d 765, 768, 448 N.E.2d 432 (1983)* [*38] ("*Hollen-der*") (quoting Restatement § 660 com-ment a); *MacFawn v. Kresler, 88 N.Y.2d 859, 860, 644 N.Y.S.2d 486, 486, 666 N.E.2d 1359, (1996)(mem.)(whether "the final disposition of the proceeding in-volves the merits and indicates the ac-cused's innocence" (citing *Hollender*)); *O'Brien v. Alexander, 101 F.3d 1479, 1486-87 (2d Cir. 1996)* (discussing cases); *Russell v. Smith, 68 F.3d [33, 36 (2d Cir. 1995)]* ("In the absence of a deci-sion on the merits, the plaintiff must show that the final disposition is indicative of innocence.") The answer to whether the termination is indicative of innocence de-pends on the nature and circumstances of the termination; the dispositive inquiry is whether the failure to proceed "implies a lack of reasonable grounds for the prose-cution," *Loeb v. Teitelbaum, 77 A.D.2d [92, 101], 432 N.Y.S.2d [487, 494 (2nd Dep't 1980)].*

*118 F.3d at 948.*

In this case, as noted above, the direct evidence con-cerning the termination of the criminal proceeding against plaintiff consists of several stipulated facts. [9] These stipulated facts show that, during the criminal trial against plaintiff, [*39] Rosenberg recanted his accusa-tions against plaintiff and that, as a result of the recanta-tion, the criminal charges against plaintiff were dropped and the indictment dismissed.

9    Although the parties had a transcript of the proceedings dismissing the criminal charges

against plaintiff, (*see* Trial Tr. 17-24), neither side ever offered the transcript in evidence.

The effect of a dismissal resulting from a witness's recantation was discussed in *Russell v. Smith, 68 F.3d 33 (2d Cir. 1995).* In that case, a witness, Viust, gave testimony in the grand jury that implicated Russell, Viust's brother and others. Viust's grand jury testimony was corroborated by another witness and by certain physical evidence. After Russell was indicted, but prior to the criminal trial, Viust recanted his testimony and the state criminal court dismissed the charges against Russell "'with leave to represent.'" *68 F.3d at 35.* Russell subsequently sued for malicious prosecution, and Viust refused to testify [*40] or to provide an affidavit in support of Russell's malicious prosecution claim. *Id.* On the basis of the foregoing evidence, the Court of Appeals affirmed the granting of summary judgment in defendant's favor, concluding that Russell had not established a genuine issue that the criminal proceeding had terminated in his favor. *68 F.3d at 38.*

*Russell* does not purport to establish a *per se* rule that dismissal based on recantation cannot be favorable to the accused. Moreover, several factual differences demonstrate that *Russell* is not controlling here. First, the dismissal in *Russell* was "'with leave to represent.'" Thus, there was no legal bar to Russell's subsequent re-indictment and conviction. In contrast, the charges in this case were dismissed after the criminal trial had commenced. Thus, any subsequent attempt to reprosecute plaintiff would be barred by the *Double Jeopardy Clause.* Second, Viust's grand jury testimony inculpating Russell was corroborated by other testimony and physical evidence. In this case, it appears that there was no corroboration whatsoever of Rosenberg's testimony inculpating plaintiff. Third, the Court of Appeals noted in [*41] *Russell* that Viust's recantation was suspect because the grand jury testimony he recanted had inculpated his own brother. *68 F.3d at 36.* Thus, the recantation in *Russell* assisted a family member. In this case, Rosenberg's recantation benefitted neither Rosenberg nor a family member. Fourth, Viust was unwilling to testify in support of Russell's malicious prosecution case. Rosenberg, on the other hand, did testify in support of plaintiff's claim and re-affirmed that his prior accusations against plaintiff were false and were instigated by defendant. Finally, the fact that plaintiff here was offered reinstatement and provided with back pay for the full period of his suspension evidences a belief by the state that the charges were groundless. If the state believed that plaintiff was, in fact, a sexual predator, it is inconceivable that it would have offered him reinstatement as a psychologist caring for developmentally disabled patients. In view of these distinctions, *Russell* is not controlling here.

The evidence discussed in the foregoing paragraph provided a sufficient basis for the jury to conclude that the charges were dismissed for reasons "indicative of [*42] innocence." Thus, defendant is not entitled to judgment as a matter of law on the theory that plaintiff failed to establish a favorable termination.

2. *Qualified Immunity*

Without citing any authority, defendant claims she is entitled to qualified immunity from plaintiff's malicious prosecution claim because there was no clearly established federal right to be free of malicious prosecutions at the time of her conduct. This argument, however, is clearly incorrect.

