UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

JOHN R. BLUMATTE, a/k/a              :
ROBERT ANGONA, a/k/a
JOHN BLUE,                                   :

              Plaintiff,            :

                                   :

   --against--                        07 Civ. 2944 (JSR)

                                   :

GERARD QUINN, DONALD ROGERS,       ECF CASE
STEPHEN FARTHING, RANDOLPH LERNER, JR., :
DAVID LEVINSON, RUSSELL C. WILKINSON,     **AMENDED**
EILEEN GUGGENHEIM, H. ROBERT BOLANDIAN,  **COMPLAINT**
CHRISTOPHER FORBES, MARGOT GORDON,
ROLAND GRYBAUSKAS, LUDWIG KUTTNER, :
DOUGLAS OLIVER, DAVID SCHAFER,
DENNIS SMITH, THE GRADUATE SCHOOL OF :
FIGURATIVE ART OF THE NEW YORK ACADEMY
OF ARTS and JEFFREY C. SLADE,        :

              Defendants.       :

--------------------------------------------------------------------x

       Plaintiff John R. Blumatte, a/k/a Robert Angora, a/k/a John Blue, by his

attorneys Bainton McCarthy LLC, for his amended complaint against Defendants avers:

### The Parties

      1.    Plaintiff is a natural person and a citizen of the State of Maryland.

      2.    Defendants Gerard Quinn ("Quinn") and Donald Rogers ("Rogers")

are natural persons, citizens of the State of New York and at all relevant times were

detectives employed by the Police Department of the City of New York (the "NYPD").

Quinn and Rogers are referred to collectively as the "Police Defendants."

      3.    Defendant The Graduate School of Figurative Art of The New York

Academy of Art (the "Academy") is a charitable organization chartered by the New York

State Board of Regents.  The Academy was founded by the late Andy Warhol and his friend, Stuart Pivar, in 1982.  At all relevant times, contributions to the Academy have been tax deductible by reason of Section 501(c)(3) of the United States Internal Revenue Code.

4.     Although located in Manhattan, the Academy has substantial effect on interstate and international commerce.  It solicits via the United States mail and interstate and international wires donations from persons with interest in the arts located throughout the world.  Its students and faculty are similarly diverse.

5.     Defendant Stephen Farthing ("Farthing") is a natural person and citizen of the United Kingdom.  During relevant times, Farthing was employed by the Academy as its Executive Director and also served on its Board of Trustees.  During all or substantially all of this period, Farthing was also employed by MBNA Bank ("MBNA") and served on its Board of Directors.

6.     Defendant Randolph Lerner, Jr. ("Lerner"), is a natural person and citizen of the State of Ohio.  At relevant times Lerner (a) was a Trustee of the Academy, (b) served as Chairman of its Board of Trustees and (c) served on the Board of Directors of MBNA, which was founded by his late father Alfred Lerner and former Academy Trustee Charles M. Cawley.  Lerner resigned his Chairmanship of the Board of Trustees of Academy when, due to his father's death, he became obliged to assume the Chairmanship of the Board of Directors of MBNA.

7.     On January 1, 2006, and February 28, 2006, respectively (after the events giving rise to this action), in a publicly disclosed transaction, Lerner and Farthing

terminated their relationship with MBNA as a result of a change of control of that institution.

8.    Defendant David Levinson ("Levinson") is a natural person and citizen of New York.  At relevant times, Levinson was a Trustee of the Academy and served as Chairman of its Board of Trustees following Lerner's resignation of that position.

9.    Defendant Russell C. Wilkinson is a natural person and citizen of New Jersey.  At relevant times Wilkinson was a member of Board of Trustees of the Academy.

10.    Defendant H. Robert Bolondian is a natural person and citizen of the State of Connecticut.  At relevant times Wilkinson was a member of Board of Trustees of the Academy.

11.    Defendant Ludwig Kuttner is a natural person and citizen of the State of Virginia.  At relevant times Wilkinson was a member of Board of Trustees of the Academy.

12.    Defendants Christopher Forbes, Margot Gordon, Roland Grybauskas, David Schafer and Dennis Smith are natural persons and citizens of New York.  At relevant times, these Defendants served as Trustees of the Academy.

13.    Defendant Eileen Guggenheim ("Guggenheim") is a natural person and citizen of New York.  At all relevant times, Guggenheim served as Special Advisor to the Board of Trustees of the Academy.  Although not officially a member of the Board of Trustees, Guggenheim served as a *de facto* Trustee and in that capacity exercised as much control over the affairs and operations of the Academy as did its actual Trustees.

14.    Defendant Jeffrey C. Slade ("Slade") is a natural person, citizen of New York, a member of the bar of the State of New York and at all relevant times of the law firm of Slade & Associates, P.C.  At relevant times, Slade served as general counsel of the Academy.  In addition to providing legal advice, Slade acted as a *de facto* Trustee and indeed exercised far greater control of the affairs of the Academy than did many of its actual Trustees.

15.    Defendants other than the Police Defendants and the Academy are from time to time referred to collectively as the "Trustee Defendants" or the "Trustees."

16.    The affairs and operations of the Academy were at all relevant times controlled, conducted and managed by the Trustee Defendants in concert and participation with one another.  Defendants routinely communicated with one another about the matters discussed below via the United States mail and interstate and international wires, including the use of internet e-mails.

17.    No Defendant is a citizen of the State of Maryland.  Thus the citizenship of Plaintiff and the citizenship of Defendants is diverse.

### Jurisdiction and Venue

18.    Plaintiff asserts claims over which this Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983; 18 U.S.C. §§ 1961, *et seq.*, and 28 U.S.C. §§ 1331, 1332, and 1367.

19.    All, or substantially all, of the events giving rise to Plaintiff's claims occurred within this district, where, upon information and belief, most of the Defendants resided at the time of the events and all transacted the business from which these claims arise.  Venue is therefore proper pursuant to 28 U.S.C. § 1391(b).

## Background of This Action

### Plaintiff's Criminal Record and Violation of His Federal Probation

20.    Plaintiff has been convicted of felonies not involving the use or threat of force by both the United States of America and the State of New Jersey.

21.    In or about 1998, Plaintiff unlawfully left the supervision of the United States Probation Department while under probation following a period of incarceration arising from proceedings had before the United States District Court for the District of New Jersey.

22.    Plaintiff's motivation for violating his probation arose principally from issues relating to his health and the unwillingness of his assigned probation officer to refrain from interfering with Plaintiff's lawful employment in the only capacity at which he had relevant experience and training, namely accounting and financial services, thereby depriving him of the ability to provide for his family and himself notwithstanding the fact that the terms of his probation did not preclude him in any way from gainful employment in this field.

23.    Consistent with the terms of his probation, Plaintiff had provided his probation officer with detailed information not only about the identity of his employer, which provided financial and accounting services to its customers, but also about the nature of the services he performed for it and on which customers' accounts he worked.

24.    Plaintiff's probation officer then made a practice of calling the customers of Plaintiff's then employer and asking them if they knew of Plaintiff's background, which she volunteered.

25.    As a general rule, the customers of Plaintiff's then employer did not react well to these unsolicited telephone calls from the probation officer and this in turn resulted in problems for Plaintiff earning an honest living while wholly complying with the terms of his probation.

26.    Ultimately the situation became untenable and instead of dealing with his probation officer's unreasonable interference with his ability to earn a lawful wage, Plaintiff chose to violate his probation -- decision he learned to later regret.

**The Formation of First Manhattan and Empire**

27.    Shortly after violating his federal probation, Plaintiff married Shirly Allyn ("Allyn"); assumed a variety of names, ultimately settling on "Robert Angona;" obtained a New York driver's license in the name of Robert Angona with the assistance of the real Robert Angona, an acquaintance of Plaintiff, who at all relevant times was incarcerated with years left to serve on his sentence before he could be eligible for release; caused Allyn to form under the laws of the State of New York two corporations named The First Manhattan Group Inc. ("First Manhattan") and Empire Solutions Inc. ("Empire"); caused Allyn to obtain federal "E.I.N. numbers" for First Manhattan and Empire; and thereafter, as the sole fulltime employee of Empire and First Manhattan, provided accounting and financial services to a number of companies until in or about April 2004.

28.    Other than continuing to violate the terms of the probationary portion of the sentence imposed by the New Jersey District Court, at all relevant times, Plaintiff did not engage in any criminal or otherwise unlawful activities.

29.    The Academy hired First Manhattan to provide the accounting services of Plaintiff in or about April 2002.  At the time, First Manhattan was providing similar services to other clients.

**Employment of Plaintiff via First Manhattan as Controller of the Academy**

30.    In or about June 2002 Plaintiff was offered the position of Controller of the Academy by Farthing and asked to sign the Academy's standard form of contract.

31.    The standard form of contract contained, among other things, representations to the effect that Plaintiff had never been convicted of a felony.

32.    Plaintiff advised Farthing that he could not sign the contract because of his prior federal and state convictions about which he provided considerable detail to Farthing.

33.    Plaintiff also explained that he would not provide the Academy with his social security number and, therefore, could not accept employment as a W-2 employee.

34.    Plaintiff was unwilling to provide his social security number because he feared doing so might lead to his detection by federal authorities in connection with his continuing probation violations.

35.    Farthing told Plaintiff that he had to consult with Lerner, who was Farthing's immediate superior at both the Academy and MBNA.

36.    Farthing subsequently told Plaintiff that Lerner, the Academy's then Chairman, and he were eager to procure Plaintiff's services on behalf of the Academy in the capacity of its Controller.

37.     Farthing proposed entering into another contract with First Manhattan, which had a legitimate federal EIN number against which the Academy could (and later did) lawfully report its payments for Plaintiff's services and those of other First Manhattan employees.

38.     Farthing told Plaintiff that he should refrain from "sharing his past" with anyone else at the Academy, including the other Trustees.

