# Exhibit R

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Indictment No.  2231          Year  2004

PEOPLE OF THE STATE OF NEW YORK,


-- against --

ROBERT ANGONA

Defendant.

## MOTION TO VACATE JUDGMENT AND SET ASIDE SENTENCE

Law Offices of
**CHARLES ANDREW MILLER**
*Attorney for Defendant*
**105-15 Cross Bay Blvd
Ozone Park, NY 11417
(718) 323-6303**

*SSecurity
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*

To:

*Attorney for*

Service of a copy of the within                          is hereby admitted.

Dated,                          ........................................................
                               Attorney(s) for

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 41

- - - - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK

NOTICE OF MOTION TO
VACATE JUDGMENT AND
SET ASIDE SENTENCE

-against-

ROBERT ANGONA

IND. NO.:2231/2004

                                    Defendant

- - - - - - - - - - - - - - - - - - - - - - X

PERSONS:

PLEASE TAKE NOTICE, that upon the annexed affirmation of CHARLES A. MILLER, ESQ., dated the 1ST day of June, 2006, and upon all the papers and proceedings heretofore had herein, the undersigned attorney will move this Court, at a Supreme Court Term, Part 41 thereof, to be held in and for the County of New York, New York, at the Courthouse located at 100 Centre Street, NY, on the 15th day of June, 2006 at 9:30 o'clock in the forenoon of that day, or as soon thereafter as Counsel can be heard for an Order granting the following relief:

1.    Pursuant to Criminal Procedure Law (CPL) 440.10 and 440.20, vacating the judgment and setting aside the sentence of the Court upon the ground that:

a.    The Court did not have jurisdiction of the action or of the defendant (CPL 440.10(1)(a));

b.    The judgment was obtained in violation of a right of the defendant under the Constitution of the State of New York and of the United States (CPL 440.10(1)(h));

c.    New evidence discovered since the entry of judgment

1

is of such character that it creates a probability that had such evidence been received prior to the judgment in this case there would have been a more favorable disposition for the defendant (CPL 440.10 (1)(g)).

2.    And for such other and further relief as to this Court may seem just and proper, or may become appropriate as a result of information disclosed pursuant to this motion.

A previous application for the relief sought herein has been made to this Court by the defendant, appearing pro se; however counsel for the defendant has not been afforded a prior opportunity to raise the specific issues mentioned in this motion or to provide attached supporting documentation.

No hearings on this motion have heretofore been held before this court.

DATED:    QUEENS, NEW YORK
          June 8, 2006

                              Very yours truly,

                              CHARLES A. MILLER
                              105-15 Cross Bay Blvd
                              Ozone Park, N.Y.  11417
                              BY: Charles A. Miller, ESQ.
                              Attorney for Defendant


TO:       ROBERT MORGANTHAU
          District Attorney
          New York County

          Clerk of the Court
          New York County-Part 41


                              2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 41
- - - - - - - - - - - - - - - - - - - - X
THE PEOPLE OF THE STATE OF NEW YORK

         **AFFIRMATION**

      -against-

         **IND. NO.:2331/2004**

ROBERT ANGONA

            **Defendant**
- - - - - - - - - - - - - - - - - - - - X

CHARLES A. MILLER, an attorney duly admitted to practice law in the State of New York, affirms under penalty of perjury as follows:

1.   I am fully familiar with the facts and circumstances of this case, and make this affirmation in support of defendant's motion herein.

2.   Unless otherwise specified, all allegations made in this affirmation are made upon information and belief, and are based upon inspection of the Court records of this case, conversations with the District Attorney's Office, conversations with the defendant, and your affiant's own investigation.


## MOTION TO VACATE JUDGMENT AND SET ASIDE SENTENCE


3.   The defendant respectfully moves this Court to vacate the judgment and set aside the sentence of this Court that was entered on October 29, 2004, on the grounds that the court did not have jurisdiction over the matter or the defendant, the defendant was denied an important right afforded him under the laws of New

3

York and the U.S. Constitution, and newly discovered evidence after the entry of the aforementioned judgment would have resulted in a more favorable outcome for the defendant had it been known earlier.

4. Pursuant to Criminal Procedure Law (CPL) section 210.35(4), the grand jury indictment in this matter was defective, thus precluding the Court of jurisdiction of the matter, because the defendant was not afforded an opportunity to appear and testify before the grand jury in accordance with the provisions of CPL section 190.50. The defendant, under both Article I section 6 the New York State Constitution and the Fifth Amendment to the U.S. Constitution, is entitled to a proper presentment of charges before a grand jury before a court has jurisdiction over such offenses. In this instance, both CPL 190.50(5)(c) and CPL 210.20 require that said indictment be dismissed.

5. CPL 190.50(5)(a) states that a defendant, prior to the filing of any indictment against him, has a right to be a witness in a grand jury when criminal charges have been submitted to such a grand jury. A defendant who has a felony complaint pending against him is entitled to reasonable notice by the district attorney of his right to testify and given a reasonable time to exercise his right to appear. People v. Smalls, 488 NYS2d 712 (1st Dep't 1985); People v. Luna, 486 NYS2d 839 (Sup. Ct., Queens County, 1985), aff'd 514 NYS2d 806 (2d Dep't 1987).

6. While a defendant is normally required to provide

4

written notice of his intent to testify, otherwise known as cross 190.50 notice, written notice requirements have been waived where a defendant was not afforded a "reasonable time to exercise his right to appear." People v. Gini, 421 NYS2d 269 (2d Dep't 1979); People v. Spence, 526 NYS2d 747 (Sup. Ct., Kings County, 1988). In this instance, the defendant was arrested on April 23, 2004, on a felony complaint. See Exhibit A. The defendant was immediately hospitalized for a heart-related condition and was denied counsel for ten (10) days. During this period of time, the District Attorney's Office failed to arraign the defendant. Notwithstanding, they presented said matter to a Grand Jury and obtained a voted indictment on April 28, 2004. See Exhibit B. Prior to voted indictment, the defendant was never arraigned at the hospital, which is routinely done, never assigned an attorney, and he was not provided with the requisite notice of his right to testify before said grand jury.

7. On May 3, 2004, the defendant was brought to New York County Criminal Court and finally arraigned on the aforementioned felony complaint. Unbeknown to the court or the defendant, the District Attorney announced and filed the grand jury indictment. The District Attorney's Office did not provide the defendant with prior notice of his right to testify, nor did they indicate that they were keeping the grand jury open to accommodate the defendant's testimony. Prior to the pronouncement, court personnel asked the defense counsel if she

5

had apprised the defendant of his grand jury rights. She replied in the affirmative. See Exhibit C. Counsel for the defendant complained on the record of the indictment proceedings occurring, "without the [defendant having the] benefit of being represented and not having the opportunity to testify". Id.

8. The Court, in its January 17, 2006 decision of the defendant's pro se motion on this matter, stated, "this is the first time defendant is complaining about a violation of his CPL 190.50 rights." The Court cites the rule under CPL 190.50(5)(c) that requires a defendant to make such a motion not more than five (5) days after a defendant has been arraigned upon the indictment. Respectfully, the defendant did raise the violation of his CPL 190.50 rights prior to his plea, and at the precise time that the indictment was being filed with the court. While such a motion was not raised in writing prior to these CPL 440.10 applications, defense counsel on May 3, 2004, did assert the defendants right to testify before the grand jury and complained of his inability, up to that point, to exercise that right.

Interestingly, even the court personnel during the arraignment, in requesting whether the defendant had been apprised of his 190.50 rights, assumed that he was still entitled to testify before the grand jury. The District Attorney's Office never allowed the defendant to testify and it circumvented his arraignment until after the presentment of the case to the grand

jury.

