```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- x
JOHN R. BLUMATTE, a/k/a ROBERT ANGONA,  :
a/k/a JOHN BLUE,                        :
                                        :
                    Plaintiff,          :
                                        :
         -v-                            :
                                        :
GERARD QUINN, et al.,                   :
                                        :
                    Defendant.          :
---------------------------------------- x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-13-07

07 Civ. 2944 (JSR)

ORDER

[with redacted attachments, to be publicly docketed]

JED S. RAKOFF, U.S.D.J.

Pursuant to a joint telephone conference held on November 9, 2007, the Court permitted counsel for plaintiff to submit, ex parte and with a request to be filed under seal, a declaration (with attached exhibits) disclosing circumstances that counsel believed might require his firm to withdraw as counsel to plaintiff in the above-captioned matter. The Court made clear, however, that the Court might release and disclose the submissions, in whole or in part, if they did not warrant confidential and/or sealing status. Further, the Court permitted defendant New York Academy of Art ("the Academy") to submit a letter-brief objecting to the filing of the declaration ex parte and under seal, and this objection was duly submitted on November 16, 2007.

Thereafter, the Court, after reviewing the declaration and the relevant case law, convened a joint telephone conference on November 28, 2007 and informed the parties that it would disclose all portions of the declaration (and attached exhibits) not covered by attorney-client or work-product privilege. In the same conference, counsel for plaintiff informed the Court that he and his law firm had

concluded that they could continue to represent Mr. Blumatte in this matter and that counsel did not wish to submit to the Court any briefing regarding which parts of his declaration and attached exhibits may or may not be protected by privilege.

After further consideration of the matter, the Court now finds that no portion of the declaration or attached exhibits is protected by attorney-client privilege but that certain portions of the declaration are protected by the work product doctrine and must be redacted, while the rest must be disclosed. Therefore, the Court hereby orders that the original declaration, along with supporting exhibits, submitted by plaintiff's counsel on November 13, 2007, be filed under seal and that the redacted declaration and exhibits, attached hereto, be filed publicly with the Clerk of Court.

SO ORDERED.

                              JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       December 12, 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
JOHN R. BLUMATTE, a/k/a
ROBERT ANGONA, a/k/a          :      07 Civ. 2944 (JSR) ECF Case
JOHN BLUE,                    :

                          Plaintiff,   :      **EX PARTE DECLARATION**
                                                   **OF J. JOSEPH BAINTON**

- against -                   :

GERARD QUINN, DONALD ROGERS, et.al,   :

                            Defendants.   :
------------------------------------------X

        J. JOSEPH BAINTON, hereby states under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

        1.      I am a member of the bar of this Court and of the firm of Bainton McCarthy LLC, attorneys for plaintiff. I make this declaration in support of our firm's motion to leave to withdraw, or, in the alternative, guidance as to whether to withdraw in the light of the recent creation of what the Court might view as the appearance of impropriety by reason the ex parte submission of one Stuart Pivar as more fully explained below.

        2.      The causal relationship between the actions of Mr. Pivar and his private detective and Plaintiff's incarceration are described in paragraphs 111 through 121 and 131 of the Amended Complaint and are respectfully incorporated herein by reference.

        3.      When Mr. Pivar later learned all of the facts he concluded that he was responsible for sending an innocent man to jail.

4. It what he described to me as a "mitzvah," Mr. Pivar agreed to pay and did pay attorney Charles A. Miller to prepare the Motion to Vacate Judgment and Set Aside Sentence dated June 8, 2006 of which a copy is attached to the Amended Complaint as Exhibit R.

5. In or about January 2007, after Plaintiff obtained by agreement his immediate release from State incarceration and immediate credit for time being served against his federal obligations as more fully described in paragraphs 266 through 272 of the Amended Complaint, Mr. Pivar approached our firm to see if we would agree to represent Plaintiff in connection with evaluating and possibly asserting the claims that were ultimately asserted in the Amended Complaint in this action if he agreed to pay our fees as he had previously agreed to pay and did pay Mr. Miller's fees.

6. We subsequently entered into a formal engagement letter with Plaintiff and a separate written agreement with Mr. Pivar both dated February 1, 2007. Copies of those documents are annexed hereto as Exhibits A and B, respectively.