In *Lennon v. Miller, 66 F.3d 416 (2d Cir. 1995),* plaintiff asserted a Section 1983-malicious prosecution claim based on conduct alleged to have occurred in 1991. Although the Court of Appeals ultimately held that the defendants in that case were entitled to qualified immunity because their actions met the standard of objective reasonableness, it noted:

> There is no question that the rights at issue in this case -- to be free from false arrest, malicious prosecution, and excessive force --were clearly established at the time of the incident. *See e.g., Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925)* (recognizing constitutional right not to be arrested [*43] or prosecuted without probable cause) . . . .

*66 F.3d at 423. See also Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)* (right to be free of malicious prosecution clearly established as of 1984-87); *Walker v. New York City Police Dep't,* 94 CV 3608, 1996 WL 391564 at *5 (E.D.N.Y. June 24, 1996) (citing *Carroll v. United States, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (1925)* for the proposition that the right to be free of malicious prosecution is clearly established); *Kampfer v. Pitcher, 1996 U.S. Dist. LEXIS 858,* *15, 95- CV-214, 1996 WL 31161 at *5 (N.D.N.Y. Jan. 19, 1996) ("A person's right to be free from . . . malicious prosecution has long been clearly established," citing *Carroll v. United States, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (1925)),* aff'd mem., *112 F.3d 504 (2d Cir. 1997); Janetka v. Dabe, 1993 U.S. Dist. LEXIS 2797,* 89-C V-3721, 1993 WL 72358 at *3 (E.D.N.Y. Feb. 24, 1993) (right to be free of malicious prosecution clearly established at least as of 1986).

The relevant conduct in this case occurred in 1985. In view of the foregoing authorities and the repeated reliance [*44] by Courts in this Circuit on *Carroll v.*

Case 1:07-cv-02944-JSR     Document 24-3     Filed 06/28/2007     Page 45 of 54

Page 12
2000 U.S. Dist. LEXIS 4237, *

*United States* -- a case decided in 1925 -- for the proposition that the right to be free of malicious prosecution has long been clearly established, defendant's qualified immunity argument is without merit.

D. *Damages*

1. *Excessiveness of the Compensatory Damages*

Although defendant claims that the jury's awards of compensatory and punitive damages are excessive, she has submitted no authorities addressing these issues. Nevertheless, the sheer size of the awards warrants their examination.

As a threshold matter, defendant claims plaintiff is not entitled to recover any damages for the period after the criminal proceedings against plaintiff terminated. Defendant argues that a damages remedy must be tailored to the constitutional injury suffered by plaintiff and that the constitutional injury terminated when the criminal charges against plaintiff were dismissed.

Defendant's argument does not withstand analysis. Although the constitutional violation ended when the charges against plaintiff were dropped, the sequelae of this violation did not. There was evidence at trial that plaintiff suffered substantial psychological injury as a [*45] result of his criminal prosecution. This psychological injury was established not merely by plaintiff's subjective testimony, *see generally Annis v. County of Westchester, 136 F.3d 239, 248-49 (2d Cir. 1998)*, but also by the testimony of his treating psychiatrist, Dr. Gorzynski. In addition, there is circumstantial corroboration of plaintiff's psychological injury in plaintiff's employment history after the termination of the criminal proceedings. Prior to the criminal prosecution plaintiff was able to function as a psychologist; after the termination of the prosecution, concerns about recurring allegations of sexual misconduct limited plaintiff's employment to relatively menial positions. [10] Viewing the evidence in the light most favorable to plaintiff, there was sufficient evidence for the jury to conclude that the baseless and malicious prosecution had consequences that lasted beyond the termination of the violation, and *Section 1983* clearly permits recovery for these consequences. *Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307, 91 L. Ed. 2d 249, 106 S. Ct. 2537 (1986); Carey v. Piphus, 435 U.S. 247, 264, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)* [*46] ("mental and emotional distress . . . is compensable under *§ 1983*"); *Burka v. New York City Transit Auth., 747 F. Supp. 214, 224 (S.D.N.Y. 1990)* (permitting recovery of wages plaintiffs would have earned prospectively but for the constitutional violation).

10   Although it might be argued that plaintiff intentionally limited his employment to low-paying positions to enhance his recovery at trial, the jury obviously did not reach this conclusion, and there is no basis to disturb its findings in this regard.