39.     On or about June 14, 2002, the Academy and First Manhattan signed a letter agreement pursuant to which Plaintiff was engaged to serve as Controller of the Academy for a term between July 1, 2002 and June 30, 2003.  Compensation for the services of Plaintiff alone was fixed at $70,000, plus reimbursement of out-of-pocket expenses.  A copy of that letter agreement is annexed hereto as Exhibit A.  Farthing signed Exhibit A on behalf of the Academy.

40.     On or about June 20, 2002, the Academy and First Manhattan entered into a second letter agreement pursuant to which First Manhattan undertook to provide First Manhattan employees other than Plaintiff to perform bookkeeping and accounting services at up to $25 per hour, payable weekly, with no annual limit; staff accounting services at up to $45,000 per year payable weekly; and Controller Special Projects at up to $70,000 payable bi-monthly.  A copy of that agreement is annexed hereto as Exhibit B.

41.     Farthing signed Exhibit B on behalf of the Academy.

42.     The execution by Farthing of both Exhibits A and B was discussed with and approved by the other Trustee Defendants.

**Plaintiff's Discovery of and Attempts to Rectify A Multiple Year**
**Pattern Of Wire Fraud, Mail Fraud, Tax Fraud, Insurance Fraud**
**Breaches of Fiduciary Duty and Other Misconduct By the Academy**
**and Its Trustees**

43.    When Plaintiff became intensely involved with the Academy after becoming its Controller he discovered that its financial affairs were in complete disarray. For example, the Academy had a restricted endowment account, whose principal was never to be invaded and the interest on which could be made available either to fund scholarships to deserving students or to otherwise support the educational activities of the Academy.

44.    Many individuals made tax deductible contributions to the Academy believing their gifts would enlarge the corpus of the restricted endowment account and thereby help to perpetuate the Academy.

45.    Plaintiff learned that for years the previous controller, Constance McCord, had routinely invaded this restricted endowment account to cover ordinary operating expenses because the Academy had no financial controls and was spending much more than it could afford.

46.    A substantial portion of the restricted endowment account had been contributed in sums of less than $5,000 by thousands of people.  For example, in its 1998 federal tax return on Form 990, the Academy reported bequests of less than $5,000 in the aggregate amount of $444,646 and in its 1999 Form 990 reported such "small donations" in the aggregate sum of $373,912.

47.    Copies of the aforesaid two tax returns are annexed hereto as Exhibits C and D, respectively.

9

48.    Upon information and belief, all of the Academy's tax returns on Form 990 were reviewed and approved by the Trustee Defendants before they were filed.

49.    Both returns were filed via the United States mail.

50.    As a consequence of gross, if not criminal, malfeasance the restricted endowment account was overstated on the Academy's financial statements by over $1+ Million.

51.    Plaintiff also discovered that the Academy's 1997 Form 990 reported cash income from gifts, interest and tuition totaling $3,603,822 and total cash expenses of $2,381,094.

52.    Of those total expenses, 66% were spent on "Fundraising" rather than for expenses relating to the Academy's charitable purpose.

53.    Thus the net asset position of the Academy's balance sheet at the end of this period should have increased in value by not less than $1,222,728, i.e., $3,603,822 - $2,381,094 = $1,222,728.

54.    Yet, an examination of the balance sheet portion of the Academy's 1997 Form 990 does not reflect the over $1.2+ million net increase in cash during the reporting period.  It is simply "missing" without explanation.

55.    A copy of the Academy's 1997 tax return is annexed as Exhibit E. That tax return was filed via the United States mail after having first been reviewed and approved by the Trustee Defendants.

56.    Plaintiff also learned that the Academy's so-called auditors lacked independence, because before conducting their audit procedures, they first themselves made the very journal entries that they would then purport to audit.

57.    An auditor auditing his own entries in books of account is in blatant violation of Generally Accepted Auditing Standards.

58.    Plaintiff also learned that the audited financial statements of the Academy routinely filed via the United States mail, among other places, with the New York Board of Regents and the Internal Revenue Service, were materially misstated in that, among other deficiencies, they falsely reported that the $1+ Million in restricted endowment funds existed.

59.    These funds had been improperly disbursed long prior to Plaintiff's involvement with the Academy to cover operating expenses.

60.    The Trustees nonetheless continued to knowingly and falsely state that these funds existed as current restricted assets in the Academy's 990 filings and in reports to the New York Board of Regents, among other places.

61.    All of these knowing, false statements were transmitted via use of the United States mail.

62.    Plaintiff also learned that the Academy was routinely spending substantially in excess of 50 percent of its annual revenues for purposes wholly unrelated to its charitable purpose of education such as fund raising junkets; frequent air travel to France, Italy and England for its Trustees; and entertainment – all in the name of increasing the restricted endowment, which in fact was shrinking due to the Trustees' gross mismanagement.

63.    The Trustees were frequently reimbursed for their fund raising efforts by check sent via the United States mail.  Similarly, the Trustees sought such

reimbursement via either the United States mail or interstate or international wire communications.

64.    These practices violated the Academy's legal obligations under Section 501(c)(3) of the Internal Revenue Code and thus placed its charitable status at risk.

65.    At all relevant times, each Trustee Defendant was aware of the Academy's aforesaid violations of law and conspired with the other Trustees to refrain from taking remedial action, including filing amended, truthful tax returns.

66.    Plaintiff also learned that there were still no financial controls at the Academy. Each department operated as a fiefdom; did not report its activities to any central source; and when viewed as a whole the Academy had no budget and no method for determining if it was operating with its means and preserving its valuable privilege of tax exempt status by complying with federal tax law and spending in excess of 50 percent of its annual income on charitable purposes.

67.    Plaintiff also learned that the Academy was violating federal law in connection with federally guaranteed student loans by knowingly and falsely informing FDIC insured banks making these guaranteed loans that the students/borrowers were participating in a 48 month program (a requirement of the federal guarantee), when in fact the students were enrolled in a so-called "three semester program" that incongruously spanned only 12 calendar months. These false reports were made via the United States mail and interstate or international wire transmittals.

68.    Accordingly, neither the students nor the Academy was lawfully entitled to receive the proceeds of these federally guaranteed loans, which proceeds were received and subsequently disbursed via United States mail.

69.    Plaintiff also discovered that the Academy did not have a legitimate certificate of occupancy for its building; had improperly dealt with insurance claims resulting from a fire; had not recorded in its books and records a recent mortgage taken to cover is net cash deficiencies; and was violating the New York State liquor laws by selling liquor in its cafeteria to its students without a license to do so.

70.    After he developed a preliminary grasp of these issues, Plaintiff had a face-to-face conversation with Farthing, the then Executive Director, and Lerner, the then Chairman of the Board of Trustees, during which he advised them that they had two choices:  either liquidate the Academy in an orderly fashion or clean up the mess that Plaintiff discovered.

71.    Farthing and Lerner told Plaintiff to use his best efforts to "clean up the mess" before the Academy lost its 501(c)(3) status, which, in turn, would vitiate its ability to offer tax deductions to potential contributors, and leave it unable to replenish its plundered endowment by seeking through the use of the United States mail and interstate and international wire communications new donations.

72.    Plaintiff made substantial progress in cleaning up the mess.

73.    As a result of the good work he had done and was doing for the Academy, on or about October 27, 2003, the Academy and First Manhattan entered into a new Employment Contract pursuant to which Plaintiff would continue his service as

Controller. A copy of that Agreement is annexed hereto as Exhibit F and is hereafter referred to as the "2003 Controller Agreement."

74.    His activities as Controller were the subject of considerable discussion at Trustee meetings to which he was routinely invited to attend and did attend without exception. During those face-to-face meetings with the Trustees, Plaintiff was wholly candid with the Board in terms of disclosing all of the problems he had identified that are outlined above.

75.    Thus to whatever extent any Trustee may have been previously uninformed about the numerous false tax returns and other violations of law that had occurred prior to Plaintiff's work with the Academy began, they were forcefully informed of these matters by Plaintiff.

76.    Every Trustee knew that Plaintiff was not only the Controller of the Academy, but an active controller as well.

77.    For example, the Trustees approved Plaintiff's recommendation that the Academy hire the law firm of Grover & Block, P.C., to address certain of the issues of gross mismanagement, outlined above, that faced the Academy; issues that were potentially of a criminal nature; and would certainly mature into criminal matters if not swiftly and properly resolved by the Academy.

78.    Plaintiff recommended this law firm to the Trustees based principally upon the fact that its members were experienced, recent alumni of the United States Justice Department's Organized Crime Strike Force. For reasons made clearer below, Plaintiff stated – and the Trustees agreed -- that these lawyers' RICO experience was highly relevant to their engagement.

**The Empire Written Contract**

79.    On August 22, 2003, Plaintiff entered into yet another letter

agreement with the Academy via his other corporation, Empire.  This agreement was –

like its predecessors – signed by Farthing on behalf of the Academy after its terms had

first been approved by the other Trustee Defendants.  It provides in pertinent part that

Empire will provide the Academy:

> with solutions and support in connection with the integration of your new
> systems, Financial Edge, Razor Edge, and your Educational Student
> Billing, Fixed Assets and Purchase Order Applications through the use of
> "Crystal Reports."

A copy of that letter agreement is annexed hereto as Exhibit G and hereafter referred to as

the "Empire Contract."

80.    Successful implementation of these programs would reduce

dramatically the Academy's needs for accounting/bookkeeping personnel and thus the

Academy was in concept "spending money to save money."

81.    The Empire Agreement concludes by requiring a "$5,000 deposit

with the acceptance of this letter."

82.    At all relevant times between Plaintiff's first contact with the

Academy and April 2004, First Manhattan and Empire were and remained viable,

successful businesses with other customers.

**The Knowingly Fraudulent Insurance Claims**

83.    In 1994 the Academy's Trustees filed by United States mail a false

insurance claim contending that a previous controller, Michael Hawkins, had embezzled

hundreds of thousands of dollars.

84.    Hawkins had, in fact, innocently used petty cash, over a period of two years, to pay casual labor to complete construction projects ordered by the Trustees.