9. The District Attorney's failure to provide reasonable notice or an opportunity for the defendant to testify before the grand jury makes the indictment in this matter defective. Furthermore, the defendant's assertion, at his May 3 arraignment, of his 190.50 rights, were sufficient, under the full context in which they were given, to constitute a motion to dismiss the indictment on those grounds. The defendant satisfied the parameters of CPL 190.50 (5)(c). Therefore, the indictment should have been dismissed.

10. Since the entry of judgment in this matter, newly discovered evidence has come to the attention of the defendant that had it been known prior to the entry of a plea or the entry of judgment a more favorable outcome would have been obtained by the defendant. This evidence is highly credible and the defendant used due diligence to obtain such favorable information toward his defense. Cf. People v. Barrero, 524 NYS2d 834 (2d Dep't 1988). Attached please find two letters that address the amount of theft initially believed to be at issue in this matter. A September 29, 2004, letter from Stuart Pivar, New York Academy of Arts (NYAA) Chairman emeritus, to the Court, indicates an alleged theft of only $30,000 by the defendant, an amount below the "C" Felony threshold. See Exhibit D. Then, a January 6, 2005, letter to the defendant's wife from a law firm representing the insurance company that insures NYAA claims that

7

the defendant owes $34,248.00, an amount that corroborates the lower threshold figure of Stuart Pivar listed above.

See Exhibit E. Notwithstanding these glaring discrepancies from the higher amount alleged in the original complaint, the most compelling piece of newly discovered evidence that fully exculpates the defendant is the December 15, 2004, response by Wayne A. Linker, Executive Director and Trustee of the NYAA, to interrogatories presented to him by the Attorney General's Office of the State of New York. Mr. Linker was specifically asked about any wrongdoing by the defendant as it pertained to whether NYAA's "restricted assets were in any way impaired or misappropriated during the period that Robert Angona was rendering services to the NYAA…." Mr. Linker's responds that after a thorough investigation by a respected private investigative firm, an audit by NYAA's regular auditors, and a review by a forensic accountant, "none of these investigative reviews have identified any inappropriate actions by Robert Angona with regard to the Academy's endowment." This shell-shocking piece of information was conveniently disclosed by NYAA through its legal counsel, Douglas Grover, to James R. Pigott, Jr., Assistant Attorney General of the State of New York, roughly one month after the defendant was sentenced. This exculpatory evidence was obtained by Stuart Pivar via a Freedom of Information Law request, dated February 15, 2006, and then shared with the defendant. A copy of the February 21, 2006 FOIL

8

response, from Stacey Rowland, Assistant Attorney General of the State of New York, with the applicable interrogatory included, is attached as Exhibit F.

If the New York County District Attorney's Office was aware of such exculpatory information from NYAA and its representatives prior to the plea or sentence in this matter, such failure to disclose would constitute a serious breach of ethical and professional responsibility and be a violation of the defendant's due process rights under the New York State and U.S. Constitution. See Brady v. Maryland, 373 U.S. 83(1963); People v. Vilardi, 556 NYS2d 518 (1990). If such information was not known to the DA's office at the time of plea or sentence, or up to now, this newly discovered information should raise serious questions as to whether the prosecution of this matter was ever warranted.

At the time of his plea and at the time of sentence, the defendant was not aware of these investigations by the NYAA or its representatives. It seems implausible that NYAA would only determine that the defendant had committed no wrong doing at just around the time he was being sentenced. The more likely scenario is that NYAA and its investigative arms knew of this exculpatory information well prior to the defendant being sentenced and they never disclosed it to the court, the DA or defense counsel. The information was material in the felony disposition realm. The defendant was indicted and offered a "C" Felony. This evidence,

9

now available to the defendant, strongly suggests that no evidence existed to substantiate any charge against the defendant.

Defendant's guilty plea seems to stem from the enormous pressure placed on him to either accept responsibility for the baseless allegations or risk the arrest of his innocent wife. In a June 29, 2004, letter from the defendant's attorney to the assigned assistant, he offers the defendant's cooperation on other uncharged improprieties at the NYAA. See Exhibit G. This cooperation was clearly aimed at attempting to thwart the District Attorney's Office's stated intention of prosecuting the defendant's wife if he did not accept responsibility for the alleged wrongdoing. This would explain the defendant's willingness to plead guilty, as he sought to protect another innocent person and because he was devoid, at the time, of exculpatory evidence in his defense. His prior criminal history would have precluded him from being considered a credible witness at any trial.

Lastly, although it is not one of the enumerated factors for the court to consider in its CPL 440.10 determination, the defendant's health is seriously declining. His physician at Upstate Medical University cites the defendant's cancer condition as "ultimately incurable" and that it is "unlikely that he will live more than five years, and he certainly could deteriorate much sooner." See Exhibit H. It is one thing for a potentially innocent man to remain incarcerated and await release at some point in the future; it is a far more serious and time-sensitive matter for

such an individual to become deceased while he awaits such release.

10. The defendant respectfully requests that the motion to vacate judgment be granted on the grounds that the court never had proper jurisdiction over this matter, that the defendant was denied a right under the Constitution of both New York State and the United States, and newly discovered evidence after the entry of judgment would have likely changed the disposition in this matter.

## RESERVATION CLAUSE

The defendant respectfully requests the right to make any and all further motions, as many as may be necessary, based upon information and disclosure which may result from the granting of requests made herein and/or information received from any record within a reasonable time.  [CPL §255.20(3)].

That no prior application for the relief herein sought has heretofore been made by the undersigned counsel.

WHEREFORE, it is respectfully prayed that the motion herein be, in all respects, granted and for whatever relief the Court may deem just and proper.

DATED:    QUEENS, NEW YORK
          June 8, 2006

_____
CHARLES A. MILLER, ESQ.

11

**EXHIBIT A**

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK
-against-

1. Robert Angona (M 63)


425467

Defendant.

FELONY
ADA RUZOW
212-335-4163

Page 1 of 2


PART F

Detective Gerard Quinn, shield 05564 of the DA Squad NY County, states as follows:

At the times and places described below in the County and State of New York, the defendant committed the offenses of:

1.  PL155.40(1)    Grand Larceny in the Second Degree
                   (1 count)
2.  PL205.30       Resisting Arrest
                   (1 count)


2004NY034854

the defendant stole property valued in excess of 50,000 dollars; and the defendant intentionally attempted to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person.

The offenses were committed under the following circumstances:

Deponent states he is informed by Michael Dandrade, of the Corporate Frauds Department at MBNA, that the New York Academy of Art account was opened in October 2003, with two cards issued on the account, one to Stephen Farthing and one to Sandra April. Informant further states that a third card in the name of Robert Angona, was called in in November 2003. Informant further states that between December 2003 and April 2004, defendant charged in excess of $29,000 on the above mentioned account.

Deponent further states he is informed by Stephen Farthing, the executive director of the New York Academy of Art, that defendant Robert Angona had no permission or authority to obtain said credit card or to charge in excess of $29,000 on said card. Informant Stephen Farthing further states that between August 2003 and April 2004, six checks totaling in excess of $40,000 were written to a company called Empire Solutions but no matching invoices could be located. A check of the New York Department of State shows that Empire Solutions is a company controlled by defendant Angona's wife Shirly Allyn and Empire Solutions is not an authorized vendor known to the New York Academy of Art.



, Robert Angona (M 63)

425467

Defendant.

Deponent further states that when he approached the defendant and identified himself as a police officer, defendant turned and ran away.  Defendant then refused to place his hands behind his back and elbowed, pushed and shoved another assisting police officer at the scene, and refused to be handcuffed.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

_____
Deponent

4/23/04    1800
Date and Time

ACT 5 Version 4.2.0 Created on 04/23/04 3:44 PM

| Adi Date: | Adi Part: |
|-----------|-----------|

SEE END OF RECORD FOR MORE INFORMATION

NAME
BLUE, JOHN B

FBI NO
3116010

DATE REQUESTED

**EXHIBIT B**

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

Robert Angona,

Defendant.