7. We have no dispute with Plaintiff and Mr. Pivar has substantially, albeit somewhat slowly, honored his financial commitments to date.

8. At no time has our firm ever provided legal advice to Mr. Pivar for any purpose. At no time have we ever compromised in any way much less shared any privileged communication with Mr. Pivar.

9. I spent a considerable amount of my time investigating the factual and legal basis for the claims asserted in the Amended Complaint. Among other things, I met face-to-face with Plaintiff at a time when he was imprisoned in upstate New York.

10. ████████████████████████████



14.     As the Amended Complaint avers in paragraph 112, Mr. Pivar and the Trustees have had a stormy relationship since 1994 -- long before Plaintiff's first association with the Academy.

15. Mr. Pivar has written a "book" entitled "How the Mob took over Andy's art school" that bears a 2006 copyright notice. I am informed that Mr. Pivar has sent copies of this book to anybody he hoped might be interested in it, including the New York Board of Regents. I am also informed that Mr. Pivar has been quite public in his criticism of the Academy Trustees.

16. In both oral and e-mail conversations with Mr. Pivar, I have consistently told him that attempting to try this case in the press was not in our client's best interests and to whatever extent he had our client's interest in mind he should refrain from doing so.

17. On several occasions I told Mr. Pivar that, while based upon a very substantial investigation I believed the averments of the Amended Complaint to be true (pointing out that I would never have signed it if I believed otherwise), the averments of the Amended Complaint remained only allegations and had to be proven in a court of law.

18. On Labor Day, September 3, 2007, Mr. Pivar told Michael J. Little, Esq., a sole practitioner who has assisted me in connection with this case, that he intended to send the Court a copy of his "book" for the obvious purpose of influencing the outcome of this action. (Mr. Little has represented Mr. Pivar and his daughter in two unrelated cases.)

19. Mr. Little informed me of that fact by e-mail the next day and in the same e-mail told me that (a) he urged Mr. Pivar not to engage in such an ex parte communication "in no uncertain terms" and (b) Mr. Pivar intended to speak to me on this same topic. Mr. Little asked that I back him up on telling Mr. Pivar not to communicate with the Court ex parte.

20. I replied to both him and Mr. Pivar via the same e-mail stating: "If Stuart sends that book to Judge Rakoff, we quit no matter what!"

21. At the time he sent me his e-mail, Mr. Little was physically in the United Kingdom remotely accessing a file server located in the United States. Mr. Little thus sent his e-mail to me at 1:04 P.M. English time, which was received here at 8:04 A.M.

22. I was traveling on Tuesday morning following Labor Day and could not check my e-mail until about noon time.

23. A copy of the aforesaid e-mail exchange is attached hereto as Exhibit C. For the foregoing geographic reasons, I did not reply to Mr. Little's e-mail one hour before he sent it as it first appears when one examines the exchange.

24. Mr. Pivar never raised this topic with me again and I thought there was no chance of him attempting an ex parte communication with the Court.

25. I was therefore nothing short of shocked when I received last week the Court's letter to Mr. Pivar returning unopened an ex parte communication from Mr. Pivar that he has since admitted to me was a copy of the book that was the subject matter of the September 4 e-mail exchange.

26. While it is true that neither our client nor our law firm (nor Mr. Little) had anything to do with Mr. Pivar's patently improper attempted ex parte communication with the Court, the fact that he has paid Plaintiff's legal expense made me very uncomfortable in terms of the Court later concluding that these facts created the appearance of impropriety and required our withdrawal as counsel.

27. I looked quickly and could not find any case or ethical ruling directly on point.

28. So, I thought that the prudent thing was to immediately make full disclosure of the foregoing facts to the Court.

29.   My personal belief is that having done everything humanly possible to implore Mr. Pivar to refrain from (a) improper ex parte communication with the Court and (b) public comment about this case, his sins should not deprive Plaintiff of an attorney even though Mr. Pivar is paying for that lawyer. We have a great deal of time invested in this case and any change of counsel would necessarily impose a hardship on Plaintiff, who has personally done no wrong. There is no reason to suspect that Mr. Pivar attempted ex parte communication at Plaintiff's request. Indeed, during a telephone conversation had after receiving the Court's letter, Plaintiff told me that he did not know of Mr. Pivar's attempted ex parte communication and further knew that what Mr. Pivar did was very wrong. I believe that Mr. Pivar's misconduct is solely the result of his own very bad judgment.