The jury here awarded $ 6.6 million in compensatory damages. There was uncontradicted evidence that plaintiff's economic loss resulting from his inability to pursue his career as a psychologist totaled $ 1,372,988, reduced to present value (Trial Tr. 410). Thus, it appears that the jury awarded $ 5,227,012 as compensatory damages for plaintiff's mental anguish, including the loss of enjoyment resulting from his inability to pursue the career of his choice.

Where, as here, the issue is whether [*47] damages awarded on a federal claim are excessive, the jury's verdict is not to be disturbed unless it shocks the conscience.

It is well established in this Circuit that in *section 1983* cases "the standard for appellate review of damages awards, whether compensatory or punitive, 'is whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988)* (quoting *Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978))* . . . .

As we have noted, the determination of whether a damages award exceeds a reasonable range "should not be made in a vacuum," *Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990)*, but should include consideration of the amounts awarded in other, comparable cases, *see, e.g., id. at 186-87; Raucci v. Town of Rotterdam, 902 F.2d 1050, 1058 (2d Cir. 1990); Zarcone, 572 F.2d at 54-55; Hogan v. Franco, 896 F. Supp. 1313, 1326 (N.D.N.Y. 1995)* . . . .

*Mathie v. Fries, 121 F.3d 808, 813 (2d Cir. 1997)*. In addition, if the verdict is found to be excessive, [*48] it should be reduced only to the maximum amount that could be upheld. *Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328-29 (2d Cir. 1990); accord Peterson v. County of Nassau, 995 F. Supp. 305, 321 (E.D.N.Y. 1998)*.

The evidence in this case sustains a substantial verdict for mental anguish. Prior to the assertion of defendant's fabricated charges, plaintiff had had no involvement with the criminal justice system. As a result of de-

fendant's misconduct, plaintiff was arrested on charges that bear an extremely high level of disgrace, namely, the sexual abuse by a mental health professional of a developmentally disabled individual placed in his care. [11] The baseless charges against plaintiff were publicized in the New York Post under the headline "SHRINK HELD IN SEX ATTACKS ON PATIENTS"; there is no evidence that the dismissal of the charges received any publicity whatsoever. Plaintiff was incarcerated for two weeks with sex offenders and murderers as a result of the charge. At the time these events were unfolding, plaintiff had a minor child, and the assertion of the charges adversely affected plaintiff's relationship with this child. Plaintiff required [*49] psychiatric intervention and years of psychotropic medication as a result of the defendant's acts. Before defendant's acts, defendant had the self-confidence and strength to come to a new country, without friends or family, and start a life as a health care professional. After defendant's acts, however, plaintiff was so demoralized and concerned about the possibility of a recurrence of false allegations that he was unable to resume his career as a psychologist and was limited to employment far below his former capabilities.

> 11   The special opprobrium society has for sex offenders is evidenced by *New York Corrections Law § 168-c et seq.* which requires the registration of sex offenders and public notice of their presence in a community. No similar requirements are applicable to convicted murderers, contract assassins, bombers, robbers, arsonists, burglars, violent muggers or narcotics traffickers who sell drugs to minors.

Although these tribulations are great, an award of more than $ 5 million is clearly excessive. [*50] Indeed, a review of other malicious prosecution and false arrest cases fails to disclose any verdict that exceeds $ 1 million. [12]

> *King v. Macri, 993 F.2d 294 (2d Cir. 1993)* - affirming award of $ 75,000 compensatory damages.

> *Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992)* - compensatory damages of $ 65,000 awarded; new trial ordered.

> *Ismail v. Cohen, 899 F.2d 183 (2d Cir 1990)* - malicious prosecution coupled with beating that caused two displaced vertebrae, cracked rib and serious head trauma; compensatory damages of $ 650,000 upheld.

> *Garner v. Meoli, 19 F. Supp. 2d 378 (E.D. Pa. 1998)* - jury awarded compensatory damages against two defendants aggregating $ 153,250.

> *Martinez v. Gayson, 1998 U.S. Dist. LEXIS 12281, 95-C V-3788 (ILG), 1998 WL 564385 (E.D.N.Y. June 30, 1998)* - remitting award of $ 310,000 in compensatory damages to $ 150,000.

> *Peterson v. County of Nassau, supra, 995 F. Supp. 305 (E.D.N.Y. 1998)* - compensatory damages of $ 160,000 reduced to $ 15,000.

> *Mason v. City of New York, 949 F. Supp. 1068 (S.D.N.Y. 1996)* - compensatory damages of $ 100,000 reduced [*51] to $ 10,000.

> *Vitale v. Hagan, 132 A.D.2d 468, 517 N.Y.S.2d 725 (1st Dep't 1987), modified on other grounds, 71 N.Y.2d 955, 524 N.E.2d 144, 528 N.Y.S.2d 823 (1988)* - affirming award of $ 750,000 for malicious prosecution.