85.    The insurer, Chubb Federal Insurance Company, was defrauded into settling this knowingly false claim for $100,000. Annexed hereto as Exhibit I is a copy of Chubb's check, which was transmitted via the United States mail as was the Academy's fraudulent claim.

86.    The filing of this claim and its resolution were, upon information and belief, discussed at Board Meetings and each Trustee conspired with every other Trustee to pursue this false insurance claim via use of the U.S. mail.

87.    The proceeds of this fraudulent insurance claim were used by the Trustees to continue their control over the Academy.

88.    When the New York Attorney General's Office (the "AG") opened an investigation into the claim in 1996,  based on the complaint of a former board member, Barbara S. Krulik, the then Academy Director refused to answer questions, "on the advice of counsel."  Attached hereto as Exhibit J is a copy of the AG's Criminal Prosecutions Bureau's request for information on the claim.

89.    The Trustees were also complicit in filing by United States mail false and vastly inflated insurance claims, on behalf of the Academy, relating to a fire.

90.    By filing these claims the Trustees sought to recover from the Academy's insurance carrier the costs of improvements to parts of its building that were not damaged by the fire.

91.    The Trustees also willfully approved of the filing by United States mail of multiple claims for the same alleged damages attributing these same damages

both to the fire and to the 9/11 tragedy.  Obviously, the Academy was not entitled to double recoveries, which the Trustees knowingly sought and obtained via use of the mails and wires.

92.    In short, through the regular use of the United States mail, telephone and internet, the Trustees willfully conspired one with the other to control and did control the Academy in a fashion that perpetrated a fraud on the Internal Revenue Service, the New York Board of Regents, the Academy's insurance carriers, individuals who thought they were contributing to a restricted endowment fund and later others, including Plaintiff, in order to foster their own social and business interests at the expense of their fiduciary duties and other obligations imposed by law.

### Events Leading Up To Plaintiff's Termination of the 2003 Controller Agreement for Cause and Convenience

93.    In a "Controllers Report" dated January 17, 2004, addressed to Farthing and Levinson and, upon information and belief, shared with all other Trustees, Plaintiff reported on "Accounting System Breakdowns, serious compliance issues, and Building C of O deficiencies," any one of which Plaintiff reported "could have rendered the Academy out of business, with its charter being revoked, and exposing its Trustees to both civil and criminal investigations."  A copy of that report is annexed hereto as Exhibit K.

94.    The Trustees refused to address most of Plaintiff's concerns including the known misstatements in the Academy's financial statements and in particular the misstatement about the "missing" $1+ Million that had been improperly disbursed from the restricted endowment account prior to Plaintiff's arrival at the Academy.

95.    The Trustees unanimously indicated that acknowledging this unlawful invasion of restricted endowment fund would fatally impair their ability to continue to seek contributions to the Academy's endowment.  In other words, if the Trustees told the truth about their stewardship of restricted endowment funds, no reasonable person would entrust additional funds to their stewardship.

96.    Once again, the Trustees conspired with one another to prevent the truth about their unlawful activities from reaching the public and governmental entities with an interest in such activities so that the Trustees could maintain their control over the Academy and through such control benefit personally.

97.    Thus although Plaintiff was able to accomplish a great deal in terms of placing the Academy's house in order, by in or about the end of the first quarter of 2004 the Trustees and Plaintiff locked horns on three issues.

98.    First, Plaintiff insisted that the Academy restate its financial statements to reflect the $1+ Million "missing" from its restricted endowment account that prior to Plaintiff's arrival at the Academy had been unlawfully invaded to cover operating expenses.

99.    Second, Plaintiff insisted that the Academy immediately comply with federal law by ceasing and desisting from spending more than 50 percent of its annual income for purposes unrelated to its charitable purpose of education in violation of Section 501(c)(3) of the Internal Revenue Code.

100.    Third, Plaintiff insisted that the Academy end its illegal practice of giving "kick-backs" to artists, who claimed publicly to donate their works for auction to

increase the Academy's endowment, but privately and secretly were paid approximately 50 percent of the sale price in violation of law.

101.  Many of these secret "kick-backs" were paid by check transmitted via United States mail and were negotiated via interstate or international telephone conversations.

102.  All of the Trustees knew that these "kick-backs" to artists were illegal and all Trustees conspired with one another initially to make them and then to continue to make them in knowing violation of the law.

103.  The net proceeds of the "donated art" were used by the Trustees to continue their aforesaid control over the Academy.

104.  Most, if not all, of the Trustees of the Academy are socially prominent, wealthy individuals.

105.  Every year the Academy hosts "The Tribeca Ball," the cost of which is very substantial.

106.  The character of the Trustees' charitable conduct is fairly described as materially different from that of Mother Teresa.  Annexed hereto as Exhibit H are copies of newspaper articles recounting the Trustees' "charitable activities," which in the words of F. Scott Fitzgerald recount a gathering of "Swells."

107.  MBNA (of which Farthing and Lerner were Directors) had substantial business activities in the United Kingdom.  Farthing, as Executive Director of the Academy, and Lerner, as its then Chairman, abused their control over the activities of the Academy in order to curry favor with prominent individuals in England, including HRH Prince Charles, for the benefit of MBNA and to the detriment of the Academy.

108.  The other Trustees also placed their intangible, social and business interests above their fiduciary obligations to the Academy that, among other things, required them to see to it that the Academy refrain from knowingly filing with the New York Board of Regents and others false financial statements.

109.  The Trustees also refused to refrain from spending more than 50% of the Academy's annual income on non-educational purposes such as interstate and international fund raising junkets, because to do so would not serve their private desires. Indeed, some Trustees donated substantial sums of money to the Academy so that they could fly across the Atlantic to entertain their friends at fancy restaurants in the name of fund raising.  Given their average tax brackets, the net consequence of these actions was that the Trustees could deduct roughly 50% of the cost of what would otherwise be purely social entertainment.

110.  Thus by around the end of the first quarter of 2004 Plaintiff and the Trustees had reached an insurmountable impasse.  Plaintiff wanted the Academy to obey the law and the Trustees would not do so because complying with the law would impair their undeserved emoluments and otherwise be inconvenient.

**A Disgruntled Former Trustee and Co-Founder of the Academy Focuses Unwanted Attention on Plaintiff**

111.  In or about February 2004, Plaintiff had surgery to deal with a serious heart episode.

112.  After surgery, Plaintiff took time off from work and went with his wife to Florida to recuperate.

113. While he was in Florida, newspaper articles appeared both in the United States and Great Britain suggesting that the Controller of the Academy, Robert Angona, was associated with organized crime.

114. This was the result of activities initiated by the surviving founder of the Academy, Stuart Pivar ("Pivar"), who has had very stormy relations with the Trustees since he was unceremoniously voted off the Board in 1994.

115. Pivar had hired the celebrity private eye, Richard "Bo" Dietl ("Dietl"), to investigate any possible wrongdoing by the current Trustees.

116. Dietl's investigation yielded the fact that the real Robert Angona had long been alleged to be associated with organized crime.

117. In response to the press barrage and a website established by Pivar/Dietl, Plaintiff spoke to Dietl.

118. He asked Dietl to compare his physical appearance with the "mug shot" of the alleged mobster Robert Angona.

119. Plaintiff assured Dietl that that comparison would persuade Dietl that Plaintiff was "not that Robert Angona."

120. Dietl did so, and, upon information and belief, learned that "that Robert Angona" was presently in custody and had been in such custody during the entirety of Plaintiff's dealings with the Academy.

121. Dietl/Pivar then admitted on their website that Plaintiff was "not that Robert Angona," but still asked on that website: who is this mystery man who serves as Controller of the Academy?

122. This press was not happily received by Levinson or Farthing.

123. Given Plaintiff's obvious desire to avoid the attention of federal probation officers, this press was even less happily received by Plaintiff, who had very good reason to avoid any publicity.

### The Brooklyn Diner Meeting At Which Plaintiff Resigns for Cause and Lerner and Farthing Accept the Resignation on Behalf of the Academy

124. In or about late March 2004, Farthing and Plaintiff met at the Brooklyn Diner on West 57th Street in Manhattan.

125. Lerner had recently resigned as Chairman of the Board of Trustees due to his increased obligations to MBNA and had been replaced by Levinson. The transition from Lerner to Levinson was still very much in process at this time.

126. Farthing remained the Academy's Executive Director, but given Lerner's resignation as Chairman, had decided to resign effective in the very near future.

127. Farthing's imminent departure was known to all of the other Trustee Defendants by the time of this meeting.

128. During the Brooklyn Diner meeting Plaintiff pointed out that the 2003 Controller Agreement provided in Section 6(D):

> **Termination by Angona for Good Cause:** Angona shall have the right to terminate his employment for "Good Cause". For the purpose of this agreement "Good Cause" Shall mean: …. (6) acts or request by the Academy that Angona and/or the Group deems as contrary or in violation of any Accounting Professional Rule or Laws ….

129. As a result of the stalemate with the Trustees described in above, Plaintiff suggested that he had cause to resign and was, therefore, entitled to the lump sum payment expressly contemplated by the 2003 Controller Agreement.

130.  Farthing agreed as a preliminary matter, but said he needed to speak privately by telephone with Lerner

131.  Farthing and the Plaintiff then returned to the Academy's offices where Farthing telephoned Lerner privately from his personal office, while Plaintiff waited in his office.

132.  Farthing then entered the Plaintiff's office and stated that Lerner had agreed to Plaintiff's proposal and stated that the Academy would pay Plaintiff his severance benefits under the 2003 Controller Agreement according to its terms.

133.  Farthing also stated that Lerner said that "they should not give Pivar any more ammunition."  They should therefore "settle this thing quietly."

134.  Farthing stated also that Lerner and he both believed that because the Trustees would not take Plaintiff's advice, the Academy would also agree that Plaintiff's services as Controller were now "without purpose" within the meaning of Section 6(A) of the 2003 Controller Agreement and would, therefore, agree that the Academy would make the same lump sum payment under that provision of the Controller Agreement as well.