CERTIFICATE OF AFFIRMATIVE
GRAND JURY ACTION

Docket No.

    Elyse Ruzow, an Assistant District Attorney in the County of New York, certifies that the Grand Jury has heard evidence in the above-captioned case and has voted an indictment or a direction to file a prosecutor's information charging defendant with one or more offenses based upon the conduct alleged in the felony complaint.

Dated: New York, New York
       April 28, 2004

Elyse Ruzow
Assistant District Attorney

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ROBERT ANGONA,

Defendant.

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuse the defendant of the crime of **GRAND LARCENY IN THE SECOND DEGREE**, in violation of Penal Law §155.40(1), committed as follows:

The defendant, in the County of New York, during the period from August 1, 2003 through April 30, 2004, stole property from New York Academy of Art and the value of the property exceeded fifty thousand dollars.

ROBERT M. MORGENTHAU
District Attorney

**EXHIBIT C**

1

1

2    CRIMINAL COURT OF THE CITY OF NEW YORK
     COUNTY OF NEW YORK - CRIMINAL TERM - PART AR3
3    ------------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
4

5

6
                        - against -
7

8

9

10    ROBERT ANGONA,

11

12

13    ------------------------------------------------ Defendant.
                                                      X
14                           100 CENTRE STREET
                             NEW YORK, NEW YORK
15                           MAY 3, 2004

16    B E F O R E:

17    HONORABLE PATRICIA NUNEZ,
                        JUDGE.

18    A P P E A R A N C E S:
      ROBERT MORGENTHAU, ESQ.,
19    DISTRICT ATTORNEY, NEW YORK COUNTY
      BY: CAREY NG, ESQ.,
20    Assistant District Attorney

21    LEGAL AID SOCIETY
      BY: MONICA WHITE, ESQ.,
22    Attorney for defendant

23

24                             DANIEL KOCHANSKI,
                             Official Court Reporter
25

1           THE COURT OFFICER:  Docket ending 854, Robert

2    Angona.

3           The defendant is charged with Grand Larceny

4    in the second and resisting arrest.

5           The sworn complaint is signed.

6           Counsel, do you waive the reading of the

7    rights and charges but not the rights thereunder?

8           MS. WHITE:  Yes.

9           THE COURT OFFICER:  Did you advise your

10   client of his 190.50 rights?

11          MS. WHITE:  Yes.

12          MR. NG:  Your Honor, the People are filing a

13   certificate of affirmative Grand Jury action on the

14   Court.

15          The People are requesting bail in this case

16   in the amount of $75,000 plus a 72-hour surety.

17          The People, for the record, filed a

18   certificate of affirmative Grand Jury action.  The

19   People are also requesting remand in this matter.

20          The defendant worked as a bookkeeper at the

21   New York Academy of Arts for over two years, and an

22   investigation by the organization revealed that the

23   defendant had written $40,000 in checks to a company

24   called Empire Solutions.  That company in fact is owned

25   by his wife, and there are no matching invoices for any

3

1   of that money.

2          Your Honor, this defendant had been indicted

3   for Grand Larceny in the Second Degree.

4          Your Honor, at the time of arrest this

5   defendant refused to give his date of birth or social

6   security number.

7          Upon investigation it turned out that this

8   defendant's name is fictitious.  The defendant's name

9   is John Blue.  His social security number was issued in

10  1956 and was subsequently changed to another name, John

11  Blue, back in 1996.

12          This defendant currently has -- is a

13  predicate felon and faces three to six years in

14  prison.

15          THE COURT:  He is a predicate felon?

16          MR. NG:  My information indicates he has a

17  conviction for Larceny in 1992, Larceny and Fraud in

18  1991 and Fraud in 1981.

19          Your Honor, this defendant is currently

20  wanted by the Federal Government in Atlanta for a

21  probation violation, and that's a mail fraud case.

22          It's the People's position that this

23  defendant poses a clear flight risk.  This defendant

24  ended his lease on his offices two weeks ago and

25  informed the landlord that he was leaving for

1   California and informed his co-workers he was departing

2   for California.

3          For the reasons previously stated, your

4   Honor, the People are requesting remand in this

5   matter.

6          MS. WHITE:  Judge, we are asking you to

7   release Mr. Angona on his own recognizance or set much

8   more reasonable bail.

9          One of the facts the DA named is that Mr.

10  Angona allegedly gave false information to the police.

11  At the time Mr. Angona was arrested he was suffering

12  from congestive heart failure and he was arrested a

13  week ago Friday, I believe the 23rd, and spent the

14  entire last week in Cornell Hospital where he received

15  a shunt in his heart and also a pacemaker.  He was in

16  the hospital the whole time, that is why I imagine that

17  the People have been able to indict him without him

18  being represented.  Although he was arrested last

19  Friday, he was not arraigned until today.

20         His family is in the audience.  His wife and

21  his daughter are sitting here today.  They verified

22  they he lives at 405 East 54th Street, Apartment 7B,

23  and also gave a phone number.

24         Mr. Angona denies that he was involved in any

25  illegal activity at work, the Academy of Arts.  He is a

1    chief financial officer there.

2           He strongly believes that the evidence will

3    show that every transaction he was involved in was

4    legal and authorized by the corporation, and if there

5    is something else going on in the corporation, it is

6    causing them to blame him.

7           I believe that the DA said he -- I asked him

8    about his record.  I don't believe he is a predicate.

9    The DA said his convictions were over ten years ago.  I

10   think that it is a close call in that case.

11          Because of the circumstances in this case,

12   where he did suffer greatly after his arrest, and he

13   also currently has leukemia and diabetes and he spent

14   the last week in the hospital and the People did

15   indict, perhaps legally but without the benefit of

16   being represented and not having the opportunity to

17   testify, and because he is probably not --

18          THE COURT:  All right, based on the

19   representation by the People, he will be remanded.

20          Medical attention is ordered.

21          What part does this case go to, People?

22          MR. NG:  Part 60, your Honor.

23

24

25

1          THE COURT:  Part 60, May 17th for Supreme

2  Court Arraignment.

3

4

5

6                    *    *    *

7          CERTIFIED to be a true and accurate

8  transcript of the proceedings.

9

10

11

12                Daniel Kochanski,

13           Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT D**

Honorable Ronald A. Zweibel
NY State Supreme Court
100 Centre Street
Room 1116
New York, NY

September 29, 2004

Your Honor,

The arrest of Robert Angona for the theft of $30,000 finally exposed the years-long conspiracy in the embezzlement of huge sums, and the falsification of records to erase evidence of frauds. I discovered his identity.  Enclosed is sworn testimony, signed affidavits and relevant documents.

The real criminals are the trustees who employed him.

Angona is a predicate felon, who will go to jail for federal parole violation. Granted immunity he will reveal the extent of the crimes of which the students are eventually victim.

Please see www.regentsny.com.

Sincerely,

Stuart Pivar  NYAA  Chairman emeritus

STUART PIVAR 15 WEST SIXTY-SEVENTH STREET NEW YORK 10023

**EXHIBIT E**



# WENIG & WENIG
ATTORNEYS AT LAW
150 BROADWAY
SUITE 911
NEW YORK, NEW YORK 10038

LARRY WENIG
ALAN WENIG •
CHRISTOPHER J. SOLTYS

JOHN M. PICCIRILLO ∆
JOSEPH W. SZALYGA

DEBRA L. KALMORE ∆
OF COUNSEL

• ALSO ADMITTED IN PA.
∆ ALSO ADMITTED IN NJ

TELEPHONE
(212) 374-9840
TELECOPIER
(212) 374-9844

January 6, 2005

Ms. Shirly Allyn
405 East 54th Street
Apt. 7B
New York, New York 10022

> Re: OneBeacon Insurance Company a/s/o The New York Academy of Arts
>        v. Robert Angona a/k/a John Blumatte and Shirly Allyn
> Your File No.: 74100348
> Our File No.: CU2151
> Amount Owed: **$34,248.00**

Dear Ms. Allyn:

Please be advised that our firm has been retained by OneBeacon Insurance Company to pursue collection from you in the amount stated above.