30.   On the other hand, I believe the Court can appreciate the issue of whether Mr. Pivar's economic association with our engagement combined with his misconduct requires us to withdraw is a decision as to which the lawyers reasonably want comfort from the Court. Neither our firm nor Mr. Little wants to run any risk of subsequent rebuke by this Court for making the wrong decision now.

31.   None of the facts disclosed above have anything to do with the merits of this case or any appeal from the dismissal of portions of the case. The public disclosure of these confidential facts could adversely affect Plaintiff's rights.

32.   For that reason and mindful of well-settled case law applicable to circumstances involving the withdrawal of counsel, I sought permission to file this declaration on an ex parte basis. *See Team Obsolete v. A.H.R.M.A.*, 464 F. Supp2d 164 (E.D.N.Y. 2006).

33.   In summary, we have been presented with a potential ethical dilemma and we frankly are not sure what to do. We are sure, however, that doing anything other than making

6

an immediate full disclosure of these circumstances would be ill advised. We will continue to represent the Plaintiff only if this Court approves of our doing so and, if it does not, we respectfully ask that it grant us leave to withdraw and stay further proceedings in this action for a reasonable period of time to allow Plaintiff to find and engage new counsel.

34. The only way that I can communicate in writing with Plaintiff is via the United States mail. I have told him by telephone the substance of this application and have mailed to him a copy of this declaration and all other papers submitted herewith.

35. I have told Mr. Pivar that I intended to make full disclosure to the Court and to confidentially seek a ruling as to our obligation, if any, to withdraw as counsel to Plaintiff. He expressed extreme displeasure at my doing so.

36. Mr. Pivar already knows everything contained herein. ███████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████

Dated: New York, New York
       November 13, 2007

                                                    _____
                                                    J. Joseph Bainton

7



26 BROADWAY
SUITE 2400
NEW YORK, NY 10004-1840

(212) 480-3500 TELEPHONE
(212) 480-9557 FACSIMILE
WWW.BAINTONLAW.COM

J. JOSEPH BAINTON
Bainton@Baintonlaw.com
212-480-2529

February 1, 2007

**FIRST-CLASS MAIL**

Mr. John Brumatte, aka Robert Angona
DIN: 04 R 4939
Cayuga Correctional Facility
PO Box 1186
Moravia
New York 13118

Re:  *Claims for False Imprisonment and Other Damages Arising from Service to The New York Art Academy*

Dear Mr. Brumatte:

We are obligated under New York law to provide our clients with an engagement letter at the beginning of each representation outlining the scope of the services we propose to render; the manner of calculating, billing and collecting legal fees; and other aspects of the representation.

1. **Services to be Provided**

We will be engaged to represent you in the above-referenced matter.

2. **Determination of Fees for Service**

A.  We will charge you our usual and customary hourly rates in connection with this engagement. Our willingness to accept this engagement rests in part upon the agreement of Mr. Stuart Pivar to personally guarantee your obligation to pay our fees and reimburse our out-of-pocket expenses in a timely fashion. To that end, he is being provided with a copy of this letter with your prior permission and will also be provided with copies of our monthly bills, which may in part be redacted to prevent possible waiver of information protected by privilege.

B.  It is our standard policy to request a reasonable retainer from our client before beginning time consuming and costly work. In this case, we require a retainer of $50,000 payable $25,000 upon signing of engagement letter and $25,000 payable on March 15, 2007.

Mr. John Brumatte
February 1, 2007
Page 2

Thus by March 15, 2007, we expect to have a retainer of $50,000, which will be replenished on a monthly basis in the amount of our statement as is more fully described below. At the conclusion of this engagement any portion of the retainer that is unearned will be repaid to Mr. Pivar assuming, as is expected, he alone will be paying our fees. Mr. Pivar's entitlement to reimbursement from the proceeds of any judgment of settlement of your claims, if any, is a matter between you and him.