> 12   Obviously, every case is different, and the results in other cases constitute, at best, a rough guide to the range or appropriate verdicts.

One qualitative difference between the foregoing cases and the present case is that none of the foregoing cases involved conduct that either effectively drove plaintiff out of his career or made it extremely difficult for plaintiff to pursue his career. A review of the cases involving such a consequence yields the following results:

> *Ortiz-Del Valle v. National Basketball Ass'n, 42 F. Supp. 2d 334 (S.D.N.Y. 1999)* - Title VII case; female plaintiff barred from career as NBA referee; $ 750,000 in emotional distress damages reduced to $ 20,000.

> *Davis v. City of New York, 264 A.D.2d 379, 693 N.Y.S.2d 230 [*52] (2d Dep't 1999)* - as a result of lead poisoning, infant plaintiff required to undergo remedial instruction to advance in school and likely to have difficulty throughout his life with

personal relationships and work - and school-related pursuits; verdict of $ 1 million reduced to $ 150,000 for future pain and suffering, no award for lost earning capacity.

*Osiecki v. Olympic Regional Dev. Auth., 256 A.D.2d 998, 682 N.Y.S.2d 312 (3rd Dep't 1998)* - plaintiff unable to pursue career as architect as a result of physical injury; award of $ 495,000 for future pain and suffering reduced to $ 243,000.

*Gallo v. Supermarkets General Corp., 112 A.D.2d 345, 491 N.Y.S.2d 796 (2d Dep't 1985)* - plaintiff suffered severe burning, scarring and disfigurement in an industrial accident; as a result of his physical appearance, plaintiff was unable to work, feared contact with other people, was unable to look at himself in the mirror, was unable to lead normal life and required ten years of psychotherapy; award of $ 1.4 million for pain and suffering affirmed.

Although none of these cases involved facts identical to the facts in this case, they all underscore [*53] the excessiveness of the $ 5.2 million awarded as non-economic compensatory damages in a case where plaintiff suffered no physical injury. *See generally Mathie v. Fries, supra, 121 F.3d at 813-14* (surveying range of compensatory damages awarded in cases of rape, sexual assault and police misconduct; awards ranged from $ 80,000 to $ 1.75 million).

Based on the foregoing and giving appropriate weight to the profound impact that defendant's misconduct had on plaintiff's life, I conclude that the appropriate measure of compensatory damages for non-economic loss is $ 500,000.00. Although this figure is at the high end of the range of verdicts awarded in the foregoing cases, it is proper here primarily because the false charge against plaintiff involved the highest level of moral turpitude, implicated his professional fitness in the most serious manner possible and destroyed his ability to practice his profession. Although plaintiff suffered no physical injury, his serious psychological injury was confirmed by his physician, circumstantially corroborated by plaintiff's employment history and may be of longer duration than many physical injuries.

Accordingly, to the extent [*54] defendant seeks a new trial on the issue of compensatory damages, the motion is granted unless plaintiff stipulates within thirty

(30) days of the date of this Opinion and Order to remit all compensatory damages awarded by the jury to the extent those compensatory damages exceed a total of $ 1,872,988.00.

## 2. *Excessiveness of the Punitive Damages*

The standards relevant to judging the excessiveness of punitive damages in a *Section 1983* were comprehensively set forth in *Lee v. Edwards, 101 F.3d 805 (2d Cir. 1996)*. Because the opinion in *Lee* is such a comprehensive statement of the relevant principles, I quote it at length.

> Punitive damages are available in a *§ 1983* action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640, 75 L. Ed. 2d 632 (1983)*. Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." *Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc., 850 F.2d 876, 883 [*55]* (2d Cir.) (quoting *Zarcone v. Perry, 572 F.2d 52, 56-57 (2d Cir. 1978)), cert. denied, 488 U.S. 967, 109 S. Ct. 495, 102 L. Ed. 2d 532 (1988)*. "If the district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995)*.

> We review for abuse of discretion a district court's ruling that a punitive damage award does not "shock the judicial conscience." *Hughes, 850 F.2d at 883.* "'We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.'" *Gasperini v. Center for Humanities, [518 U.S. 415, 435], 116 S. Ct. 2211, 2223-24, 135 L. Ed. 2d 659 (1996)* (quoting *Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2d Cir. 1961))*.