**Resolution of Issues Relating to Plaintiff's Loan To Officer Account**

135.  During these discussions, Plaintiff raised the issue of the outstanding balance of his portion of the Academy's "Loans to Officers" account and personal charges on a credit card issued by MBNA bearing both his name and that of the Academy that had not yet been received by the Academy, i.e. recent charges for which the Academy had not yet received a bill.

136.   At Farthing's insistence, most of the Academy's officers had MBNA cards.  Indeed, Farthing as a director of both MBNA and the Academy had signed the authorizations for these cards wearing in substance two hats.

137.  It was common for the Academy's officers, from time to time, to charge expenses unrelated to the Academy's business on these credit cards.

138.  One of the procedures that Plaintiff initiated as Controller was for the Academy accounting staff to reconcile each officer's monthly MBNA credit card statement before the Academy paid the statement.  Each expense properly charged to the Academy was assigned to the proper expense account within the Academy's table of accounts and those charges unrelated to the Academy's business were booked to a "loan to officer" account, which was subdivided by officer.  These notations of which account a particular expense was to be charged were made in hand on the MBNA bill charge by charge in addition to the two corresponding entries made in the Academy's books of account.

139.  Thus at no time during Plaintiff's term of service as Controller did the Academy ever advance funds on behalf of an officer (including Plaintiff) without simultaneously recording in its books of account the officer's obligation to repay the advanced funds.

140.  Plaintiff proposed to Farthing and Lerner that either the balance of his loans to officer account (after the posting of the most recent charges) be deducted from the lump sum severance payment he was owed under the 2003 Controller Agreement, or, alternatively, Plaintiff would write a check once the full amount was known.

141.  None of Farthing, Lerner or Plaintiff indicated any strong preference as to either alternative, and Farthing undertook to solicit the views of the other Trustees.

142.  Farthing told Plaintiff that, after having spoken with Lerner, they "had a deal" and that Farthing's imminent "last day" at the Academy would be Plaintiff's "last day."

143.  Thus when Plaintiff left the Academy's offices on the evening of the Brooklyn Diner meeting he understood based upon Farthing's unequivocal statements that he had struck a deal with the Academy regarding his departure.

144.  Plaintiff then began to make plans to expand the business of Empire and First Manhattan following his departure from the Academy, since he obviously would have more of his own time to devote to the other clients of Empire and First Manhattan.

**Levinson and Other Trustees in the "Anti-MBNA" Clique
Seize Upon the Unfavorable Press to Embarrass Lerner and the other
"MBNA Trustees" and To Blame Plaintiff for Their Transgressions,
Including Improperly Invading the Academy's Restricted
Endowment Account**

145.  For some time prior to April 2004 the Academy Board of Trustees was populated with cliques.  One clique included those Trustees having an association with MBNA, consisting of Trustees Lerner, Farthing and Bolandian and another clique fairly described as an "Anti-MBNA" clique, which was lead by new Chairman Levinson and to which Guggenheim, Slade and Wilkinson belonged.

146.  The Levinson lead clique viewed the adverse press as an opportunity to embarrass Lerner and the other MBNA Trustees.

147.    During March 2004, Plaintiff had alienated Levinson by refusing to fraudulently issue a receipt for a charitable contribution actually made by Levinson's employer, Studley Inc., as one made by Levinson personally.   *See* correspondence annexed as Exhibit L.

148.    Plaintiff had in addition offended Levinson's wife, Simone, by refusing to pay with Academy funds an invoice addressed to her personally for $9,000. Plaintiff's action was in conformity with the Academy's strict policy (implemented by Plaintiff) against paying with Academy funds invoices to third parties, who not infrequently attempted to exploit for their personal gain the Academy's tax status as a charity.. *See* annexed correspondence, Exhibit M.

149.    For these and other reasons, by March 2004 there was "bad blood" between Plaintiff and Levinson.

150.    Particularly in light of the Dietl/Pivar website and related press coverage, the anti-MBNA clique desperately wanted to learn more about Plaintiff's real identity and other facts about Plaintiff's background.

151.    Farthing was aware in April 2004 that neither Lerner nor he had disclosed to the other Trustees the detailed information that Plaintiff had shared with them about his past prior to accepting the position of Academy Controller via contract between the Academy and First Manhattan.

152.    Plaintiff and Farthing had previously enjoyed a most cordial and close relationship often having dinner or drinks together at the end of the day over which they discussed Academy business.

153. Commenting on the close relationship between and among Plaintiff, Farthing and Lerner, on August 27, 2004, Nancy Lindberg Zahzam, now the Director of Financial Aid at Brooklyn Law School, but formerly the Registrar of the Academy, testified under oath that Farthing once stated directly to her: "If Robert [Plaintiff] ever gets arrested, we are all through."

154. Slade was involved from the outset with this inquiry about Plaintiff after his resignation for cause had been accepted by the Academy on the night of the Brooklyn Diner meeting effective on Farthing's last day. Slade's law firm's invoice to the Academy for the month of April 2004 showed charges for his time relating to Plaintiff on April 1, 8, 12, 13. 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, and 29.

155. On or about April 14, 2004, Slade and the Academy engaged the firm of IPSA International ("IPSA") to investigate Plaintiff.

156. IPSA employees conducted 24-hour surveillance of Plaintiff and his wife between April 15 and 18, 2004.

157. The IPSA surveillance revealed nothing interesting other than the ability of both Plaintiff and his wife to perceive they were being followed.

158. Many, if not all, of the IPSA employees assigned to the Academy engagement were former (and in many cases retired) special agents of the Federal Bureau of Investigation (the "FBI").

159. As former FBI agents, IPSA – and through IPSA Slade and the Academy – enjoyed a special relationship with both the New York Police Department and the Office of the District Attorney for the County of New York.

160.  By April 16, 2004, Levinson, Wilkinson, Guggenheim, Slade, Farthing and employees of IPSA were in direct contact with Assistant District Attorney Elyse Ruzow (the "ADA").

161.  For obvious reasons, Plaintiff was trying to avoid further publicity and seeking to leave the public stage as quickly as possible.

162.  After Plaintiff had had his resignation accepted on the evening of the Brooklyn Diner meeting, he received a telephone call from Levinson, Wilkinson, Guggenheim and Slade demanding that he immediately report in person to the Academy and explain who he really was if he was not "that Robert Angona."

163.  Plaintiff initially declined to do so.

164.  Plaintiff then consulted with the Grover & Block firm regarding his obligations, if any, to provide the Academy with further information about his background in light of the fact that it had accepted his resignation for both cause and convenience.

165.  At this time, Grover & Block had completed its work for the Academy and had no conflict of interest in providing legal advice to Plaintiff.

166.  Plaintiff disclosed to the Academy during a telephone conversation with Levinson that he had engaged Grover & Block to advise him as to his continuing obligations, if any, to the Academy.

167.  The Academy expressed no objection to this representation.

168.  Plaintiff was advised by Grover & Block that he had no obligation to provide any information about his background since his employment by the Academy

had been terminated by mutual agreement and for cause effective in the very immediate future.

169.  Plaintiff therefore adhered to his position of "no comment" in reliance on the Grover & Block advice.

170.  With his relationship with the Trustees at complete loggerheads, on April 22, 2004, Plaintiff concluded that he could not await Farthing's departure as he had agreed to do on the night of the Brooklyn Diner meeting.

171.  Plaintiff therefore caused First Manhattan and Empire to send the Academy by mail, three invoices, Nos. ATO-9, NY04-10 and NY04-11. On invoice No. AT04-9, Plaintiff, through First Manhattan, credited the Academy for the sum of $11,968.58 for Charges on MBNA Controller Card. Copies of those invoices all dated April 22, 2004, are annexed hereto as Exhibit N.

### Levinson, Farthing, Wilkinson, Guggenheim and/or Slade Enlist the Aid of the Police Defendants and the ADA to Violate Plaintiff's Civil Rights

172.  Upon information and belief, Levinson, Farthing, Wilkinson, Guggenheim and Slade were introduced by IPSA to the ADA, Quinn and Rogers.

173.  As of the morning of April 23, 2004, none of the Trustees, the ADA, Quinn or Rogers had any reason to believe that Plaintiff had committed any crime.

174.  The IPSA agents, Levinson, Slade, Wilkinson, Guggenheim and Slade, on behalf of the other Trustees, urged the ADA, Quinn and Rogers to use their best efforts to learn Plaintiff's true identity in light of Plaintiff's refusal to provide further information based upon the Grover & Block advice mentioned above.

175.  On the early morning of April 23, 2004, Plaintiff left his doorman apartment building on East 54th Street in Manhattan to walk his dog.

176.  Upon his return to his apartment building, Quinn and Rogers followed him into the lobby of his building barging past his doorman and yelled "Mr. Angona – Robert – we want to talk with you."

177.  Quinn then said "What's your real name?"

178.  These statements were made by Quinn and Rogers inside the lobby of Plaintiff's apartment building, which they had entered without a warrant or probable cause to believe that Plaintiff had engaged in unlawful conduct or that exigent circumstances justified the absence of a warrant.

179.  Neither Quinn nor Rogers identified himself as a police officer and Plaintiff assumed that they were employees of Dietl.

180.  Plaintiff told Quinn and Rogers that he did not want to talk to them and then turned to enter the elevator with his dog.

181.  Rogers then threw Plaintiff up against the wall and placed him in a chokehold.

182.  Quinn punched him in the chest and started to put him in handcuffs – again without possession of a warrant for his arrest; probable cause to believe that he had committed a crime; or the existence of exigent circumstances that might have otherwise justified his conduct or that of Rogers.

183.  Plaintiff was still recovering from heart surgery, which was well known to all of the Trustee Defendants and, upon information and belief, had been disclosed to the ADA, Quinn and Rogers.

184.  As a result of the aforesaid use of unwarranted and grossly excessive force by Quinn and Roberts, Plaintiff had another heart episode; was in great pain; could barely breathe; and then begged for his Nitro pills that were located in his apartment – a short elevator ride away.