The above amount owed arises from certain funds embezzled from The New York Academy of Arts.

Accordingly, it is requested that you forward payment directly to my office, drawing your check payable to the order of OneBeacon Insurance Company and Wenig & Wenig, Esqs., as attorneys.

Please be advised that if payment is not received within ten (10) days from the date of this letter, appropriate legal action will be taken.

Guide yourself accordingly.

Very truly yours,

CHRISTOPHER J. SOLTYS

CJS:sr

**EXHIBIT F**



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ELIOT SPITZER
Attorney General

KERMITT J. BR
Deputy Attorney Gener

STACEY B. ROV
Records Access (

February 21, 2006

Mr. Stuart Pivar
15 West 67th Street
New York, NY 10023

RE: Freedom of Information Law (FOIL) #05540

Dear Mr. Pivar:

This is in response to your letter dated February 15, 2006 regarding the above FOIL request.
We are in receipt of your check in the amount of $18.25.

Enclosed are documents 05-540-0001 through 05-540-0078 which you requested.

This FOIL request is now closed.

Sincerely,

Stacey B. Rowland
Assistant Attorney General

Enclosure

# THOMPSON HINE

BRUSSELS  CINCINNATI  CLEVELAND  COLUMBUS  DAYTON  NEW YORK  WASH

December 15, 2004

**BY HAND**
James R. Pigott, Jr.
Assistant Attorney General
State of New York Office of the Attorney General
120 Broadway
New York, New York 10271

RE:  New York Academy of Art
     Endowment Fund Inquiry: document production

Dear Mr. Pigott:

Enclosed please find documents responsive to the above-mentioned request for documents and interrogatories, returnable December 15, 2005.

At the top of the production is Wayne Linker's analysis and answers to your inquiries about the "endowment" funds.  Behind that are a series of schedules, prepared by or for Mr. Linker to assist you in this inquiry.  Finally, backup documentation, to the extent available, has been gathered and included as well.

We have not included copies of the Academy's Internal Revenue Service Form 990 Tax Returns, including annual financial statements, for the years 1998 through 2002, but they can be can be provided to you if requested.

If you have any questions, please do not hesitate to call me.

Very truly yours,

Douglas E. Grover

Douglas.Grover@ThompsonHine.com  Phone 212.908.3920  Fax 212.809.6890

THOMPSON HINE LLP
ATTORNEYS AT LAW
A Limited Liability Partnership
Including A Professional Corporation

One Chase Manhattan Plaza
58th Floor
New York, N                    www.Tho                    adr  122



NEW YORK
ACADEMY
OF ART

HRH THE PRINCE OF WALES, PATRON

December 10, 2004

**Response to the Letter of Inquiry, Dated 1 November, 2004, from Assistant Attorney General Robert Pigott, Charity Bureau, New York Attorney General's Office**

*1. The NYAA reports permanently restricted net assets on its IRS Form 990. With respect to such permanently restricted net assets:*

*(i) Identify each separate fund or gift that makes up the total permanently restricted net assets, and for each such separate fund or gift identify (a) the nature of the restrictions to which the fund or gift is subject, (b) historic dollar value within the meaning of N-PCL 103(a)(16) and (d) the current market value.*

Exhibit 1, attached, reflects the breakdown of each of the gifts/funds related to the information that has been reported on the Academy's IRS Form 990 in recent years. As my tenure with the Academy began on August 16, 2004, with the assistance of the Academy's accountant, I reviewed files and gift records relating to each of the funds which had been reported as "permanently restricted net assets." By and large, most of the funds, while often gifts to the "endowment" of the Academy, do not appear to have been made as "permanently restricted" by the donors, as defined under accounting rules. (See individual correspondence submitted herewith.)

In late 1997, Academy staff and trustees initiated a small fundraising campaign, the goal of which was to raise $5 million for an endowment. Two phases of the campaign were envisioned: first, securing $2 million in gifts and pledges from the members of the board of trustees of the Academy; and second, "going public" to raise the balance of funds from other sources. It appears that the Academy never implemented phase 2 of the fundraising effort.

In the letters that I reviewed regarding the campaign, it appears that the request was for funds for a capital campaign or an endowment fund, and no mention has been found of solicitations seeking "permanently restricted funds". Conversations with the trustees who were on the board in 1997-99 as to the nature of the endowment campaign indicated that it was a very broad fundraising effort, and while it was hopeful that the proceeds from the campaign would generate annual income to sustain the institution, it was also envisioned

05-540-0002

REDACTED

that these funds would constitute an operating reserve, an emergency fund and a source of funding for certain capital improvements.

By and large, the nearly $1.6 million reported as permanently restricted funds in fact appear to be gifts given in support of an "unrestricted or board restricted endowment or quasi-endowment fund" as few donors indicated a restriction on principal or a purpose for the gift aside from "the campaign" or "the endowment". In some cases there were restrictions on the use or purpose of the funds (Temporarily Restricted gifts and grants), but the Academy seems to have directed these gifts as well to the endowment. In a number of instances, based on the gift award letters, the gifts or grants appear to be totally unrestricted.

Based on these findings, I spoke with the Academy's auditor (in her 7th year of service to the Academy and thus covering the entire period during which "permanently restricted" funds were reported in the audit report and the IRS Form 990.) She appears to have accepted staff statements that these funds were permanently restricted gifts based on the use of the term "endowment," which in her mind is/was synonymous with "permanently restricted endowment". I have been unable to determine why certain gifts or grants which were clearly intended for operating purposes or were fully unrestricted by the donor were classified as "permanently restricted" on the IRS Form 990 or in the Academy's audit.

## ANNOTATED DESCRIPTIONS OF GIFTS, DONATIONS AND GRANTS TO THE ACADEMY'S ENDOWMENT FUND AS LISTED IN IRS FORM 990

Several gifts were made to the Academy through the John L. Weinberg Charitable Trust and The John L. Weinberg Family Fund of The New York Community Trust.

*Original Gift*:        $76,000
*Current Value*:        76,000
*Restriction*:          Gifts to the "Endowment Fund". No mention of purpose or permanent restriction on principal. Several Academy trustees report, however, that her intentions were that the gifts be permanently restricted.

Quarterly anonymous gifts were made to the Academy over a period of time.

*Original Gift*:        $300,000
*Current Value*:        0
*Restriction*:          Donations were made as gifts to the Endowment Fund, and no mention has been found of the donor permanently restricting principal of the gifts or limiting use of the funds to a particular project or purpose. . . .          ed letters approving the Academy's draw upon the gifts he made to the Endowment Fund supporting expenditures for general operations.