### 3. **Firm Personnel.**

A. Our attorneys have varying areas of expertise, amounts of experience, and billing rates. We will attempt in each instance to provide services in the most efficient manner. To accomplish this goal, you agree that J. Joseph Bainton will have principal responsibility for your general representation. However, we reserve the right to assign the particular attorneys, law clerks and legal assistants who will be working on your behalf. Typically, more junior personnel will provide whatever services they can appropriately perform, such as research and drafting. More senior personnel will need to discuss with them specific assignments and the results of research and drafting, and attorneys within the firm may need to confer on certain aspects of the representation to provide levels of expertise appropriate to your legal needs. We will discuss the assignment of our personnel with you at your request.

B. The principal attorney who is assigned to provide services under this agreement is J. Joseph Bainton, whose current customary hourly rate for litigation such as this case is $550.

Associates are billed at hourly rates of $180 to $250. Legal assistants and law clerks are billed at hourly rates of $100-$180. We may employ the services of Michael Little, Esq., for which you will be billed as a disbursement at the hourly rate of $200. All of these rates may be subject to increase on an annual basis effective January 1, 2008.

### 4. **Disbursements and Expenses.**

We may incur various expenses in providing services to you. You agree to pay all such expenses and to reimburse us for all out-of-pocket expenses that we pay on your behalf. Expenses that may be incurred include, but are not necessarily limited to, charges for serving and filing papers, courier and messenger services, recording and certifying documents, deposition transcripts, investigations, expert witness fees, long-distance telephone calls, facsimile charges, copying charges, travel and expense including mileage.

It is our firm's policy to charge only toll charges on long-distance faxes. There is no per-page charge on top of that, nor any charge for local faxes. Our usual charge for photocopies made internally is 20¢ per page, which includes a mark-up to cover a portion of our related overhead. Outside duplication services will be billed to you at cost.

Mr. John Brumatte
February 1, 2007
Page 3

### 5. Billing

We will send you an invoice and statement reflecting all fees and reimbursable disbursements owed on a monthly basis. All amounts billed are due upon receipt in order to replenish the retainer described above.

### 6. Scope of Representation

The scope of our representation is to assist you in evaluating and likely asserting claims arising from or relating to your false imprisonment against all or some of the following individuals who served as Trustees of The New York Art Academy during the period when companies controlled by you provided financial and accounting services to that Academy, namely Stephen Farthing, E. Randolph Lerner, Kuttner, Wayne Linker, David W. Levinson, Russell Wilkinson, Kip Forbes, Eileen Guggenheim, Dennis Smith, Margot Gordon, David Long MD, David Shafer and Julia Jitkoff.

### 7. Your Right to Terminate Representation

You reserve the right to terminate this representation with or without cause. You must notify us in writing if you want to terminate our representation. When we receive your written notice of termination, we will stop all legal work on your behalf immediately. We will also waive any rights to further compensation for our representation; provided, however, that you will promptly reimburse us for all fees, charges and expenses incurred pursuant to this Agreement before the date of the written notice of termination.

### 8. Work Papers, Etc.

All work papers and other materials that we create during our representation are initially our property. However, all of your documents that come into our possession and copies of all other materials for which you have paid a fee will be provided to you as soon as reasonably possible on your written request.

### 9. Waiver of Warranties

Our entitlement to payment of fees and reimbursement for disbursements described above is not contingent upon the final outcome of this matter that you have requested us to undertake. We cannot and do not warrant or predict final outcomes or results of any matter.

### 10. Our Right to Terminate Representation

We reserve the right to terminate our representation (to the extent permitted by applicable ethical and court rules) at any time if you breach any material term of this agreement or fail to cooperate or follow our advice on a material matter, if a conflict of interest develops or is discovered, or if there exists at any time any fact or circumstance that would, in our opinion, render our continuing representation unlawful, unethical, or otherwise inappropriate. If we elect

Mr. John Brumatte
February 1, 2007
Page 4

to terminate our representation, you will take all steps reasonably necessary and will cooperate as reasonably required to free us of any further obligation to perform legal services, including the execution of any documents necessary to complete our withdrawal from representation. In such case, you agree to pay for all legal services performed and expenses incurred before the termination of our representation.