2000 U.S. Dist. LEXIS 4237, *

In gauging excessiveness, [*56] we must keep in mind the purpose of punitive damages: "to punish the defendant and to deter him and others from similar conduct in the future." *Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992)* (citing *Smith, 461 U.S. at 54, 103 S. Ct. at 1639).* Thus, our task is "to make 'certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'" *Id. at 121* (quoting *Pacific Mut. Life Ins. co. v. Haslip, 499 U.S. 1, 21, 111 S. Ct. 1032, 1045, 113 L. Ed. 2d 1 (1991)); see also BMW of North America, Inc. v. Gore, [517 U.S. 559, 568], 116 S. Ct. 1589, 1595, 134 L. Ed. 2d 809 (1996)* (punitive damages vindicate a state's legitimate interests in punishment and deterrence).

The Supreme Court [has] erected three guideposts that should assist us in the application of our standard, by which we deem excessive a punitive damage award that "shocks our judicial conscience," *Hughes, 850 F.2d at 883.* These guideposts include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of [*57] punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Gore, [517 U.S. at 575], 116 S. Ct. at 1598-99.*

*101 F.3d at 808-09. See also Mathies v. Fries, supra, 121 F.3d at 816-17; Fernandez v. North Shore Ortho. Surg. & Sports Med., P.C., supra, 79 F. Supp. 2d at 207; Del Valle v. National Basketball Ass'n, supra, 42 F. Supp. 2d at 344-46; Ettinger v. State University of New York, 1998 U.S. Dist. LEXIS 2289, 95 Civ. 9893 (RWS), 1998 WL 91089 at *10 (S.D.N.Y. March 2, 1998).*

Applying the three *Gore* factors identified in *Lee* demonstrates that the jury's award of $ 10 million in punitive damages is far beyond the range of reasonableness and shocks the conscience.

*Reprehensibility.* Reprehensibility is the most important of the *Gore* factors. *Lee v. Edwards, supra, 101 F.3d at 809.* The Supreme Court has identified three aggravating sub-factors to be considered in evaluating reprehensibility: "(1) whether a defendant's conduct was violent or presented a threat of violence; (2) whether

[*58] a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant engaged in repeated instances of misconduct." *Lee v. Edwards, supra, 101 F.3d at 809.* The third sub-factor requires inquiry into whether defendant has engaged in similar conduct aimed at individuals other than plaintiff. *Fernandez v. North Shore Ortho. Surg. & Sports Med., P.C., supra, 79 F. Supp. 2d at 207 n. 15; Del Valle v. National Basketball Ass'n, supra, 42 F. Supp. 2d at 345.*

Although only one of the aggravating factors identified in *Gore* is present in this case, to wit, malice, I find that defendant's conduct involved the highest degree of reprehensibility. First, the nature of the charge she caused to be made against plaintiff -- sexual assault on a developmentally disabled patient entrusted to plaintiff's care -- is the most serious charge that can be made against a mental health professional. It not only goes to the heart of plaintiff's profession, it also constitutes an allegation that plaintiff has abused his position of trust with a particularly vulnerable victim to satisfy the basest of desires. A mental [*59] health care professional may engage in a wide range of professional misconduct -- from bill-padding to malpractice. However, a charge of sexual misconduct with a developmentally disabled patient is qualitatively different and carries with it a stigma that is unlike that resulting from any other form of professional misconduct.

Second, the means plaintiff used exhibited not only malice toward plaintiff, but the most callous disregard for her own responsibilities as a Therapy Aide. Defendant did not directly allege that she saw plaintiff engaging in misconduct. Instead, she manipulated a patient into doing her sinister deed for her. Rather than care for the patients who were entrusted to her, defendant instead made them tools to carry out her malicious plan. Thus, in implementing her scheme, plaintiff not only caused plaintiff profound injury, she abused her own position of trust with a vulnerable patient.

Accordingly, defendant's misconduct here was extremely reprehensible.

*Ratio of Punitive to Compensatory Damages.* Prior to the remittitur determined above, the award of punitive damages was less than twice the jury's award of compensatory damages. If plaintiff accepts the remittitur, [*60] the jury's award of punitive damages is approximately 5.2 times the reduced award. Neither ratio is conscience-shocking.

*Comparison with Other Awards.* A survey of the punitive damages awards in other malicious prosecution cases clearly demonstrates the excessive nature of the punitive damages awarded against defendant.

*Lee v. Edwards, supra, 101 F.3d 805* - reducing verdict of $ 200,000 to $ 75,000.

*King v. Macri, supra, 993 F.2d 294 (2d Cir. 1993)* - punitive damages awards against two defendants aggregating $ 250,000 reduced to an aggregate of $ 150,000.