185.  In response, Rogers told Plaintiff that "he had delivered people to the morgue before."

186.  Other residents of the building, upon observing the commotion, demanded that Quinn and Rogers identify themselves.

187.  The doorman telephoned Plaintiff's wife, who brought him his Nitro pills thereby saving his life.

188.  Quinn called his NYPD supervisor on his cell phone and then told Rogers that the supervisor and the ADA had instructed them to call EMS.

189.  Plaintiff and his wife asked Quinn and Rogers whether Plaintiff was being arrested.

190.  They replied by stating "they did not know yet."

191.  Plaintiff and his Wife also asked if Quinn or Rogers had a warrant for Plaintiff's arrest.

192.  They replied they did not.

193.  At no time prior to the arrival of EMS did Quinn or Rogers offer any explanation for their assault on Plaintiff before identifying themselves as police officers after unlawfully accosting him in the lobby of his building without either a warrant or lawful cause to be in that non-public place.

194.  Nor did they offer any explanation for their use – indeed excessive use – of force given that Plaintiff was a frail 64 year-old man, incapable of violent or aggressive action, and was known to be recovering from recent heart surgery.

195.  EMS arrived with a cardiac specialist, who applied heart monitor and took an EKG.

**At the Behest of Levinson, Wilkinson, Slade and Guggenheim, Quinn and Rogers Continued to Violate Plaintiff's Civil Rights While He Was In Cornell Medical Center**

196.  Plaintiff was then taken by ambulance to Cornell Medical Center still handcuffed.

197.  Quinn rode in the ambulance and continued to try to interrogate Plaintiff, who was obviously in great pain.

198.  Notwithstanding Plaintiff's demand for an attorney, Quinn continued to question him.

199.  Quinn stated that he wanted Plaintiff's "real identity" and asked whether Plaintiff took any money from the Academy.

200.  Plaintiff continued to decline to answer questions and continued to insist upon his right to counsel.

201.  Plaintiff was admitted to the Cornell Medical Center and remained in guarded condition for some 12 hours.

202.  During this period, Quinn and Rogers continued to question Plaintiff as to his identity and his activities at the Academy notwithstanding his demand for counsel and his precarious physical condition.

203. During this period Plaintiff heard Quinn state to Rogers that the ADA was meeting with Farthing, Levinson, Wilkinson, Guggenheim and Slade and that as a consequence they would be working overtime.

204. Quinn then thanked Plaintiff for the "extra pay."

205. Plaintiff remained in the Cornell Medical Center for ten days from April 23, 2004 until May 3, 2004. During the entire period he remained under armed guard.

206. During his hospital stay, a cardioverter defibrillator was surgically implanted in his heart.

207. While Plaintiff was undergoing pre-operative preparations for this surgical procedure, Quinn and Rogers continued to question him as to (a) his identity and (b) his activities at the Academy. Upon information and belief, this questioning was at the behest of the Trustee Defendants.

208. Plaintiff continued to decline to answer these questions and continued to demand that he be permitted to exercise his right to counsel. The questioning nonetheless persisted literally until medical staff wheeled Plaintiff into the operating room.

209. During his hospitalization, Plaintiff was given the Last Rites by a Catholic priest as Plaintiff is of the Catholic faith.

210. Following this private and privileged communication, Quinn and Rogers attempted to interrogate the priest about this privileged communication in violation of law and common decency.

**Plaintiff Is Falsely Charged With Grand Larceny**

211.   By the evening of April 23, 2004, the NYPD, Quinn, Rogers and the Trustees knew that they had a mutual problem.  Quinn and Rogers had taken Plaintiff into custody that morning with neither a warrant nor probable cause to do so as a consequence of agreeing to perform a "favor" (at IPSA's request) for the Trustees by browbeating Plaintiff's true identity out of him so that they could better answer the questions being posed on the Dietl/Pivar website and in the press.

212.   Their problem was exacerbated by the fact that Quinn and Rogers had had no right to enter the lobby of Plaintiff's apartment building to attempt to intimidate him.

213.   In the process of intimidating a fragile man in the process of recovering from a heart operation they used vastly excessive and inappropriate force and caused him to suffer another heart episode that would require further surgical intervention.

214.   Their mutual problem was further exacerbated by the fact that Plaintiff was demanding both an attorney and a bed-side arraignment if, as and when he was told he was being charged with a crime.

215.   So, lead by Levinson, Slade, Wilkinson and Guggenheim, the Trustees provided a solution for the NYPD, the ADA, Quinn and Rogers by fabricating a series of false allegations of fraud, embezzlement and grand larceny against the Plaintiff and then inducing Farthing to swear to them by extortion.

34

216.  In a felony complaint purportedly signed at 6:00 P.M. on April 23, 2004 – some 9½ hours after the assault on Plaintiff – Quinn stated that he was informed by Farthing that:

    a.   "Empire Solutions is not an authorized vendor known to the New York Academy of Art;" and

    b.   "Between August 2003 and April 2004, six checks totaling in excess of $40,000 were written to a Company called Empire Solutions but no matching invoices could be located."

217.  These statements by Farthing were known by him to be false at the time he made them because he signed the Academy's contract with Empire (Exhibit D hereto).

218.  Upon information and belief, Farthing was induced to make these demonstrably false statements by Levinson, Slade, Guggenheim and Wilkinson on behalf of the other Trustees in order to preserve his severance package and to resolve all existing disputes between the Trustees and him thereby smoothing the way for Farthing's planned departure from the Academy.

219.  Upon information and belief, Levinson, Slade, Guggenheim and Wilkinson on behalf of the Trustees sought through the use of interstate mail and interstate wire communications the unwarranted criminal prosecution of Plaintiff in order to discredit his disclosure of the aforesaid multiple year pattern of mail fraud, tax fraud, bank fraud, insurance fraud and wire fraud they had employed and continued to employ in controlling and administering the affairs of the Academy in violation of various laws

and therefore in furtherance of their ongoing conspiracy to control and operate the Academy through the aforesaid pattern of racketeering activities.

220.   Upon information and belief, Levinson, Slade, Guggenheim and Wilkinson, acting on behalf of the other Trustee Defendants in furtherance of their conspiracy, used the power they had over Farthing to induce him to testify falsely against Plaintiff.

221.   The scheme to falsely charge Plaintiff with criminal activity was but another step by the Trustee Defendants in conspiracy one with the other to continue their control of the Academy for their own selfish interests through a persistent and consistent pattern of activities that include mail fraud, wire fraud, bank fraud, insurance fraud and tax fraud.

222.   The Trustees expected the Police Defendants and the ADA to purport to rely upon the false testimony provided by Farthing because they desperately needed an excuse to explain the wrongful conduct of Quinn and Rogers earlier that day.

223.   Farthing's statements were also known to be false by the other Trustee Defendants, since all of them knew based on many face-to-face exchanges, including the Plaintiff's attendance at every Board Meeting, that Plaintiff was the Controller of the Academy and based upon the Academy's own business records that Empire was entitled to payment pursuant to the terms of Exhibit D annexed hereto.

224.   Indeed, a comparison of the Empire Contract with either the Academy's Invoice History Report relating to Empire or to the actual checks summarized in that report would have shown all payments to Empire were authorized.

225. As noted above, the Empire Contract is dated August 22, 2003, and provides for payment by the Academy of $5,000 with its execution.

226. Annexed hereto as Exhibit O is a copy of an Invoice History Report prepared from the Academy's computer based records relating to Empire.

227. The first payment to Empire was made on the very same date as the Empire Contract in exactly the $5,000 sum that the Empire Contract expressly requires be paid at the time of its signing by the Academy.

228. This precise congruence of date and amount is no accident.

229. The next payment to Empire of $7,000 under description states "November **Crystal** Project **Blaubaud**/December retainer." This description aligns with the Empire Contract's express reference to "**Crysta**l Reports." (Emphasis added.)

230. The next payment is described as being for "Report Formatting and **Integration**." The Empire Contract expressly refers to "the **integration** of your new systems." (Emphasis added.)

231. The next payment is described as "Completion of **"Contract**."

232. The final payment is described as "Training and assisting the closing of the books in **Blackbaud**."

233. Thus anyone with a modicum of common sense, who compares the Empire Contract and subsequent invoices, with the Academy's Invoice History Report relating to Empire, cannot escape the conclusion that each and every payment made to Empire was wholly consistent with the plain language of the Empire Contract. Annexed hereto as Exhibit P are copies of Empire Invoices paid by the Academy.

234. All of these documents were available to Quinn, Rogers and the ADA, who should have considered them before charging Plaintiff with a crime.

235. In addition, many employees of the Academy and all of the Trustees knew that during the period that payments were made to Empire the Academy was integrating the new systems to which the Empire Contract makes express reference. Indeed, the Invoice History Report attached to this amended complaint was prepared on one of those very systems.

236. Last and certainly not least, Farthing physically signed both the Empire Agreement and some of the checks in payment of Empire invoices.

237. Indeed at page 8 of a report prepared by IPSA dated May 4, 2004, the Trustees and Slade were informed that Farthing had in fact signed some of the Empire checks, while others had been signed using a signature stamp.

238. That same May 4 IPSA report advised the Trustees and Slade in finding number 9 on page 14 that IPSA had "[c]onfirmed that the results of operations as communicated in Board meetings [by Plaintiff] agreed with the audited financial."

239. In addition, upon information and belief, an accountant, Mr. Thomas Harris ("Harris"), was engaged by the Trustees during the first quarter of 2004 before any issues relating to Plaintiff had arisen.

240. Harris then reviewed the Academy's books and records.

241. Upon information and belief, Harris subsequently issued a written report that praised highly Plaintiff's performance as controller (the "Harris Report").

242.  The favorable findings of the Harris Report were, upon information and belief, known to all Trustees and to Slade and Guggenheim on or before April 1, 2004.