REDACTED

3

Periodic gifts were made to the Academy during the campaign period. Academy acknowledgments indicate application of the funds to the campaign or the Endowment Fund.

| | |
|---|---|
| *Original Gift*: | $536,000 |
| *Current Value*: | 100,000 |
| *Restriction*: | None of the donor letters reviewed placed any restrictions on the use of funds. No mention has been found of funds being "permanently restricted". _____ lso signed letters approving the Academy's draw upon gifts he made that were held in the Academy's Endowment Fund for use for capital and general operating expenses. |

A pledge of $300,000 over a 3-year period was made and fulfilled.

| | |
|---|---|
| *Original Gift*: | $299,419 |
| *Current Value*: | 0 |
| *Restriction*: | No donor transmittal or pledge letter was found in the files. Staff acknowledgements indicate that the gift commitment was "to the capital campaign to establish an endowment for the Academy". Signed note confirming the Academy's use of $100,000 of his gift for the support of operating expenses. |

A pledge of $75,000 was made in 1998 to be fulfilled over a five-year period.

| | |
|---|---|
| *Original Gift*: | $73,808 |
| *Current Value*: | 0 |
| *Restriction*: | Donor imposed no restriction on the gift and asked that it be allocated to the endowment fund. |

A pledge of $15,000 was made to the campaign in 1998, but only a portion of the pledge was fulfilled.

| | |
|---|---|
| *Original Gift*: | $10,000 |
| *Current Value*: | 1,500 |
| *Restriction*: | Pledge and gift acknowledgement letters from the Academy indicate that the commitment was to "the capital campaign to establish an endowment for the Academy" and that "funds will be added to the Academy's Endowment Fund". Donor did not fulfill pledge and it was written down in the audit of 2003. |

**REDACTED**

A gift of stock was made to the Academy by

| | |
|---|---|
| *Original Gift:* | $10,013 |
| *Current Value:* | 0 |
| *Restriction:* | The gift transmittal letter for 1998 indicates that it is simply a contribution to the Academy. No restriction on the funds is noted. The Academy's acknowledgment of this gift does not state that there is any restriction on the gift nor does it even indicate that it was a gift to the Endowment Fund. |

### The Prince of Wales Foundation

The Academy applied to the foundation for a grant to provide scholarship support for students from the United Kingdom. A grant was awarded, and an endowment fund was established.

| | |
|---|---|
| *Original Gift:* | $100,000 |
| *Current Value:* | 100,000 |
| *Restriction:* | Permanently restricted fund per donor. An endowed scholarship was established and donor requested that it support "in perpetuity" "The Prince of Wales Scholar". |

### Gosnell/Lucelia Foundation

A gift was made to the Academy on 18 December 1998 to support the library and faculty salaries.

| | |
|---|---|
| *Original Gift:* | $50,000 |
| *Current Value:* | 50,000 |
| *Restriction:* | The donor's gift transmittal letter is explicit defining this as a temporarily restricted operating grant to "purchase books, periodicals, slides, videotapes, etc. and the gift to support the faculty will increase faculty salaries…" The Academy in error has treated this gift as a permanently restricted gift. |

### ⸻ ─── ⸺ ⸻e, ⸺u ⸺rankel Foundation

A pledge of $50,000 was made to the Academy late in 1998, which was to be fulfilled over 5 years. In the audit of 2002 the pledge was written down by $24,000 as was not able to fulfill the original commitment. The Evan Frankel Foundation contributed toward the fulfillment of the pledge.

| | |
|---|---|
| *Original Gift:* | $22,500 |
| *Current Value:* | 22,500 |
| *Restriction:* | Once again the pledge is to the capital campaign and the establishment of an Academy endowment, as noted in the Academy's thank you letter. There is no mention that the funds are "permanently restricted'. ⸺s pledge was partially fulfilled by a grant to the Academy from the Evan Frankel Foundation, and the file on this $10,000 contribution reveals that the grant was unrestricted; the Academy thanked the foundation for the gift, not noting any restriction on use of the funds; and |

REDACTED

5

the award ends up being recorded in the Academy's 990 report under permanently restricted endowment. Thus it appears that these are unrestricted and not permanently restricted funds.

▲, now chairman of the board of trustees of the Academy, contributed to the campaign.

| | |
|---|---|
| *Original Gift:* | $15,094 |
| *Current Value:* | 0 |
| *Restriction:* | A letter dated 14 December 1999 from        states that a gift of stock (approximately $10,000) was being given to the Academy and the money from the gift was to be "put into the Academy's endowment." No further restriction was noted in the donor's letter. |

**The Horace W. Goldsmith Foundation**
A grant was made to the Academy in two separate payments.

| | |
|---|---|
| *Original Gift:* | $50,000 |
| *Current Value:* | 50,000 |
| *Restriction:* | The Foundation's award letters indicate that there was great latitude in how the Academy could use the funds awarded. Thus it is not a permanently restricted endowment, although the Academy has treated it as if it were. |

In 1998 Trustee and Academy Treasurer        nfirms in a letter a pledge to the Academy of $35,000 to be paid over a 5-year period.

| | |
|---|---|
| *Original Gift:* | $32,652 |
| *Current Value:* | 0 |
| *Restriction:* | The pledge letter provided to the Academy places no restriction on the use of the gift. |

**Erlebacher Fellowship Fund**
The Academy and a faculty member established an endowed fund in honor of Walter Erlebacher. A list of donors and the amounts are attached on the following page.

| | |
|---|---|
| *Original Gift:* | $16,023 |
| *Current Value:* | 16,023 |
| *Restriction:* | Set up as a permanently restricted scholarship fund, the earnings of which will eventually support a full-year student at the Academy. |

2. *With respect to the Prince of Wales Restricted Endowment, describe the nature, purpose and amount of this fund. Identify the extent to which this restricted fund has been invaded, if any, and the circumstances of any such invasions.*

Please see above description of origin of the grant from the Price of Wales Foundation and its restrictions, purpose and current and original value. The fund has not been invaded and the principal remains in tact. (Original award letter for this grant is included in the following attachments.)

3. *Describe any efforts undertaken by the NYAA to ascertain whether its restricted assets were in any way impaired or misappropriated during the period that Robert Angona was rendering services to the NYAA and the results of any inquiry by the NYAA into this subject matter.*

After Robert Angona was terminated, we engaged several means of determining the extent of his employee dishonesty, misuse of Academy funds, misuse of the Academy credit card and fraud. First, we engaged IPSA, a respected private investigation firm, to investigate the extent of his dishonesty; second, Cohen, Greve & Company, our regular auditors, undertook an audit for the Fiscal Year 2004; third, there was an insurance investigation undertaken by Atlantic Mutual upon the Academy's submission of a claim (approximately $35,000 in covered funds) under its employee dishonesty coverage. And finally, a forensic accountant, Thomas Harris, had been engaged before the discovery of Angona's illegal activities, and he had already begun to review and examine income and spending at the institution in preparation of an improved business plan. None of these investigative reviews have identified any inappropriate actions by Robert Angona with regard to the Academy's endowment.


Respectfully submitted,

Wayne A. Linker
Executive Director and Trustee
New York Academy of Art

Enclosures

EX - E

05-5b0-0007

# MICHAEL A. RODI
### ATTORNEY AT LAW

150 Broadway, Suite 1207
New York, New York 10013

Tel    (212) 565-9351
Mobile  (717) 499-5540
Fax    (212) 965-9351

June 29, 2004

**VIA FASCIMILE**
Janet Lipinski
Assistant District Attorney
New York County
One Hogan Place
New York, NY 10013

(212) 335-8914

Re:        **People v. Robert Angona**
           **Indictment Number: 02331-04**

Dear Ms. Lipinski:

As per our telephone conversation on June 21, 2004, please accept this proffer on behalf of the above named defendant

The defendant can offer proof as to following illegalities and improprieties at the New York Academy of Art (hereinafter the "Academy")

For a period between the years 2001-2002, $1,050,000.00 was misappropriated from the Restricted Endowment going to Stephen Farthing and other officers of the Academy. The General Fund was depleted and showed a negative of $300,000.00 at the time of this misappropriation

For a period between the years 2002-2003 the Academy would collect loan proceeds from a number of different banks for the same student during the same semester

For a period between the years 2002-2003 false scholarships of an average of $500,000 a year were claimed by the Academy for its foreign students. No such scholarships were ever awarded These claims were made to New York State Regents Board, the U.S. Department of Education, on loan applications and INS Visa applications.