### 11. Entire Agreement

This agreement constitutes the entire agreement between the parties to it and may not be modified except in writing signed by the parties or their authorized representatives.

### 12. Binding Effect

This agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns.

### 13. Assignment

This agreement may not be assigned by any party except with the written consent of the other party, except to the extent that our employment of other attorneys and third parties is expressly contemplated in this agreement.

### 14. Controlling Law

This agreement shall be construed and enforced in accordance with the laws of the State of New York in effect at the time of such construction or enforcement, except New York choice of law statutes and doctrines. New York law provides clients with the right to arbitrate fee disputes under certain circumstances. If those circumstances are applicable you, any dispute concerning fees would be submitted to arbitration pursuant to Part 137 of the Rules of the Chief Administrator. Each party hereto consents to the jurisdiction of the state and federal courts of New York, and, if applicable, a local program for fee dispute within New York State.

Mr. John Brumatte
February 1, 2007
Page 5

      Please indicate your agreement to these terms by signing the copy of this letter enclosed herewith in the space provided for that purpose.

      With best personal regards, I am,

                                                                 Faithfully yours,

                                                               J. Joseph Bainton

I understand and accept the terms of this agreement.

_____          _____
By: John Brumatte, aka Robert Angona                                 Date



26 BROADWAY
SUITE 2400
NEW YORK, NY 10004-1840

(212) 480-3500 TELEPHONE
(212) 480-9557 FACSIMILE
WWW.BAINTONLAW.COM

February 1, 2007

J. JOSEPH BAINTON
(212) 480-2529
bainton@baintonlaw.com

VIA E-MAIL

Mr. Stuart Pivar
15 West 67th Street
New York, NY 10023

Re:  Mr. John Brumatte, aka Robert Angona

Dear Mr. Pivar:

I refer to an engagement letter of equal date between our firm and the above-entitled person of which a copy is being sent herewith. I write to confirm that in order to induce our firm to represent Mr. Brumatte you have agreed to guarantee payment of his financial obligations to our firm in accordance with the provisions of that engagement letter.

We have explained to you that notwithstanding your payments our fiduciary duties are owed exclusively to our client, Mr. Brumatte, and further that certain communications between him and us will inevitably be of a privileged nature and, therefore, may not be shared with you. That said, both Mr. Brumatte and we acknowledge your extensive knowledge of many of the facts relevant to Mr. Brumatte's situation and appreciate your willingness to share that knowledge with us on an informal basis.

Please confirm your understanding of and agreement to the foregoing by signing a copy of this letter is the space provided and returning it to us at your early convenience together with your check in the sum of $25,000, which is due immediately.

Mr. Stuart Pivar
February 1, 2007
Page 2

        With best regards, I am,

                                          Very truly yours,

                                          J. Joseph Bainton

Encl.


READ AND AGREED


_____                     _____
        Stuar Pivar                                                    Date

## Guest1

**From:** J. Joseph Bainton
**Sent:** Tuesday, September 04, 2007 12:06 PM
**To:** Guest1
**Cc:** 'SPivar@aol.com'
**Subject:** RE: Pivar

If Stuart sends that book to Judge Rakoff, we quit no matter what! The research is not necessary.

J. Joseph Bainton
Bainton McCarthy LLC
26 Broadway
New York, NY 10004-1840
Telephone: (212) 480-2529
Facsimile: (212) 480-9557
Cell: (917) 612-0831

**From:** Guest1
**Sent:** Tuesday, September 04, 2007 1:04 PM
**To:** J. Joseph Bainton
**Subject:** Pivar

Joe---
Have done a fair bit of research on assumed name law in New York and will forward the results to you later in the day. Stuart wants to publish his spiral bound : 'How the Mob took over the Academy' and send a copy to Judge Rakoff. I urged him that he was not to do so, in no uncertain terms. He said he would speak to you about it. Please back me up.
Michael

11/12/2007