*Garner v. Meoli, supra, 19 F. Supp. 2d 378 (E.D. Pa. 1998)* - declining to reduce punitive damages awards of $ 500,000 and $ 250,000 against two defendants.

*Martinez v. Gayson, supra, 1998 U.S. Dist. LEXIS 12281, 95-C V-3788 (I.G.), 1998 WL 564385 (E.D.N.Y. 1998)* - jury award of $ 10,000 in punitive damages found appropriate.

As noted in the discussion above concerning compensatory damages, every case involves factual distinctions. The verdicts in other cases are, therefore, probably best viewed as suggesting the dimensions of the range of reasonableness rather [*61] than as establishing any firm rules.

In light of all the foregoing factors, I conclude that the maximum amount of punitive damages that a reasonable jury could have awarded in this case is $ 500,000.00. Again, I believe this amount is toward the upper end of the range of reasonableness, but I find that it is warranted by the high degree of reprehensibility of the defendant's conduct. It is difficult to conceive of a more infernal and hateful scheme for demolishing a life than that hatched and executed by defendant in this case. The outrageous nature of her conduct requires a substantial award of punitive damages.

IV. *Conclusion*

Accordingly, for all the foregoing reasons, defendant's motion for judgment as a matter of law is granted to the extent that it seeks judgment in defendant's favor on plaintiff's "stigma plus" theory. Defendant's motion is denied to the extent it seeks judgment in defendant's favor on plaintiff's malicious prosecution theory. Defendant's motion addressed to plaintiff's 1983 malicious prosecution claim is granted to the extent that a new trial limited to the issue of damages is granted unless, within thirty (30) days of the date of this Opinion and [*62] Order, plaintiff stipulates to accept a total award of compensatory damages of $ 1,872,988.00 and a total award of punitive damages of $ 500,000.00.

Dated: New York, New York

March 31, 2000

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

LEXSEE 1999 U.S. DIST. LEXIS 5447

**DANIEL ROBINSON, Plaintiff, - against - P.O. NICOLE MATOS, P.O. JOHN DOE # 1, P.O. JOHN DOE # 2, DESK SGT. (9TH PCT.) JOHN DOE, CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, N.Y.C.P.D. DRUG TASK-FORCE, U.S. DRUG ENFORCEMENT ADMINISTRATION, U.S.D.E.A. AGENT # 1, U.S.D.E.A. AGENT # 2, D.E.A. SPECIAL INFORMANT KNOWN AS MAGIC-7, Defendants.**

**97 Civ. 7144 (TPG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1999 U.S. Dist. LEXIS 5447**

**April 16, 1999, Decided**
**April 19, 1999, Filed**

**DISPOSITION:** [*1] Defendants' motions to dismiss the complaint granted.

**COUNSEL:** DANIEL ROBINSON, plaintiff, Pro se, Auburn, NY.

**JUDGES:** THOMAS P. GRIESA, U.S.D.J.

**OPINION BY:** THOMAS P. GRIESA

**OPINION**

*Opinion*

Plaintiff Robinson brings this civil rights action pro se. The federal defendants and city defendants have made separate motions to dismiss the complaint.

The complaint is just over 70, single-spaced, typed pages in length. It purports to allege 32 separate claims for relief as a result of Robinson's alleged arrest on May 11, 1994 and subsequent detainment at the New York City Police Department's 9th-Precinct station-house. The vast majority of the complaint repeats a long and conclusory recital of common law and constitutional tort violations, with no intelligible statement of fact to support them.

Scattered throughout the complaint are a few factual allegations which may or may not support a claim or claims. Taken together, however, the factual basis for this lawsuit is so disjointed and incomplete that neither the court nor the defendants have been able to decipher whether Robinson has one or more causes of action, and if so, what they are.

The city defendants move to dismiss Robinson's claims, whatever [*2] they may be, under Rule 8(a) of the Federal Rules of Civil Procedure. Rule 8(a)(2) states that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A principal function of this rule is to provide the defendants with fair notice of the claim asserted so as to enable them to answer and prepare for trial. *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

When a complaint fails to comply with the requirements of Rule 8(a), the district court has the power, on motion or sua sponte, to dismiss the complaint or to strike those parts of the complaint that are redundant or immaterial. *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995). Dismissal is usually reserved for cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, "is well disguised." *Id.* If the court dismisses the complaint, it should generally grant the plaintiff leave to amend.

Robinson's complaint fails to comply with Rule 8(a). The court therefore dismisses the complaint in its entirety, with leave to replead, within 60 days of the date of this opinion, a short and plain statement [*3] of the facts Robinson alleges give rise to his claim or claims. Specifically, Robinson should avoid making a bald recital of legal conclusions to the effect that defendants committed particular constitutional or common law violations, and focus on a clear statement of what, factually, defendants allegedly did or did not do to violate his legal rights.