243.  There can be no doubt that Farthing's statement to Quinn, made on behalf of the Academy and within the scope of his then employment, to the effect that "the Academy had never heard of Empire" was known to Farthing to be false.  It was also known by all of the Trustees to be false.

244.  On the evening of April 23, 2004, Quinn also swore that Farthing told him that

    a.  Between August 2003 and April 2004 Plaintiff charged over $29,000 on his MBNA credit card; and

    b.  Plaintiff had no permission or authority to obtain that card.

245.  These statements by Farthing were known by him to be false at the time he made them because he authorized the issuance of Plaintiff's credit card; on several occasions observed him use it to pay for proper Academy charges; and was aware of the existence of the Academy's accounting records in general and the loans to officers ledger in particular.  Indeed, Farthing was personally subject to the same procedures described above that had been implemented by Plaintiff regarding reconciliation of officers' monthly credit card statement before such statements were paid.

246.  Farthing was also aware that the terms of the Brooklyn Diner Agreement precluded Farthing from stating that any funds owed by Plaintiff could not be offset against the far greater amount owed to the Plaintiff by the Academy.

247. Quinn's felony complaint, based on Farthing's false testimony, was presented to a grand jury . The grand jury returned an indictment against Plaintiff.

248. Each of the Trustees knew that (a) Farthing had made these statements in aid of the criminal prosecution of Plaintiff; (b) the statements were recklessly false; (c) the statements would be relied upon by, among others, the grand jury; and (d) likely result in the criminal prosecution of Plaintiff for crimes he did not commit.

249. During an interstate telephone conference call on April 24, 2004, one D. Roth, an IPSA employee, reported to all Trustees on the progress of the bogus criminal prosecution of Plaintiff. During this conference call the Trustees all acquiesced in continuing their scheme to destroy by fraud and deceit the Plaintiff and his businesses, First Manhattan and Empire, in order to protect and preserve their control over the Academy for their own selfish purposes. This interstate telephone conference call was therefore in furtherance of the Trustees' common scheme to protect themselves by discrediting Plaintiff through the mechanism of a false criminal prosecution.

250. A similar interstate telephone conference call in which all Trustees participated was had on April 27, 2004 for the same purpose. During this telephone conference call, IPSA was represented by Scott Moritz. During this conference call the Trustees all acquiesced in continuing their scheme to destroy by fraud and deceit the Plaintiff and his businesses, First Manhattan and Empire, in order to protect and preserve their control over the Academy for their own selfish purposes. This interstate telephone conference call was therefore in furtherance of the Trustees' common scheme to protect themselves by discrediting Plaintiff through the mechanism of a false criminal prosecution.

251.  Before the testimony was presented to the grand jury, the Academy had received the April 22 invoices from First Manhattan, which reflected a credit against monies otherwise owed by the Academy for personal charges on Plaintiff's MBNA credit card.

252.  Thus the Trustees had further confirmation of Plaintiff's acknowledgement of indebtedness to the Academy relating to his use of the MBNA card.

253.  Upon information and belief, Quinn, the New York Police Department, the ADA, the Office of the New York County District Attorney all purported to rely upon knowingly false communications from Farthing about Plaintiff many of which were transmitted by mail or by wire, or both.

254.  Plaintiff was not given the opportunity to testify before the Grand Jury as was his right.

255.  Had he testified before the Grand Jury, as was his right, Plaintiff would have produced the Empire Contract annexed hereto, copies of the Empire invoices, the Academy Invoice History Report and the Academy checks.   Faced with this evidence, the Grand Jury would not have indicted Plaintiff based upon the proposition that:  "Empire Solutions is not an authorized vendor known to the New York Academy of Art."

256.  Had Plaintiff testified before the Grand Jury, as was his right, Plaintiff would have produced evidence of the Academy's "loans to officers" account and its procedures regarding credit card reconciliation.  He also would have produced the

April 22 invoice reflecting the credit for the MBNA credit card charges and pointed out that the Academy owed him far more than he owed it.

257. Faced with this evidence, the Grand Jury would not have indicted him for his use of his MBNA credit card on which he was jointly and severally liable to MBNA with the Academy.

258. By the time of his arraignment, Plaintiff's violation of his New Jersey federal probation had come to light and federal authorities had issued a warrant for his detention.

259. At this point, Plaintiff was certain that he owed the federal government jail time.

260. The ADA was threatening to prosecute Plaintiff's wife based upon her association with Empire and First Manhattan.

261. Defendants (other than the Academy) were engaging in a common scheme to blame Plaintiff for all of the Academy's long existing financial problems, including the $1+ Million that had been missing from the Academy's restricted endowment account long before Plaintiff's arrival at the Academy. For example, at the time of his arraignment on May 17, 2004, the ADA stated:

> Your Honor, the Defendant was indicted for stealing approximately $60,000 at this time. However, we are looking at donations that were made to the school, pledges that were made.
>
> However, no checks associated with them were ever deposited and we believe it would be a substantial amount of money. The investigation in this case is continuing.
>
> Since Defendant has become controller of the New York Academy of Art, I believe they began operating with a deficit of $40,000 and now they are operating at a deficit at **over a million dollars**. The extent to which that is contributed to the Defendant at this point is not yet known.

However, we do believe we will find a much larger dollar amount associated with this Defendant's theft.

(Emphasis added.)

262.  This statement was made by the ADA, upon information and belief, with actual knowledge of its falsity based, among other reasons, upon IPSA finding number 9, quoted above in paragraph 233, which information, upon information and belief, was provided to the ADA approximately two weeks before she made the statement quoted in the preceding paragraph.

263.  Plaintiff had received the Last Rites, was exhausted, was in agonizing pain, and was afraid his wife would be indicted for forming his companies as the law enforcement officials had threatened.

264.  Indeed, the threats about Plaintiff's wife were so serious that by letter dated June 29, 2004, Plaintiff's attorney offered to surrender her into custody at a mutually agreed upon time.  A copy of that letter is annexed hereto as Exhibit Q.

265.  Plaintiff was clearly aware and afraid of the vast social, political and business power of the Trustees.

266.  He was cognizant of the fact that he owed the federal government prison time by reason of his probation violation and was under the mistaken belief that any time he might serve in connection with his wrongful New York indictment for larceny would be served concurrently with a federal sentence for his violation of probation.

267.  Accordingly, on October 29, 2004, Plaintiff pled guilty to a Class C felony and was sentenced to a term of 4 to 8 years.

268.  As the Plaintiff slowly recovered sufficient strength, he was able to engage new criminal defense counsel in 2006, who marshaled much of the evidence outlined above.

269.  A copy of Plaintiff's Motion To Vacate Judgment and Set Aside Sentence dated June 8, 2006 is attached hereto as Exhibit R.  That motion states with considerable specificity the prior violations of Plaintiff's rights.  It is respectfully incorporated herein by reference.

270.  After speaking with Farthing by telephone and obviously perceiving that an injustice had been perpetrated, on November 30, 2006, the District Attorney chose not to oppose the motion and agreed to vacate Plaintiff's prior conviction and offered to permit Plaintiff to replead to a Class D felony for which he would sentenced to a term of 2.5 to 5 years and, more importantly, to have that sentence be immediately concurrent with the time Plaintiff knew he owed the federal government for his probation violation.

271.  The practical consequence of this proposed re-sentencing would that Plaintiff would immediately be eligible for parole; while awaiting immediate parole he was told that he would immediately be given credit for the federal time he knew he owed, and thus if he accepted this offer he would be free many, many months earlier than he could have been had he successfully pursued a re-trial and won.

272.  Since Plaintiff has only a year or two left to live due to a terminal medical condition that was exacerbated while in custody of the State of New York, accepting this proposal would multiple geometrically the percentage of Plaintiff's life left to be lived while not incarcerated.

273.  Plaintiff did not have the power to compel the State of New York to dismiss voluntarily all criminal charges against him.

274.  Thus the offer described above, which given Plaintiff's very short life expectancy, he accepted, was quite dramatically the best of all outcomes available to him because it represented freedom considerably faster than a re-trial and acquittal would provide.

275.  Plaintiff's decision to re-plead under all of the foregoing circumstances is not inconsistent with his innocence.

276.  Plaintiff's arrest, conviction and incarceration were (a) the direct result of Farthing's aforesaid false statements, which formed the basis of Quinn's felony complaint, and (b) part of a greater and continuing fraudulent scheme of the Trustees perpetrated in large part through the use of the United States mail and interstate wire communications that pre-existed Plaintiff's first contact with the Academy that was designed to prevent public discovery and subsequent criminal and civil prosecution of the Trustees and others for tax fraud, bank fraud, mail fraud, insurance fraud, breach of fiduciary duties and other misconduct and to permit them to keep the Academy as their toy.

**The Pattern of Fraud of the Trustees Continues In Respect of the Restricted Endowment Account So That They Could Maintain Their Control Of the Academy**

277.  As a result of the notoriety generated by the Pivar/Dietl website and Plaintiff's arrest, the Charity Bureau of the New York Attorney General's Office made an inquiry as to the status of the Academy's restricted endowment account in 2004.

278.  The Academy responded via a letter and its enclosures dated December 15, 2004, signed by Douglas E. Grover, Esq., formerly of Grover & Block and now of the Thompson Hine law firm.

279.  A copy of that response is annexed hereto as Exhibit S.

280.  Recognizing that for the most part all of the restricted funds had gone missing, the Academy responded by telling the Attorney General that the funds reported for many years on its tax returns as "restricted" had in fact never been restricted.

281.  The Academy's response, signed by Wayne A. Linker, Executive Director and Trustee, states in pertinent part:

> In late 1997, Academy staff and trustees initiated a small fundraising campaign, the goal of which was to raise $5 Million for an endowment. Two phases of the campaign were envisioned:  first securing $2 million in gifts and pledges from members of the board of trustees of the Academy; and second, "going public" to raise the balance of funds from other sources.  It appears that the Academy never implemented phase 2 of the fundraising effort.

282.  That statement is demonstrably false and it frankly is difficult to understand how the Attorney General could accept it at face value because, among other reasons, it is flatly contradicted by the Academy's tax returns.