For a period between the years 2002-2003 the Academy misappropriated for private use equipment and donated materials. Randy Lerner and the Academy's Long Island School were the most abusive  The Academy's building manager was inappropriately given cash payments to move this equipment to Long Island. $100,000 worth of cast statues was also misappropriated with various records being altered to hide the transfer

EX-F

Page 2

For a period between the years 2001-2003, alcohol was illegally sold out of a café opened in the school by Stephen Farthing. No New York State liquor license or beer and wine license was ever obtained. Sales tax was neither collected nor paid to the State on these sales. Gross sales totaled approximately $60,000.00 a year in this period.

Stephen Farthing, Randy Lerner and other officers of the Academy are most responsible for the acts outlined in this proffer.

The defendant has personal knowledge of many of these events as well as records of some of the transactions.

Please contact me if you find any of the information useful and would like to meet.

If you decide that there is nothing to be gained from my client's cooperation, please notify me. Please also be kind enough to notify me if you intend to prosecute my client's wife and I will arrange for her surrender.

Sincerely,

Michael A. Rodi, Esq

MAR/jr

# Exhibit S

# THOMPSON HINE

BRUSSELS  CINCINNATI  CLEVELAND  COLUMBUS  DAYTON  NEW YORK  WASHINGTON, D.C.

December 15, 2004

**BY HAND**
James R. Pigott, Jr.
Assistant Attorney General
State of New York Office of the Attorney General
120 Broadway
New York, New York 10271

RE: New York Academy of Art
    Endowment Fund Inquiry: document production

Dear Mr. Pigott:

Enclosed please find documents responsive to the above-mentioned request for documents and interrogatories, returnable December 15, 2005.

At the top of the production is Wayne Linker's analysis and answers to your inquiries about the "endowment" funds. Behind that are a series of schedules, prepared by or for Mr. Linker to assist you in this inquiry. Finally, backup documentation, to the extent available, has been gathered and included as well.

We have not included copies of the Academy's Internal Revenue Service Form 990 Tax Returns, including annual financial statements, for the years 1998 through 2002, but they can be can be provided to you if requested.

If you have any questions, please do not hesitate to call me.

Very truly yours,

Douglas E. Grover

Douglas.Grover@ThompsonHine.com  Phone 212.908.3920  Fax 212.809.6890                    adr 127710.1

THOMPSON HINE LLP
ATTORNEYS AT LAW
A Limited Liability Partnership
Including A Professional Corporation

One Chase Manhattan Plaza
58th Floor
New York, New York 10005-1401

www.ThompsonHine.com
Phone 212.344.5680
Fax 212.806.6890

05-540-0001



NEW YORK
ACADEMY
OF ART

HRH THE PRINCE OF WALES, PATRON

December 10, 2004

**Response to the Letter of Inquiry, Dated 1 November, 2004, from Assistant Attorney General Robert Pigott, Charity Bureau, New York Attorney General's Office**

*1. The NYAA reports permanently restricted net assets on its IRS Form 990. With respect to such permanently restricted net assets:*

*(i) Identify each separate fund or gift that makes up the total permanently restricted net assets, and for each such separate fund or gift identify (a) the nature of the restrictions to which the fund or gift is subject, (b) historic dollar value within the meaning of N-PCL 103(a)(16) and (d) the current market value.*

Exhibit 1, attached, reflects the breakdown of each of the gifts/funds related to the information that has been reported on the Academy's IRS Form 990 in recent years. As my tenure with the Academy began on August 16, 2004, with the assistance of the Academy's accountant, I reviewed files and gift records relating to each of the funds which had been reported as "permanently restricted net assets." By and large, most of the funds, while often gifts to the "endowment" of the Academy, do not appear to have been made as "permanently restricted" by the donors, as defined under accounting rules. (See individual correspondence submitted herewith.)

In late 1997, Academy staff and trustees initiated a small fundraising campaign, the goal of which was to raise $5 million for an endowment. Two phases of the campaign were envisioned: first, securing $2 million in gifts and pledges from the members of the board of trustees of the Academy; and second, "going public" to raise the balance of funds from other sources. It appears that the Academy never implemented phase 2 of the fundraising effort.

In the letters that I reviewed regarding the campaign, it appears that the request was for funds for a capital campaign or an endowment fund, and no mention has been found of solicitations seeking "permanently restricted funds". Conversations with the trustees who were on the board in 1997-99 as to the nature of the endowment campaign indicated that it was a very broad fundraising effort, and while it was hopeful that the proceeds from the campaign would generate annual income to sustain the institution, it was also envisioned

05-546-0002

REDACTED

2

that these funds would constitute an operating reserve, an emergency fund and a source of funding for certain capital improvements.

By and large, the nearly $1.6 million reported as permanently restricted funds in fact appear to be gifts given in support of an "unrestricted or board restricted endowment or quasi-endowment fund" as few donors indicated a restriction on principal or a purpose for the gift aside from "the campaign" or "the endowment". In some cases there were restrictions on the use or purpose of the funds (Temporarily Restricted gifts and grants), but the Academy seems to have directed these gifts as well to the endowment. In a number of instances, based on the gift award letters, the gifts or grants appear to be totally unrestricted.

Based on these findings, I spoke with the Academy's auditor (in her 7th year of service to the Academy and thus covering the entire period during which "permanently restricted" funds were reported in the audit report and the IRS Form 990.) She appears to have accepted staff statements that these funds were permanently restricted gifts based on the use of the term "endowment," which in her mind is/was synonymous with "permanently restricted endowment". I have been unable to determine why certain gifts or grants which were clearly intended for operating purposes or were fully unrestricted by the donor were classified as "permanently restricted" on the IRS Form 990 or in the Academy's audit.



## ANNOTATED DESCRIPTIONS OF GIFTS, DONATIONS AND GRANTS TO THE ACADEMY'S ENDOWMENT FUND AS LISTED IN IRS FORM 990

Several gifts were made to the Academy through the John L. Weinberg Charitable Trust and The John L. Weinberg Family Fund of The New York Community Trust.

*Original Gift:*      $76,000
*Current Value:*      76,000
*Restriction:*        Gifts to the "Endowment Fund". No mention of purpose or permanent restriction on principal. Several Academy trustees report, however, that her intentions were that the gifts be permanently restricted.

Quarterly anonymous gifts were made to the Academy over a period of time.

*Original Gift:*      $300,000
*Current Value:*      0
*Restriction:*        Donations were made as gifts to the Endowment Fund, and no mention has been found of the donor permanently restricting principal of the gifts or limiting use of the funds to a particular project or purpose. . . .        ed letters approving the Academy's draw upon the gifts he made to the Endowment Fund supporting expenditures for general operations.

# REDACTED

Periodic gifts were made to the Academy during the campaign period. Academy acknowledgments indicate application of the funds to the campaign or the Endowment Fund.

*Original Gift:*     $536,000
*Current Value:*      100,000
*Restriction:*     None of the donor letters reviewed placed any restrictions on the use of funds. No mention has been found of funds being "permanently restricted".         lso signed letters approving the Academy's draw upon gifts he made that were held in the Academy's Endowment Fund for use for capital and general operating expenses.

A pledge of $300,000 over a 3-year period was made and fulfilled.

*Original Gift:*     $299,419
*Current Value:*        0
*Restriction:*     No donor transmittal or pledge letter was found in the files. Staff acknowledgements indicate that the gift commitment was "to the capital campaign to establish an endowment for the Academy". Signed note confirming the Academy's use of $100,000 of his gift for the support of operating expenses.

A pledge of $75,000 was made in 1998 to be fulfilled over a five-year period.

*Original Gift:*     $73,808
*Current Value:*        0
*Restriction:*     Donor imposed no restriction on the gift and asked that it be allocated to the endowment fund.

A pledge of $15,000 was made to the campaign in 1998, but only a portion of the pledge was fulfilled.