1999 U.S. Dist. LEXIS 5447, *

If Robinson chooses to replead the complaint, he must further take into consideration the following rulings of the court on defendants' present motions.

First, the City defendants have moved to dismiss the complaint against the New York City Police Department and the Police Department's Drug Task-Force. The motion is granted. These entities are not properly named parties in a lawsuit and can only be sued in the name of the City. New York City Charter Chapter 16, § 396, *Signorile v. City of New York*, 887 F. Supp. 403, 421 (E.D.N.Y. 1995). The complaint is therefore dismissed with prejudice as to these named defendants. In repleading his complaint, Robinson may name the City of New York as a defendant, but must not name the Police Department or the Department's Drug Task-Force.

The City defendants also move to dismiss any alleged [*4] state tort law claims against the individual police officer defendants, because Robinson failed to file the requisite notice of claim within the applicable statute of limitations.

Pursuant to New York General Municipal Law §§ 50-e and 50-i, a plaintiff who asserts state law claims against a municipal entity or its employees must file a notice of claim against the City within 90 days of the occurrence giving rise to the claim, and commence the action within a year and ninety days. *Baez v. New York City Health and Hospitals Corp.*, 80 N.Y.2d 571, 576, 592 N.Y.S.2d 640, 607 N.E.2d 787 (1992). A plaintiff's failure to file a notice of claim requires dismissal of pendent state tort claims against the City or its employees in a federal civil rights action such as this one. *Felder v. Casey*, 487 U.S. 131, 151, 101 L. Ed. 2d 123, 108 S. Ct. 2302 (1988).

In his opposition papers, Robinson claims that he served a notice of claim on the Comptroller's Office of the City of New York shortly after his arrest on May 11, 1994. Robinson requested that defendants perform a search of the Comptroller's Office. Defendants did so. In an affidavit submitted by Michael Aaronson, Bureau Chief for the [*5] Bureau of Law and Adjustment for the Office of the Comptroller, Aaronson states that a thorough search of the Comptroller's paper and computer records was conducted and although he discovered eight notices of claims filed by Robinson in 1996 and 1997 unrelated to this action, no record was found that Robinson had ever served a notice of claim regarding the events arising out of his arrest on May 11, 1994. The court therefore holds that Robinson may not assert any pendent state law claims against the individual City defendants. If Robinson files an amended complaint, he may not allege any state law tort claims against police officer defendants.

The federal defendants also move to dismiss any constitutional or common-law tort claims Robinson may have against the DEA or DEA agents in their official capacities.

The United States has not waived sovereign immunity for constitutional torts, *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 477-78, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994), and common law tort claims against the Government that have not been presented at the administrative level must be dismissed. *McNeil v. United States*, 508 U.S. 106, 112, 124 L. Ed. 2d 21, 113 S. Ct. 1980 (1993). Accordingly, the [*6] court dismisses any constitutional or common law torts Robinson may have against the DEA or DEA agents acting in their official capacities. In repleading the complaint, Robinson may name the individual DEA agents as defendants in their individual capacities if the allegations against them have a reasonable basis, but must not name either the DEA as a defendant, or the DEA agents as defendants in their official capacities.

The court further dismisses the complaint as against the unidentified DEA informant known as "Magic-7." The complaint, on its face, is frivolous against this defendant and Robinson is instructed that in repleading his complaint he is not to name the DEA informant known as Magic-7 as a defendant.

As to any remaining claims available to Robinson, both the federal and city defendants argue that these claims, whatever they may be, are time barred. The applicable statute of limitations to a § 1983 or a *Bivens* claim is three years. Robinson's complaint is based on his arrest on May 11, 1994 and events that occurred during his detainment for some short number of days thereafter. His complaint was not filed, however, until September 24, 1997, more than three months [*7] after the three-year statute of limitations had run.

In his opposition papers, Robinson states that he gave his complaint to prison authorities for mailing on May 6, 1997. The Pro Se Clerk's Office received it on May 12, 1997, just within the limitations period. The complaint was not docketed until September 24, 1997, and the amended complaint not until December 12, 1997.