283.  First and foremost, if the Academy never reached Phase 2, why did it employ Sandra April ("April"), Farthing's one time girlfriend, at an annual salary of some $125,000, plus bonus, to serve as "Director of Development?"

284.  Second, the Forms 990 for years 1997 to 2004 filed via the United States mail by the Trustees on behalf of the Academy show tax deductible donations to the Academy's endowment of $8,425,000 of which an aggregate of at least $2,600,000 were of $5,000 or less.  $8,425,000 exceeds the total "goal" of the "small fund raising

campaign" stated in Mr. Linker's letter by $3,425,000 and exceeds the first "phase" stated in Mr. Linker's letter by $6,425,000.

285.  The contributions of under $5,000 represented the donations of thousands of individual donors who reasonably and forseeably relied on the veracity of the Academy's 990's.

286.  Those 990's are the only publicly available information for donors to verify that their donations are actually applied in accordance with their wishes, namely to permanently endow the **charitable** activities of the Academy.

287.  The income derived from these donations was used by the Trustee Defendants to maintain their control over the Academy.

288.  The simple facts are that (a) the Trustees launched and more than completed "phase 2"of the fundraising campaign; (b) grossly mismanaged the Academy by, among other things, continuing to invade its restricted endowment funds to pay for operating costs (including substantial bonuses paid to Farthing and April); (c) failed to report to the Academy's financial supporters that the Trustees had squandered their restricted contributions; and (d) then lied to the Attorney General of the State of New York via the United States mail so that they could maintain their control over a RICO enterprise, to wit the Academy.

289.  The practice of filing knowing false insurance claims also continued after Plaintiff's departure.

290.  Attached hereto as Exhibit T is a claim made through the United States mail to recover the funds that the Academy was lawfully obliged to pay and did pay under the Empire contract.

291. This claim also fraudulently seeks reimbursement of charges of the MBNA credit card that Plaintiff never disputed he owed personally.

## AS AND FOR A FIRST CLAIM
### (Against All Defendants Other Than the Academy
### for Money Damages Pursuant to 42 U.S.C. 1983)

292. Plaintiff repeats and reavers the averments of paragraphs 1 through 291 as if fully set forth herein.

293. At the time that Plaintiff was unlawfully taken into custody on the morning of April 23, 2004, the Police Defendants used excessive and unreasonable force.

294. Slade, Levinson, Farthing, Guggenheim and Wilkinson acting in furtherance of their conspiracy with the other Trustees met with and spoke by telephone with the Police Defendants and the ADA on April 16, 19, 20, and 22, 2004, for the purpose of inducing them to engage in conduct designed to coerce Plaintiff to reveal the information he had disclosed to Farthing and Lerner and to forebear from disclosing publicly the wrongdoings at the Academy he had discovered and threatened to reveal publicly in a letter to Farthing dated April 13, 2004 of which a copy is annexed hereto as Exhibit U.

295. Based upon the initially oral findings by IPSA later confirmed in its written reports; the existence of the Empire Contract; the consistency of the descriptions of the payments to Empire with the express language of the Empire Contract; the existence of a loans to officers account; and all other circumstances then pertaining, Defendants lacked bona fide probable cause as of the morning of April 23, 2004 to believe that Plaintiff had committed a crime and therefore the conduct of the Police

Defendants in the lobby of Plaintiff's apartment building, acting at the behest of the Trustees, violated Plaintiff's federal rights.

296.  The Trustees actively conspired with and induced Quinn, Rogers and the ADA to violate Plaintiff's federal rights and by reason of that conspiracy and concert of action are jointly and severally liable to Plaintiff for his damages as persons acting under color of state law.

297.  As a proximate and foreseeable consequence of the aforesaid excessive use of force in violation of Plaintiff's rights arising under the Fourth and Fifth Amendments of the Constitution of the United States, Plaintiff was damaged in a sum not less than $5 Million.

### AS AND FOR A SECOND CLAIM
### (Against All Defendants Other Than the Police Defendants for Fraud and Deceit)

298.  Plaintiff repeats and reavers the averments of paragraphs 1 through 297 as if fully set forth herein.

299.  Without any doubt Farthing knew that the statements described in greater detail above about payments made pursuant to the Empire Contract and Plaintiff's use of his MBNA credit card that were presented to the Police Defendants, the ADA and the grand jury about Plaintiff were absolutely false in their entirety.

300.  Upon information and belief, each of the Trustee Defendants knew of the charges that had been made by Farthing and further knew them to be false.

301.  The Police Defendants, the ADA, and the grand jury have claimed to have relied upon the false statements made by Farthing on behalf of the Academy and its Trustees.

302.  Farthing, the Trustees and the Academy all knew that the Police Defendants, the ADA and the grand jury would claim to rely upon the false statements made by Farthing on behalf of the Academy and its Trustees in furtherance of the Trustees' conspiracy to control and operate the Academy through a pattern of mail fraud, wire fraud, bank fraud, insurance fraud and tax fraud..

303.  Farthing and the Trustees all conspired to commit perjury and then committed perjury relating to the Empire Contract and Plaintiff's use of his MBNA credit card as part of a larger scheme described above whose goal was to maintain the Trustees' control of the Academy and to exploit that control for their personal benefit.

304.  The fraud that had been and continues to be perpetrated by the Trustee Defendants (and through their acts by the Academy) is much greater in scope than the issues in the criminal proceeding against Plaintiff in which Farthing's perjurious testimony was given and of which larger fraud the perjurious testimony relating to Plaintiff was but a small part.

305.  As a foreseeable and proximate result of this fraudulent scheme and conspiracy to commit perjury Plaintiff was imprisoned for a period of approximately 2.5 years.

306.  During that term of that imprisonment Plaintiff was denied appropriate medical care for his heart condition and his leukemia and was otherwise mistreated.

307.  As a consequence, his life expectancy has been shortened by a term of approximately 6 years.

308.  Plaintiff has lost past earnings and future earnings; endured past pain and suffering; and will endure future pain and suffering all as the foreseeable and proximate result of these Defendants' culpable conduct.

309.  Plaintiff was thus damaged by these Defendants' fraud, conspiracy to commit perjury and deceit in a sum not less than $5 Million.

310.  The conduct of the Trustees is of such a nature as to entitle Plaintiff to the recovery of punitive or exemplary damages.

### AS AND FOR A THIRD CLAIM
### (Breach of Contract Against the Academy)

311.  Plaintiff repeats and reavers the averments of paragraphs 1 through 310 as if fully set forth herein.

312.  Lerner and Farthing had authority to – and did – accept Plaintiff's resignation on the evening of the Brooklyn Diner meeting in March 2004 effective on Farthing's last day, which was then imminent.

313.  Upon acceptance of that resignation, under the terms of the 2003 Controller Agreement the Academy owed First Manhattan the sum of $190,208.39.

314.  On behalf of First Manhattan, Plaintiff agreed that the Academy could set-off against the aforesaid amount the final aggregate amount of his indebtedness to it in respect of his loan to officer account once the Academy received the final MBNA bill for the credit card account in the names of Plaintiff and the Academy.

315.  Upon information and belief, that sum is between approximately $12,000 and approximately $25,000.

316.  Prior to the commencement of this action, First Manhattan and Empire assigned to Plaintiff their contractual rights to recover from the Academy monies owed it under the 2003 Controller Agreement and the Empire Agreement.

317.  Accordingly, the Academy is indebted to Plaintiff in the sum of $190,208.39 less the Academy's proof at trial of the amount of Plaintiff's final loan to officer account.

## AS AND FOR A FOURTH CLAIM
### (Against the Trustees for
### Civil Remedies Pursuant to 18 U.S.C. § 1964)

318.  Plaintiff repeats and reavers the averments of paragraphs 1 through 317 as if fully set forth herein.

319.  At all relevant times, the Academy has been an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

320.  At all relevant times, the Trustees controlled, conducted and participated in the affairs of the Academy, including without limitation being parties to each of the instances of mail fraud, wire fraud, bank fraud, tax fraud and insurance fraud discussed in more detail above.

321.  To whatever extent, if any, any Trustee was not directly involved in each of the foregoing instances of mail fraud, wire fraud, bank fraud, tax fraud, and insurance fraud, such Trustee aided and abetted such acts and conspired with the other Trustees in their commission all in furtherance of their common scheme to control the Academy and participate in its affairs for their personal gain.

322.  The Trustees used the United States mail to file each of the fraudulent insurance claims and fraudulent tax returns that are attached as exhibits to this amended complaint on or about the dates that each of those documents bear.

323.  At the time of filing of each of these insurance claims and tax returns, each Trustee intended to defraud those persons who would foreseeably rely upon those documents, including insurance companies which paid the bogus claims and contributors to the Academy who believed their donations would increase the corpus of a restricted endowment fund.

324.  These fraudulent tax returns and fraudulent insurance claims were filed in furtherance of the Trustees' common and intentional scheme to control, conduct and participate in the affairs of the Academy through a pattern of racketeering activities for their own personal gain.

325.  Similarly, the fraudulent student loan papers discussed above in paragraphs 67 and 68 were sent by the Trustees via the United States mail with the intention of defrauding banks by obtaining funds to which the Academy was not lawfully entitled in furtherance of the Trustee's common scheme to control the Academy for their personal gain by, among other ways, funding its operations with these fraudulently obtained funds.

326.  For many years, every Trustee has known of the aforesaid pattern of wrongful conduct and no Trustee has taken any action to stop repetition of the pattern, much less to rectify it.

327.  The Trustees caused Farthing's knowingly false statements about the Empire payments and Plaintiff's use of his MBNA credit card to be transmitted to the

Police Defendants and the ADA, upon information and belief, via use of the United States mail and interstate and international wire, in furtherance of their long standing conspiracy to control, conduct and participate personally in the affairs of the Academy through a pattern of racketeering activities for their own personal gain.