*Original Gift:*     $10,000
*Current Value:*      1,500
*Restriction:*     Pledge and gift acknowledgement letters from the Academy indicate that the commitment was to "the capital campaign to establish an endowment for the Academy" and that "funds will be added to the Academy's Endowment Fund". Donor did not fulfill pledge and it was written down in the audit of 2003.

05-546-0004

**REDACTED**

4

A gift of stock was made to the Academy by

| | |
|---|---|
| *Original Gift:* | $10,013 |
| *Current Value:* | 0 |
| *Restriction:* | The gift transmittal letter for 1998 indicates that it is simply a contribution to the Academy. No restriction on the funds is noted. The Academy's acknowledgment of this gift does not state that there is any restriction on the gift nor does it even indicate that it was a gift to the Endowment Fund. |

**The Prince of Wales Foundation**

The Academy applied to the foundation for a grant to provide scholarship support for students from the United Kingdom. A grant was awarded, and an endowment fund was established.

| | |
|---|---|
| *Original Gift:* | $100,000 |
| *Current Value:* | 100,000 |
| *Restriction:* | Permanently restricted fund per donor. An endowed scholarship was established and donor requested that it support "in perpetuity" "The Prince of Wales Scholar". |

**Gosnell/Lucelia Foundation**

A gift was made to the Academy on 18 December 1998 to support the library and faculty salaries.

| | |
|---|---|
| *Original Gift:* | $50,000 |
| *Current Value:* | 50,000 |
| *Restriction:* | The donor's gift transmittal letter is explicit defining this as a temporarily restricted operating grant to "purchase books, periodicals, slides, videotapes, etc. and the gift to support the faculty will increase faculty salaries…" The Academy in error has treated this gift as a permanently restricted gift. |

**⸺⸺ ⸺⸺ ⸺ ⸺, and Frankel Foundation**

A pledge of $50,000 was made to the Academy late in 1998, which was to be fulfilled over 5 years. In the audit of 2002 the pledge was written down by $24,000 as was not able to fulfill the original commitment. The Evan Frankel Foundation contributed toward the fulfillment of the pledge.

| | |
|---|---|
| *Original Gift:* | $22,500 |
| *Current Value:* | 22,500 |
| *Restriction:* | Once again the pledge is to the capital campaign and the establishment of an Academy endowment, as noted in the Academy's thank you letter. There is no mention that the funds are "permanently restricted". ⸺'s pledge was partially fulfilled by a grant to the Academy from the Evan Frankel Foundation, and the file on this $10,000 contribution reveals that the grant was unrestricted; the Academy thanked the foundation for the gift, not noting any restriction on use of the funds; and |

# REDACTED

the award ends up being recorded in the Academy's 990 report under permanently restricted endowment. Thus it appears that these are unrestricted and not permanently restricted funds.

━━, now chairman of the board of trustees of the Academy, contributed to the campaign.

*Original Gift:*     $15,094
*Current Value:*        0
*Restriction:*       A letter dated 14 December 1999 from          states that a gift of stock (approximately $10,000) was being given to the Academy and the money from the gift was to be "put into the Academy's endowment." No further restriction was noted in the donor's letter.

## The Horace W. Goldsmith Foundation

A grant was made to the Academy in two separate payments.

*Original Gift:*     $50,000
*Current Value:*      50,000
*Restriction:*       The Foundation's award letters indicate that there was great latitude in how the Academy could use the funds awarded. Thus it is not a permanently restricted endowment, although the Academy has treated it as if it were.

In 1998 Trustee and Academy Treasurer          nfirms in a letter a pledge to the Academy of $35,000 to be paid over a 5-year period.

*Original Gift:*     $32,652
*Current Value:*        0
*Restriction:*       The pledge letter provided to the Academy places no restriction on the use of the gift.

## Erlebacher Fellowship Fund

The Academy and a faculty member established an endowed fund in honor of Walter Erlebacher. A list of donors and the amounts are attached on the following page.

*Original Gift:*     $16,023
*Current Value:*      16,023
*Restriction:*       Set up as a permanently restricted scholarship fund, the earnings of which will eventually support a full-year student at the Academy.

6

2. _With respect to the Prince of Wales Restricted Endowment, describe the nature, purpose and amount of this fund. Identify the extent to which this restricted fund has been invaded, if any, and the circumstances of any such invasions._

Please see above description of origin of the grant from the Price of Wales Foundation and its restrictions, purpose and current and original value. The fund has not been invaded and the principal remains in tact. (Original award letter for this grant is included in the following attachments.)

3. _Describe any efforts undertaken by the NYAA to ascertain whether its restricted assets were in any way impaired or misappropriated during the period that Robert Angona was rendering services to the NYAA and the results of any inquiry by the NYAA into this subject matter._

After Robert Angona was terminated, we engaged several means of determining the extent of his employee dishonesty, misuse of Academy funds, misuse of the Academy credit card and fraud. First, we engaged IPSA, a respected private investigation firm, to investigate the extent of his dishonesty; second, Cohen, Greve & Company, our regular auditors, undertook an audit for the Fiscal Year 2004; third, there was an insurance investigation undertaken by Atlantic Mutual upon the Academy's submission of a claim (approximately $35,000 in covered funds) under its employee dishonesty coverage. And finally, a forensic accountant, Thomas Harris, had been engaged before the discovery of Angona's illegal activities, and he had already begun to review and examine income and spending at the institution in preparation of an improved business plan. None of these investigative reviews have identified any inappropriate actions by Robert Angona with regard to the Academy's endowment.

Respectfully submitted,

Wayne A. Linker
Executive Director and Trustee
New York Academy of Art

Enclosures

05-540-0007

# Exhibit T

**Slade & Associates, P.C.**

ATTORNEYS AT LAW

115 Greenwich Street, 4th Floor
New York, New York 10013
212.226.8787  212.226.3619 fax
www.sladelaw.com

July 30, 2004

Jeffrey C. Slade
jslade@sladelaw.com

Lawton P. Cummings
Maria Tzokova

Chinyere Okoronkwo
Of counsel

**BY EXPRESS MAIL**

Ray Page, AIC
General Adjuster
GAB Robins NA, Inc.
Suite 510
PO Box 80705 (30366)
Atlanta, Georgia 30341

Re: Claim No. 33955682, Atlantic Mutual Ins. Co., 760-00-65-000
     New York Academy of Art

Dear Mr. Page:

Enclosed is the notarized Proof of Loss for this claim, of which Atlantic Mutual was originally put on notice in April of this year.  Please note that the loss was not discovered until April 14, 2004, less than 120 days ago.  I do not understand where your questioned date of January 23, 2003 came from, but it bears no relation to this claim.

We are of course ready to provide any additional information that Atlantic Mutual would request.  I understand that we will be contacted by an adjuster, and I look forward to working with the adjuster to resolve this claim.

Best regards.

Sincerely,

Jeffrey C. Slade

cc: Ms. Jackie Le Donne (by regular mail)

**Atlantic Mutual**
**Companies**

**Proof of Loss - Fidelity**
Use Page 2 to Calculate Credits and Loss(es)

Insured: New York Academy of Art

Claim No. 33955682

Policy No. 766-00-85-0000

Employee's full name "Robert J. Angona," a/k/a John R. Blunck

Social Security No. [unknown digits] but believe it to be [illegible]

Last known address 405 E. 54th St, #7B    NY, NY 10022

Position held Controller

Date employed 3/1/02    Date terminated 4/23/04

Reason for termination Fraud

Date loss first discovered 4/13/04    By whom Executive Director Stephen Farthing

Date loss first reported to surety (or agent) 4/21/04    Amount of loss $ _____

Loss occurred between 6/13/03    and    2/9/04

State briefly the manner in which the loss occurred See Rider A

Date employee's accounts were previously checked Annual audit

By whom made and result School's auditor. No discrepancies

Has employee ever been short before? ☒No   ☐Yes   If "Yes", state approximate amount, whether cash or stock and how shortage was adjusted _____

The furnishing of this form or acceptance and/or retention by the insurer designated above, does not constitute a waiver of any of the terms of the bond or policy, or a waiver of any defenses; or an admission of liability thereunder.