As the federal defendants concede, there is case law to support the proposition that a pro se prisoner plaintiff should be deemed to have filed his complaint on the day he gave it to prison authorities for mailing. *See Houston v. Lack*, 487 U.S. 266, 273, 101 L. Ed. 2d 245, 108 S. Ct. 2379 (1988) (notice of appeal deemed filed the day it is given to prison authorities for mailing); *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993) (extending *Houston* to apply to the filing of a complaint). Accordingly, the court construes Robinson's complaint to have been filed on

May 6 1997, within the limitations period, and defendants' motions are denied as to this limitations issue.

There is, however, another statute of limitations problem. With the one exception of NYPD Officer Nicole Matos, the complaint names unidentified [*8] individual defendants. The federal defendants argue that the claims against the unidentified defendants are barred by the statute of limitations because it was incumbent upon Robinson to replace the "John Doe" defendants with named defendants within the limitations period of three years, and that such an amendment now would fail to meet the requirements of Rule 15(c) of the Federal Rules of Civil Procedure for relation back of an amendment to the filing date of Robinson's original complaint within the limitations period.

Rule 15(c) provides in pertinent part:

An amendment of a pleading relates back to the date of the original pleading when

. . .

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be [*9] prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Rule 4(m) allows for 120 days to effect service of a timely filed summons and complaint. The federal defendants do not argue that Robinson has failed to satisfy requirement (A) of Rule 15(c)(3). As to requirement (B), however, defendants argue that Robinson did not "mistake" the identity of the proper parties as required by the Rule, but simply did not know their identities.

It is well established that "John Doe" pleadings cannot be used to circumvent statutes of limitation because

replacing a "John Doe" with a named party in effect constitutes a change in the party being sued. *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir 1993).

In *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466 (2d Cir. 1995) (as modified January 31, 1996) the Second Circuit held that Rule 15(c) does not allow an amended complaint adding named defendants in place of "John Doe" defendants to relate back if the newly named defendants were not named originally because the plaintiff [*10] did not know their identities. Specifically, the Court concluded that the addition of new names to correct a lack of knowledge as to the properly named parties does not serve to correct a "mistake" for purposes of Rule 15(c). In that case, however, the facts were that prior to the end of the limitations period, the district court below specifically had instructed Barrow, who had originally proceeded pro se, to amend his complaint to add individual officers as defendants in place of unnamed police officers. Barrow failed to do so until he obtained pro bono counsel and attempted to amend the complaint after the limitations period had run.

District courts which have addressed the relation-back question in the pro se context after the decision in *Barrow* have concluded that a "mistake" includes the failure of a pro se plaintiff to amend "John Doe" pleadings within the limitations period because of an inability to discover the officers' names, or simply because plaintiff did not know, and was not instructed by the court, that he needed to name the individual defendants. *See Thomas v. Arevalo*, 1998 U.S. Dist. LEXIS 11588, 1998 WL 427623 at *14-15 (S.D.N.Y. 1998); *Byrd v. Abate*, 964 F. Supp. 140, 145-46 (S.D.N.Y. [*11] 1997).

The court further notes that in *Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir. 1997), the Second Circuit recognized that the district court has a duty to assist pro se plaintiffs in ascertaining the identities of the defendants, particularly where, as is apparently the case here, the plaintiff is incarcerated and cannot carry out a full pretrial investigation.

The court therefore declines to rule that Robinson is barred from suing the John Doe defendants because they have not been identified within the limitations period. If Robinson files an amended complaint, he should do his best to identify any John Doe defendants he is suing. He should at least be specific about what wrongful acts he alleges against them. If an amended complaint is filed, and if it complies with the legal requirements of a valid pleading, the court will consider what assistance, if any, Robinson needs in identifying John Doe defendants.

In the event that Robinson files an amended complaint, he must of course serve it on defendants through their counsel. But defendants should not file any answer

1999 U.S. Dist. LEXIS 5447, *

or motion until the court has had an opportunity to scrutinize the amended complaint and make an initial [*12] determination of whether it complies with Rule 8(a).

Defendants' motions to dismiss the complaint are granted, with leave for Robinson to file and serve an amended complaint within 60 days of the date of this opinion, except for those claims that are dismissed with prejudice and may not be repleaded, as described in this opinion.

SO ORDERED

Dated: New York, New York

April 16, 1999

THOMAS P. GRIESA

U.S.D.J.

Index No. 07 Civ. 2944 (JSR)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN BLUMATTE a/k/a ROBERT ANGONA
a/k/a JOHN BLUE,

                                        Plaintiff,

            -against-

GERARD QUINN, DONALD ROGERS et al.,

                                        Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendants Quinn and Rogers*
*100 Church Street*
*New York, New York 10007*

*Of Counsel:  SHAWN D. FABIAN*
*Tel:  (212) 788-0906*
*NYCLIS No. 2007-016376*