328.  In April/May of 2004, Plaintiff was the latest victim of the Trustees' knowingly false and fraudulent statements communicated at least in part via use of the United States mail and interstate and/or international wire in aid of their scheme to control the Academy for their own personal gain.

329.  Each of the Trustees in conspiracy, concert and participation with each of the other then Trustees derived disposable income via federal and state tax deductions from the aforesaid pattern of racketeering activities including (a) mail fraud, (b) wire fraud, (c) tax fraud, (d) bank fraud and (e) extortion and in turn used that income to acquire and to perpetuate their absolute control and in all practical effect ownership of the Academy by donating those tax savings back to the Academy to fund, among other things, the Trustees' fund raising junkets.

330.  Each of the Trustees in conspiracy, concert and participation with each of the other then Trustees controlled the Academy through the aforesaid pattern of racketeering activities including (a) mail fraud, (b) wire fraud, (c) tax fraud, (d) bank fraud and (e) extortion in violation of 18 U.S.C. § 1962(b).

331.  During their respective terms of service each of the Trustees in conspiracy, concert and participation with each of the other Trustees participated directly in the conduct of the Academy's affairs through the aforesaid pattern of racketeering

activities including (a) mail fraud, (b) wire fraud, (c) tax fraud, (d) bank fraud and (e) extortion in violation of 18 U.S.C. § 1962(c).

332.  By reason of the foregoing, each of the Trustees violated 18 U.S.C. § 1962(d).

333.  Plaintiff was one of many persons who was proximately injured in his business and property by the Trustees' violations of 18 U.S.C. § 1962(b), (c) and (d). Indeed, Plaintiff's businesses, Empire and First Manhattan, were completely destroyed as the direct result of the Trustee Defendants' desire to silence or at a minimum discredit Plaintiff's public disclosure of the Trustees' acquiring and maintaining control over the Academy through a pattern of racketeering activities and then conducting its affairs through such a pattern as described in this amended complaint.

334.  The communications via the mail and wire that led to Plaintiff's imprisonment were but a few instances of a multi-year pattern of the Trustees intentionally reporting to federal and state governmental authorities false information about the Academy's affairs via mail and wire upon which the Trustees anticipated the governmental authorities would rely to their detriment and the Trustees' gain.

335.  Prior to the commencement of this action, Empire and First Manhattan assigned to Plaintiff all claims they may have against the Defendants in this action.

336.  Plaintiff's actual damages from the Trustees' violations of 18 U.S.C. § 1962(b), (c) and (d) exceed $5 Million.

## AS AND FOR A FIFTH CLAIM
### (Against Defendants Levinson, Slade, Wilkinson, Guggenheim and the Other Trustees for Civil Remedies Pursuant to 18 U.S.C. § 1964)

337.  Plaintiff repeats and reavers the averments of paragraphs 1 through 336 as if fully set forth herein.

338.  Upon information and belief, shortly after the first "Robert Angona" newspaper article described above, Levinson, Slade, Wilkinson and Guggenheim formed an *ad hoc* subcommittee of the Academy's Board to deal with the issues relating to Plaintiff.  These Defendants are hereinafter referred to as the "Subcommittee."

339.  At the time of the formation of the Subcommittee, Farthing's imminent departure from the Academy was well known to all Board Members.

340.  Upon information and belief, during April 2004, Farthing told the Subcommittee about circumstances of Plaintiff's background that had been disclosed to Lerner and Farthing prior to Farthing's execution of the first First Manhattan Contract.

341.  Upon information and belief, prior to this time, neither Lerner nor Farthing had disclosed these facts to other Board Members.

342.  Prior to this time, as Lerner and Farthing had instructed, Plaintiff had not disclosed to other Trustees what he disclosed to Lerner and Farthing about himself before entering into the first First Manhattan Contract.

343.  Upon information and belief, upon learning of the information about Plaintiff that Farthing had withheld from them, the Subcommittee threatened to hold Farthing liable for the consequences of his non-disclosure and further threatened to deny him his severance benefits in connection with his imminent departure from the Academy.

344. By on or before April 23, 2004, the Subcommittee knew of the information contained in the Harris Report that in substance praised Plaintiff's performance as Controller of the Academy.

345. By on or before April 23, 2004, the Subcommittee knew of the findings later formally reported in IPSA's written report dated May 4, 2004, including its finding that the Academy's "results of operations as communicated [by Plaintiff] in Board meetings agreed with the audited financial."

346. Upon information and belief, on or before April 23, 2004, Farthing reminded the Subcommittee of the existence of the Empire Contract and that the payments made to Empire pursuant to it were in all respects proper, or, alternatively, they already knew of these facts

347. Upon information and belief, on or before April 23, 2004, Farthing reminded the Subcommittee the existence of the Academy's loans to officers account and propriety of Plaintiff's use of his Controller's MBNA credit card in connection therewith or, alternatively, they already knew of these facts.

348. Upon information and belief, on or about April 23, 2004, the Subcommittee told Farthing that they would not hold him accountable for his failure to disclose to the entire Board the facts that Plaintiff had disclosed to Lerner and Farthing about his background and would not impair any of the terms benefiting him following his imminent departure from the Academy, if – but only if – he would provide the false information to Quinn that is set forth in Quinn's April 23, 2004 declaration in support of criminal charges against Plaintiff.

349. But for the Subcommittee's threats, Farthing had no reason to lie about the Empire Contract, payments pursuant to it or Plaintiff's accepted use of his MBNA credit card.

350. The Subcommittee knew as of April 23, 2004, that the statements that Farthing made to Quinn were false.

351. The Subcommittee made the offer to confer the benefits on Farthing set forth in paragraph 344 in order to influence Farthing to testify falsely against Plaintiff.

352. The Subcommittee thus violated § 215.00 of the New York Penal Law, an offense punishable by more than one year's imprisonment.

353. The Subcommittee intentionally and unlawfully influenced Farthing's testimony as part of their continuing scheme to control the Academy for their own personal benefit and the benefit of the other Trustees.

354. Unlawfully influencing Farthing's testimony was but one of a series of interrelated acts through which the Subcommittee and the other Trustees controlled and participated in the affairs of the Academy through a pattern of racketeering activities for their own personal benefit.

355. Upon information and belief, the other Trustees knew that Farthing's testimony against Plaintiff had been improperly influenced, acquiesced in such influence in furtherance of their conspiracy to control the Academy and aided and abetted such influence by failing to take any action to bring the true facts to light and accepting the personal benefits that flowed from Farthing's false testimony.

356. Influencing Farthing's testimony violated 18 U.S.C. § 1962 (b) and (c).

357. By reason of the foregoing, each of the Trustees violated 18 U.S.C. § 1962(d).

358. Plaintiff was one of many persons who was proximately injured in his business and property by the Subcommittee's violations of 18 U.S.C. § 1962(b), (c) and (d). Indeed, Plaintiff's businesses were destroyed in their entirety as the direct result of the Trustees' desire to silence or at a minimum discredit Plaintiff's public disclosure of the Trustees' acquiring and maintaining control over the Academy through a pattern of racketeering activities and then conducting its affairs through such a pattern by blaming him for the consequences of their own culpable conduct.

359. The communications (in part via the mail and wire) that led to the complete destruction of Empire and First Manhattan were but several of a multi-year pattern of the Trustees knowingly reporting to federal and state governmental authorities false information about the Academy's affairs via mail and wire in aid of their conspiracy to control the Academy for their personal benefit.

### AS AND FOR A SIXTH CLAIM
### (Against Slade Pursuant to Judiciary Law § 487)

360. Plaintiff repeats and reavers the averments of paragraphs 1 through 359 as if fully set forth herein.

361. By reason of the foregoing, Slade is guilty of deceit and collusion and knowingly and willfully consented to deceit and collusion by Farthing.

362. Slade intended to deceive the Police Defendants, the ADA and the Supreme Court of the State of New York as to Plaintiff's alleged criminal conduct relating to the Empire Contract, payments to Empire pursuant to that contract and Plaintiff's use of his MBNA credit card.

363.  The fraudulent scheme that Slade's deceit and collusion and consenting to deceit and collusion advanced, namely the continued control of the Academy by the Trustees (including Slade) for their personal benefit and to the detriment of its charitable purposes, was far greater in scope that the issues in the criminal action against Plaintiff in which Farthing's perjurious testimony was given.

364.  Pursuant to New York Judiciary Law § 487, Slade is liable to Plaintiff for three times the damages caused by Slade's deceit and collusion and consenting to deceit and conclusion.

365.  Slade is therefore liable to Plaintiff for a sum not less than $5 Million before trebling.

WHEREFORE, Plaintiff demands judgment as follows:

On his First Claim in his favor and against all Defendants other than the Academy in a sum not less than $5 Million, together with an award of his reasonable attorney's fees;

On his Second Claim in his favor and against all Defendants other than the Police Defendants in a sum not less than $5 Million, together with an award of punitive or exemplary damages in such amount as is just;

On his Third Claim in his favor and against the Academy in the sum of $190,208.39, together with prejudgment interest thereon at the rate of 9% per annum less the proof at trial, if any, of the amount of Plaintiff's final loan to officer account;

On his Fourth Claim against the Trustees in the sum of not less than $5 Million actual damages; not less than $15 Million trebled damages; and a reasonable attorney's fee pursuant to 18 U.S.C. § 1964(c);

On his Fifth Claim against the Trustees in the sum of not less than $5 Million actual damages; not less than $15 Million trebled damages; and a reasonable attorney's fee pursuant to 18 U.S.C. § 1964(c);

On his Sixth Claim against Slade in the sum of not less than $5 Million actual damages and not less than $15 Million trebled damages pursuant to New York Judiciary Law § 487; and

Such other, further or different relief as to the Court may seem just and proper.

Dated: New York, New York
     July 18, 2007

BANTON McCARTHY LLC

By: _____
    J. Joseph Banton (JB-5934)
Attorneys for Plaintiff
26 Broadway
New York, NY 10004-1840
Telephone:  (212) 480-3500
Facsimile:  (212) 480-9557