State of New York    County of New York

Stephen Farthing    being duly sworn, deposes and says:

that he (she) is the Executive Director of New York Academy of Art the claimant herein, having its main office at 111 Franklin Street New York, NY 10013

that the claimant's former employee named herein has dishonestly converted to his (her) own use and misappropriated funds of the claimant equal to the net amount of claim indicated in this statement, that the statements above and on the reverse side hereof constitute a complete and truthful recital of all the facts as now known, and nothing material has been suppressed or withheld by the claimant.

Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

Sworn to and subscribed before me

this 26th day of July 2004

NOTARY PUBLIC

INSURED

JEFFREY C. SLADE
Notary Public, State of New York
No. 02SL4715213
Qualified in New York County
Commission Expires November 30, 2006

Following is an itemized statement of claim showing all credits to be applied against the loss. Submitted herewith is all available documentary evidence in substantiation thereof.

Claim No.

| Date | Description of Item | Amount |
|---|---|---|
| (1) 8/22-03 → 1/30/0x | Payments to corporation controlled by Mr. "Argena" for which no work was done See Exhibit D | $18,550 |
| (2) 12/7/03 → 2/6/0x | Unauthorized personal expenses charged to Academy's MBNA credit card. See Exhibit E | $11,552.08 |
| (3) 6/13/05 → 12/3/03 | Unauthorized personal expenses charged to Academy's American Express credit card. See Exhibit F | $1,832.49 |
| (4) 8/3/03 → 12/8/03 | Reimbursement for unauthorized expenditures by Mr. Argena or First Manhattan Group, Mr. Argena's Company. See Exhibit G | $3,459.69 |
| (5) — | Expense of IPSA investigation to assist in evaluating claim. See Exhibit H | $41,868.84 |
| (6) — | Expense of Slade & Associates to investigate claim. See Exhibit I | $28,090.00 |

| | |
|---|---|
| Total Loss > | $105,353.10 |
| Credits:  Salary | |
| Commission | |
| Cash Bond | |
| Other Credits | |
| Total Credits > | |
| Net Loss > | 105,353.10 |

L-2389 C699

### Rider A

The losses were sustained as a result of illegal conduct by the Controller of the New York Academy of Art, a person known to the Academy as "Robert J. Angona." Mr. "Angona" was first hired as a part-time employee in March 2002 and was later promoted to full-time Controller. During the relevant period, he was employed pursuant to a contract with his company, The First Manhattan Group, Inc. A copy of the employment contract is attached as Exhibit A. The Academy no longer has a personnel file for Mr. "Angona" and believes that Mr. "Angona" surreptitiously removed that file from the Academy's offices.

The first of the losses were discovered by Academy staff, working with Executive Director Stephen Farthing, on April 14, 2004. Subsequently, counsel for the Academy, Jeffrey C. Slade, and an investigate agency, IPSA International, directed the investigation. Two reports by IPSA International are attached as Exhibit B. The losses are detailed on the schedule that is being submitted herewith.

Following initial discovery of the losses, the facts of Mr. "Angona's" criminal activities were disclosed to the Manhattan District Attorney's Office by counsel, Mr. Slade. With the full cooperation of the Academy, including the Grand Jury testimony of Executive Director Farthing, the District Attorney obtained an indictment of Mr. "Angona." A copy of that indictment is attached as Exhibit C. Mr. "Angona" was arrested and remains incarcerated, to the best of the Academy's knowledge. The criminal case is still pending and is currently being handled by Assistant District Attorney Janet Lipinski, telephone number 212-335-4035. As a result of the arrest, we learned that Mr. "Angona's" real name is apparently John Blumatte.

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )  C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

1. Article Addressed to:

New York Academy of Art
c/o Jeffrey C. Slade, Atty at Law
Slade & Associates, P.C.
315 Greenwich St., 4th Floor
New York, N.Y. 10013

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number

PS F

102595-02-

---

**CERTIFIED RECEIPT** (Domestic) No Insurance Coverage Provided

Article Sent To:
New York Academy of Art

33 955682
07-21-04

Postage $
Certified Fee
Return Receipt Fee (Endorsement Required)
Restricted Delivery Fee (Endorsement Required)
Total Postage & Fees $

Postmark Here

1357 8651 0002 3220 7099

Name (Please Print Clearly) (To be Completed by mailer)
New York Academy of Art
c/o Jeffrey C. Slade, Atty at Law
Slade & Assoc, P.C.
315 Greenwich St., 4th Floor
New York, NY 10013

PS Form 3800, July 1999   See Reverse for Instructions

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

33 955682
08-03-04

Postage $
Certified Fee
Return Receipt Fee (Endorsement Required)
Restricted Delivery Fee (Endorsement Required)
Total Postage & Fees $

Postmark Here

0988 8984 0001 3110 7003

Sent To:
New York Academy of Art
c/o Jeffrey C. Slade, Atty at Law
Slade & Assoc, PC
315 Greenwich St., 4th Floor
New York, N.Y. 10013

PS Form 3800, June



**NEW YORK ACADEMY OF ART**
MAIN ACCOUNT
111 FRANKLIN STREET
NEW YORK, NY 10013

NORTH FORK BANK
MAIN ACCOUNT
111 FRANKLIN STREET
NEW YORK, NY 10013

50-791/214

| CHECK DATE | CHECK NO. |
|---|---|
| 3/29/2004 | 7201 |

| CHECK AMOUNT |
|---|
| $**8100.00 |

PAY     ''Eight thousand one hundred and 00/100 Dollars''

TO
THE
ORDER
OF

Empire Solutions Inc.
1040 First Avenue #180
New York, NY 10022

AUTHORIZED SIGNATURE

⑈007201⑈ ⑈021407912⑈9614002799⑈     ⑈000081000

Serial:7201 TR:0214-0791 Account:9614002799 TranCode:82 Amount:$8,100.00 Sequence:14748950 DbCr:D InstID:3
Date:03-30-3004

# **EXHIBIT U**

# The First Manhattan Group Inc.
### 226 East 54th Street Suite 306
### New York, New York,  10022
### 212-980-3510  (Fax) 212-980-3523

April 13, 2004

Stephen Farthing
New York Academy of Art
200 West 57 Street 808
New York, New York 10022

Dear Mr. Farthing,

This letter will confirm that you have constructively terminated my
services as Controller of the Academy, on orders of the Chairman.

The usurpation of the duties of the Controller by You, the Chairman, and
Mr. Wilkinson (A Trustee) is inappropriate at a time that I am wrongfully
Accused of being part of their wrong doings. This appears to be a cover
Up of allegations, and your actions prevent me from performing my
Duties, making my efforts without purpose, and is a clear violation of my
Contract.

We have been in constant contact with our Attorneys and as of today had
Agreed that both my self and John Cleary will appear on Friday at Doug
Grovers Office at 5pm after we filed our reports with the Police Agencies.
At 3pm after this arrangement you terminate my services.

As you know I would than proceed to conduct an internal audit into
The allegation currently being associated with Levinson, Lerner, and
Wilkinson to which I have been attached.

Other violations of my contract is ordering me to issue funds
And receive funds from corporations to clear private debts of
The chairman.

Being barred from the Academy as a contributor and ticket holder
Is outrageous.

As Controller and a $30,000 plus contributor I have the standing and the
duty to bring an action that Pivar does not. I also have a duty to report
Wrong doings to the appropriate agencies.

I shall use all legal means to enforce the provisions of my contract.


Yours truly,

Robert Angona